UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
                                      :
UNITED STATES OF AMERICA              :        13cr368 (DLC)
                                      :
        -v-                           :        OPINION & ORDER
                                      :
ARTHUR BUDOVSKY,                      :
                                      :
                Defendant.            :
                                      :
------------------------------------- X

APPEARANCES

For the Government:

Serrin Turner
Christian R. Everdell
Christine I. Magdo
Assistant United States Attorney
United States Attorney's Office
One St. Andrew's Plaza
New York, NY 10007

For Defendant:

John Francis Kaley
Doar, Rieck, Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007-29118

Donna Rita Newman
Law Offices of Donna R. Newman
20 Vesey Street, Suite 400
New York, NY 10007

Jeffrey G. Pittell
Maher & Pittell, LLP
42-40 Bell Boulevard, Suite 302
Bayside, NY 11361

Darryl Emmanuel Austin
Eric S. Pennington, P.C.
1 Gateway Center, Suite 105
Newark, NJ 07102

DENISE COTE, District Judge:

Defendant Arthur Budovsky ("Budovsky") has moved to dismiss the three-count Indictment filed against him, his company Liberty Reserve S.A. ("Liberty Reserve"), and other co-defendants on May 28, 2013.  Budovsky further moves to strike certain allegations in the Indictment as surplusage and moves for an order directing the Government to disclose <u>Brady</u> materials in its possession.  Budovsky, the principal founder of Liberty Reserve, is charged under several statutes with creating and operating an unlicensed money transmitting business designed to facilitate illegal financial transactions and launder criminal proceeds.  For the following reasons, Budovsky's motion is denied.

## BACKGROUND

The following allegations are taken from the Indictment. Liberty Reserve, a company incorporated in Costa Rica in 2006, operated one of the world's most widely used digital currencies.[1] Through its website, Liberty Reserve provided access to "instant, real-time currency for international commerce," which could be used to "send and receive payments from anyone, anywhere on the globe."  With its virtual currency, known

---

[1] "Digital currency" and "virtual currency" are used interchangeably here.

commonly as "LR," Liberty Reserve touted itself as the Internet's "largest payment processor and money transfer system," serving "millions" of people around the world, including those in the United States.  An established Liberty Reserve user could receive and transfer LR with any other user, with Liberty Reserve collecting a one-percent fee per transaction.

Budovsky and his co-defendants are alleged to have intentionally created, structured, and operated Liberty Reserve as a business venture designed to help criminals conduct illegal transactions and launder the proceeds of their crimes. According to the Indictment, Liberty Reserve emerged as the "financial hub of the cyber-crime world, facilitating a broad range of online criminal activity, including credit card fraud, identity theft, investment fraud, computer hacking, child pornography, and narcotics trafficking."  Liberty Reserve's user base was global, with more than one million users worldwide, including more than 200,000 users in the United States.  The Indictment further alleges that from 2006 to 2013, Liberty Reserve processed an estimated 55 million separate financial transactions and laundered more than $6 billion in criminal proceeds.  At no point did Liberty Reserve register with the United States Department of the Treasury as a money transmitting business.

The Indictment describes how Liberty Reserve took steps to allow its users to hide their identities.  Unlike traditional banks or legitimate online payment processors, Liberty Reserve did not require users to validate their identity information.  For an additional privacy fee of 75 cents per transaction, users could hide their account numbers when transferring funds, effectively making the transfer untraceable.  To add additional layers of anonymity, Liberty Reserve prohibited users from depositing or withdrawing funds directly.  Rather, users were required to exchange real currency for LR and vice-versa through third-party exchangers, a number of whom were pre-approved on the Liberty Reserve website.  These recommended exchangers were often foreign unregulated and unlicensed money transmitting businesses that charged high transaction fees for their services.

The Indictment alleges that through these layers of anonymity, Liberty Reserve became the "bank of choice for the criminal underworld."  Liberty Reserve users routinely established accounts under false names, including blatant criminal aliases such as "Russian Hackers" and "Hacker Account." Criminal users, including computer hackers for hire, drug-dealing websites, and traffickers of stolen credit card and personal identity information used Liberty Reserve to process payments for illegal goods and services.  Other cyber-criminals

4

used Liberty Reserve to launder criminal proceeds and transfer funds among criminal associates.  Users of Liberty Reserve included credit-card theft and computer hacking rings operating in countries around the world, including China, Nigeria, and the United States.  The Indictment also alleges that Budovsky and his associates were well aware of Liberty Reserve's function as an unlawful money laundering enterprise and deliberately attracted a criminal customer base by making financial activity anonymous and untraceable.

The Indictment further describes the circumstances surrounding Budovsky's founding of Liberty Reserve.  In or about 2006, Budovsky, along with co-defendant Vladimir Kats, operated a company called Gold Age, Inc., which functioned as an exchanger for e-gold, a popular digital currency of that time. In December 2006, Budovsky and Kats were convicted in New York State of operating Gold Age, Inc. as an unlicensed money transmitting business.  At or about the same time, "E-Gold and several of its principals" were charged with various offenses, including money laundering.  In the wake of his conviction, Budovsky emigrated to Costa Rica where, in 2006, he and co-defendant Ahmed Yassine Abdelghani incorporated Liberty Reserve in an effort to evade U.S. law enforcement.  In or about 2011, Budovsky renounced his United States citizenship and became a Costa Rican citizen.

The Indictment also contains allegations concerning Budovsky's efforts to conceal Liberty Reserve's operations and assets.  For example, in or around 2009, the Costa Rican agency Superintendencia General de Entidades Financieras ("SUGEF") notified Liberty Reserve that it needed to apply for a license to operate as a money transmitting business in Costa Rica.  Upon reviewing Liberty Reserve's application, SUGEF refused to grant a license due to concerns that Liberty Reserve did not have basic anti-money laundering controls.  In response, Budovsky and co-defendants Allan Esteban Hidalgo Jimenez, Mark Marmilev, and Maxim Chukharev created a computer portal for Costa Rican regulators to access and monitor transactional information for suspicious activity.  According to internal communications among the defendants, however, this data was mostly fake and could be manipulated to hide incriminating information from regulators.

