## Doar Rieck Kaley & Mack
ATTORNEYS AT LAW

JOHN DOAR (1921-2014)
JOHN JACOB RIECK, JR.
JOHN F. KALEY
WALTER MACK
JAMES R. DeVITA

OF COUNSEL
EILEEN MINNEFOR
JAMES I. WASSERMAN
MICHAEL MINNEFOR

ASTOR BUILDING
7TH FLOOR
217 BROADWAY
NEW YORK, N.Y. 10007-2911

TELEPHONE: (212) 619-3730
FACSIMILE: (212) 962-5037
e-mail: firm@doarlaw.com
website: www.doarlaw.com

January 13, 2016

**VIA ECF FILING**
Hon. Denise L. Cote
United States District Judge
500 Pearl Street
New York, NY  10007

Re: <u>United States v. Arthur Budovsky, Docket No. 13 Cr. 368 (DLC)</u>

Dear Judge Cote:

      We write regarding the Court's order of January 8, 2016, which addressed Arthur Budovsky's ("Budovsky") letter dated January 5, 2016, and which ordered the Defense not to submit a letter regarding discovery problems until the Defense has consulted with the Government in an attempt to resolve any such problems. *See* Court Order 1/8/2016, Dkt. Entry # 244. We also write to request again an adjournment of the trial as we are not ready and it is not possible for us to be ready for a February 1, 2016 trial start date.

      Regarding our letter of January 5, 2016, we apologize if we misunderstood the Court's response to Defense counsel's statements during December 29, 2015 conference in support of our motion for an adjournment[1] in which we advised the Court that Mr. Budovsky was not receiving the allotted time to access his computer/discovery, despite the best intentions of the legal staff at the Metropolitan Correction Center ("MCC"). *See*, Docket # 233.  The Court indicated we were remiss in not advising the Court of the problems immediately.  The

---

    [1]The Court had indicated during that conference, and the Government indicated in its response to the Defense January 5, 2016 letter (*see*, Government letter dated, Dkt. # 241), that in requesting an adjournment of the trial we had not specified a date for the adjourned trial. We had, however, made it clear, in our prior requests for an adjournment of the trial that the defense sought first an adjournment until May (*see* tr. 8/ 3 /2015) and then in November, we believed we could not even be ready for trial in May and therefore, requested a date of September 2016.

Hon. Denise L. Cote -2- January 13, 2016

Government subsequently in their January 4, 2016 letter updated the Court concerning what they had learned regarding MCC/access for Mr. Budovsky. However, Defense counsel after communicating with MCC legal counsel, Adam Johnson, gained additional information. Accordingly, in our January 5, 2016 letter, we tried simply to update the Court regarding Mr. Budovsky's continued problems with accessing discovery, whether due to issues at the Metropolitan Correction Center ("MCC") or due to software which had not been installed in his computer and which prevented him from accessing the discovery.

However, as stated in our recent letter to the Court, the government's recent cooperation with the defense simply does not come close to resolving the impossible task of being ready for trial in this case for February 1st. As discussed in court on December 29, 2015, the discovery contained on 32 hard drives was received by Mr. Pittell, in January 2015, but January 2015 cannot and should not be the start date for analyzing when the defense effectively was able to review and analyze the evidence against Mr. Budovsky. The problems the Defense has had with access stems from the Government's failure, when it produced the 66.4 terabytes of discovery back in January 2015, in not producing the discovery in searchable form and in not promptly revealing to the Defense the problems the Defense would have with accessing important parts of the discovery. Indeed, it was not until the Government's April, 2, 2015 letter responding to specific discovery demands and inquiries made in December 2014 and January 2015, that the Government revealed that significant data could not be accessed without forensic assistance. These were technical difficulties which the Government had to have been aware of from its own use of the data and its own need for computer forensic expertise to decrypt some of the information they downloaded onto the 32 hard drives. Further, that the Government claims to have had no problem with finding items on the hard drives is of no consequence to the issue of the Defense ability to find and access the mountain of discovery produced. The Government had after all created the 36 pages of 500+ categories of discovery, with each category containing anywhere from a few to thousands upon thousands of pages of documents. Severely complicating access by the Defense to the discovery "dump" was that it was produced in a non-searchable format, an issue separate and apart from other forensic and decryption issues as to access to a significant part of the data.

