G1TTBUDP

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                    13 CR 368 (DLC)

ARTHUR BUDOVSKY,

                Defendant.

------------------------------x

                                    New York, N.Y.
                                    January 29, 2016
                                    3:00 p.m.


Before:

                    HON. DENISE L. COTE,

                                    District Judge


                        APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
SERRIN TURNER
CHRISTINE MAGDO
KEVIN MOSLEY
CHRISTIAN EVERDELL
     Assistant United States Attorneys

JOHN KALEY
DONNA R. NEWMAN
JEFFREY PITTELL
DARRYL AUSTIN
     Attorneys for Defendant
```

G1TTBUDP

1          (In open court)

2          DEPUTY CLERK:  United States of America versus Arthur

3     Budovsky.  Is the government ready to proceed?

4          MR. TURNER:  Yes, good afternoon, your, Serrin Turner

5     for the government.  With me at counsel table is AUSA Christine

6     Magdo, AUSA Kevin Mosley, AUSA Chris Everdell, Special Agent

7     Tate Jarrow from the Secret Service, paralegals Nicholas Evert

8     and Molly Rosen as well.

9          DEPUTY CLERK:  And for the defendant Budovsky.

10          MR. KALEY:  Good afternoon, your Honor, John Kaley for

11     Mr. Budovsky, who is seated to my right, with Donna R. Newman,

12     Jeffrey Pittell and Darryl Austin.

13          THE COURT:  Good afternoon.  I will take a report from

14     you, Mr. Turner.

15          MR. TURNER:  Your Honor, I have been informed by the

16     defense that the defendant intends to enter a plea to Count One

17     of the indictment, which the government is willing to accept.

18          THE COURT:  And you're willing to accept that in full

19     satisfaction of the three charges in the indictment?

20          MR. TURNER:  Correct, your Honor.

21          THE COURT:  Mr. Budovsky, please stand.

22          Do you require the services of an interpreter?

23          THE DEFENDANT:  No, I do not.

24          THE COURT:  Before accepting your plea, I'm going to

25     ask you certain questions to establish to my satisfaction that

G1TTBUDP

1      you're pleading guilty because you are guilty and not for some

2      other reason.  If at any time you do not understand my

3      questions or if you wish for a further opportunity to consult

4      with your lawyers, will you let me know?

5              THE DEFENDANT:  Yes, I will.

6              THE COURT:  Please place the defendant under oath.

7              (Defendant sworn)

8              THE COURT:  You are now under oath, and if you answer

9      any of my questions falsely, you can be prosecuted for perjury.

10     Do you understand that?

11             THE DEFENDANT:  Yes, I do.

12             THE COURT:  What is your full name?

13             THE DEFENDANT:  Arthur Budovsky Belanchuk.

14             THE COURT:  And how do you spell that last name?

15             THE DEFENDANT:  There are two.  The first last name is

16     B-U-D-O-V-S-K-Y, the second last name is B-E-L-A-N-C-H-U-K.

17             THE COURT:  Thank you.  How old are you?

18             THE DEFENDANT:  42.

19             THE COURT:  How far did you go in school?

20             THE DEFENDANT:  Finished two years out of college.

21             THE COURT:  Two years of college?

22             THE DEFENDANT:  Two years of college.

23             THE COURT:  Thank you.  Have you ever been treated or

24     hospitalized for any mental illness?

25             THE DEFENDANT:  No.

G1TTBUDP

<pre>
 1              THE COURT:  Are you now or have you recently been
 2    under the care of a doctor or psychiatrist?
 3              THE DEFENDANT:  Psychiatrist in prison, but I'm not
 4    under his care.
 5              THE COURT:  And are you under the care of any medical
 6    personnel for any medical condition now?
 7              THE DEFENDANT:  No.
 8              THE COURT:  Are you taking --
 9              MS. NEWMAN:  Excuse me, if I may.
10              (Pause)
11              MR. KALEY:  Your Honor, he is receiving some
12    medications.
13              THE DEFENDANT:  It's for the sugar condition.  I have
14    diabetes type 2.
15              THE COURT:  And what medication do you take for that
16    condition?
17              THE DEFENDANT:  Metformin.  It's a pill.
18              THE COURT:  And does the metformin that you take
19    affect your ability to understand what's happening here?
20              THE DEFENDANT:  Absolutely not.
21              THE COURT:  Does it affect your ability to consult
22    with your attorneys?
23              THE DEFENDANT:  No.
24              THE COURT:  Does it affect your ability to remember
25    what happened in the past?
