USA v. Arthur Budovsky  13 CR 368 (DLC)

# Privileged Communication

Honorable Judge Denise L. Cote
U.S. District Court, 2nd Circuit
500 Pearl Street, New York NY 10007

Dear Your Honor,

USDC SDNY
ELECTRONICALLY FILED
DOC #:
DATE FILED: 4/6/2016

RECEIVED
APR 07 2016
CHAMBERS OF
DENISE COTE

    I am afraid that I have very few options left but to send this urgent communication directly to Your Honor. There are a lot of unexplained events and inconsistencies that have prompted me to speak my mind with hope to be heard at least this once. The issues that I would like to bring up in this letter are neither easy, nor simple for me to discuss. But I believe that in the best interest of justice, as well as, to make all things clear, this communication is necessary and perhaps long overdue. I would also like to apologize if the format of this letter is not the one Your Honor has become accustomed to. I will do my best to keep things brief and clear.

    From the very beginning, this case has raised more questions for me than answers. As this case progressed, evidence and facts were misinterpreted, misrepresented, omitted or in many cases, made up. Most importantly, I would like to make one thing very clear – this communication is not an attempt to contest any information provided to Your Honor during my allocution statement. I am, however, confused and filled with fear that I have not been in power to present any materials, hence clarifying many misconceptions brought up by the prosecution in this case.

    Your Honor has indicated before that I have a "speaking indictment". But what if the indictment speaks of untruths and disinformation that not only goes against logic and common sense, but against the very same evidence that was produced in discovery for this case. My attorneys have agreed with the evidence that I have discovered and presented to them. However, they have expressed concerns that led me to believe that they would not pursue this matter as vigorously as they could have. Nor, would they speak publicly of any bias and untruths told by the prosecutors, for the fear of not being able to change the outcome or be able to present credible, clear evidence to rebut many ill-defined allegations. I have asked them: if all this is so partial, unfair, and outright bizarre (all in their own words) why not go to the media and express your concerns publicly to be heard. Their reply was: "Are you crazy? They will "kill" us". I am sure they did not mean to be physically harmed, but it does express a valid concern that sometimes has helped me understand their behavior and reasoning for certain decisions they have made. I have pointed out a lot of false information presented in the indictment and other documents

produced by plaintiffs, that contradicts the statements made by plaintiffs and their own cooperating witnesses. I have also showed them, that at least in a few cases, the main cooperator was not only lying in proffer hearings but has elected to hide from the cooperation process very serious facts, such as his ties to the Ukrainian mob and bribing Ukrainian government officials and law enforcement agencies to receive his green card in Ukraine, while making up unbelievable claims against me. The reply of my attorneys was - "The case is coming from Washington, and my prosecutors probably do not know or care much about it", and as for untruths, in the words of my own attorneys - "They have to say all those lies to make them fit in their narrative and press releases that they have made before". They have also led me to believe that prosecutors and Your Honor in this case are working together and that no matter what our side does, regardless of the degree of guilt, the outcome of this case (as well as of my life) has long been spoken for. I was led to believe that prosecutors can act and produce such misleading information because they will always have Your Honor "on board" with them.

I felt hopeless for a long time, until one day, almost half a year ago, another inmate moved into the cell I was occupying, who happened to have Your Honor presiding in his case as well. His name is Edwin Guzman. He told me that at one time, when he had issues with his attorneys Your Honor handled that incident swiftly and fairly. And I have received a breath of fresh air, a new hope that perhaps I will have a chance to at least be heard, and that Your Honor will not always "side with the prosecutors" automatically, as I was made to believe. I fully understand, that had I been the Judge in this case I would have many reasons to be anxious about and suspect that something is strange. Especially when Your Honor has four defendants pleading guilty, regardless of their reasons, the inability of defense to process voluminous discovery in time, and many other aspects that would normally speak for themselves in most cases. I would like to clarify, however, a few quick things: at no time, was it my or my attorneys' intent (at least to my knowledge) to delay unnecessarily the trial process in order to try to manipulate the process itself (as Your Honor has probably believed, rightfully so, under the circumstances). The voluminous discovery could have been processed in the time asked for by my attorneys (around May 2016), and was definitely processed in its entirety by the prosecutors years ago. If I, myself, would have an additional couple of months, I would have been able to go through all of it. (I am now at about 85% as of this writing). Since the degree of my involvement in this crime is not as extensive as prosecutors allege, and me being involved from the very beginning as a technical person, who was not involved in day-to-day operations, would not allow me to pinpoint precisely which information was contained where. Therefore, I had to do it at "page by page" speed.