Moreover, on November 18, 2011, the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a notice to financial institutions about the risks associated with providing financial services to Liberty Reserve. In response, Liberty Reserve falsely informed Costa Rican officials that its business had been sold and that it would no longer be operating in Costa Rica.  Instead, Liberty Reserve continued to operate in Costa Rica with a reduced staff out of office space held in the name of a shell company controlled by

Budovsky.  At the same time, Budovsky and co-defendants Jimenez and Azzeddine El Amine began transferring millions of dollars from Liberty Reserve's Costa Rican accounts to a bank account in Cyprus held by a shell company controlled by Budovsky and El Amine.[2]  This money was then transferred to a bank account in Russia held by yet another shell company.  Shortly afterward, the Costa Rican government seized pursuant to a request by United States law enforcement approximately $19.5 million in Costa Rican bank accounts held by Liberty Reserve.  After this seizure, Budovsky, Jimenez, and El Amine moved Liberty Reserve funds into more than two dozen shell-company accounts around the world to evade further seizures.

    The Indictment charges Budovsky in three counts with (1) conspiracy to commit money laundering in violation of 18 U.S.C § 1956(h); (2) conspiracy to operate an unlicensed money transmission business in violation of 18 U.S.C. § 371; and (3) operation of an unlicensed money transmission business in violation of 18 U.S.C. § 1960.  On June 23, 2015, Budovsky moved to dismiss each of these counts, strike surplusage from the Indictment, and order the Government to disclose Brady materials

---

[2] Count Two of the Indictment notes that this transfer went through a correspondent bank account in the Southern District of New York.

in its possession.  The motion became fully submitted on July
20.


**DISCUSSION**

**I.   Motion to Dismiss the Indictment**

Budovsky moves to dismiss all counts of the Indictment.
Under the Federal Rules, an indictment "must be a plain,
concise, and definite written statement of the essential facts
constituting the offense charged" and must include the "statute,
rule, regulation, or other provision of law that the defendant
is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  The
Fifth Amendment imposes two constitutional requirements for an
indictment: "first, it must contain the elements of the offense
charged and fairly inform a defendant of the charge against
which he must defend, and second, it must enable him to plead an
acquittal or conviction in bar of future prosecutions for the
same offense."  United States v. Bastian, 770 F.3d 212, 217 (2d
Cir. 2014) (citation omitted).

But, it is also well established that "an indictment need
do little more than to track the language of the statute charged
and state the time and place (in approximate terms) of the
alleged crime."  United States v. Vilar, 729 F.3d 62, 80 (2d
Cir. 2013) (citation omitted).  Thus, the indictment need only
allege the "core of criminality" the Government intends to prove

at trial, since the indictment is "read . . . to include facts which are necessarily implied by the specific allegations made." United States v. Rigas, 490 F.3d 208, 228-29 (2d Cir. 2007) (citation omitted).  "The core of criminality of an offense involves the essence of a crime, in general terms; the particulars of how a defendant effected the crime falls outside that purview."  United States v. D'Amelio, 683 F.3d 412, 418 (2d Cir. 2012) (citation omitted).

On a pretrial motion to dismiss, "the facts alleged by the government must be taken as true."  United States v. Velastegui, 199 F.3d 590, 592 n.2 (2d Cir. 1999).  It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to present at trial."  United States v. Perez, 575 F.3d 164, 166 (2d Cir. 2009) (citation omitted). This is because an indictment is "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." United States v. Juwa, 508 F.3d 694, 701 (2d Cir. 2007) (citation omitted).

Budovsky seeks an Order: (i) dismissing the Indictment as a whole due to a lack of nexus between Budovsky's alleged conduct and the United States; (ii) partially dismissing Count Three due

to a failure to allege that Liberty Reserve was an unlicensed money transmission business as set forth in 18 U.S.C. § 1960(b)(1)(B); (iii) partially dismissing Count Three because Liberty Reserve was not required to register with the Secretary of the Treasury on the date the Indictment was filed; (iv) dismissing Counts One and Three on multiplicity grounds; (v) dismissing Count Three as the actions of Liberty Reserve did not affect interstate and foreign commerce and 18 U.S.C. § 1960 is unconstitutional; (vi) dismissing Count Two because Count Three, the object of the conspiracy, must be dismissed; and (vii) dismissing the Indictment because LR as a virtual currency is not subject to the requirements of 18 U.S.C. § 1956 and 18 U.S.C. § 1960.  Each of these grounds for dismissal is without merit and will be addressed in turn.

### A.   Nexus Between the Alleged Conduct and the United States

Budovsky first seeks dismissal of the Indictment in its entirety on the ground that the alleged conduct has no nexus with the United States and therefore violates the Due Process Clause of the Constitution.  "[A]s a general proposition, 'Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.'"  United States v. Yousef, 327 F.3d 56, 86 (2d Cir. 2003) (quoting EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248 (1991)).  "When the text of a

criminal statute is silent" regarding extraterritorial effect, the Congressional intent to apply the statute extraterritorially is "inferred from the nature of the offense."  United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011) (citation omitted).