The magnitude of the discovery and the forensic complications related to access to certain of the discovery necessitated the Defense application to the Court in May, 2015, and the Court's Order authorizing an expenditure of approximately $800,000 for the purpose of having Catalyst – the Defense forensic technology firm - create a searchable data platform to assist the Defense in reviewing the voluminous discovery produced. In the absence of a searchable database, the Defense would have been left to review the 66.4 terabytes of data on 32 hard drives virtually one page at a time.

Catalyst provided a searchable database in late August, 2015. So while the Government trumpets the fact that it produced hard drives in January, 2015, the Defense did not begin to have real access to the discovery, allowing for training on the Catalyst system, until September, 2015, approximately only four months ago. The Government, on the other hand, had created some

form of searchable access for themselves, which they had access to for several years, and would not share with the Defense. We, in contrast, have had only four months to search this enormous data (not including the massive transactional material which was only made available to Defense counsel on December 8th and to Mr. Budovsky on January 8th), while at the same time having to prepare various motions, review the thousands of pages of Government exhibits, review their newly produced discovery, their expert disclosure, and related materials, and confer and draft Joint Requests to Charge, and communicate with our own experts and consultants, etc. Given the time constraints of the upcoming trial, we have been forced to seriously truncate our review of the discovery on the platform, have not been able to make full use of the Catalyst data platform, and have not had adequate and sufficient time to do so. We have not, accordingly, been able to conduct a reasonable investigation of the facts alleged by the Government, look for evidence that dispels the Government's theory which we have a good faith belief exists in the data, or to review and analyze the Government's evidence, no less have time to discuss the discovery and these issues with Mr. Budovsky or with our experts and consultants at any length. Mr. Budovsky at the MCC does not have access to the Catalyst data platform and he continues to review isolated parts of the discovery on the hard drives one page at a time. This situation if a far cry from an even and fair playing field.

When the Defense team began working on Catalyst, as we advised the Court previously, and unbeknownst to the Defense at the time, the transactional data had not been forensically decrypted and uploaded to the data platform by Catalyst. It was not until we started working with the data platform that we realized that we could not locate the transactional data on the platform. After trying to locate what the problem was, we learned the data was in a language called "SQL" which required an SQL expert and had not been loaded to the platform. We immediately brought this problem to the attention of Catalyst and to the Government and the Court in November, 2015. In any event, with the assistance of the Government in November through early December, Catalyst completed uploading the transactional data to a separate server (required by the "language" of the data) and made that data available to the Defense on December 8, 2015. At this point Mr. Budovsky, who only has the hard drives still could not access the significant transactional data. As a result, at our request, Catalyst undertook the further task of creating a "virtual" machine (so that Mr. Budovsky could have access to and review the transactional data at the MCC) and uploaded the transactional data to it. That task was quite time consuming even for these experts and not completed until after the Christmas/New Years holidays. When that was completed, it was sent to the FBI for uploading to the computer which the Government had supplied to Mr. Budovsky at the MCC. Mr.Kaley met with Agent Jarrow at the MCC on January 6, 2016 for that purpose. However, Agent Jarrow was unable to upload the data to Mr. Budovsky's computer because of technical issues. As a result, Agent Jarrow took the "virtual" machine with him and uploaded the transactional data from the "virtual" machine to a separate computer. Agent Jarrow then delivered the new computer to the MCC, we think on January 8. Mr. Budovsky received this laptop on about January 8, 2016, but problems remain with his review of the voluminous transactional data. Indeed, the Government has estimated that there are 270 million transactions reflected in the transactional data. As of yesterday, he has been able to access on the new computer only **one** of the approximately 70 tables of data. The uploading

process of the one table took him in excess of seven hours and he was unable to complete the uploading because the computer provided could not accept the volume of data and gave an error message. Accordingly, he has not reviewed the data in this one table, or analyzed it, and thus, is not ready to discuss even this one table with counsel. He has the remainder of the tables to upload, review and analyze and then discuss his findings with counsel. Plainly, Mr. Budovsky has the right to review this important discovery material.