</pre>

G1TTBUDP

1          THE DEFENDANT:  No.

2          THE COURT:  In the last 24 hours have you taken any

3     other drugs besides the metformin, any medicine, pills of any

4     kind besides the metformin?

5          MS. NEWMAN:  If I might, your Honor, because I want

6     the record accurate.

7          (Pause)

8          MR. KALEY:  Your Honor, Mr. Budovsky was taking some

9     other medication for antidepression.  He hasn't taken it in the

10    last few days, but if the Court wants to inquire about it.

11         THE DEFENDANT:  I don't know if it's immediately today

12    or in the past.

13         THE COURT:  I asked you specifically about the last 24

14    hours.

15         THE DEFENDANT:  24 hours I didn't take any medication.

16         THE COURT:  But you are also under the care of a

17    physician or a psychiatrist to treat depression?

18         THE DEFENDANT:  Yes.

19         THE COURT:  And you have been prescribed medication

20    for that condition?

21         THE DEFENDANT:  Yes.

22         THE COURT:  And you haven't taken that medication in

23    the last 24 hours.  Do I understand that correctly?

24         THE DEFENDANT:  That's correct.

25         THE COURT:  Now has anything about that experience of

G1TTBUDP

1   depression affected your ability to understand today what is

2   happening in court?

3          THE DEFENDANT:  No.

4          THE COURT:  Has it impaired your ability to discuss

5   this case with your lawyers?

6          THE DEFENDANT:  No.

7          THE COURT:  Do you believe that your mind is clear

8   today?

9          THE DEFENDANT:  Yes.

10         THE COURT:  You understand what is happening here?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Do any counsel have any doubt as to the

13  defendant's competence to enter a plea of guilty?

14         MR. KALEY:  No, your Honor.

15         MS. NEWMAN:  No, your Honor.

16         MR. PITTELL:  No.

17         THE COURT:  So the three defense counsel have each

18  individually answered no.

19         I will ask the government, does the government have

20  any doubt as to the defendant's competence to enter a plea of

21  guilty today?

22         MR. TURNER:  No, your Honor.

23         THE COURT:  Thank you.

24         Based on the defendant's responses to my questions,

25  his demeanor as he stands here before me, I find he is

G1TTBUDP

1    competent to enter a plea of guilty at this time.

2         Now Mr. Budovsky, have you had a sufficient

3    opportunity to discuss your case with your lawyers?

4         THE DEFENDANT:  Yes.

5         THE COURT:  Have you had a sufficient opportunity to

6    discuss with them Count One of the indictment?

7         THE DEFENDANT:  Part one?

8         THE COURT:  Count One.

9         THE DEFENDANT:  Yes.

10        THE COURT:  And have you had a sufficient opportunity

11   to discuss with them your intention to plead guilty to Count

12   One, any defenses that you might have to the charge in Count

13   One, and also the consequences to you of entering a plea to the

14   charge in Count One?

15        THE DEFENDANT:  Yes.

16        THE COURT:  Are you satisfied with the representation

17   your attorneys have given you?

18        THE DEFENDANT:  Yes, I am.

19        THE COURT:  I'm now going to explain certain

20   constitutional rights that you have.  You will be giving up

21   these rights if you enter a plea of guilty.

22        Under the Constitution and laws of the United States,

23   you're entitled to a speedy and public trial by a jury on the

24   charges contained in the indictment that's been filed against

25   you.  Do you understand that?

G1TTBUDP

1              THE DEFENDANT:  Yes.

2              THE COURT:  And you know that trial is scheduled to

3    begin on Monday?

4              THE DEFENDANT:  Yes.

5              THE COURT:  At that trial, you would be presumed to be

6    innocent, and the government would be required to prove you

7    guilty by competent evidence and beyond a reasonable doubt

8    before you could be found guilty.  You would not have to prove

9    that you were innocent, and a jury of twelve people would have

10   to agree unanimously that you were guilty.  Do you understand

11   that?

12             THE DEFENDANT:  Yes, I understand.

13             THE COURT:  At that trial, and at every stage of your

14   case, you would be entitled to be represented by a lawyer, and

15   if you could not afford one, one would be appointed to

16   represent you.  Do you understand that?

17             THE DEFENDANT:  Yes.

18             THE COURT:  During the trial, the witnesses for the

19   government would have to come to court and testify in your

20   presence, and your lawyer could object to evidence offered by

21   the government, cross-examine the witnesses called by the

22   government, and, if you desired, issue subpoenas, offer

23   evidence, and even compel witnesses to come to court and

24   testify on your behalf.  Do you understand that?