I understand, that a very simple solution can be proposed – why not go for trial and clear all

those inconsistencies. I would be more than happy to explain, briefly, the happenings on the defense counsels' side, at the time of preparation for trial, that would address Your Honors' concern as to what went on behind the scenes. Up to four to six weeks before the trial date, my attorneys exhibited all signs of hard work on the case, even though, I had not seen or heard from some of the people on my team at all. I did notice however, in numerous conversation that we had, that whatever I produced for my attorneys (the evidence that I find that is crucial for the trial) was not being looked at or paid attention to. Numerous times, in discussions, they have said - "But this was not done, and that was not done". I replied that it was done and I provided them with all the evidence on DVDs. Their reply was "Oh, we did not get to it". Since they had a difficult time absorbing the entire evidence for the case at once, I was hoping that they would pay attention, at least to what was being provided to them "ready to serve" by me. Not once have I heard that they have actually seen something from what I have produced. I have started to have doubts that they had any intent to go to trial at all. About the middle of December they mentioned that they met with the prosecution team. After that meeting things changed drastically. They said that the prosecutors hinted at fifteen years and that I must take it. It was never disclosed to me that it was an offer of some sort, or that it was not factually fifteen years but zero to fifteen years, or that it had an expiration date. I have told them that fifteen years is not possible because the maximums for my charges would not add up to fifteen. They have said, that in this particular case prosecutors can do whatever they want and they will dismiss the current charges and re indict with something that will add up to fifteen years. That meeting ended up in a personal attack against me, lasting almost four hours, as to why, no matter what, I *have* to agree. I was suspicious because nothing new had come up in this case and if something did change - they were not telling me. I got scared, and quietly had asked for a consultation with another, separate attorney. He has explained to me, that they can not just dismiss the charges because of extradition, so I can be charged only with what I was extradited for. He has said if it was an offer, I had to see it on paper with all conditions spelled out. He also asked me if I knew my guidelines, and to his surprise - no one discussed anything of that nature with me. Once he has explained to me what an offer of zero to fifteen actually means, and explained additional options such as the PSI, and all facts that can be presented in court in my defense still, I agreed to that "hint" from prosecutors. I had notified my attorneys that I will accept the zero to fifteen years plea agreement. In turn, my attorneys said that after speaking with the supervisors of my prosecutors, they were told that an offer of that nature is not possible and that the prosecutors did not know what he was talking about and was not authorized by anyone to offer that. Even though in court, the prosecutors have acknowledged that they have made an offer at that time. Instead my attorneys have said that they were offered zero to twenty years, to match the largest charge and that they will not go to trial, because they will lose 100% by not being ready and prepared, and I, beyond reasonable

doubt, will get the maximum of thirty years, because everyone "hates" me. I figured out from previous conversations between my attorneys and me, that in all likelihood they were not prepared, nor probably even going to get prepared, for the trial. Thus, when I finally heard "we start trial in three days, and we _will_ lose because we are not ready and not prepared! You know how the judge is and how everything else went in this case" - I said that I will do whatever they want. Hence, the allocution hearing on Friday, just days before the trial.

I understand, but at the same time feel awful, discovering the amount of resources that went into this investigation and the resulting court case. Especially, the amount of money that was spent for my discovery production alone, once I found out during one of the last meetings with my attorneys, is mind boggling. I honestly wish I could have prevented many of those expenses by having been notified of what was going on at that time. But it always felt that I was receiving the least amount of information necessary to render any coherent decision. I also wish, that at least once, anyone from the prosecutors involved in this case would have spoken to me or asked a single question. Extradition, I am convinced, was not even necessary as I would have come on my own, if simply asked to do so. Just as I have indicated during my arrest, which was suspicious enough to start questioning the legality of due process applied from the very beginning, I was always open to talk and provide any information requested.