While the Supreme Court has not yet applied the Due Process Clause to limit Congress's authority to apply criminal statutes to extraterritorial conduct, the Second Circuit has held that in order to extraterritorially apply a federal criminal statute to a defendant in accordance with due process, "there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair."  Id. (citation omitted).  A jurisdictional nexus exists "when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."  Id.  Given this formulation, it should come as no surprise that cases in which extraterritorial application of a federal criminal statute is deemed a due process violation are rare.  See United States v. Ali, 718 F.3d 929, 944 n.7 (D.C. Cir. 2013) (locating no such case); United States v. Perlaza, 439 F.3d 1149, 1168-69 (9th Cir. 2006) (conviction of foreign crew of foreign flagged vessel reversed where the Government presented no evidence of any connection to the United States); United States v. Sidorenko, --- F. Supp. 3d ---, 2015 WL 1814356, at *7 (N.D. Cal. Apr. 21, 2015) (dismissing a bribery and honest services

wire fraud indictment that alleged "nothing . . . to support the proposition that any of the [foreign] Defendants knew that the conduct alleged even involved the United States.").

Budovsky's nexus argument is meritless.  Assuming that the Government is required to state the nexus of the alleged crimes to the United States in an indictment, the Indictment includes several allegations that establish a sufficient nexus with the United States.  The Indictment alleges, among other things, that Liberty Reserve had over 200,000 users in the United States; the site's users included criminal rings operating in the United States; Budovsky moved $13.5 million from a Costa Rican bank account held by Liberty Reserve through a correspondent bank account in the Southern District of New York; and Budovsky engaged in money laundering with the object of transferring funds in and out of the United States.

Budovsky argues that his conduct and Liberty Reserve's operations occurred wholly outside the United States, that Liberty Reserve targeted a global market rather than the United States, and that the Indictment's claim that Liberty Reserve had 200,000 users in the United States could "only be supposition." Since in a motion to dismiss an indictment the facts alleged by the Government are taken as true, Budovsky's evidentiary arguments do not require dismissal.

Budovsky further argues that even if the existence of a large user base in the United States constitutes a sufficient nexus, "any operator of any web business -- located anywhere in the world -- could be hauled into United States courts."  While the advent of the web may create a theoretical concern about the extraterritorial reach of U.S. criminal laws, in this case the Indictment has sufficiently alleged the conduct of a criminal business with the aim of causing harm to U.S. citizens and U.S. interests.  See Al Kasser, 660 F.3d at 118; see also United States v. Rowe, 414 F.3d 271, 279 (2d Cir. 2005) (upholding venue in a child pornography case based on viewing of defendant's Internet advertisement in the forum state).

### B.   Failure to Allege in Count Three Conduct Requiring Duty to Register

Count Three charges Budovsky and his codefendants with knowingly conducting, in two separate ways, a money transmitting business affecting foreign commerce in violation of 18 U.S.C. § 1960.  Budovsky argues, in connection with one prong of Count Three, that the Indictment does not disclose how Liberty Reserve engaged in conduct in the United States in violation of the statute and does not identify the specific federal regulation that required Liberty Reserve to file reports with the Department of the Treasury.

Count Three alleges, in relevant part, that Budovsky violated § 1960 by knowingly conducting a money transmitting business affecting foreign commerce which (1) "failed to comply with the money transmitting business registration requirements set forth in Title 31, United States Code, Section 5330, and the regulations prescribed thereunder, including Title 31, Code of Federal Regulations, Sections 1010.100(ff)(5) and 1022.380(a)(2)," and which (2) involved the transportation and transmission of funds known to Budovsky to have been derived from a criminal offense and intended to be used to promote and support unlawful activity.  This section of Budovsky's motion is only addressed to the first prong of this charge.

The statutory scheme underlying this charge is complex. Section 1960 makes it a crime to knowingly conduct, control, manage, supervise, direct, or own an "unlicensed money transmitting business."  It defines money transmitting as including "transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier."  18 U.S.C. § 1960(b)(2).  The statute defines an unlicensed money transmitting business as a money transmitting business which affects interstate or foreign commerce in any manner or degree and which fulfills at least one of the three

14

other listed requirements.[3]  One of those three requirements is
that the business "fails to comply with the money transmitting
business registration requirements under section 5330 of title
31, United States Code, or regulations prescribed under such
section[.]"  Id. at § 1960(b)(1)(B).  Accordingly, the
registration requirements to which § 1960(b)(1)(B) refers can be
found under § 5330 or under § 5330's regulations.  Id.

      Section 5330, a provision of the Bank Secrecy Act, 31
U.S.C. §§ 5311 et seq., governs the registration of money
transmitting businesses.  It states in relevant part that "any
person who owns or controls a money transmitting business shall
register the business . . . with the Secretary of Treasury[.]"
31 U.S.C. § 5330(a)(1).  The statute describes the date by which
such registration must occur and the contents of the
registration.  Id. at §§ 5330(a)-(b).  It authorizes the
Treasury Secretary to issue regulations addressing the form and
manner of the registration and the criteria for treating a

---

[3] The first alternative, 18 U.S.C. § 1960(b)(1)(A), which
addresses the operation of the money transmitting business
without the appropriate State license, is not listed in the
Indictment as one of the ways in which the defendants violated
§ 1960.  The third alternative avenue for violating § 1960,
which is charged in Count Three but which is not the subject of
this part of the motion, addresses the involvement of the
business in "the transportation or transmission of funds that
are known to the defendant to have been derived from a criminal
offense or are intended to be used to promote or support
unlawful activity."  18 U.S.C. § 1960(b)(1)(C).

person as an agent of the business.   Id. at §§ 5330(a)(2),
(c)(1).

Section 5330 defines a "money transmitting business" as a
business that:

> (A) provides check cashing, currency exchange, or
> money transmitting or remittance services, or issues
> or redeems money orders, travelers' checks, and other
> similar instruments or any other person who engages as
> a business in the transmission of funds, including any
> person who engages as a business in an informal money
> transfer system or any network of people who engage as
> a business in facilitating the transfer of money
> domestically or internationally outside of the
> conventional financial institutions system;
>
> (B) is required to file reports under section 5313;
> and
>
> (C) is not a depository institution (as defined in
> section 5313(g)).