The Government claims that Mr. Budovsky is having problems with accessing the transactional data because he is not conducting a narrow search and confirmed that the computer supplied is not capable of accessing the data in the manner in which Mr. Budovsky wishes to review the data. We believe, it is not fair for the Government to limit how Mr. Budovsky reviews this important data.

Further, only since around the end of December or just after the new year, has Mr. Budovsky been provided with the software necessary to review the thousands of Skype chats contained in the discovery and the information contained in the pen register data, also contained in the discovery. Of course, the Government had to be aware for quite some time, if not back in January of 2015, that Mr. Budovsky who only had the hard drives and no internet access would not be able to access this data without special software – software they had not uploaded to the computer initially provided to Mr. Budovsky. Similarly, the Government did not alert Defense counsel until the beginning of December that special software was required to view the Skype chats from the hard drives. In other words, access to this information either by Defense counsel or Mr. Budovsky was not possible even if found in the mountain of hard drives produced by the Government in discovery. Mr. Budovsky is entitled to have an opportunity to review this material and review it with counsel. Counsel admit we have not had an opportunity to review even a narrower directed search of the Skype chats which, nonetheless, number in the thousands.

The problems with accessing the Google Analytics data was set forth in our January 5, 2015 letter. The Government's contrary assertions notwithstanding, we continue to adhere to our view that the two Google Analytics reports identified in the Government's proposed exhibits were not contained on the hard drive which the Government had identified on the discovery item list provided to counsel, a fact which seems to be confirmed by the e-mail exchange attached to the parties' letters. As we stated in court on December 29, 2015, as best as we can tell the Defense received a CD from the Government containing the two Google Analytics reports sometime in the latter part of November. Further, nowhere in the Government's April 2, 2015 discovery response did the Government disclose that the only way we could access the raw Google Analytics data which they had reviewed for the preparation of their summary reports was by a password. In fact, we did not have and were not provided with the password until after the December 29th conference when the Government emailed it to us by secure message. As explained previously, we were unable to open the secure message. By email dated January 6, 2016 the Government provided further instructions necessary to access this information.

The Government has suggested, rather surprisingly, that Mr. Budovsky is to blame for the time constraints he now finds himself under. Disregarding the problems with their own discovery production, the Government argues Mr. Budovsky would not be under these time constraints had he taken advantage of their offer to produce the 66.4 terabytes of data on 32 hard drives while he was incarcerated in Spain contesting extradition. It is remarkable statement which contains so many assumptions about advice provided to him by his Spanish attorney, the logistics of Mr. Budovsky's imprisonment and having access to and an ability to review this discovery, etc. Furthermore, this does not excuse the Government's failure to provide truly accessible data. Moreover, any providing of discovery to Mr. Budovsky while he was incarcerated in Spain is irrelevant to his United States Defense counsel's need to review the evidence and to prepare a defense.

As a further update on Mr. Budovsky's access to his discovery at the MCC, as of December 31, 2015, Mr. Johnson assured the Defense and the Government that Mr. Budovsky would receive at least 50 hours of access per week to his discovery. He likewise advised that Mr. Budovksy would receive his meals and his medication in the room set aside for him in the attorney conference area on the 3rd Floor. From December 31 through January 11th, Mr. Budovsky had not received even close to the promised access. While the Government represented in its letter to the Court dated January 4, 2016 that the MCC had put in place a plan to enable Mr. Budovsky access to a computer and accompanying media between 8:00 am and 8:00 pm on week-days and between 8 am and 3 pm on week-ends and holidays, that plan has not been executed. We have advised the Government and Mr. Johnson of these facts. Although we have once again been assured the problems which Mr. Budovsky has experienced will be eradicated, this has been promised before without delivery.