25             THE DEFENDANT:  Yes.

G1TTBUDP

1           THE COURT:  At that trial, although you would have the

2    right to testify if you chose to do so, you would also have the

3    right not to testify, and no inference or suggestion of guilt

4    could be drawn from the fact that you did not testify if that

5    is what you chose to do.  Do you understand that?

6           THE DEFENDANT:  Yes, I understand.

7           THE COURT:  Do you understand that if you were

8    convicted at a trial that you would have the right to appeal

9    from that verdict?  Do you understand that?

10          THE DEFENDANT:  Yes.

11          THE COURT:  Even at this time right now, even as

12   you're entering this plea, you have the right to change your

13   mind and plead not guilty and go to trial.  Do you understand

14   that?

15          THE DEFENDANT:  Yes, I do.

16          THE COURT:  If you plead guilty and I accept your

17   plea, you will give up your right to a trial and all the other

18   rights I have just described.  There will be no trial.  And I

19   will enter a judgment of guilty and sentence you based on this

20   plea after I read whatever submissions I get from you and your

21   lawyers and the government's lawyers and after I read a

22   presentence report prepared by the probation department.  Do

23   you understand that?

24          THE DEFENDANT:  Yes.

25          THE COURT:  If you plead guilty, you're also going to

G1TTBUDP

1   give up your right not to incriminate yourself because I'm

2   going to ask you today what you did, and you're going to have

3   to describe your conduct to me.  Do you understand that?

4           THE DEFENDANT:  Yes.

5           THE COURT:  Now let me make sure you understand what

6   you're charged with in Count One.  Count One in general terms

7   is referred to as a money laundering conspiracy.  A conspiracy

8   is an agreement between two or more people to violate the law.

9           Count One charges that you were a knowing and willing

10  participant in the conspiracy charged there.  It charges that a

11  conspiracy existed between approximately 2006 and May 2013, and

12  that at least some activities in connection with that

13  conspiracy occurred here in the Southern District of New York,

14  which includes Manhattan and the Bronx, among other locations.

15  Do you understand that?

16          THE DEFENDANT:  Yes.

17          THE COURT:  It charges that the goal of this

18  conspiracy -- and let me ask the government, with respect to

19  the goals of the conspiracy, as I understand it, there are two

20  listed in the indictment.  Is the plea proceeding, as far as

21  the government's concerned, with respect to both goals?

22          MR. TURNER:  Either one is sufficient, your Honor.

23  The first goal I think largely overlaps with the second in any

24  event.

25          THE COURT:  Fine.  I will instruct the defendant with

G1TTBUDP

1   respect to both goals.

2           MR. TURNER:  Thank you.

3           THE COURT:  Count One charges that there were two

4   goals of this conspiracy.  The first is that you and others,

5   knowing that the property involved in certain financial

6   transactions represented the proceeds of some form of unlawful

7   activity, essentially felony violations of law, would and did

8   conduct financial transactions which in fact did involve the

9   proceeds of specified unlawful activity.  Now I'm going to list

10  some of the specified unlawful activity charged here in this

11  count in a moment.  And that at that time you knew that the

12  transactions were designed, in whole or in part, to conceal or

13  disguise the nature, the location, the source, the ownership or

14  the control of the proceeds of the unlawful activity.  Do you

15  understand that's part of the charge against you?

16          THE DEFENDANT:  Yes, I do.

17          THE COURT:  Now I referred to the fact that the

18  financial transactions had to involve the proceeds of specified

19  unlawful activity.  Specifically charged in this count, the

20  specified unlawful activity includes the following:  Identity

21  theft, access device fraud, computer hacking, wire fraud, child

22  pornography, and narcotics trafficking.  Do you understand

23  that's part of the charge against you?

24          THE DEFENDANT:  Yes.

25          THE COURT:  Let me go to the second goal.  It's

G1TTBUDP

charged that it was also a goal of the conspiracy that you and
others would transport, transmit, or transfer money instruments
or funds from places in the United States to or through places
outside the United States and to places in the United States
from places outside the United States, all the while knowing
that the instruments or funds involved the transportation or
transfer of proceeds of some form of unlawful activity, and
knowing that the transfers were designed, in whole or in part,
to conceal or disguise, again, the nature, location, source,
ownership, or control of the proceeds of specified unlawful
activity.  Do you understand that's part of the charge against
you?

    THE DEFENDANT:  Yes, I do.

    THE COURT:  And again, that same list of specified
unlawful activity applies to this goal of the conspiracy.  Do
you understand that?