For instance, during my arrest the two U.S. individuals that appeared and later conducted a short questioning and a search of all my luggage and belongings, while the Spanish Police watched, asked me numerous times if I would be willing to speak with the authorities. Every time I replied that I would be more than happy to answer any questions as long as they would bring _any_ legal representative of their choice to be a witness to this conversation. In reply, they noted that I was not serious and went silent for a few moments before bringing up the same question again. Before that, the police unit that met me on the tarmac and impersonated Interpol (while acting suspiciously, looking around as if being afraid to be spotted and covering their mouths while they were talking to me), according to my attorneys in Spain, were not supposed to detain me. There was no official order in The Interpol Central Office (where such request or alert would land) and, as my attorney later confirmed with Interpol itself, it did not have any alerts nor was it notified of any action to be taken against me. This document is also available. As my attorney in Spain has indicated, this invented, unofficial way of detaining people in Spain normally corresponds to an unofficial agreement between authorities from both sides, and is happening in cases of political or economical nature. He has spoken at length about this during his interview in Spain by the press in 2014, when I was "extracted" from the Spanish prison. Even that

event has caused me more distress in my life than the initial arrest. Where after almost eighteen months of filing papers and going to courts to question and oppose extradition, I was released from Spanish prison and told that I was free, with one condition - for my safety I was to be escorted from Spanish prison by police (which my attorney in Spain claims had to be at the very least bribed, to act in this manner). Police also assured me that I was free and just "needed" to go with them. After which time, they handcuffed me again, threw me in the back of the van that transports prisoners and started driving for about one and a half hours. At this time, I actually thought I was being taken to Guantanamo. No explanations were provided, lies again, no paperwork provided for any of their actions (to this day). In my head, I had said "goodbye" to my friends and family as I was not sure where or why I was being taken, or if I would ever see them again. My mother was calling my attorney in Spain who could not answer where I was and why I was not in prison. Having recently been through breast cancer surgery, it added more devastating stress to her health, both physically and emotionally.

I am a grown man who has been through a lot in my life and am not easily scared. I do not complain quickly and always try to give it the best shot at understanding any situation before taking any action. But all those incidents, and more, only reenforced my suspicion of a possible failure of proper due process in this matter and, that perhaps there were other powers or "parties" involved in this matter who are above certain procedural legal nuances, as my Spanish attorney warned me about earlier.

Your Honor, I am not looking for pity or "oh, poor guy" with this statement. Neither am I trying to prove my complete innocence in this offense. I am only seeking to be heard and understood. Without this communication, I feel that the prosecutors, by abusing the complexity and the magnitude of this case, are trying to shift the focus away from the real issue behind this case and the people who were involved more extensively and in a greater capacity than me from the beginning. By their own admission, in the evidence that would be presented during sentencing, they acknowledge that none of the progress the company has made would have been possible without *their* efforts. Unfortunately, the prosecutors have to exaggerate and quite often ignore the facts and evidence, to keep me in the main focus so that their narrative is whole. I have been offered a few more explanations as to reasons behind such a vicious campaign to discredit me and to portray me as "evil" in the eyes of the public: I am being punished for giving up my citizenship, the company has crossed the path of another industry, and its easier to prosecute and convict me as a main person because of the renunciation. Others jumped to cooperate and the prosecutors would not go against cooperators because their testimony is the gist of their case, as well as many other conspiracy theories.

As I have clarified before, I am not seeking to proclaim innocence or dispute information provided during my allocution. I am not looking to "make waves". I truly and sincerely hope that Your Honor will find it in your heart and in your busy schedule to go over the evidence presented for my sentencing so that at least Your Honor will have a complete and clear picture as to what exactly went on, how and why, as well as, the involvement of every co-defendant listed on the indictment.