Id. at § 5330(d)(1) (emphasis added).

Accordingly, § 5330's duty to register as a money
transmitting business hinges in part on the duty to file reports
pursuant to § 5313.  Section 5313 governs the filing of currency
transaction reports ("CTRs").  The statute provides that,

> [w]hen a domestic financial institution is involved in
> a transaction for the payment, receipt, or transfer of
> United States coins or currency (or other monetary
> instruments the Secretary of the Treasury prescribes),
> in an amount . . . or under circumstances the
> Secretary prescribes by regulation, the institution
> and any other participant in the transaction the
> Secretary may prescribe shall file a report on the
> transaction at the time and in the way the Secretary
> prescribes.

16

Id. at § 5313(a) (emphasis added).  Section 5313 also contains

several exemptions from this filing requirement and authorizes

the Secretary to issue appropriate regulations.

Definitions for various terms used in § 5313 and elsewhere

in this subchapter of the United States Code are contained in 31

U.S.C. § 5312.  Section 5312 instructs that the term "domestic

financial institution" "appl[ies] to an action in the United

States of a financial agency or institution."  Id. at

§ 5312(b)(1) (emphasis added).  This term applies not merely to

financial institutions located in the United States, but to any

financial institution, wherever located, that acts in the United

States.  United States v. Mazza-Alaluf, 621 F.3d 205, 210-11 (2d

Cir. 2010) (finding foreign-located money transmitting business

qualified as a "domestic financial institution" based on the

maintenance of bank accounts in the United States).

A "financial institution" is defined in that same section

to include entities engaged in many different categories of

activities, among them a person "who engages as a business in

the transmission of funds, including any person who engages as a

business in an informal money transfer system or any network of

people who engage as a business in facilitating the transfer of

money domestically or internationally outside of the

conventional financial institutions system."  31 U.S.C.

§ 5312(a)(2)(R) (emphasis added).  The statute also defines a

financial agency to include

> any business . . . which engages in any activity which
> the Secretary of the Treasury determines, by
> regulation, to be an activity which is similar to,
> related to, or a substitute for any activity in which
> any business described in this paragraph is authorized
> to engage; or any other business designated by the
> Secretary whose cash transactions have a high degree
> of usefulness in criminal . . . matters."

Id. at §§ 5312(a)(2)(Y)-(Z).

As noted above, § 1960 defined an unlicensed money

transmitting business to include one that failed to comply with

the registration requirements found in the regulations

prescribed under § 5330.  18 U.S.C. § 1960(b)(1)(B).  The

implementing regulations of the Bank Secrecy Act are found in

Chapter X of Title 31 of the Code of Federal Regulations.[4]  These

regulations apply § 5330's registration requirements to certain

types of businesses.  Under 31 C.F.R. § 1022.380(a)(1), each

"money services business . . . must register with FinCEN"

pursuant to § 5330.  The term "money services business" is

defined in 31 C.F.R. § 1010.100(ff) to include any "money

transmitter," meaning a person who transmits "currency, funds,

or other value that substitutes for currency" between persons or

---

[4] Bank Secrecy Act regulations, including those promulgated under
§§ 5330 and 5331, are administered by FinCEN.

locations "by any means"; or "[a]ny other person engaged in the transfer of funds."  31 C.F.R. § 1010.100(ff)(5).

These regulations apply registration requirements to foreign-located businesses.  The definition of "money services business" was amended in 2011 to include "[a] person <u>wherever located</u> doing business . . . wholly or in substantial part within the United States."  31 C.F.R. § 1010.100(ff) (2011) (emphasis added).[5]  Indeed, 31 C.F.R. § 1022.380(a)(2) requires a "foreign-located money services business doing business . . . in the United States" to designate an agent for service "with respect to [FinCEN] compliance" under § 5330.  31 C.F.R. § 1022.380(a)(2).

FinCEN regulations in Title 31 also spell out when a financial institution is required to submit CTRs to the Department of the Treasury.  <u>See</u> <u>id.</u> at §§ 1010.300-.370.  These

---

[5] This amendment was designed to "ensur[e] that certain foreign-located persons engaged in [money services business] activity within the United States, such as having customers in the United States, are subject to the [Bank Secrecy Act] rules[.]"  U.S. Dep't of Treasury, FinCEN, RIN 1506-AA97, <u>Bank Secrecy Act Regulations -- Definitions and Other Regulations Relating to Money Services Businesses</u>, 76 Fed. Reg. 43585, 43586 (July 21, 2011) (to be codified at 31 C.F.R. § 1022.380).  Prior to this amendment, a "money services business" was defined as applying to "[e]ach agency, branch, or office within the United States of any person doing business, whether or not on a regular basis or as an organized business concern" in one of six listed categories of money services businesses, including money transmitters "engag[ed] as a business in the transfer of funds."  31 C.F.R. § 103.11(uu) (1999).

regulations "set forth rules for the reporting by financial institutions of transactions in currency." Id. at § 1010.310. For example, 31 C.F.R. § 1010.311 states that "[e]ach financial institution other than a casino shall file a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such financial institution which involves a transaction of more than $10,000[.]" The remaining regulations describe various requirements for currency reports, as well as other instances when a report would need to be filed. See id. at §§ 1010.312-.370. Money services businesses are subject to these same regulatory reporting requirements. Id. at §§ 1022.300-.320.

Against this backdrop, an indictment need only allege a violation of § 5330's implementing regulations to sufficiently allege a violation of 18 U.S.C. § 1960(b)(1)(B). Here, the Indictment identified two such regulations: §§ 1010.100(ff)(5) and 1022.380(a)(2) of Title 31 of the C.F.R. As described above, these regulations require foreign fund transfer businesses to comply with registration requirements in the event they do business in substantial part within the United States.