With respect to Mr. Budovsky's access since December 31st, Mr. Budovsky has had problems being escorted to the 3rd floor attorney/conference room and providing him his food and his medication. Christmas week he had approximately 8 hours of review time. During that week there were lock-downs for full and partial days, and staff shortage problems, making it impossible for Mr. Budovsky to be escorted anywhere. The staff shortage problems continued through New Years. On January 4, despite Mr. Budovsky's repeated requests to be escorted to the attorney/conference room, he was not taken there because his unit officer was advised by the officer in charge of the attorney/conference rooms that no room was available. On January 5th Mr. Budovsky had 1.5 hours of review time on the 3rd floor. On January 6th, Mr. Budovsky reported his ability to be escorted to the 3rd floor was hampered because large segments of the staff were away on training. He also advised that the prison staff insists he must be in his unit to receive his medication. His psychologist advised him he cannot miss his daily medication. Accordingly, Mr. Budovsky cannot go to the conference area until he receives his medication in the morning or returns to his unit to receive his medication in the evening. At times over the last few days, he has chosen to review the discovery rather than go back to his unit for his medication in the evening. On January 7th, he was escorted to the attorney conference room at 11:45 but his computer was not delivered until 1:30 pm. His lunch was not brought down so at 6:00 PM, he went back upstairs as he was light headed and feared a low sugar attack. On January 8th, he had

Hon. Denise L. Cote				-6-				January 13, 2016

access from 11:30 to 6:30 pm and then went upstairs to eat and obtain his medication. On that day, Mr. Budovsky spoke directly with the assistant legal officer who assured him that he was to receive his medication and food at the attorney/conference area. The officer explained there is a problem with him receiving eating utensils and drinks at the attorney/conference area. She assured him she would work it out, to be patient and advised that it would likely take a few days to resolve. On January 9th, because of food, medical and other issues Mr. Budovsky did not go to the attorney/conference area. On January 10th, his unit officer called the attorney conference room officer from 11am to 1pm and advised Mr. Budovsky that no one answered the telephone. On that day he had no access to his computer or discovery. On January 11th, he did have close to seven hours of access on the 3rd floor. However, since his food and his medication were not delivered, he went back to his unit after seven hours.

The room reserved from him is very small and he is not permitted out of the room for even a break or to stretch his legs. While for the last two days his access to the attorney/conference area and his computer has improved, his food delivery and medicine delivery to the 3rd floor remains an unresolved problem. We advised Adam Johnson and the Government of these continual problems. Mr. Johnson assured Defense counsel via email that the food and medication problems would be remedied. We spoke to Mr. Johnson again to today in person and again there were promises to remedy these problems. These repetitive unfulfilled promises are too little too late. In reality, the combined technical problems with the access to the discovery and the MCC's institutional inability to provide Mr. Budovsky on a regular basis the promised access to his discovery and other material, as is evident from his access problems over the past year and which continue now – less than three weeks before the scheduled start of trial – it is impossible for Mr. Budovsky to complete his review of the discovery, the Government proposed trial exhibits, and analyze and meet and confer with counsel to discuss same.

Nor has the Defense had adequate time to review the Government's proposed trial exhibits produced to the Defense late on December 4, 2015. These exhibits span in length from a few pages to thousands upon thousands of pages. Last week, we received a CD of additional proposed trial exhibits from the Government, which also appear substantial from a cursory look. We have not had the time to review them. Mr. Budovsky advised as of yesterday he has not as of yet received this CD, although the Government had delivered the CD for Mr. Budovsky to the MCC. Mr. Budovsky advises further that there are numerous hard drives that he has not even had the opportunity to review. In November the Government supplied an additional three CDs of discovery (named the 7th wave) and in the past few days provided counsel with still another CD of discovery. It is impossible for Mr. Budovsky and/or his counsel to review all of what fairly needs to be reviewed in order to prepare adequately, to be ready for trial on February 1, and to provide Mr. Budovsky with his Constitutional rights to effective assistance of counsel.