    THE DEFENDANT:  Yes.

    THE COURT:  And I should have mentioned in connection
with the first goal, of course, that those financial
transactions are charged also to have been conducted in a way
that involved or affected United States commerce, either
interstate or foreign commerce.  You understand that?

    THE DEFENDANT:  Yes.

    THE COURT:  Let's talk about the elements of some of
these specified unlawful activity crimes.  And in terms of the

G1TTBUDP

1    allocution, Mr. Kaley, I want to make sure I'm focusing on what

2    would be most pertinent here.

3              MR. KALEY:  Your Honor, it's wire fraud and high yield

4    investment programs.

5              THE COURT:  Thank you.

6              So wire fraud would be 1343, and let me start there.

7    The crime of wire fraud contains several elements, and let me

8    describe those to you.  The crime is committed by someone who

9    devises or intends to devise a scheme or artifice to defraud or

10   to obtain money or property by means of false or fraudulent

11   pretenses, representations, or promises, and transmits or

12   causes to be transmitted by means of wire communication in

13   interstate or foreign commerce any writings, pictures, signals,

14   or sounds for the purpose of executing that scheme or artifice

15   to defraud.  Do you understand that that is a description of

16   the crime of wire fraud?

17             THE DEFENDANT:  Yes, I understand.

18             THE COURT:  And which other statute, Mr. Turner,

19   should I be describing here in connection with high yield

20   investment programs?

21             MR. TURNER:  I think wire fraud covers it, your Honor.

22             THE COURT:  So having described to the defendant the

23   elements of Section 1343, I will capture both of the schemes

24   that are described -- well, both wire fraud itself and frauds

25   connected with high yield investment programs.

G1TTBUDP

          1          MR. TURNER:  The high yield investment programs are

          2    the wire frauds to further Ponzi schemes.

          3          THE COURT:  Thank you.

          4          Let me describe the penalties that apply to a plea of

          5    guilty with respect to Count One, the money laundering charge.

          6    It carries a maximum term of imprisonment of 20 years, a

          7    maximum term of supervised release of three years, a maximum

          8    fine of $500,000 or twice the value of the property involved in

          9    the transaction, whichever is greater, and a requirement that

          10   you pay a special assessment of $100.  Do you understand that?

          11         THE DEFENDANT:  Yes.

          12         THE COURT:  Now supervised release means that you will

          13   be subject to monitoring when released from prison.  There are

          14   terms of supervised release with which you must comply, and if

          15   you do not comply with them, you could be returned to prison

          16   without a jury trial and be given no credit for any time you

          17   already spent in prison and no credit for any time that you

          18   spent on post-release supervision.  Do you understand that?

          19         THE DEFENDANT:  Yes.

          20         THE COURT:  There may also be a requirement that you

          21   pay restitution in connection with this offense.  Do you

          22   understand that?

          23         THE DEFENDANT:  Yes.

          24         THE COURT:  Are you a citizen of this country?

          25         THE DEFENDANT:  No.

G1TTBUDP

1          THE COURT:  Do you understand that a conviction of

2    this crime could make it far easier for the government to

3    deport you from this country?  Do you understand that?

4          THE DEFENDANT:  Yes, I do.

5          THE COURT:  Have you discussed the immigration

6    consequences of this conviction with your attorneys?

7          THE DEFENDANT:  Yes, I have.

8          THE COURT:  There may also be a requirement that you

9    make forfeiture in connection with this conviction.  Do you

10   understand that?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Now do you understand that if your

13   attorney or anyone else has attempted to predict to you what

14   your sentence might be, that their prediction could be wrong?

15   Do you understand that?

16         THE DEFENDANT:  Yes.

17         THE COURT:  No one, not your lawyer, not the

18   government's lawyer, can give you any assurance of what your

19   sentence will be because I will decide your sentence, but I'm

20   not going to it now, I am going to wait.  I will wait until I

21   get a presentence report prepared by the probation department,

22   do any own independent calculation of your sentencing

23   guidelines range, decide whether I should depart up or down

24   from that range, look at all the other information that's been

25   presented to me, consider the factors set forth in the section

G1TTBUDP

1   of the law we call Section 3553(a), and only then, after that

2   whole process, will I decide what a reasonable sentence is for

3   you.  Do you understand that?

4           THE DEFENDANT:  Yes, I do.

5           THE COURT:  Even if your sentence is different from

6   what your attorney or anyone else has told you it might be,

7   even if it's different from what is calculated in your plea

8   agreement, if you have one with the government, you are still

9   going to be bound by your plea of guilty and cannot withdraw

10  your plea of guilty.  Do you understand that?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  Now has anyone threatened you or anyone

13  else or forced you to plead guilty?