One quick note, having been in the company, in one capacity or another, from the very beginning, I would be best suited to know what actually went on and how. Even though I started as a network technician, I did involuntarily end up as someone more in charge than I expected, during the last three years of the company's existence. And it makes me sad that I simply do not know how else to refute many misstatements issued by the prosecutors in this case, other than by simply speaking the truth. I did not have to cooperate to speak the truth, as my cooperating witnesses have (hence their eagerness to cooperate). I had no reason to hide (hence my extensive travels). In all fairness, if I had to "run" I would run to Ukraine where I would feel right at home, within my language and culture. If I had to run, I would not apply for a visa to visit the U.S. again after I renounced my citizenship (as I had). If I had to run, I would stay in Costa Rica and not leave, knowing that I can not be extradited from that country. Prosecutors claim that once I discovered that the company was under investigation I renounced the citizenship, whereas according to their own information, the investigation of Liberty Reserve started in fall of 2011 and I renounced my citizenship half a year *before*, on the advice of the two legal counsels in Costa Rica.

And finally, I would like to address the issues of anti-fraud procedures. I think that an application to FinCEN or introducing even more stringent Anti-Money Laundering controls would have resulted in the same scenario as far as criminals being attracted to any payment system. Most importantly, I am *not* arguing against or undermining the importance of such registration or controls in any way, as we can see even under the guidance of Central Americas' top law firms the company could not escape the abuse of malicious users. This calls for a different kind of regulation and oversight. This tragic experience can be turned into something positive, as we can clearly see that the guidelines for digital currencies, introduced, ironically, after I was arrested, are not sufficient enough to deter such activity, as they address compliance only and not fraud or digital payment system abuse. As with Western Union, by far the most popular method for laundering proceeds of cyber criminals according to the leading cyber security experts, online crimes did not diminish. For instance, all identity theft cases that I have learned about from the produced discovery would not have triggered any alarms or any suspicious activity because the amounts being transferred and the frequencies were miniscule for

vast majority of them. On the other hand how one can verify a user with a stolen identity, is if users such as those will pass any verification and will continue with their business. Nowadays, as the industry is still new, there are no clear *fraud* deterrent procedures, just compliance procedures. I genuinely believe it is a must to have fraud deterrence compliance procedures and regulations, at least for online businesses. There are many examples I can provide as to how inefficient current guidelines and regulations are against fighting online fraud. Even the complaints submitted to government websites that mention Liberty Reserve were not shared with Liberty Reserve so that further action could have been taken. Having said all that, and knowing now what I have learned from discovery documents, there is a way to keep customers more educated, there is a way to have coherent, clear anti-fraud compliance procedures and guidelines that all online businesses should adhere to, as well as many other technical solutions that can be implemented to provide a safer online experience. I believe, that the knowledge I have acquired from this case, combined with my unique experience and expertise would allow me to become part of the solution, rather than part of the problem, of this global concern. I could not have even imagined to what degree malicious users have infiltrated the company, but not because of lack of trying – mostly because I had to invent my own anti-fraud measures that sometimes even backfired. Of course all this is a part of the learning experience that should not be dismissed or overlooked. However, because any anti fraud measures only come out as a result of discovering new frauds, and due to the lack of regulatory and informational anti fraud resources available now the solutions were slow to be implemented. I would like to commit myself to the movement of making internet experience safer *and* to show the authorities, governments and the world, that a secure business environment is possible and attainable, with the contribution of my unique experience, that so very few people around the world possess. Given the opportunity, I would like to do everything possible to come up with ways to protect communities. I spent over 1,000 days in prison to figure out what to do with my life in the future and to better understand how it can be done. I believe I have a viable, working solution. Being a man of my word, Your Honor would not have to wait long to see my work in progress. My actions have always spoken louder than words, as anyone who knows me can attest to.

    I sincerely appreciate the time Your Honor will take to read this communication.


Respectfully,

*[signature]*

Arthur Budovsky

03.28.16

Arthur
71571057
150 Park Row
MCC
New York, NY 10007

Honorable Judge Denise L. Cote
U.S. District Court
2nd Circuit
500 Pearl Street
New York, NY 10007

Privileged Communication



CHAMBERS OF
DENISE COTE
APR 01 2016
RECEIVED