Budovsky argues that Count Three does not identify "how" Liberty Reserve engaged in actions "in" the United States since its offices were located abroad. This argument stems from the terms of § 5312(b)(1), which explain that a domestic financial

20

institution is one that takes "an action <u>in</u> the United States."
31 U.S.C. § 5312(b)(1) (emphasis added).  There is, however, no
requirement that an indictment explain how a defendant committed
the crime with which he is charged.  <u>See, e.g.</u>, <u>Vilar</u>, 729 F.3d
at 80.  In any event, the Indictment gives the defendant notice
of various kinds of evidence on which the Government intends to
rely at trial to demonstrate that Liberty Reserve is a "domestic
financial institution" for purposes of the crime charged in
Count Three, including the large number of Liberty Reserve's
U.S. users.  Budovsky's related arguments concerning the
adequacy of the Government's evidence in this regard must await
trial.  <u>See</u> <u>Perez</u>, 575 F.3d at 166.

Budovsky next argues that Count Three fails to identify a
regulation pursuant to § 5313 that required Liberty Reserve to
file a report with the Secretary of the Treasury.  Budovsky
contends that neither of the regulations listed in Count Three
mandate the filing of reports.  But, Count Three charges a
violation of § 1960.  It essentially tracks the language of
§ 1960 and provides the approximate time and place of the crime,
and that is all that is required in order to provide the
defendant with adequate notice of the offense with which he is
charged.  <u>Vilar</u>, 729 F.3d at 80.  Budovsky does not point to any
authority which requires an indictment to describe the entire
regulatory regime encompassed by the criminal statute.

In his reply, Budovsky reveals that his motion in fact seeks dismissal of this portion of Count Three for another reason.  Budovsky contends that the only Treasury regulations that might have required Liberty Reserve to file CTRs with the Treasury Department are inapplicable because LR is a virtual currency and the Treasury regulations "only apply to transactions which involve 'currency'" or monetary instruments. Budovsky cites 31 U.S.C. § 5313(a), 31 C.F.R. § 1010.311, and related definitions of currency and monetary instruments.  See 31 C.F.R. §§ 1010.100(m), (dd).

Budovsky's argument ignores the alternate registration requirements imposed by the law recited above and misconstrues § 5313(a).  To recap, criminal liability under § 1960(b)(1)(B) rests in part on a failure to comply with registration requirements, including those set forth in § 5330 or in § 5330's regulations.  18 U.S.C. § 1960(b)(1)(B).  Section 5330 requires money transmitting businesses to register and defines such businesses as those that are required to file reports under § 5313, among other things.  31 U.S.C. § 5330(d)(1).  Section 5313, on which Budovsky rests his argument here, requires a "domestic financial institution" to file CTRs.  31 U.S.C. § 5313(a).  As described above, domestic financial institutions are further defined broadly to include businesses engaged in the transmission of funds, including international money transfer

networks.  31 U.S.C. §§ 5312(a)(2)(R), (b)(1).  Read together, these provisions require virtual currency transfer businesses to register with the Department of the Treasury.[6]

In addition, § 5330's regulations require money services business, including any person engaged in the transfer of funds, to register with FinCEN.  31 C.F.R. § 1022.380(a)(1), 1010.100(f)(5).  This duty applies to foreign money services businesses so long as they do business in substantial part in the United States.  Id. at § 1010.100(ff).  Budovsky's argument ignores this chain of definitions and obligations to focus exclusively on that portion of § 5313(a) that imposes reporting requirements for coin and currency transactions.

Section 5313 requires a report "when a financial institution is involved in a transaction" involving coins or currency.  31 U.S.C. § 5313(a) (emphasis added).[7]  Because a domestic financial institution has a duty to file reports if it engages in coin or currency transactions, it also has a duty to register.  This registration obligation exists whether or not the financial institution engages in such transactions.  Thus,

---

[6] Moreover, FinCEN regulations unequivocally require all money services businesses to submit to currency transaction reporting requirements.  See 31 C.F.R. §§ 1022.300-.320.

[7] 31 C.F.R. § 1010.311 requires a CTR to be filed for each deposit, withdrawal, exchange of currency, or transfer in excess of $10,000 in a single day.

if the Government proves that Liberty Reserve was a "domestic financial institution," then it was subject to the § 5313 reporting requirements, and was also required to register with the Department of the Treasury, assuming all other statutory requirements are shown, even if it never engaged in any real currency transactions.  See, e.g., United States v. E-Gold, Ltd., 550 F. Supp. 2d 82, 94-97 (D.D.C. 2008) (holding that virtual currency services are subject to FinCEN regulations under §§ 5330 and 5313).

### C.   Commencement of Registration Obligation

Budovsky next seeks to dismiss the same prong of the Count Three § 1960 charge under the rule of lenity.  Relying on a FinCEN publication of March 18, 2013, he argues that it was not clear until that time that Liberty Reserve was required to register with FinCEN, and that the law thus permitted Liberty Reserve an additional six months to do so, or until September 2013.[8]  Since the Indictment was filed on June 28, 2013, he

---

[8] This 180-day registration window stems from Budovsky's interpretation of 31 U.S.C. § 5330(a)(1).  That statute requires registration of money transmitting businesses within 180 days of either (1) the date of the enactment of the Money Laundering Suppression Act of 1994, or (2) the date on which the business is established.  Budovsky argues on lenity grounds that Liberty Reserve's 180-day registration time limit should be deemed to have begun on March 18, 2013, the date of the FinCEN publication, rather than the date of Liberty Reserve's establishment in 2006.

argues that this portion of Count Three should be dismissed for its failure to give him fair warning that his conduct was illegal.  This argument also fails.