We have tried to make clear to the Court that the task before us is impossible and we can not be prepared for trial in any sense of the word. And this, to be clear, is despite our substantial efforts of working hard on this case. Regarding the "deep team" which the Court has alluded to in our conferences at which the Defense sought to secure a needed trial adjournment, a couple of

points need to be mentioned. First, while Mr. Pittell was appointed in October, 2014 and received the 32 hard drives in January, 2015, the time to reproduce the hard drives so that Mr. Budovsky could have a set of the hard drives (albeit, unsearchable) in the MCC itself took some time. Further, Mr. Pittell was not told about the need for a forensic expert until the Government on April 2, 2015 finally responded to the discovery requests which Mr. Pittell had made in December 2014 and in January 2015. Those requests made clear that he was having difficulty finding, nonetheless, accessing the evidence referenced in the Indictment and the Government's submission with respect to Marmilev sentencing. As noted above, that then precipitated the search for a computer forensic company, which also took some time, and resulted in the Court's authorization in May 2015 for the defense to engage the services of Catalyst. Further, regarding the depth of the Defense team, Mr. Kaley was first appointed in February 2015. After obtaining an overview of the case, he met with Mr. Budovsky, reviewed selected and limited portions of the discovery materials which Mr. Pittell had provided to him and assisted in the preparation of pre-trial motions. He also worked with Mr.Pittell in speaking to technology firms regarding creation of the data platform. Once the decision was made to engage the services of Catalyst and the Court authorized same, it made sense to wait for Catalyst to create the platform as opposed to attempting to review further at that time the 66.4 terabytes of unsearchable data, much of which was encrypted, although additional review of selected data from the hard drives continued. Additionally, the Court has been made aware of the limitations on Mr. Pittell's involvement in the case after August, 2015, as disclosed at the August conference and more recently at the conference on December 29, 2015.

Further, regarding the depth of the Defense team, Ms. Newman entered her appearance on September 17, 2015. She has been on the case for just about four months. Darryl Austin, who is Mr. Kaley's mentee in the District's CJA mentoring program, was appointed associate counsel and he entered his appearance September 9, 2015. He too has been on the team for just four months. Clara Kalhous, who has been on the team since October also had been on the team less than four months. Julie de Almeida, was appointed as the Defense technologist to assist in utilizing the Catalyst data platform in September, 2015. As such, the "deep" Defense team only has been a team for less than four months, plainly insufficient to fairly and adequately provide Mr. Budovsky with the effective defense and assistance of counsel to which he is entitled.

Parenthetically, we note that the Government in its letter of January 7, 2016 somewhat chided the Defense for not expressly asking for an adjournment. While we thought that was obvious from the conference and our letter, our point in that letter was to address what we believed were inaccuracies in the Government's presentation at the conference on December 29, 2015 and their follow-up letter to the Court[2] and to update the Court on issues relating to Mr. Budovsky's access to discovery.

---

[2] This is particularly so regarding the Google Analytics reports, which the email communications submitted with the Defense letter of January 5, 2016 and the Government's letter of January 6, 2016 make plain were not contained on the hard drive referenced in the Government's discovery Item – they were not received by the Defense until mid-late November, 2015 when the Government provided them on a CD.

Hon. Denise L. Cote -8- January 13, 2016

      Mr. Budovsky again has directed us to ask for an adjournment of the trial to enable him to effectively assist counsel and to enable him to review discovery and the Government's proposed trial exhibits and to enable his counsel time to review those materials, to investigate, and analyze the evidence in order to receive effective assistance. We do so herein and, accordingly, we ask most respectfully for an adjournment of the trial. Although we believe an adjournment to September is fully warranted given the volume of the material yet to be reviewed and analyzed by Mr. Budovsky ad his counsel, having now received the transactional data and access to other parts of the discovery, we believe we could be ready for a May 1 trial date, as we requested in August 2015. A few months adjournment is something the Government should agree to as the request is in the interest of justice. In August, Mr. Kaley requested the May date and the Government prior to any subpoena to any witness was sent, objected to this date. In weighing the rights of a defendant against the inconveniences of witnesses who have sufficient time to change plans, the defendant's rights should carry the greater weight.

      In conclusion, Mr. Budovsky, and we as his counsel, simply cannot and will not be able to be ready for trial on February 1, 2016. The task is impossible and proceeding to trial on February 1 is to Mr. Budovsky's prejudice and detriment. Moreover, in our respectful view, it violates his right to due process, a fair trial, and the effective assistance of counsel.

                                                 Respectfully submitted,

                                                 _____/s/_____
                                                 John F. Kaley

                                                 _____/s/_____
                                                 Donna Newman

cc: All Counsel (via ECF and email)