14          THE DEFENDANT:  No.

15          THE COURT:  Now I understand there has been a plea

16  agreement between you and government.  Do you have a copy of it

17  in front of you right now?

18          MR. KALEY:  We do, your Honor.

19          THE COURT:  Does it have the date, Mr. Budovsky, of

20  January 26 on the first page?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Does it have six pages in all?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Is your signature on the last page?

25          THE DEFENDANT:  Yes.

G1TTBUDP

1          THE COURT:  What's the date next to your signature?

2          THE DEFENDANT:  January 29.

3          THE COURT:  That's today.  Did you sign this today?

4          THE DEFENDANT:  Yes, I did.

5          THE COURT:  Before you signed this document, did you

6    read it?

7          THE DEFENDANT:  Yes, I did.

8          THE COURT:  Before you signed this document, did you

9    discuss it with your lawyers?

10          THE DEFENDANT:  Yes.

11          THE COURT:  When you signed this document, did you

12    think you had a good understanding of its terms?

13          THE DEFENDANT:  Yes.

14          THE COURT:  You understand that in this document you

15    and the government agreed that your sentencing guidelines range

16    is 360 months to life imprisonment.  Do you understand that?

17          THE DEFENDANT:  Yes, I do.

18          THE COURT:  Do you understand, however, because the

19    count to which you are pleading guilty carries a maximum term

20    of 20 years imprisonment, that maximum term of imprisonment is

21    below the sentencing guidelines range as calculated in this

22    document?  Do you understand that?

23          THE DEFENDANT:  Yes.

24          THE COURT:  Do you understand that by signing this

25    document you have given up your right to appeal or challenge or

G1TTBUDP

 1   litigate your sentence so long as I don't sentence you to more

 2   than 20 years in prison?  Do you understand that?

 3          THE DEFENDANT:  Yes, I do.

 4          THE COURT:  Now do you have any agreement with the

 5   government about your plea or about your sentence that has been

 6   left out of this written plea agreement?

 7          THE DEFENDANT:  No.

 8          THE COURT:  Tell me in your own words what you did

 9   that makes you believe you're guilty of the crime you're

10   charged with in Count One.

11          THE DEFENDANT:  On or about 2002 I was approached by

12   Vladimir Katz to assist him in his development of Liberty

13   Reserve virtual currency, and I accepted his offer.  Although

14   we kicked around the concepts for a while, as I recall, it was

15   not until about 2005 that Liberty Reserve was launched by

16   booting up a web site.

17          THE COURT:  Slow down, please.

18          So it was launched in 2005, as you remember, by

19   putting up a web site?

20          THE DEFENDANT:  Yes.

21          THE COURT:  Thank you.

22          THE DEFENDANT:  I knew from my knowledge of other

23   virtual currencies, from what Katz advised me of, and from my

24   participating in various online forums, that virtual

25   currencies, because it did business solely via the internet,

G1TTBUDP

was susceptible to use and abuse by criminals.  For example, I

was aware that high yield investment programs run by fraudsters

were Ponzi schemes and that these high yield investment

programs were attracted to E-currency.

THE COURT:  Were attractive to?

THE DEFENDANT:  Attracted to E-currency.

THE COURT:  To which currency?

THE DEFENDANT:  To Liberty Reserve and others, all the

currencies.

MR. KALEY:  The word he is using, your Honor, is

"E-currency."

THE COURT:  E-currency?

MR. KALEY:  Yes.

THE COURT:  They were attracted to E-currencies?

THE DEFENDANT:  Mm-hmm.

THE COURT:  Thank you.

THE DEFENDANT:  I knew they would, and in fact did,

use Liberty Reserve.  I knew that Liberty Reserve had

insufficient safeguards, insufficient anti-money laundering

procedures in place to minimize Liberty Reserve's use by these

HYIPs, which is high yield investment programs.

THE COURT:  HYIP?

THE DEFENDANT:  Yes, it's short for the high yield

investment programs.

I knew that Liberty Reserve had features that criminal

G1TTBUDP

1   users utilized to conceal their identity and to launder their

2   criminal proceeds.  I knew that there was a percentage of users

3   from the United States.  I knew that facilitating money

4   laundering for the United States users was contrary to the

5   United States law.  I was involved with Liberty Reserve in one

6   capacity or another from 2002 to 2013.  I had developed a

7   networking platform and the networking infrastructure for the

8   business of Liberty Reserve, and I knew what I did was illegal.