On March 18, 2013, FinCEN provided what it labelled as "interpretive guidance" to clarify the application of existing Bank Secrecy Act regulations to persons creating or transmitting virtual currencies, among other things.  See U.S. Dep't of Treasury, FinCEN, FIN-2013-G001, Guidance: Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), available at http://fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf. ("2013 FinCEN Guidance").  The 2013 FinCEN Guidance observes that the definition of a money transmitter contained in 31 C.F.R. § 1010.100(ff)(5) "does not differentiate between real currencies and convertible virtual currencies."  2013 FinCEN Guidance at 3.  It proceeds to explain how the existing regulations apply to three different virtual currency activities.  Id.

The FinCEN Guidance did not create new law.  It is, as it announces, merely interpretive guidance.  See Perez v. Mortgage Bankers Ass'n, 135 S. Ct. 1199, 1204 (2015) (interpretive rules do not have the force of law); 5 U.S.C. § 553.  Interpretive rules or guidance do not "create new law, right[s] or duties," but "merely clarify an existing statute or regulation."  United

States v. Lott, 750 F.3d 214, 217 (2d Cir. 2014) (citation omitted).

Citing the rule of lenity, Budovsky argues that the issuance of the 2013 FinCEN Guidance demonstrates that there was ambiguity in the prior law, and Liberty Reserve lacked sufficient notice to register with the Secretary of the Treasury.  The rule of lenity is a rule of statutory construction of last resort.  "[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended."  United States v. Castleman, 134 S. Ct. 1405, 1416 (2014) (citation omitted); see also Moskal v. United States, 498 U.S. 103, 108 (1990).

The rule of lenity does not apply here.  The FinCEN regulations are clear on their face, and the issuance of the 2013 FinCEN Guidance does not create an ambiguity where none existed.  As described previously, FinCEN regulations broadly define a "money transmitter" to include a person engaged in the "transmission of currency, funds, or other value that substitutes for currency to another location or person by any means."  31 C.F.R. § 1010.100(ff)(5)(i).  This definition, in effect since September 19, 2011, includes "informal value transfer system[s]" and "[a]ny other person engaged in the

26

transfer of funds."  Id.  The earlier version of this regulation, in effect from September 20, 1999, defined "money transmitter" to include any businesses engaged in the acceptance and transfer of "funds denominated in currency" or the "value of . . . currency or funds."  31 C.F.R. § 103.11(uu)(5) (1999). Consequently, with the 180 day window for compliance, Liberty Reserve's duty to register pursuant to this regulation began no later than its date of incorporation in 2006.  Indeed, the FinCEN regulations were applied to virtual currencies well before the release of that guidance in 2013.  See, e.g., E-Gold, Ltd., 550 F. Supp. 2d at 84-85 (2008 decision applying regulations to digital currency e-gold).

### D.  Multiplicity

Budovsky next argues that one prong of Count One and one prong of Count Three are multiplicitous since these Counts criminalize the same conduct.[9]  He protests that he should not be subjected to additional punishment for the same conduct. Budovsky's argument for dismissal fails for at least two reasons.  First, the Government may prosecute a defendant in a single proceeding for multiple offenses that are constitutionally the same offense without violating the Double Jeopardy Clause.  See, e.g., Ball v. United States, 470 U.S.

---

[9] Budovsky's argument regarding multiplicity does not affect the entirety of either Count One or Count Three.

856, 865 (1985); <u>Ohio v. Johnson</u>, 467 U.S. 493, 500-01 (1984).
When a defendant is charged with two constitutionally identical
offenses, "the Double Jeopardy Clause does no more than prevent
the sentencing court from prescribing greater punishment than
the legislature intended." <u>Garrett v. United States</u>, 471 U.S.
773, 793 (1985) (citation omitted).

Moreover, the portions of Counts One and Three to which
this motion is addressed are not multiplicitous. To assess
whether two charges are multiplicitous, courts employ the "same-
elements" or "<u>Blockburger</u>" inquiry, which looks not at whether
the same conduct underlies each count but at whether each
charged offense contains an element not contained in the other.
<u>United States v. Weingarten</u>, 713 F.3d 704, 708 (2d Cir. 2013);
<u>see also</u> <u>Blockburger v. United States</u>, 284 U.S. 299, 304 (1932).
"[T]he critical double jeopardy inquiry is not factual, i.e.,
whether the same conduct is at issue in charges brought under
different statutes, but legal, i.e., whether the 'offense' -- in
the legal sense, as defined by Congress -- complained of in one
count is the same as that charged in another." <u>Weingarten</u>, 713
F.3d at 710 n.5 (citation omitted).

The international money laundering charge in Count One,
brought pursuant to §§ 1956(h) and 1956(a)(2)(B), requires the
Government to prove, <u>inter alia</u>, (1) that the defendant
conspired to transport funds into or out of the United States;

(2) that he did so knowing that the funds represented the proceeds of some form of specified unlawful activity; and (3) that he did so with the knowledge that the transportation was designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds.  18 U.S.C. § 1956(a)(2)(B)(i).  The specified unlawful activity in the Indictment is identity theft, access device fraud, computer hacking, wire fraud, child pornography, and narcotics trafficking.  In contrast, Count Three's § 1960(b)(1)(C) charge requires the Government to prove, <u>inter alia</u>, (1) that the defendant knowingly conducted a money transmitting business; (2) that the business affected foreign commerce; and (3) that the business involved the transportation or transmission of funds that were known to the defendant to have been derived from a criminal offense or intended to be used to promote or support unlawful activity.  18 U.S.C. § 1960(b)(1)(C).