9           THE COURT:  You knew what?

10          THE DEFENDANT:  What I did was illegal.

11          THE COURT:  You knew what you were doing was wrong?

12          THE DEFENDANT:  Yes.

13          THE COURT:  You understood at the time it was a

14   violation of U.S. law?

15          THE DEFENDANT:  Yes.

16          THE COURT:  Now I think I heard you say that Liberty

17   Reserve had features which you understood at the time were

18   designed to help criminals transmit their funds and conceal

19   their source and identity.  Did I understand that correctly?

20   Did you refer to features?

21          MR. KALEY:  Just one second.

22          MS. NEWMAN:  Sorry, your Honor.

23          (Pause)

24          THE COURT:  I think I should reflect for the record

25   what is happening here.  Mr. Budovsky, you were reading to me

G1TTBUDP

1    from a document, is that right?

2              THE DEFENDANT:  Yes.

3              THE COURT:  Did you help prepare that document?

4              THE DEFENDANT:  Yes.

5              THE COURT:  Did you review it carefully before you

6    read it to me?

7              THE DEFENDANT:  Yes, I have.

8              THE COURT:  Did you believe at the time you were

9    reading it to me that everything you said in that document was

10   truthful and accurate?

11             THE DEFENDANT:  Yes.

12             THE COURT:  Okay.  I think I heard you refer to

13   certain features, and I am not sure I captured everything you

14   said at that time.  And so if you could just tell me what you

15   were referring to when you referred to features of Liberty

16   Reserve.

17             THE DEFENDANT:  Well, Liberty Reserve did not require

18   all users to provide identification documents, and in many

19   cases did not follow up on a consistent basis with the

20   identification process, thereby allowing users a level of

21   anonymity that facilitated their ability to conceal their

22   identity and the nature of monies passing through the Liberty

23   Reserve system.

24             THE COURT:  Concealed their identity and what?

25             THE DEFENDANT:  And nature of the monies passing

G1TTBUDP

1    through the Liberty Reserve system.

2            THE COURT:  Nature of the monies transferred through

3    the Liberty Reserve system?

4            THE DEFENDANT:  Yes.

5            THE COURT:  I'm trying to make sure I capture all your

6    words.

7            Does the government agree there's a sufficient factual

8    predicate for a plea?

9            MR. TURNER:  The government asks the defendant

10   allocute on certain matters, your Honor.  The allegation

11   against the defendant is that he knowingly agreed with others

12   to conduct financial transactions by operating Liberty Reserve.

13   That's the allegation.  I didn't hear that admitted here today.

14   I heard him say that he designed -- did work on the platform or

15   something like that.  The allegation is that he ran Liberty

16   Reserve and that is how he conducted these financial

17   transactions.  That's one thing we would like the defendant to

18   allocute.

19           MR. KALEY:  I think the allocution satisfies all the

20   elements of the offense.  He indicated that he was working with

21   Katz.  He set up the networking platform and the networking

22   infrastructure.  He was aware that it was being used for money

23   laundering purposes from proceeds of unlawful activity,

24   specifically the high yield investment programs.  So the

25   elements of a conspiracy were the agreement with Katz, at a

G1TTBUDP

1    minimum.  So clearly the elements have been satisfied.

2              THE COURT:  Okay.  Mr. Budovsky, keep your voice up so

3    I can hear everything you have to say to me.

4              THE DEFENDANT:  Okay.

5              THE COURT:  As I understood what you were telling me,

6    you were well aware at the time you were involved with Liberty

7    Reserve, which was roughly 2005 to 2013 --

8              THE DEFENDANT:  Mm-hmm.

9              THE COURT:  -- that criminals were using Liberty

10   Reserve's services to move proceeds of their criminal activity

11   through Liberty Reserve in conducting financial transactions.

12   Did I understand that correctly?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And you described to me part of the

15   Liberty Reserve design, and I understood you to be saying that

16   part of the way you designed Liberty Reserve, along with

17   others, was to make sure it didn't have the anti-money

18   laundering features that it should have had so that these

19   criminals could use Liberty Reserve's services to hide their

20   criminal activity.  Did I understand that correctly?

21             THE DEFENDANT:  Yes, you did.

22             THE COURT:  And in designing Liberty Reserve this way

23   and operating it this way, were you working with others who had

24   that same intent and purpose?