Each of these charges "requires proof of a fact which the others does not." <u>Blockburger</u>, 284 U.S. at 304.  For example, only § 1956(a)(2)(B)(i) requires proof of an intent to conceal or disguise the source of the proceeds of the specified unlawful activity.  While only § 1960(b)(1)(C) requires proof that the defendant conducted a money transmitting business.  Budovsky's motion to dismiss portions of either Count One or Count Three on multiplicity grounds is therefore denied.

### E.    Interstate Commerce and Unconstitutional Vagueness

Next, Budovsky seeks to dismiss one prong of Count Three on the ground that the Indictment does not adequately charge that the operation of Liberty Reserve's money transmitting business affected interstate or foreign commence, and to dismiss all of Count Three on the ground that § 1960 is unconstitutionally vague.  Both arguments are meritless.

Budovsky first argues that Count Three's charge pursuant to § 1960(b)(1)(C) does not sufficiently explain how Liberty Reserve's operations affected interstate commerce, since it acknowledges that all of its transmissions were made from abroad.[10]  As explained above, this argument misconstrues the appropriate standard for the review of an Indictment.  It also mischaracterizes the Indictment.

The Indictment need only allege that Budovsky's conduct had an effect on interstate and foreign commerce; there is no requirement that it explain how that effect occurred.  See, e.g., Vilar, 729 F.3d at 80.  Moreover, as noted at length above, the Indictment alleges multiple connections between the United States and Liberty Reserve, including that Liberty

---

[10] Section 1960(b)(1)(C) makes it criminal for an unlicensed money transmitting business to be involved in the transmission of funds that the defendant knows to have been derived from a criminal offense, among other things.  18 U.S.C. § 1960(b)(1)(C).

Reserve had over 200,000 users in the United States and that
many U.S. criminal rings used Liberty Reserve's services.

Budovsky relies on Lambert v. California, 355 U.S. 225,
228-30 (1957), to assert that the Indictment must do more than
allege the passive conduct of a wire transfer passing through a
U.S. bank to charge that he affected interstate or foreign
commerce.  The Lambert decision, however, did not address the
sufficiency of an indictment's charge.  In any event, the
Indictment here charges that Budovsky was knowingly and actively
engaged in the illegal operation of an unlicensed money
transmitting business.

Budovsky next argues that § 1960 is unconstitutionally
vague in two respects.  First, Budovsky argues that § 1960(b)(2)
defines "money transmitting" to include "transferring funds on
behalf of the public," but does not specify whether the term
"public" includes only individuals in the United States.
Budovsky similarly claims that § 1960(b)(1)(C)'s use of the
terms "criminal offense" and "unlawful activity" does not
specify whether activity illegal under only foreign law would
suffice.

"[T]he void-for-vagueness doctrine requires that a penal
statute define the criminal offense with sufficient definiteness
that ordinary people can understand what conduct is prohibited
and in a manner that does not encourage arbitrary and

discriminatory enforcement." United States v. Rosen, 716 F.3d 691, 699 (2d Cir. 2013) (citation omitted); see also Skilling v. United States, 561 U.S. 358, 402-03 (2010).  "Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." United States v. Coppola, 671 F.3d 220, 235 (2d Cir. 2012) (citation omitted).

Budovsky does not make an as-applied challenge to § 1960. Rather, he provides a series of hypothetical scenarios, none of which fits the allegations in the Indictment.  The Indictment makes it clear that the "public" served by Liberty Reserve included many users within the United States, and that Liberty Reserve moved funds associated with activities that were criminal under U.S. law.  Budovsky's constitutional challenge is therefore denied.

### F.  Dismissal of Count Two

Budovsky seeks dismissal of Count Two, which charges a conspiracy to violate § 1960, on the same grounds on which he seeks to dismiss Count Three.  Budovsky's various challenges to Count Three having been denied, his motion to dismiss Count Two is likewise denied.

### G.  Virtual Currency as "Funds"

Finally, Budovsky seeks dismissal of the Indictment on the ground that virtual currency does not constitute "funds," as

required for charges brought under §§ 1956 and 1960.  Budovsky's
argument is unavailing as to both sections, and each will be
addressed in turn.

### 1.   Count One -- 18 U.S.C § 1956

Count One charges Budovsky under 18 U.S.C. § 1956(h) with
conspiring to commit both concealment money laundering in
violation of 18 U.S.C. § 1956(a)(1)(B)(i) and international
money laundering in violation of 18 U.S.C. § 1956(a)(2)(B)(i).[11]
Section 1956(a)(1)(B)(i) makes it a crime to conduct a
"financial transaction" involving the proceeds of specified
unlawful activity, with knowledge that the transaction is
designed to conceal or disguise the nature, location, source,
ownership, or control of the proceeds.  The term "financial
transaction" includes any transaction affecting interstate or
foreign commerce that involves "the movement of funds by wire or
other means" or "one or more monetary instruments," among other
things.  18 U.S.C. § 1956(c)(4).  Section 1956(a)(2)(B)(i)
criminalizes knowingly transferring "a monetary instrument or
funds" representing criminal proceeds from the United States to

---

[11] While Budovsky's motion only explicitly discusses
§ 1956(a)(1)(B)(i), he demands that the entirety of Count One be
dismissed.  Furthermore, his argument that LR is not a "monetary
instrument" is relevant to the § 1956(a)(2)(B)(i) charge under
Count One.  As such, the terms "funds" will be addressed here in
both the concealment and international money laundering
contexts.

or through a foreign location, or vice-versa, with knowledge
that the transaction is designed to conceal the nature,
location, source, ownership, or control of the proceeds.
Budovsky argues that because LR does not qualify as a "monetary
instrument," Count One fails to allege the "financial
transaction" element of money laundering.