25             THE DEFENDANT:  Yes.

G1TTBUDP

1          THE COURT:  And was one of those people with whom you

2     were working with that same intent and purpose Mr. Katz?

3          THE DEFENDANT:  Yes.

4          THE COURT:  We're pausing while the government

5     consults.

6          MS. MAGDO:  One moment, your Honor, excuse me.

7          (Pause)

8          MR. TURNER:  Your Honor, we ask for clarifications on

9     a couple of things.  First, I know your Honor mentioned the

10    word "operating," I just didn't hear it clearly come through

11    the defendant he admitted operating Liberty Reserve.

12         The second thing is in terms of the conspirators

13    involved.  Mr. Katz left Liberty Reserve -- was kicked out of

14    Liberty Reserve in 2008.  So in terms of the continuing

15    conspiracy, we would ask the defendant to allocute there were

16    other conspirators with whom he agreed to operate the Liberty

17    Reserve after that point, including Mark Marmilev, as an

18    example.

19         And I think it would also help, just to have a clear

20    allocution, that there were transactions that the defendant was

21    aware of that he knew came from criminal activity and that he

22    knew were designed to conceal the proceeds of that activity.

23    Just to get a straight allocution to that.

24         MR. KALEY:  As to the latter question, your Honor, I

25    think that has been said more than once.

G1TTBUDP

1          Regarding the conspiracy continuing after Mr. Katz

2    left in 2009, I am sure Mr. Budovsky would be prepared to say

3    that the conspiracy continued with others.  And I think that

4    should be more than sufficient if your Honor wants to ask that

5    question.

6          THE COURT:  Thank you, counsel, and I appreciate

7    everyone is being careful here, and I appreciate your

8    assistance.

9          So Mr. Budovsky, give me an example of something you

10   did to help operate Liberty Reserve during the period 2005 to

11   2013.

12         THE DEFENDANT:  I hired some employees for the

13   customer support.  I had installed the network infrastructure.

14   I had to teach them how to use customer support, and worked

15   with -- I caused accounts, bank accounts, to be opened, and I

16   caused money to be moved from Costa Rica to other countries.

17         THE COURT:  And you heard the government just now

18   mention that Mr. Katz wasn't associated with Liberty Reserve

19   from some point in 2008 going forward, so let me focus on that

20   period of time.

21         During the period of time 2008 to 2013, you told me

22   you were engaged in the operation of Liberty Reserve.  Did I

23   understand that correctly?

24         THE DEFENDANT:  Yes.

25         THE COURT:  Okay.  And during that time, did you have

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   an agreement with others at Liberty Reserve to help violate the

2   law in the way you've described to me, that is, knowingly

3   facilitating the transfer of criminal proceeds from activities

4   like wire fraud?  Did you do that with others?

5          THE DEFENDANT:  Yes.

6          THE COURT:  And it was the goal of you and those

7   others during that latter period of time to also help conceal

8   the ownership and source of those illegal funds that were being

9   transmitted through Liberty Reserve.  Do I understand that

10  correctly?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Now how did you know that any of the

13  proceeds you have just described to me came from wire fraud,

14  including high yield investment programs?  How did you acquire

15  that knowledge?

16         THE DEFENDANT:  From visiting numerous forums where

17  such high yield investment programs were discussed, and it was

18  mentioned that Liberty Reserve was being used by some of them.

19         THE COURT:  And I think, if I remember correctly, you

20  also told me that, in part, you participated in the design of

21  features at Liberty Reserve that would facilitate that

22  concealment of illegal money transfers, am I right?

23         THE DEFENDANT:  Yes.

24         THE COURT:  Does the government have further questions

25  that it wishes me to put to the defendant?

G1TTBUDP

1          MR. TURNER:  Only as to to venue, your Honor.  I don't

2     know if you intend to address that separately.

3          THE COURT:  So you mentioned in your allocution to me,

4     Mr. Budovsky, that you were aware that some of these criminal

5     funds were coming in or out of the United States.  We're here

6     in the Southern District of New York, which again includes

7     Manhattan and the Bronx.  Were you aware of any of the money

8     transfers that involved illegally obtained funds moving in or

9     out of New York through the services of Liberty Reserve?

10          MS. NEWMAN:  If I may have a moment.

11          Thank you very much, your Honor.

12          (Pause)

13          MR. KALEY:  Your Honor, I think the answer to that is

14     we're not challenging the fact that it happened.  We have seen

15     documentation reflecting that money en route passed through an

16     intermittent bank in the Southern District, and we are also

17     aware one of the victims who had a Liberty Reserve account was

18     living in the Bronx.  And so that would establish the venue.