Budovsky's argument fails for several reasons.  First, he
argues that virtual currencies are not "monetary instruments"
and thus transactions in virtual currencies are not "financial
transactions."  This argument ignores the statutory definition
of "financial transaction," which includes not only monetary
instruments, but also "funds."  Giving effect to every clause in
the statutory definition, the term funds has a separate meaning
and is not coterminous with the term monetary instrument.  See
In re Barnet, 737 F.3d 238, 247 (2d Cir. 2013) ("Statutory
enactments should . . . be read so as to give effect, if
possible, to every clause and word of a statute." (citation
omitted)).

Next, Budovsky appears to argue that virtual currencies
cannot be included within the term "funds."  This precise
argument was rejected recently in a case applying § 1956 to the
owner and operator of the website Silk Road, a marketplace for
illegal drugs that used the virtual currency Bitcoin.  United
States v. Ulbricht, 31 F. Supp. 3d 540, 568-70 (S.D.N.Y. 2014).

Addressing a pretrial motion to dismiss an indictment, the
Ulbricht court found that since the term "funds" is not defined
under § 1956, it must be given its ordinary meaning: assets that
"can be used to pay for things in the colloquial sense."  Id. at
570; see also United States v. Day, 700 F.3d 713, 725 (4th Cir.
2012) (defining funds under § 1956 to include gold since it is
an asset of monetary value that is susceptible to ready
financial use).  The Ulbricht court's reasoning is adopted here.

     Budovsky relies on discussions of the term "currency" that
appear in guidance issued by the Internal Revenue Service and
the 2013 FinCEN Guidance in support of his position that virtual
currency is not "funds."  See Internal Revenue Serv., Notice
2014-21, IRS Virtual Currency Guidance (Apr. 14, 2014),
available at http://www.irs.gov/irb/2014-16_IRB/ar12.html; 2013
FinCEN Guidance at 1.  These documents are inapposite and do not
suggest that the term "funds" should not be read to encompass
virtual currencies.  See also Ulbricht, 31 F. Supp. 3d at 569.

     Finally, Budovsky argues that Congress could not have
intended for virtual currencies to be "funds" under § 1956
because virtual currencies did not exist when the money
laundering statute was enacted.  "[T]he fact that a statute can
be applied in situations not expressly anticipated by Congress
does not demonstrate ambiguity.  It demonstrates breadth."
Hayden v. Pataki, 449 F.3d 305, 357 (2d Cir. 2006) (citation

35

omitted); see also Barr v. United States, 324 U.S. 83, 90 (1945) ("[I]f Congress has made a choice of language that fairly brings a given situation within a statute, it is unimportant that the particular application may not have been contemplated by the legislators."). The broad language of § 1956 alone is sufficient to conclude that Congress intended to address a general problem with many variations.

### 2.   Count Three -- 18 U.S.C § 1960

Count Three charges that Budovsky operated an unlicensed money transmitting business in violation of § 1960.  Budovsky argues here as well that the transmission of a virtual currency falls outside the scope of § 1960 in Count Three because virtual currencies are not "funds."  Section 1960 defines "money transmitting" to include "transferring funds on behalf of the public by any and all means."  18 U.S.C. § 1960(b)(2).

Once again, Budovsky's line of reasoning was recently rejected in a virtual currency case applying § 1960 to an operator of the Bitcoin website Silk Road.  United States v. Faiella, 39 F. Supp. 3d 544, 545-47 (S.D.N.Y. 2014).  The Faiella court found that Bitcoin as a virtual currency qualified as "funds" under the statute, since it can "be easily purchased in exchange for ordinary currency, acts as a denominator of value, and is used to conduct financial transactions."  Id. at

36

545.  For these same reasons, LR qualifies as "funds" for
purposes of § 1960.

As he did with § 1956, Budovsky relies on IRS and FinCEN
Guidance and Congress's inability to contemplate virtual
currency at the time of § 1960's enactment to argue that the
statute does not cover LR.  The reasons for rejecting these
arguments in the context of § 1956 apply with equal force here.

Budovsky further claims that applying § 1960 to LR would
violate the rule of lenity.  This argument fails.  Having
considered the text, purpose, and legislative history of § 1960,
there is no ambiguity that would require resort to the rule of
lenity.

Finally, Budovsky cites Bouie v. City of Columbia, 378 U.S.
347, 353 (1964), and the Due Process Clause to argue that
enforcement of § 1960 against him constitutes an "unforeseeable
judicial enlargement of a criminal statute."  Bouie does not
assist Budovsky.  He does not point to any prior law that failed
to apply § 1960 to virtual currencies, and thus does not explain
how its application here represents an "unforeseeable and
retroactive judicial expansion of narrow and precise statutory
language."  Id. at 352.

## II.  Motion to Strike Surplusage

Budovsky moves to strike as surplusage references to his
prior criminal conviction and references to the purpose and

effect of § 1960 and its implementing regulations.  To prevail

on a motion to strike, a defendant must show that the challenged

allegations are "not relevant to the crime charge and are

inflammatory and prejudicial."  United States v. Mulder, 273

F.3d 91, 99 (2d Cir. 2001) (citation omitted).  Budovsky has not

made that showing.

Budovsky's prior conviction for operating an unlicensed

money transmitting business is relevant to, among other things,

his mens rea.  Budovsky does not claim that the Indictment's

description of the genesis of § 1960 and its implementing

regulations is inaccurate.  That they are not "essential" to

charge an offense is not a basis for striking the allegations.

Accordingly, Budovsky's motion to strike surplusage from the

Indictment is denied.

## III. Motion to Compel Production of Brady Material

Lastly, Budovsky asks for an order compelling the

Government to produce Brady material.  The Government has

acknowledged its obligations under Brady.  Budovsky's motion to

compel production of Brady material is denied as moot.

**CONCLUSION**

Budovsky's June 23, 2015 motion to dismiss, to strike surplusage, and to compel is denied.

SO ORDERED:

Dated:    New York, New York
          September 23, 2015

_____
          DENISE COTE
United States District Judge