19          As to whether or not Mr. Budovsky was specifically

20     aware that this person lived in the Bronx, I don't believe that

21     he did, but we're not contesting that, and so I think the

22     allocution is more than sufficient.

23          THE COURT:  Did you do anything while you were in

24     Manhattan or the Bronx to assist the Liberty Reserve operation

25     either by helping design it or set it up or facilitate it in

G1TTBUDP

1    any way, Mr. Budovsky?

2              THE DEFENDANT:  While I was living in the U.S.?

3              THE COURT:  Yes.

4              THE DEFENDANT:  Yes.

5              THE COURT:  Give me an example of something you did

6    while you were in Manhattan or the Bronx to help establish

7    Liberty Reserve, just an example.

8              THE DEFENDANT:  I developed a protection scheme, which

9    I know that a lot of virtual currencies are susceptible for, so

10   I devised a way to protect the web site against that.  And I

11   had worked with Mark Marmilev, before he pled guilty as well,

12   and we were working together on technical aspects of the web

13   site.

14             THE COURT:  And that is while you were here in

15   Manhattan?

16             THE DEFENDANT:  Yes, while I was here in Manhattan.

17             THE COURT:  And you said you -- I didn't catch every

18   word you first said to me.  You had worked on designing what?

19             THE DEFENDANT:  It's a distributed denial-of-service

20   attack.  This is a part of a networking solution for any web

21   site that is online.

22             MR. TURNER:  Perhaps I could simplify things, your

23   Honor, by making a proffer.  The defendant, by operating the

24   reserve, caused the web site to be transmitted to the Southern

25   District of New York, among many other places.  And that alone

G1TTBUDP

1   is an act in furtherance of the conspiracy that is sufficient

2   for venue under Second Circuit case law.

3           MR. KALEY:  We're not challenging that, your Honor.

4           THE COURT:  The defendant isn't challenging venue.

5   And I can take a proffer from the government, that's fine, but

6   the defendant has added his own knowledge of activities in the

7   Southern District of New York that facilitated this crime.

8           Okay.  Does defense counsel agree there's a sufficient

9   factual predicate for a plea?

10          MR. KALEY:  Yes, your Honor.

11          THE COURT:  Mr. Kaley, do you know of any reason why I

12  should not accept this plea?

13          MR. KALEY:  No, your Honor.

14          THE COURT:  So Mr. Budovsky, since you acknowledge

15  that you are in fact guilty as charged in Count One of the

16  indictment, since I am satisfied that you know of your rights,

17  including your right to go to trial, and that you're aware of

18  the consequences of your plea, including the sentence that may

19  be imposed, and since I find you're voluntarily pleading

20  guilty, I accept this plea and enter a judgment of guilty on

21  Count One of the indictment.

22          At some point here the probation department is going

23  to want to interview you.  If you speak with them, make sure

24  anything you say is truthful and accurate.  They prepare a

25  report, and that report is important to me in deciding what

G1TTBUDP

1  sentence to impose.  You read it with care as well before

2  sentence.  If you see any errors in it, point them out to your

3  attorneys.  Will you do that?

4           THE DEFENDANT:  Yes, I will.

5           THE COURT:  You may be seated.

6           Mr. Kaley, will you cooperate with the probation

7  department so that the defendant can be interviewed within the

8  next two weeks?

9           MR. KALEY:  Certainly, your Honor.

10          THE COURT:  Thank you.

11          Sentence is set for --

12          MR. KALEY:  I was going to ask your Honor for a day in

13  June.  I think because of the fact that there are many records

14  relating to Mr. Budovsky overseas, it may take some time to get

15  them.  Plus, we want an opportunity to do our own sentencing

16  submission.  So we were going to ask your Honor for a date in

17  early June.

18          THE COURT:  I'm going to set it in early May, three

19  months out, which is customary in this district for

20  incarcerated defendants and other defendants.

21          Sentence is set for --

22          DEPUTY CLERK:  Friday, May 6 at 3:00 p.m.

23          Any defense submissions regarding sentence shall be

24  due April 22nd, the government's response due April 29.

25          THE COURT:  Mr. Turner, is there anything else that we

G1TTBUDP

1   need to do from the government's point of view?

2          MR. TURNER:  No, your Honor.  Thank you.

3          THE COURT:  Mr. Kaley, is there anything else that we

4   need to do from the defendant's point of view?

5          MR. KALEY:  No, your Honor.

6          THE COURT:  Thank you.

7                          o0o

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25