UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,                    :

    v.                                                      :                    13 CR. 368 (DLC)

ARTHUR BUDOVSKY,                             :

           Defendant.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


## SENTENCING MEMORANDUM SUBMITTED
## ON BEHALF OF ARTHUR BUDOVSKY

John F. Kaley, Esq.
Doar Rieck Kaley & Mack
217 Broadway, Suite 707
New York, NY 10007
(212) 619-3730

Donna Newman, Esq.
20 Vesey Street, Suite 400
New York, New York 10007
(212) 229-1516

Jeffrey Pittell, Esq.
Maher & Pittell, LLP
4299 East Shore Road
Great Neck, New York 11023
(516) 829-2299

*Attorneys for Arthur Budovsky*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE
BELOW 180 MONTHS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   A. Application Of Law To The Instant Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

   B. A Non-Guidelines Sentence Less Than 180 Months Is Sufficient,
      But Not Greater Than Necessary, To Comply With The Purposes
      Set Forth In Section 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

         1.    The Government had agreed that a sentence no
              greater than fifteen years was appropriate in this case . . . . . . . . . . . . . . 13

         2.    A non-Guidelines sentence below 180 months is sufficient
              to reflect the seriousness of the offense, promote respect
              for the law and provide just punishment for the offense . . . . . . . . . . . . 16

         3.    A non-Guidelines sentence below 180 months would not
              encourage criminal conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

         4.    A sentence less than 180 months is sufficient to protect the public
              from future wrongdoing by Arthur Budovsky . . . . . . . . . . . . . . . . . . . . . 19

   C. The Section 3553(a) Factors Support A Non-Guidelines Sentence
      Below 180 Months . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         1.    The nature and circumstances of the offense . . . . . . . . . . . . . . . . . . . . . . 21

         2.    The history and characteristics of Arthur Budovsky . . . . . . . . . . . . . . . . 40

         3.    The kinds of sentences available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

         4.    The amount of money laundered drives up the offense
              level disproportionately and should not be followed . . . . . . . . . . . . . . . 41

         5.    Imposing a non-Guidelines and non-Guidelines below 180
              months will not result in unwarranted sentencing disparities . . . . . . . . 45

         6.    No fine should be imposed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

## TABLE OF AUTHORITIES

<u>Cases</u>

*Cunningham v. California,*
    549 U.S. 270 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . fn. 8

*Gall v. United States,*
    552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, fn. 8, 11, 16, 40

*Kimbrough v. United States,*
    552 U.S. 85, (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8, fn.8, 11, 41

*Nelson v. United States,*
    555 U.S. 350 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Rita v. United States,*
    551 U.S. 338 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, fn. 8

*Simon v. United States,*
    361 F. Supp. 2d 35 (E.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Spears v. United States,*
    555 U.S. 261 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, fn. 8, 41

*United States v. Adelson,*
    441 F. Supp. 2d 506 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 43

*United States v. Booker,*
    543 U.S. 220 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, fn.6, 7, fn. 40, 42

*United States v. Cavera,*
    550 F.3d 180 (2d Cir. 2009)(*en banc*),
    *cert. denied*, 129 S. Ct. 2735 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Cole,*
    662 F.Supp.2d 632 (N.D.Ohio 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*United States v. Crosby,*
    397 F.3d 103 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . fn. 40

*United States v. Emmenegger,*
    329 F. Supp. 2d 416 (S.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Faibish,*
12 Cr. 265 (E.D.N.Y. March 10, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Gardellini,*
545 F.3d 1089 (D.C. Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Gupta,*
904 F. Supp.3d 349 (S.D.N.Y. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*United States v. Hoffmann,*
2006 WL 3390736, at *6 (D.Neb. Nov. 22, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Kloda,*
133 F. Supp. 2d 345 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Litvak,*
3"14 Cr. 19 (D.Conn. July 23, 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Nellum,*
2005 WL 300073, at *3 (N.D. Ind. Feb. 3, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Parris,*
573 F. Supp. 2d 744 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 42

*United States v. Ruiz,*
2006 WL 1311982 at *4 (S.D.N.Y. May 10, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Seval,*
2008 WL 4376826 (2d Cir. Sept. 25, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Statutes

18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. § 3553(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

18 U.S.C. § 3553(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

18 U.S.C § 3582 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Sixth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . fn. 8

U.S.S.G. § 2A1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A1.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A2.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2A3.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

U.S.S.G. § 2B3.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B3.1(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B3.1(b)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B3.2(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2B3.2(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G § 2L1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2M5(2)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2M5.3(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § 2N1.1(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

U.S.S.G. § S1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Miscellaneous

Robert J. Anello and Richard F. Albert, "Rise of ABA Task Force's
    'Shadow Sentencing Guidelines,'"
    N.Y.L.J. April 5, 2016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds after Booker*,
    20 Fed. Sent. R. 167, 169, 2008 WL 2201039 at *4 (Feb. 2008) . . . . . . . . . . . . . . . . . 42

Immanuel Kant, *The Science of Right*
    (W. Hastie trans., 1790) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gary Kleck, et al., *The Missing Link in General Deterrence Theory*,
    43 Criminology 623 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Kate Stith & Jose A. Cabranes,
    *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998) . . . . . . . . . . . 41

Derek R. Vollrath, *Losing the Loss Calculation:*

*Toward a More Just Sentence Regime in White-Collar Criminal Case,*
59 Duke L.J. 1001, 1025 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity:*
*An Analysis of Recent Research* (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, fn.17

David Weisburd et al., *Specific Deterrence in a Sample of Offenders*
*Convicted of White Collar Crimes,*
33 Criminology 587 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17


Online Citations

Frank O. Bowman, III, "Comment on Proposed Amendments to Economic Crime Guideline,
§ 2B.1.1" (Feb. 19, 2015) citing Remarks of Judge Patti B. Saris, Jan. 9, 2015,
http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-
meetings/20150109/Remarks.pdf) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Costs of Imprisonment Far Exceed Supervision Costs,*
(sept. 5, 2012) < http://www.uscourts.gov/News/NewsView/09-05-12/
Costs_of_Imprisonment_Far_ Exceed_Supervision_Costs.aspx> . . . . . . . . . . . . . . fn.18

*Recidivism and the First Offender* (May 2004)
<http://ussc.gov/publicat/Recidivism_General.pdf > . . . . . . . . . . . . . . . . . . . . . . . . 19

*Supervision Costs Significantly less than incarceration in Federal system,*
<http://news.uscourts.gov/supervision-costs-significantly-less-than-
incarceration-in-federal-system> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . fn. 18

U.S. Sentencing Commission, *2011 Sourcebook of Federal Sentencing Statistics,*
<http://www.ussc.gov/research_and/statistics/annual_reports_sourcebook>. . . . . . . . . 42

U.S. Sentencing Commission, *2014 Sourcebook of Federal Sentencing Statistics Tables2,*
(Table 13) <http://www.ussc. gov/sites/default/files/pdf/research-and-
publications/annualreports-and-sourcebooks/ 2014/Table13.pdf>. . . . . . . . . . . . . . 45, 50

U.S. Sentencing Commission, *2014 Sourcebook of Federal Sentencing Statistics Tables2,*
(Table 14) <http://www.ussc. gov/sites/default/files/pdf/research-and-
publications/annualreports-and-sourcebooks/ 2014/Table14.pdf>. . . . . . . . . . . . . . 45, 50

U.S. Sentencing Commission, *2014 Sourcebook of Federal Sentencing Statistics Tables2,*
(Table 15) <http://www.ussc. gov/sites/default/files/pdf/research-and-
publications/annualreports-and-sourcebooks/ 2014/Table15.pdf>. . . . . . . . . . . . . . fn. 45

U.S. Sentencing Commission, *A Comparison of the Federal Sentencing Guidelines*

*Criminal History Category and the U.S. Parole Commission Salient Factor Score*
(Jan. 4 2005) <http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf> . . . . . 19

U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An*
*Assessment of How Well the Federal Criminal Justice System is*
*Achieving the Goals of Sentencing Reform* (2004) . . . . . . . . . . . . . . . . . . . . . . fn. 9, fn.10

U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History*
*Computation of the Federal Sentencing Guidelines* (May 2004)
<http://www.1b5.uscourts.gov/Archived URLs/Files/08-10643%281%29.pdf> . . . 19, 20

U.S. Sentencing Commission, *Supplementary Report on the Initial*
*Sentencing Guidelines and Policy Statements* (1987),
<http://www.fd.org/pdf_lib/Supplementary%20Report.pdf>. . . . . . . . . . . . . . . . . 9, fn.9

## PRELIMINARY STATEMENT

The defendant Arthur Budovsky respectfully submits this memorandum in support of his request for a non-Guidelines sentence less than 180 months. Considering Arthur Budovsky's age, his life history, and the reasons why we punish people who commit a crime, such a sentence would be sufficient, but not greater than necessary, to achieve the purposes set forth in 18 United States Code § 3553(a) to be considered by the Court in imposing sentence. This is particularly so here, given Mr. Budovsky's already three years of incarceration and his likely removal from the United States after completion of whatever sentence the Court imposes.

## I. BACKGROUND

Arthur Budovsky is 42 years old. He was arrested in connection with this case in Spain on or about May 24, 2013. He remained in a Spanish prison until he was extradited to the United States on or about October 10, 2014. He has been held without bail at the MCC since then. As such, he has been in custody on this case for just short of three years. Mr. Budovsky was and had been a "good neighbor" in his communities, performing simple acts of kindness and charity as reflected in the many letters submitted contained in the Sentencing Exhibit Volume also being filed.

Arthur Budovsky is the son of Irina Belanchuk and the step-son of Anatoly Belanchuk. Arthur was abandoned by his biological father at a young age, reconnected with his biological father when Arthur was in his thirties, forgave his father for abandoning him and has not had much contact with his biological father for many years. As a child and young adult, Arthur suffered from anxiety and depression and still does. There were times as a young man that he was so depressed and fearful of the outside world that for months he was unable to leave the home, and contemplated suicide. His mother and step-father and others speak of these matters

in their letters to the Court, copies of which are contained in separate Sentencing Exhibits Volume also being filed at Exhibit "1."[1]  The originals of these letters and others from the people in the Ukraine have been translated from Russian, the language in which they were written, into English by Yana Agoureev, a Court Certified interpreter.

Like most offenders who come before the Court, Arthur Budovsky is a complex individual, with no single narrative. He cannot simply be defined by the offense of conviction. His life, like each person's life, contains contradictions and a compilation of facets, dimensions and stories. If we simply reduce Arthur Budovsky to the single story of his offense, we take away all of his humanity. That is not the aim of sentencing. Indeed, the aim of sentencing is to view the entire person. The goal of sentencing is to find the right balance among what at times may be conflicting narratives.

As noted in the many letters submitted, Arthur Budovsky has many good qualities. He is described as caring, kind, generous, and charitable. The poignant letter from the young man in the Ukraine who needed surgery, which Arthur Budovsky paid for, depicts a side of Arthur Budovsky far different than the narrative of his offense. The young man's mother's letter is equally moving, describing how Arthur Budovsky paid the medical expenses for her son, which enabled him to have the surgery, but even more telling were their descriptions of Arthur's presence in the hospital at the hour of their greatest need. In his letter, the young man writes of Arthur:

> One of the high points of my relationship with him came about after, in the beginning of 2013, I had had a complicated major

---

[1] All of the Exhibits identified herein are contained in a separate Sentencing Exhibit Volume also being filed.

> surgery. I opened my eyes, waking up from anesthesia, and saw
> Arthur, together with my mom, sitting by my bedside and holding
> my hand. The first thing I saw was Arthur comforting my mom
> and saying that it would be alright.
>
> Only upon my release form the hospital, already back home, did I
> find out from my mom that Arthur had helped us purchase the
> medications and completely footed the medical bill, as my mom
> had problems finding a job and could not afford to cover all the
> expenses.
>
> I am ever so grateful to Arthur for the fact that, in him, I found my
> best friend . . . .

The young boy's mother, who raised her son on her own, speaks similarly of Arthur's friendship,

generosity and concern:

> Arthur came forward to help me at a very dire moment for me,
> when I had a hard time getting work, while my son needed urgently
> to undergo a rather expensive surgical procedure. Without
> hesitation, Arthur picked the right hospital for it and took care of
> all the issues. My son and I are forever grateful to him for that.
> Even more so, I recall Arthur spending time in the hospital with us,
> holding my son's hand as he was coming back to his senses after
> the anesthesia.

She goes on to note how Arthur Budovsky tried to set up a charitable fund in Kiev for low-

income families who needed help paying for expensive medical services for their children. She

notes further that:

> Arthur Budovsky was always solving issues that his friends and
> family were facing, as if they were his own. He is someone that
> would come to someone else's aid at any time.

The letter from the young man and his mother are included in the Exhibit Volume as part of

Exhibit "1." Letters from the Ukraine were translated from Russian into English by Yana

Agoureev, a certified reporter.

Other letters voice similar sentiments and are a testament to the good in Arthur Budovsky. Some writers describe events of significance; others describe the simple everyday kindness of helping a neighbor repair household appliances or holding a door for an elderly person. Such simple everyday acts of kindness provide a window into the good of a person. Even on the occasion when Arthur contemplated suicide as a young man, he first brought food for his grandmother so that she would not go hungry, as his parents were away at that time.

Arthur Budovsky's kindnesses extended to his neighbors in Brooklyn, his friends in the Ukraine and the community in Costa Rica where Liberty Reserve operated. The letters also note his generosity to the poor, homeless and orphaned children in Costa Rica. Exhibit "1." Liberty Reserve also was known in Costa Rica for its generosity and donations to many charitable causes. Exhibit "1." Other documents regarding some of Liberty Reserve's charitable activities are produced at Exhibit "46.

Finally, Arthur Budovsky's generous nature has made things better for his fellow inmates at the MCC, where he has been a suicide watch and mental health inmate companion. The "Inmate Companion Program" in which Arthur participates is considered by the institution to be a valuable program. The letter from the Director of the Bureau of Prisons, Exhibit "2" notes that by participating as an inmate companion Arthur is "contributing to your community by providing support and hope to your peers." The Director further notes his "great respect and appreciation" for the work done by companions to "prevent suicide and support your peers through their darkest moments. Your work . . . truly has the power to save lives." Inmates themselves also have taken the unusual step of writing a letter to the Court regarding Arthur's efforts to help inmates through their dark times. Exhibit "2."

In sentencing Arthur Budovsky, we ask the Court also to consider the good in Arthur and not focus solely on his offense conduct. There is far more than simply the narrative of an offense to Arthur Budovsky and in fashioning an appropriate sentence, Arthur's humanity should not be overlooked or rendered insignificant.

Complicating Arthur Budovsky's present circumstances is the further fact that upon completion of his sentence, he will be removed from the United States, possibly to Costa Rica, where he is a citizen but has no family. He truly will be a man without a country, or at least not a country he can go back to with the support of his family to assist him in reconstructing his life.

Additionally, Arthur Budovsky's financial condition and prospective financial outlook are poor. He has forfeited everything and anything which he has or had to the Government. Whenever he is released, he will start life anew, without assets, without a home, possibly without a country and without the nearby support of family.

Finally, we note that Arthur Budovsky's mother presently suffers from a serious illness. She has been diagnosed with cancer, has had surgery and is receiving treatment. It is possible, depending on the length of the sentence imposed, that they may never again see each other on the outside of a prison facility.

## II. THE COURT SHOULD IMPOSE A NON-GUIDELINES SENTENCE BELOW 180 MONTHS.

### A. Application of Law To The Instant Case

The parties' plea agreement and the Presentencing Report ("PSR") calculated an advisory Guidelines sentencing offense level 41 with an advisory sentencing range of 360 months to life. As stipulated in the parties' plea agreement, this offense level was based on a base offense level

of 8, with an enhancement based on the amount of money laundered, and with further enhancements, along with a 3-level reduction for acceptance of responsibility, resulting in an advisory sentencing range of 360 months to life, capped by a statutory maximum of 240 months, a term that is far greater than necessary for this Criminal History Category II defendant. This memorandum addresses why the Court should impose a non-Guidelines sentence below the statutory maximum, which in our respectful view, is appropriate considering the factors set forth in 18 U.S.C. § 3553(a).

The Court should impose a non-Guidelines sentence below 180 months because: (1) such a lesser sentence for this offender is sufficient, but not greater than necessary, to comply with the purposes set forth in Section 3553(a)(2)[2]; (2) the factors that the Court must consider, which are set forth in Section 3553(a), support the non-Guidelines sentence sought herein; and (3) the stipulated Guidelines are the product of a very high starting point which otherwise fails to give appropriate consideration to the Section 3553(a) factors.

We start with the obvious. The Sentencing Guidelines no longer are mandatory[3] and this Court should consider the applicable Guidelines as only one factor in determining Arthur Budovsky's sentence. *Kimbrough v. United States*, 552 U.S. 85, 101, 128 S.Ct. 558 (2007). The Supreme Court's decision in *Booker/Fanfan* requires sentencing courts to treat the Guidelines as but one of a number of sentencing factors set forth in 18 U.S.C. § 3553(a); *Booker*, 543 U.S. at

---

[2] The corollary to this argument is that the calculated range is far greater than necessary to promote the goals of sentencing and is out of balance with the purposes of sentencing set forth in the statute.

[3] The sentence this Court imposes on Arthur Budovsky is subject to appellate review only for "unreasonableness". *United States v. Booker*, 543 U.S. 220, 261, 125 S.Ct. 738 (2005).

245, 125 S.Ct. at 757.  The Guidelines are entitled to weight no greater than that afforded to the

other factors listed in § 3553(a).  *Kimbrough*, 552 U.S. at 114, 128 S. Ct. at 577, (Scalia, J.

concurring)(there can be no "thumb on the scales" in favor of Guidelines sentences).

There is likewise no presumption as to the reasonableness of the Guidelines sentencing

ranges.  *See Gall v. United States*, 552 U.S. 38, 128 S. Ct. 586, 596-97 (2007).  *See also Nelson

v. United States*, 555 U.S. 350, 351, 129 S.Ct. 890 (2009).  As such, in each case a court must

make an "individualized assessment" of the appropriate sentence "based on the facts presented"

and the factors detailed in § 3553(a).  *Kimbrough*, 552 U.S. at 114, 128 S.Ct. at 577.

In sum, in every case, a sentencing court must now consider all of the § 3553(a) factors,

not just the Guidelines, in determining a sentence that is sufficient but not greater than necessary

to meet the goals of sentencing and a judge is not prohibited from including in that consideration

the judge's own sense of what is a fair and just sentence under all circumstances.  Further, as one

district judge has noted, "the Guidelines may be tempered by compassion."  *United States v.

Kloda*, 133 F. Supp. 2d 345, 349 (S.D.N.Y. 2001) (Hellerstein, J.).

It is well settled that Judges "may vary [from the Guidelines ranges] based solely on

policy considerations, including, disagreements with the Guidelines," *Kimbrough*, 552 U.S. at

101-02, 128 S. Ct. at 570 (internal quotations marks omitted).  *Spears v. United States*, 555 U.S.

261, 264-67, 129 S.Ct. 840, 843-44 (2009).  Whether a judge may draw any useful advice from a

guideline depends first on whether the Sentencing Commission in promulgating or amending it,

acted in "the exercise of its characteristic institutional role."  *Kimbrough*, 552 U.S. at 109-11,

128 S.Ct. at 575.  As described in *Rita v. United States* 551 U.S. 338, 127 S.Ct. 2456 (2007), the

exercise of this role has two basic components: (1) reliance on empirical evidence of pre-

guidelines sentencing practice, and (2) review and revision in light of judicial decisions,

sentencing data, and comments from participants and experts in the field. *Rita*, 551 U.S. at 349-

51, 127 S.Ct. 2464-65. Thus, where, as here, the applicable guidelines, 2 S1.1 and 2B1.1, were

not developed based on "empirical data and national experience," it is not an abuse of discretion

to conclude that it "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes,

even in a mine-run case." *See Kimbrough*, 552 U.S. at 109-11, 128 S. Ct. at 575. *See also*

*Spears*, 555 U.S. at 264-67, 129 S. Ct. at 843-44 (2009).[4] Although it does not appear that

Guidelines 2 S1.1 and 2 B1.1 are based on any congressional directive, even were they to have

been so derived, courts are free to disagree with any of the guidelines, including guidelines that

do emanate from congressional actions. *See United States v. Cavera*, 550 F.3d 180 (2d Cir.

---

[4] The court's ability to impose a non-guidelines sentence based solely on a policy disagreement with a guideline itself applies to all guidelines not just the crack guidelines at issue in *Kimbrough* and *Spears*. *See Cunningham v. California*, 549 U.S. 270 (2007), where the Court recognized that the ability of judges to sentence outside the guidelines range based solely on general policy objectives, without any fact finding anchor, is necessary to avoid a Sixth Amendment violation. *Id.* at 279-81. In *Rita,* the Court held that because guidelines may not be presumed reasonable at sentencing, sentencing judges are permitted to find that the guidelines sentence itself fails properly to reflect § 3553(a) considerations, that the guidelines reflect an unsound judgment, or that the guidelines do not generally treat certain defendant characteristics in the proper way. 551 U.S. at 350-51, 127 S. Ct. 2465, 2468. In *Kimbrough*, the Court reiterated that a district judge may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations, or perhaps the case warrants a different sentence regardless," 552 U.S. at 570, 128 S.Ct. at 102, quoting *Rita*, 551 U.S. at 351, 127 S. Ct. at 2465, and, thus, "courts may vary [from Guideline ranges] based solely on policy considerations, including disagreements with the Guidelines." 552 U.S. at 570, 128 S.Ct. at 102. While *Kimbrough* and *Gall* referred to the drug guidelines generally as not having been based on empirical data, *see Kimbrough,* 552 U.S. at 109-10, 127 S. Ct. at 575; *Gall,* 552 U.S. at 534, 127 S. Ct. at 594 n.2, *Rita* made clear that judges may disagree with any guideline. *See* 551 U.S. at 356,127 S. Ct. at 2465, 2468. Indeed sentencing courts must be free to disagree with the guidelines on the basis of policy so that judges can play their role in providing information to the Sentencing Commission so that "the Guidelines [can] constructively evolve over time." *Rita*, 551 U.S. at 109-10, 127 S. Ct. at 2469.

2009)(*en banc*), *cert. denied*, 129 S. Ct. 2735 (2009). *See also United States v. Seval*, 2008 WL 4376826 (2d Cir. Sept. 25, 2008); *United States v. Parris*, 573 F. Supp. 2d 744, 751 (E.D.N.Y. 2008).

The 2 B1.1 table in this case produces an overly harsh result and imposition of a sentence in this case of 240 months is a sentence "greater than necessary" to achieve the aims of sentencing. Indeed, the Guidelines loss table in 2 B1.1 used in this case was not based on pre-Guidelines practice and the Commission appears to have adopted the table without any empirical basis. At its inception, this Guideline called for sentences higher than pre-Guidelines sentences and the increases in the tables over the years also were done without any empirical basis. The Sentencing Commission's Supplementary Report on the Initial Sentencing Guidelines and Policy Statements[5] discussed the lack of agreement regarding an underlying philosophy for the Guidelines. As stated in a fifteen-year "look-back" and follow-up study, the Sentencing Commissions noted that "the Commission, either on its own initiative or in response to congressional actions, established guideline ranges that were significantly more severe than past practice" for the most frequently sentenced offenses in the federal courts, including white collar offenses.[6] Further, in estimating past practice sentencing levels, the Sentencing Commission in promulgating the initial guidelines did not include probationary sentences. *See Supplementary*

---

[5]*U.S. Sentencing Commission, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) (hereinafter "*Supplementary Report*"), available at http://www.fd.org/pdf_lib/Supplementary%20Report.pdf.

[6]*U.S. Sentencing Commission, Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* at 47 (2004 ) (hereinafter "*Fifteen Year Review*"), citing *Supplementary Report*.

*Report* at 24. This was no small omission, since nearly 40% of all defendants were sentenced to straight probation in 1984.[7]

Moreover, the Guidelines as presently constituted contain anomalies in their treatment of offenses which undermine their utility and permit a sentencing court to disagree with a particular guideline on a policy basis. In this case, the PSR places Arthur Budovsky at a total stipulated offense level 41. However, in what essentially is a non-violent crime by a Criminal History Category II offender, Mr. Budovsky is treated under the Guidelines as, or more, harshly than someone convicted of Voluntary Manslaughter under U.S.S.G. §2A1.3 (offense level 29-3 for acceptance); Involuntary Manslaughter under U.S.S.G. § 2A1.4 (even after trial) (offense level 12, 18 or 22 depending on the circumstances); Assault with Intent to Commit Murder or Attempted Murder under U.S.S.G. § 2A2.1(a)(2) (offense level 27); Statutory Rape under U.S.S.G. § 2A3.2 (offense level 18); Robbery under U.S.S.G. § 2B3.1 (offense level 20); Robbery with Serious Bodily Injury under U.S.S.G. § 2B3.1(b)(3)(B)(level 24); Robbery with Permanent or Life Threatening Bodily Injury under U.S.S.G. § 2B3.1(b)(3)(D) (offense level 18); Extortion under U.S.S.G. § 2B3.2(a) (offense level 18); or U.S.S.G. § 2B3.2(b) (Extortion with Firearm Discharge) (offense level 18 + 7 levels for firearm discharge); Alien Smuggling under U.S.S.G § 2L1.1(a) (offense level 25); Exportation of Arms without a Valid Export License under U.S.S.G. § 2M5(2)(1) (offense level 26); Providing Material Support to Terrorist Organizations under U.S.S.G. § 2M5.3(a) (offense level 26); Tampering with Consumer Products Involving Risk of Death or Bodily Injury under U.S.S.G. 2N1.1(a) (offense level 25). These are just some examples. In this light, the PSR's Guidelines calculations in this case for this offender

---

[7] *Fifteen Year Review* at 43.

are not supported by empirical data, simply make no sense and should be rejected on policy grounds.

Written in another time and for a different purpose Albert Einstein's observation that "Not everything that can be counted counts, and not everything that counts can be counted," has a particular application to this case. A man's life and the measure of that life cannot simply be reduced to a box on a sentencing grid impelled by an equally uncaring slot on the 2 B1.1 table.

Further, the Court should not impose sentence at the statutory maximum of 240 months because it is not in line with the factors set forth in 18 U.S.C. § 3553(a). *See Gall*, 522 U.S. at 39. The Court must consider the individual defendant, Arthur Budovsky, when imposing his sentence. *See Gall*, 522 U.S. at 50; *Kimbrough*, 522 U.S. at 108.

A sentence below 180 months is sufficient, but not greater than necessary because: (1) Arthur Budovsky already has been and is being punished by the consequences of his conviction; (2) studies show that certainty, not severity, of punishment affords adequate deterrence to criminal conduct; (3) Arthur Budovsky will have no opportunity to repeat the conduct of which he was convicted; and (4) Arthur Budovsky is 42 years old, he has a college education, and has never had a substance abuse problem – all factors that result in a lower rate of recidivism, mitigate strongly in favor of some lenity, and are important factors not considered in the Guidelines' calculus.

The Section 3553(a) factors that the Court must consider also support a non-Guidelines sentence because a sentence of 240 months is overly harsh for this defendant and would result in a sentence disparate from similarly situated defendants in similar cases as discussed *infra*.

-11-

Lastly, the agreed upon Guidelines range is the product of an unreasonably high

Guidelines starting point and fails to give appropriate consideration to the Section 3553(a)

factors.

## B.  A Non-Guidelines Sentence Less Than 180 months Is Sufficient, But Not Greater Than Necessary, To Comply With The Purposes Set Forth In Section 3553(a)(2).

Section 3553(a) requires a sentencing court to "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."

Paragraph 2 specifies that the court must consider:

the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

These purposes in this case all would be satisfied by a non-Guidelines sentence below 180

months.

Generally, speaking, "[d]eterrence, incapacitation and rehabilitation are prospective and

societal – each looks forward and asks: What amount and kind of punishment will help make

society safe? In contract, retribution imposes punishment based on moral culpability and asks:

What penalty is needed to restore the offender to moral standing within the community?" *United

States v. Cole*, 662 F.Supp.2d 632, 637 (N.D.Ohio 2008).  In this case, each of these purposes

can be served by a non-Guidelines sentence below the statutory maximum.  Incarceration of

Arthur Budovsky for a period of even ten years serves the intended goal as this period of time is

extensive and removes Arthur from society.  Certainly a period of twice that amount, 20 years, is

not needed to restore Arthur Budovsky to moral standing in the community.  Arthur Budovksy

-12-

has learned a harsh lesson. People who know him well have provided ample examples that
Arthur Budovsky has benefitted his community. Incarceration for an extremely lengthy period of
time is not necessary.

1. The Government had agreed that a sentence no greater than fifteen years was appropriate in this case.

Sometime in or about late November of last year, the Government and the defense
had some informal discussions concerning the parameters of a plea offer for Mr. Budovsky,
capping his exposure at 15 years. In having this discussion, the Government noted the Rule of
Speciality and that permission to proceed along those lines was needed from the Spanish
Government, which took some time to do. Through December, those discussions continued.
Although the government advised initially in November that a plea which would involve Mr.
Budovsky pleading to a charge not set forth in the extradition warrant and would require a waiver
from Spain, as the plea discussions continued through December and into January, the
Government did not again reference the Rule of Speciality as a possible hurdle to Mr.
Budovsky's entering a plea with a 15-year cap. In these plea negotiations in December and into
January, while the defense argued for a maximum exposure no greater than 10 years, which was
double the exposure the government had agreed to for Mark Marmilov, the government's
position remained that a 15 year maximum was the plea they believed, as a team, was justified
for Mr. Budovsky. During one telephone conference in December, 2015, the defense inquired if
there was room for a counter-offer to the Government's 15-year proposal. AUSA Turner
responded that this was their best offer but we were free to s speak with their chief, AUSA Nicki
Friendland. The Christmas holidays approached and there was less communication with the

-13-

Government. However, after the Court conference on December 29, 2015, the topic of a plea was raised and the Government continued to insist that their plea proposal was not negotiable and once again set forth the basis for their decision that a 15 year maximum exposure was the right result in this case. The Government did not advise that the 15-year "cap" plea offer had a deadline or that it was not a formal plea offer. At the beginning of January the plea negotiations continued, and the subject was raised during other telephone communications with the government. The government remained steadfast that they would not budge from their offer of a 15-year exposure.

At the conference on January 15th, the Court inquired of counsel whether a plea offer had been made to Mr. Budovsky. AUSA Turner, speaking for the Government, informed the Court that the Government had offered Mr. Budovsky a plea which would expose him to a maximum fifteen-year term of incarceration but that Mr. Budovsky had rejected that offer. *See* Transcript, 1/15/2016 hearing pg. 6 ( responding that the plea offer "was to charges that carried a total of 15 years maximum."). Defense counsel, John Kaley, Esq., clarified the plea negotiations for the Court and explained that the offer as stated by AUSA Turner, had only been extended to the defense recently. Transcript 1/15/16 hearing, pg. 27 ("[T]here was no plea offers until more recent days when the offer that Mr. Turner has indicted was made."). At no time during that conference did the Government advise the Court or defense counsel that the plea offer of a 15-year maximum which it had extended had expired or that in any event, due to the Rule of Speciality, there would be no time before the scheduled start of trial, February 1st, for such a plea to be accepted.

-14-

Plea negotiations and discussions continued after the conference and with the advancing trial, defense counsel had regular telephone conferences with the Government. The defense continued to seek an offer of less than the 15-year maximum proposed by the Government. On Friday, January 22nd, the defense counsel advised the Government that Mr. Budovsky had agreed to their offer. Counsel made that call on January 22nd from the lobby of the Metropolitan Correction Center. AUSA Turner then advised he would speak with his team. After about maybe an hour or maybe a bit less, AUSA Turner called defense counsel and informed them that in light of all the work they had done in preparing for trial, the team could no longer accept the 15-year proposal. That same day, defense counsel met with AUSA Dan Stein, Chief of the Criminal Division, and explained why it was unfair for the Government to turn down the defense acceptance of the plea offer with the 15-year cap. The defense explained further that the 15-year offer had never been withdrawn.[8] Defense counsel sent follow-up email over the weekend to the Government. On Tuesday, January 26, 2016, AUSA Stein called counsel and advised that the U.S. Attorney's Office only would accept a plea with a 20-year exposure. Thereafter, the defendant accepted the 20-year "cap" plea. The written plea agreement memorializing the Government's 20-year "cap" plea offer was signed on January 29th and the plea was entered later that day. We understand that on April 8, 2016, the Court heard argument touching on this point in connection with a letter sent to the Court by Mr. Budovsky. We do not seek now to reargue that issue.

---

[8] Notably, this is not the case that as a result of trial preparation, the Government unearthed facts that made a prior more lenient offer unreasonable. Here the Government sought to punish Mr. Budovsky for their preparation for trial, a position that AUSA Daniel Stein assured counsel is not acceptable and would not be a basis for either withdrawing an offer previously made or increasing a defendant's exposure.

Our point simply is this: the 15-year "cap" offer which had been made was believed by the Government to be adequate in this case to meet all of the sentencing goals set forth in 18 U.S.C. § 3553(a). While we are hopeful that based on all of the facts and arguments set forth herein the Court will impose a sentence less the 15 years, any sentence should not be greater than 15 years for the reasons stated.

> 2. A non-Guidelines sentence below 180 months is sufficient to reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense.

As a non-violent person in Criminal History Category II, a non-Guidelines sentence below 180 months is appropriate and sufficient to reflect the seriousness of the offense of which Arthur Budovsky was convicted and to promote respect for the law and to provide just punishment. In fact, a sentence of an overly lengthy incarceration may undercut respect for the law. *See Gall*, 552 U.S. at 54, 128 S.Ct. at 594 ("'a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing'") (quoting the district court).

The substantial period of time Arthur Budovsky already has served in prison in Spain and the MCC, all have had a dramatic effect on his life. He has lost everything and his future is far from certain in that he will be removed from the United States to another country, most likely Costa Rica where his is a citizen, but where he will be without family, any support system and any means of support, all of which are harsh consequences of his conviction. In this regard also, his health has deteriorated since his extradition from Spain. In Spain, he was taking 2 pills per

-16-

day. At the MCC, he receives 10 pills each day (2 aspirin, 4 Paxil, 4 pills for his sugar, 1 blood pressure pill and 1 pill for his cholesterol).

### 3. A non-Guidelines sentence below 180 months would not encourage criminal conduct.

Imposing a sentence below 180 months in this case would have little, if any, bearing on deterrence. Empirical research shows no relationship between sentence length and deterrence. In a pre-Guideline study of specific deterrence, which involved white collar offenders (presumably among the most rational), no difference in deterrence was found as a result of sentence severity, including between probation and imprisonment. *See* David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White Collar Crimes*, 33 Criminology 587 (1995). *See also* Andrew von Hirsch, et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding "correlations between sentence severity and crime rates . . . were not sufficient to achieve statistical significance," and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects.").[9] "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms. Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005).

In addition to the ineffectiveness of imprisonment on deterrence, an over-emphasis on general deterrence poses the ethical problem of punishing one person to promote deterrence of others. "Judicial punishment can never be administered merely as a means for promoting another

---

[9] A summary of the Von Hirsch report is available at http://members.lycos.uk/awnet/ SENTENCE.pdf.

good either with regard to the criminal himself or to civil society, but must in all cases be imposed only because the individual on whom it is inflicted has committed a crime. For one man ought never to be dealt with merely as a means subservient to the purpose of another." Immanuel Kant, *The Science of Right* 195 (W. Hastie trans., 1790).[10] General deterrence simply is not a good reason for a lengthy prison term. *See Cole*, 662 F.Supp.2d at 637. Taken together, these considerations support our view that a sentence of less than 180 months is appropriate and sufficient in this case.

Lastly, to the extent there is any need for general, as opposed to specific, deterrence, that need has long been satisfied by the publicity widely disseminated by the United States Attorney's Office and in the media reporting on this case and by the sentences imposed on co-defendants, which likewise were widely publicized by the United States Attorney's Office and in the media. Given all that he already has lost, it would hardly be a blow to any concepts of general deterrence were Arthur Budovsky to be given a sentence less than 180 months.

---

[10] The practical problem of the high cost of imprisoning an individual also is a consideration militating in favor of a non-Guidelines sentence. In 2008, the cost of imprisoning an individual was $25,894.50 per year. *See Costs of Imprisonment Far Exceed Supervision Costs*, available at http://www.uscourts.gov/News/NewsView/09-05-12/Costs_of_Imprisonment _Far_ Exceed_Supervision_Costs.aspx. In 2012, the annual cost of imprisoning an individual was $28,948.00 per year. *See Supervision Costs Significantly less than incarceration in Federal system*, available at http://news.uscourts.gov/supervision-costs-significantly-less-than-incarceration-in-federal-system. In comparison, its costs $3,347.41 for supervision and less when a defendant is removed from the country after confinement. Placing an offender in a Bureau of Prisons institution was roughly at least eight times the cost of placing the same offender under post-conviction supervision by a federal probation officer.

-18-

4.      A sentence less than 180 months is sufficient to protect the public from
future wrongdoing by Arthur Budovsky.

The Court should consider Mr. Budovsky's lower risk of recidivism in assessing the need

to protect the public from any future crimes by Arthur Budovsky. *See United States v. Ruiz*, No.

04CR.1146-03, 2006 WL 1311982 at \*4 (S.D.N.Y. May 10, 2006) (noting courts have imposed

non-guidelines sentences for defendants based on age due to markedly reduced recidivism risk);

*United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (affirming district court's

sentence of a fine and five years of probation rather than 10 to 16 months of imprisonment under

the guidelines based in part on defendant's low risk of recidivism); *United States v. Hoffmann*,

2006 WL 3390736 at \*6 (D.Neb. Nov. 22, 2006) (because of defendant's low risk of recidivism,

court sentenced defendant to three years of probation instead of 8 to 14 months under

guidelines); *United States v. Nellum*, No. 2:04-CR-30-PS, 2005 WL 300073, at \*3 (N.D. Ind.

Feb. 3, 2005) (in consideration of defendant's age and lower risk of recidivism, court reduced

sentence from 168-210 months to 108 months).

The Sentencing Commission has published studies concluding that the Guidelines

overstate the risk of recidivism and that, on the contrary, "there is no correlation between

recidivism and [a] guidelines' offense level." *See Measuring Recidivism: The Criminal History

Computation of the Federal Sentencing Guidelines* at 15 (May 2004) available at

http://www.ussc.gov/publicat/Recidivism_General.pdf ("Measuring Recidivism"); *Recidivism

and the First Offender* (May 2004) available at http://ussc.gov/publicat/Recidivism_General.pdf

("First Offender"); *A Comparison of the Federal Sentencing Guidelines Criminal History

Category and the U.S. Parole Commission Salient Factor Score* (Jan. 4 2005) available at

-19-

http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf. "The guidelines' offense level

is not intended or designed to predict recidivism." *See* USSC, *Measuring Recidivism*, at 15. The

Sentencing Commission itself has found that "[t]here is no correlation between recidivism and

guidelines' offense levels. Whether an offender has a low or high guideline offense level,

recidivism rates are similar. While surprising at first glance, this finding should be expected.

The Guidelines offense level is not intended or designed to predict recidivisim." *See Measuring*

*Recidivism* at 15, http://www.ussc.gov/publicat/Recidivism_General.pdf. Conversely, the

Commission's own studies have shown that the following factors, consideration of which the

Guidelines either prohibit or discourage, *do* correlate with reduced recidivism:

- Age: Recidivism rates decline consistently as age increases. *Measuring Recidivism* at 12. Mr. Budovsky is 42 years old, in the range where recidivism declines;

- Education: Recidivism rates decline with increased education level, with college graduates having the lowest rate of recidivism. *Id.* at 12. Mr. Budovsky has a college education;

- Family: Recidivism rates decline for defendants who have families. *Id.* Mr. Budovsky has parents whom he loves, and who are supportive of him;

- Abstinence from Drug Use: Recidivism rates are lower for offenders who did not use illegal drugs for one year prior to the offense. *Id.* at 13; Arthur Budovsky has no history of illegal substance use;

- Non-Violent Offenders: Offenders sentenced under the fraud guidelines are the least likely to repeat criminal activity. *Id.*

Taking these factors in turn, Arthur Budovsky is 42 years old. He has an education and

degrees. He has supportive parents. He has no drug use issues. The offenses for which he was

convicted are non-violent. An analysis of these factors demonstrates that Arthur Budovsky has a

lower risk of recidivism and thus, an overly lengthy custodial sentence is not called for to protect

-20-

the public and prevent future criminal activity.  Indeed, Congress has directed that, in considering whether and to what extent imprisonment is appropriate based on the § 3553 (a) factors, a sentencing judge is required to "recogniz[e] that imprisonment is not an appropriate means of promoting correction and rehabilitation."  *See* 18 U.S.C § 3582.

## C.   The Section 3553(a) Factors, Support A Non-Guidelines Sentence Below 180 Months

Section 3553(a) requires a sentencing court to consider additional factors when determining its sentence.  These additional factors include the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the range established by the Sentencing Guidelines, any pertinent policy statement from the Sentencing Commission, the need to avoid unwarranted sentencing disparities and the need to provide restitution to any victims.  Consideration of these additional factors supports a non-Guidelines sentence below 180 months.

### 1.   The nature and circumstances of the offense.

We are not unmindful of the fact that Arthur Budovsky stands convicted of a serious offense.  Nonetheless, in our respectful view, consideration of all of the circumstances of the offense supports a non-Guidelines sentence less than 180 months and not greater than fifteen years.

As set forth in Mr. Budovsky's allocution and as agreed in the parties' joint letter to the Court of April 18, 2016 (Docket Entry # 333, the "Letter"), Vladimir Kats and Arthur Budovsky "jointly conceived, created, controlled, and ran Liberty reserve as full-fledged partners until May/June 2008 when Kats' association with Liberty Reserve ended and Arthur Budovsky

-21-

assumed full supervisory control." Within the contours of the Letter, it is not a contradiction to

note that Kats and Budovsky each contributed different pieces to the overall operation.

The initial idea for Liberty Reserve ("LR") originated with Vladimir Kats, who

approached Budovsky in or about 2002 and asked him to assist in developing a virtual currency.

*See* Transcript of Plea Hearing held on Jan. 29, 2016 ("Plea Hrg. Trans.") at p. 18.  Kats needed a

"technical" person to create a platform and communicate with programmers.[11]  Budovsky

accepted Kats' proposal.  *Id.*  The currency that Kats and Budovsky developed became available

to the public in approximately 2005 when the LR website was launched.  Plea Hrg. Trans. at p.

18. Throughout LR's founding and early development, although 50/50 partners who discussed

and jointly implemented all major strategic decisions, each had differing roles.  On a day-to-day

basis Kats primarily was in charge of the business operations of Liberty Reserve.  Budovsky was

in charge on a day-to-day basis of the technical side of the business, i.e., the computer

networking and infra-structure to make possible their jointly held goals for Liberty Reserve.  *See*

Kats-Alex chat at 6:34 pm ("I told you before; I was the CEO and business leader. Arthur

[Budovsky] was in charge mostly of technical stuff, employees (programmers, etc).  He just

---

[11]  *But see* Kats chat with OlegCh on 8/7/2008, Exhibit "3," regarding hiring a
programmer and indicating control of other entities as well:

| | |
|---|---|
| OlegCh: | … [t]ell me which salary you can pay? |
| Kats: | I need to see CV first and know what you can do, your experience, etc. We can pay up to 1.5 for a really good full-time programmer, plus raises, bonuses, etc. … We also need more than one programmer, we're looking for a team of 2 or 3. |
| OlegCh: | ok, I understand […] what kind of project do you have? |
| Kats: | Digital currency to start with, then many others, and then maintenance and constant upgrades to current ones.  Digital currency is like e-gold.com or c-gold.com […] We also need periodic, small changes to www.cambist.net, [absolutexchange.eu] and asianagold.com. |

-22-

implemented what I envisioned.") (Exhibit "4"); Kats-Spacegold/Centregold.ca chat at 11:23:12 ("I founded LR. I named it. . . . I grew it.") (Exhibit "5"); Kats-Alex chat at 7:31 pm (Budovsky "is stupid. He does not understand.") (Exhibit "4"). While discussion and strategy were joint, Kats' role was focused more on concepts and business development; Budovsky's role was more focused on the technical implementation of the parties' joint plan. Of course, both were aware of what the other was doing, agreed to and discussed those acts, and acts by one were the acts of both in the implementation of their jointly held plans for Liberty Reserve. *See* Letter.

At about the same time that Kats and Budovsky began envisioning creating a virtual currency with LR, Kats and Budovsky were engaged in the operation of GoldAge, an on-line exchanger that dealt mainly in E-Gold, a virtual currency located in the United States. To a degree conceptionally, Kats and Budovsky modeled LR on E-Gold and envisioned LR as a competitor to E-Gold.

Kats and Budovsky also both knew they could not continue to operate LR in the United States and looked for alternative locations. Kats was the primary force behind the option to move to Costa Rica. *See* Kats-Alex chat at 6:38 pm (It was all my connections... that allowed us to survive when they shut down GoldAge. We could not run LR if I did not bring it to [Costa Rica].") (Exhibit "4"); *Id* at 7:16 pm ("[T]he current business model is all that I taught Arthur."); Kats-Trankilo chat at 13:15:09 9/10/2010 (Kats: "LR was always my idea. I founded it, named it."). (Exhibit "6"). Arthur agreed to the move.

In their operational and functional division of responsibility, Kats took the lead in business development including, *inter alia*, the marketing and promoting of LR, and the enrollment of exchangers who were an integral part of their conception of LR. Kats 3507-07 at p.

4. (Exhibit "7").  To promote exchangers, Kats, as well as Budovsky, both posted on message

boards, and sent messages to forum administrators.  *See, e.g.*, Kats-Budovsky chat at 01:08:18

2/06/2008. (Exhibit "8").  Both agreed to seek out HYIP's, but primarily Kats', in his function,

conceived of the idea how to seek out and obtain HYIP's use of LR.  *See, e.g.*, Kats 3507-15 at p.

3. (Exhibit "9").  Budovsky, on the other hand, was in charge of developing LR's networking

platform and infrastructure, likewise with the in-put of Kats.  *See* Plea Hrg. Trans. at p. 20, *see,*

*e.g.*, Kats 3507-15 at p. 3 (Exhibit "9"), and there were times when Budovsky also posted on chat

forums.

It is an overstatement, we think, to claim, as the Government does, that LR was

developed and created *solely* to "cater to criminals." Certainly Budovsky and Kats knew,

anticipated and intended from the inception of LR that, because of certain LR design features, e-

commerce criminals would use LR "to launder their criminal proceeds." *Id.* and Letter.  Kats and

Budovsky also were aware that LR had United States users and that by "facilitating money

laundering for the United States users" LR was operating contrary to United States law.  *See* Plea

Hrg. Trans. at p. 20.  While the majority of LR's business came from criminal activities, we do

not think it accurate to state that the "vast" majority of LR "users" from the United States and

elsewhere came from HYIPs or even from criminal activity.  Indeed, to the extent that users did

invest in HYIPs, we think that many of them did so knowingly, attempting to make a quick profit

in a scheme they knew was too good to be true by pulling their money out before the scheme

collapsed.  This is not denying that the majority of the HYIPs using LR were fraud schemes, but

there can be no question that the HYIP's existence relied upon the "complacent victims."  Here,

for example, the Government's "victim" witness, Eric Boateng, was an experienced investor with

-24-

an E-Trade account before he decided to speculate on HYIPs to make a quicker, faster, profit. *See* Boateng 3506-03 at p. 3. (Exhibit "10"). In our view, as we discuss *infra,* Boateng was not a complacent victim.

From the date of LR's creation, Budovsky's intent (and Kats' as well, if his proffers to the Government are to be believed), was for LR to build its name recognition by attracting as many users as possible including fraudsters) and then ultimately to rid itself of e-commerce criminals (to the extent possible) and become a licensed, legitimate e-currency service and internet bank. *See* Kats 3507-10 at p. 7 (Exhibit "11"); Kats-Budovsky chat at 10:57:20-11:00:58 14/06/2009 (discussing banking license and IPO for LR). (Exhibit "8"). *See also* Kats-Alex chat at 7:09 pm-7:12 pm (Exhibit "4"):

| | |
|---|---|
| Kats: | But SUGEF still supervises, asks questions? |
| [...] | |
| Alex: | yes just to decide if and IF they will give LR some [license] |
| Kats: | So LR can still get a license. |
| Alex: | no . . . they wont [*sic*] get it |
| Kats: | Why? |
| Alex: | [Because] they don't [*sic*] like the business model |
| Kats: | Business models can be changed, should be changed. That was my whole vision.  Get enough money with one type [of] business model, then go mainstream. Get investors, maybe even go public, etc. |

Some of the same LR features that were designed for and attractive to e-commerce fraudsters also served legitimate purposes. For example, LR's anonymity features protected LR users against hackers– a real and continued threat to users of any virtual currency payment

system. *See, e.g.*, Kats 3507-03 at p. 4. (Exhibit "12"). Similarly, LR in part, required users'

transactions to be processed through exchangers, as opposed to direct payment systems such as

PayPal, because LR did not want to risk being scammed by taking money directly from users.

*See* Kats 3507-03 at p. 7. (Exhibit "12"). Fees for transfer inside the LR system were

particularly small—1% of a transaction's cost up to a cap of $2.99—to encourage users to engage

in commerce with other LR users. Charges by exchangers were not under the control of LR, but

in any event, when the overall fees charged by LR were considered, LR's fees were not

considerably higher than fees for similar transactions charged by banks, Western Union, or other

established institutions.

Following the demise of E-Gold and, the failure of E-Gold's other competitors, LR's star

began to rise. Kats and Budovsky understood that it was unwise to operate LR in the United

States and decided to move the company. Kats chose to move LR to Costa Rica on the advice of

James Ray, who introduced him to Ahmed Yassine. *See, e.g.*, Kats 3507-07 at p. 3 (Exhibit "7");

Kats-Alex chat at 6:38 pm ("It was all my connections: exchangers, James Ray, you, that allowed

us to survive when they shut down GoldAge. [. . .] We could not run LR if I did not bring it to

CR.") (Exhibit "4")[12]; Kats-Trankilo chat 23:16:31 14/10/2010 (Kats: "And I'm the one who

conceived of everything, brought LR to CR, etc.") (Exhibit "6"); Kats-Sharapov [Vladimir

Grinevskiy] chat at 13:22:24 9/10/2010 (Kats: Yassine is "the guy that was recommended by

James Ray of e-gold (he met with him in CR), and the one that orchestrated LRs move to CR

_____

[12] Later, Kats regretted having put Budovsky in charge of the move to Costa Rica. *See*
Kats-Alex chat at 6:52-53 pm (Kats: "I should have come to CR with him…. But I did not want
to [spend] additional funds on airplane, hotel, etc.") (Exhibit "4"); *Id.* at 6:57 pm (Kats: "Maybe
he was overwhelmed. Maybe I should not have trusted him with such a big task…").

with me.") (Exhibit "13"). Kats believed Yassine to be reliable because Ray told him that Yassine had previously referred a prostitute to him. Kats 3507-03 at p. 5. (Exhibit "12"). While Budovsky would have preferred to move to Europe, he and Kats discussed the move to Costa Rica and Budovsky ultimately agreed with Kats to relocate LR to Costa Rica.

At that point in LR's existence, Kats and Yassine, after discussion with Budovsky, functionally were the primary decision-makers in their roles as managers of LR's day-to-day operations. *See, e.g.*, Kats-Sharapov chat at 13:12:07 (Yassine "incorporated and opened and managed LR's accounts with millions in them") (Exhibit "13"); Kats-Trankilo chat at 13:15:09 (Kats: "LR was always my idea. I founded it, named it. Moved it to CR. I'm not happy about losing it.") (Exhibit "6"); *Id.* at 12:50:23 (Kats: "If it were not for you, there would have been no LR in CR...")); Kats-Rafaele chat at 02:57:19-02:57:56 28/03/2009 (Kats: "Nothing is in my name, and none of the bank accounts are in the US. [. . .] [People] know I'm mastermind of LR... But I built it offshore.") (Exhibit "14"); Kats 3507-07 at p. 3. (Exhibit "7"). Again, this is not to deny that Budovsky and Kats discussed these matters and that decisions were joint. But at the same time, one cannot ignore the operational reality and how they carried out and implemented their joint plan and how Kats, at least, viewed each of their respective roles.

The "financial part of the company structur[e] that was me," boasted Yassine, "the hiring, the image, advertising." *See* Kats-Alex chat at 6:35 pm. (Exhibit "4"). Kats had daily conversations with Yassine, who opened Costa Rican bank accounts for LR, managed the company's Costa Rican office, and filed the paperwork to incorporate LR in Costa Rica. *See* Kats 3507-03 at p. 3, 5. (Exhibit "12") *See also* Kats-Alex chat at 7:46 pm (Kats: "you were my employee"). (Exhibit "4"). Yassine also controlled LR's bank accounts. *See* Kats-Sharapov

-27-

chat at 13:06:49-13:12:58 9/10/2010 (discussing that Yassine held and managed LR's bank accounts). (Exhibit "13").[13]

In or around 2008 and until 2009, after LR's move to Costa Rica, Budovsky bought out Kats' interest in LR for $200,000. *See* Kats-Budovsky chat at 18:01:02 4/06/2008. (Exhibit "8"). Thereafter, Budovsky was the ultimate decision-maker for LR. *See* Letter. He hired management, continued to be involved in the installation of the network infrastructure, caused bank accounts to be opened, and caused money to be moved from Costa Rica to other countries. *See, e.g.*, Plea Hrg. Trans. at p. 25. Budovsky, however, while in overall charge, did not handle all of the day-to-day operations of LR, much of which he initially left to co-defendants Yassine and then to Alan Hidalgo. Budovsky himself was absent from Costa Rica a good portion of the time from 2008-2013.

When Budovsky took charge after LR relocated to Costa Rica, Budovsky thought it wise to apply for a license with SUGEF. Under his control, LR ultimately implemented some AML procedures, hired an attorney, formed a verification department, developed a compliance manual, and had LR employees trained in AML and tested. This was part of his long-term goal for LR to be a legitimate company and he had high hopes it would ultimately be a bank. *See* Kats-Budovsky chat at 10:56:24-11:04:43 14/06/2009. (Exhibit "8"). However, Budovsky does not dispute that Cubero and Lopez, the individuals he hired to assist with the SUGEF application and

---

[13] In part, Kats' reliance on Yassine was due to the fact that Kats was not physically present in Costa Rica. He was stuck in New York unable to move because his term of probation from the GoldAge sentence was longer than Budovsky's. *See, e.g.*, Kats-Budovsky chat at19:10:52 10/06/2008 (discussing Kats' trip to probation that day). (Exhibit "8"). Furthermore, Kats advised Budovsky that in his (Kats') opinion (as LR's de facto attorney) that it would be best to move LR to Costa Rica and to use Yassine as a nominee, lest their felony convictions tarnish LR's name. *See, e.g.*, Kats 3507-07 at p. 2. (Exhibit "7"). Budovsky agreed.

AML compliance requirements, were not given access to all of LR's transactional data through implementation of the "GAA". To a large degree, the limits imposed through implementation of the "GAA" were intended to foreclose authorities' review of the transactional fees generated on behalf of LR in order to avoid Costa Rican tax obligations. Of course, Budovsky knew that the GAA also prevented Cubero and Lopez from understanding the nature of the majority of the money flowing through LR.

Ultimately, there were roughly 5.23 million accounts on LR's books. However, looking solely at the number of accounts opened is somewhat misleading because of the roughly 5.23 million total accounts, 3,690,546 (or 70.94%) of these accounts were never funded and no transactions were conducted in these accounts. Of the 5.23 million accounts, another 749,062 (or 14.40%) had a total transaction volume ranging from $0.01 to $100.00 and 464,816 accounts (or 8.93%) had a total transaction volume ranging between $100.01 to $1,000.00. The remaining accounts, representing approximately 6% of the total LR accounts can be broken down as follows:

- 4.55% (or 236,853 accounts) had a total transaction volume ranging between $1,000.00 to $10,000.00

- 1.03% (or 53,605 accounts) had a total transaction volume ranging between $10,000.01 to $100,000.00

- 0.13% (or 6,501 accounts) had a total transaction volume ranging between $100,000.01 to $1,000,000.00

- 0.02% (or 831 accounts) had a total transaction volume greater than $1,000,000.00.

Many of the accounts with high transactional volumes were exchanger accounts.

-29-

Although the transactional volume handled by LR certainly was significant, and the applicable Guidelines range is based on the parties' agreement that $250-500 million is a reasonable estimate of use by United States users, the Government's calculation of the total dollar value by all users is misleading because, among other things, the Government's calculation double-or even triple- (if not even more) counts money flowing into and out of the same LR accounts or within the LR system. Thus, if $10 was received into an LR account and then that same $10 was transferred to another LR account, in the Government's math, that equals $20 in transactional volume, even though it involves the same $10. Further, contrary to the Government's implication, from 2009 to 2013, LR had only two months where the transactional volume exceeded $300,000,000.00. It was not an every month occurrence, as the Government and PSR suggest. Approximately 10% of LR's transactions came from United States "users." Notably, even that figure may be high as an IP address is not a reliable indicator of from where the user was transacting business. Nor, in light of the Government's allegations regarding the fraudulent information submitted by LR registrants on their LR applications, a registrant's given address is not necessarily a reliable indicator of whether the user was located in the United States. In any event, Budovsky and the Government stipulated in the plea agreement that Budovsky is responsible for laundering between $250 and $500 million (not $550 million) in criminal proceeds originating from U.S. users.

While we do not dispute that LR monies were moved to different countries, the Defense has seen no evidence that Budovsky *personally* netted over $25 million in profits as the PSR asserts in ¶ 21. Yes, money was moved into accounts in Budovsky's name and in the names of others, but all of that money was frozen. For these reasons, it is our view that Budovsky himself

-30-

did not *personally* benefit in the amount claimed by the Government and recited in the PSR.

Budovsky acknowledges that he agreed with Kats not to implement sufficient anti-money laundering ("AML") controls. *See* Plea Hrg. Trans. at p. 19. But, although they were aware and intended that LR's anonymity and other features made it attractive to criminals, as noted above, this was not the sole reason for the implementation of those features. In part, in the later years, LR's insufficient AML controls were due in part to Budovsky's inability to set up a system with the required sophistication. *See* Kats-Budovsky chat 4:20:24-04:21:27 9/04/2008 (discussing the work required to set up LR platform and servers). (Exhibit "8").

After Kats' involvement with LR ended, Budovsky did make some efforts to implement AML controls including verifying exchangers and, occasionally, users. *See, e.g.*, Email dated June 22, 2011, from LR Verification Department to Duxton Ventures Pte. Ltd. re: Verification. (Exhibit "15"). Even prior to Kats' departure from LR., Budovsky, began efforts to eliminate clearly criminal LR usage. In a chat in 2009, Budovsky instructed Kats to tell an exchanger to stop providing false information. *See* Kats-Budovsky chat at 10:40:06-10:40:52 17/02/2009 (Budovsky: "he contacted support under 3 different names . . . and the stories were different all times . . . tell him not to do it"). (Exhibit "8").

LR took the position that its customers were the exchangers and not the users. This position was not disavowed by Portela, Cubero and Lopez. Therefore, LR asserted that it bore no responsibility for the users' AML compliance and was entitled to rely on the AML verification procedures of those banks and/or Western Union through which the users' funds were transferred. It is not accurate to say that LR transactions were completely untraceable. Through the transactional data and the exchangers' records, LR transactions could be traced to bank wires

and Western Union transfers received by the exchangers going in both directions.

Additionally, from 2009 through at least 2012, LR made some strides (albeit small) in AML compliance. LR crosschecked accounts against the list of names published by the U.S. Office of Foreign Asset Control ("OFAC"). LR hired counsel and a compliance officer, provided AML training and created a compliance manual, responded to inquiries from law enforcement authorities regarding particular users, applied to SUGEF (the Costa Rican regulatory authority) for registration, and froze approximately 5,000 accounts. *See*, LR Compliance Manual (Exhibit "16"); Email dated July 28, 2010 from Eric Paltz [Budovsky] to Detective Inspector Henrik Engelkes re: Request from Swedish Police. (Exhibit "17").

LR's verification department was instructed to check the credentials of the exchangers. In addition, in the development stage were flags embedded into the system to detect accounts with transactions over $10,000.00. Verification also had begun in the post-Kats' period to verify some users, although admittedly very few attempts were made in this direction. Nonetheless, it is important to recognize that the vast majority of the accounts (about 4 million accounts) had no transactions or insignificant transactions.

In their respective functions, Kats advised Budovsky that it was not necessary to register LR in the United States because the business would be and was being operated from Costa Rica. Budovsky relied on Kats' advice, because Kats was a lawyer and a CPA. Hence, the decision not to register in the United States was a joint decision. Budovsky and Kats also were concerned about their names being associated with LR because of the New York conviction.

The discussion forum postings were Kats' idea. The defense does not contest that HYIPs were attracted to LR and that Budovsky and Kats were aware and intended that some of LR's

-32-

features would encourage HYIPs' use of LR. *See* Plea Hrg. Trans. at pp. 19-20; Letter. But it was Kats, with Budovsky's knowledge and agreement, who offered commissions to chat forum users to recruit HYIPs. *See, e.g.*, Kats-djblade chat at 17:33:46 (Kats: "Well, you can get commissions by having HYIP's advertise on GoldAge. Also, I know Liberty Reserve could hire you to promote them to HYIPs to accept them.") (Exhibit "18"); *Id.* at 18:30:00 23/03/2007 (Kats: "LR pays up to $500 if you bring in a large HYIP that will accept LR payments.").

Lastly, while there is no doubt that some users lost money when Liberty Reserve's accounts were frozen and the business shut down, some of the alleged "victims" of HYIPs were, in fact, not necessarily victims in the traditional sense–as we noted above they were well aware that they were taking a calculated risk that they could make money and "get out" before the scheme collapsed. The defense has seen no evidence that Budovsky or LR sought out vulnerable victims or attempted to persuade LR users to invest in HYIPs. In fact, the LR website contained a warning to users to be wary of HYIPs. Nor is it possible to say that Budovsky reviewed every email on which he was copied, or that he directed the responses to every individual who complained of having lost money in an HYIP investment.

Insofar as the PSR and the Government assert that HYIP investors were victims of LR, the Defense notes that the sole purported "victim" whom the Government intended to call at trial, Eric Boateng, was an experienced investor who deliberately chose to invest in multiple HYIPs after his E-Trade account lost money. 3506-02 at p. 1-2. (Exhibit "19"). Boateng came to the United States on a tourist visa, which he overstayed, eventually earning United States citizenship through marriage. 3506-02 at p. 1. *Id.* Boateng worked as a computer salesman and would have been well aware of sales tactics and the manner in which salesmen inflate the claimed

-33-

capabilities of their products. *Id.*

A review of Boateng's 3500 material suggests that, at trial, Boateng would have testified that he became interested in investing when he read a book on achieving the American dream by using your brain. 3506-02 at p. 1. He invested in E-Trade but was unsatisfied with his rate of return, especially when he lost money. *Id.* at p. 2. He used his own first and last name as his user name when he set up the E-Trade account. 3506-01 at p. 7. (Exhibit "20").

Boateng would have testified that he learned about HYIPs from a person who saw him reading an investment book on the train. 3506-02 at p. 1. The person seemed like a "novice" to him. *Id.* Nonetheless, Boateng Googled "HYIP" and saw websites promising high rates of return. *Id.* at p. 2. He decided to take a chance and invested small sums in various HYIPs, setting up accounts with them under an assumed name, both for himself and for two other individuals. *Id.* at p. 2-3. *See also generally* 3506-01 (listing accounts and user names used for each). Although Boateng told the Government that he was looking for long-term investments, he invested multiple times in HYIPs promising quick returns. 3506-02 at p. 2. In fact, the average term of the HYIPs in which he invested was about 46 days and the longest was 180 days. *See generally* 3506-01 (listing each investment including rates and terms).

Several of the HYIPs in which Boateng invested accepted credit card payments, yet Boateng chose to use LR. Further, it appears that Boateng may have used an assumed name and transferred LR to his HYIP accounts rather than using his own credit card not because he had to or was scammed into doing so but because he was well aware that many HYIPs were frauds and he did not want his online activity to be linked to his name. He chose to accept the higher fees and inconvenience of transferring money through an exchanger because of the increased

-34-

anonymity that LR provided.  Likewise, he made multiple investments of small amounts, hoping
to outsmart the system by pulling his money out with a profit before any one of the HYIPs
collapsed.  *See generally* 3506-01 (showing individual investments of small amounts) and
Boateng's transactional history.  Far from an innocent victim, Boateng understood the difference
between a legitimate investment program like E-Trade and the HYIPs in which he dabbled. He
was an unlucky opportunist, not an unwitting victim.

Because of what we think was  the regulatory uncertainty as to LR's status in Costa Rica,
we take this opportunity to discuss briefly the applications to SUGEF to the extent the
Government may argue that the registration process undertaken by LR was a total fraud.  Of
course, this does not contradict that Kats and Budovsky intended to and did launder money for
fraudsters, but it does add context to the facts.

LR took the position, and so advised SUGEF, that the exchangers, not the end users, were
LR's customers and that only exchangers needed to be verified according to "know-your-
customer" procedures.  It appears that the Costa Rican authorities themselves were unsure
whether LR was required to do more or even to be registered.

LR's application to SUGEF began in April 2008 and continued into late 2011, even after
LR sought to withdraw its application. When SUGEF requested changes to LR's compliance
manual, they were made. SUGEF never sought to shut LR down for non-compliance; nor did the
dialogue between LR and SUGEF cease up to the point where LR sought to withdraw its
application in November 2011.  At the time of the application, Budovsky and Kats both were
owners of LR and both made decisions with the knowledge of the other.

LR's application for registration (Exhibit "21") under Article 15, Law 8204 disclosed that LR marketed digital currency which was used as an electronic means of payment over the internet. LR explained that it did not receive money directly from members of the public or end users, that LR converted physical money from the exchangers into electronic digital currency, that LR had contractual agreements with exchangers, and that LR received commissions from the exchangers. LR explained that the exchangers had responsibility for the exchangers' own clients.

SUGEF then began to conduct its review and investigation of LR's application. By letter dated December 1, 2008 (Exhibit "22"), SUGEF requested additional information from LR to determine if LR was engaged in activities which could be classified as an unauthorized currency exchange operation as well as a financial brokerage of third party funds regulated under Article 15, Law 8204 and Articles 116 and 156 of the Basic Law of the Central Bank of Costa Rica. In response, another office within the Costa Rican regulatory authority concluded that LR was not violating said laws and that as a result, LR was permitted to continue the registration process. (Exhibit "23"). SUGEF then reviewed LR's documents, interviewed individuals, analyzed LR's contracts with its exchangers and noted that LR did not receive money directly from the public or end users. (Exhibit "24"). SUGEF also noted LR's position that the exchanger was accountable to the end users and that the exchanger was responsible for verifying its clients and complying with the regulations and laws in the country where an exchanger operated. After reviewing LR's operations, the internal SUGEF report concluded that LR was not violating Article 59 or Article 86 or Article 116. (Exhibit "24"). The SUGEF application for registration under Article 15, Law 8204 was allowed to continue and did continue. LR submitted further information as requested

-36-

and the process moved forward.  LR complied with further requests for information and comments regarding LR's Compliance Manual in 2009.

The process continued into 2010.  LR advised SUGEF through counsel that LR had put in place a system of alerts when a user account received an amount greater than $10,000 from an exchanger and would review any suspicious accounts.  SUGEF responded to a request from the Technical Services Office for an opinion whether LR was legally authorized to create a digital currency as an electronic means of payment over the internet or whether doing so infringed on the powers of the Central Bank.  SUGEF concluded that LR was not money and not subject to the laws of the Central Bank.  (Exhibit "26").

In March 2011, SUGEF inquired of Banco Central whether LR was a permanent system which qualified as one of systemic importance.  (Exhibit "27").  By letters dated July 29, 2011 and August 11, 2011, Banco Central responded that the activity engaged in by LR was legal, that the business of LR was neither prohibited nor regulated because people were free to transact business at their own risk and that the LR system was not considered as "having systemic significance."  (Exhibit "28")  The August 11, 2011 letter concluded that the activities of LR were neither regulated nor prohibited in Costa Rica.  (Exhibit "29").

In a letter dated August 22, 2011, SUGEF advised LR that it also needed to verify users.  (Exhibit "30").  After further discussions, LR withdrew its application for registration from SUGEF in a letter dated November 28, 2011.  (Exhibit "31").

Lastly, it is not correct that Budovsky did not intend to implement any AML controls requested by SUGEF.  Some were implemented.

-37-

Cubero, LR's General Manager and an expert in banking, was hired by Arthur to assist LR with its SUGEF application and to assist LR to go more mainstream. Budovsky also hired in-house counsel (Portela) and, through Cubero, a Compliance Officer (Lopez), demonstrating LR's efforts, albeit insufficient ones, to legitimize LR and implement some AML controls. Cubero helped draft and update LR's Compliance Manual, worked to verify all exchangers, and planned to institute verification procedures for end users. Many of these matters were works in progress at the time of Budovsky's arrest.

While Budovsky may not have acted at Cubero's preferred speed, some, although not sufficient controls were being implemented. Budovsky also was ill for a period of time, which slowed the process. Budovsky did direct that Cubero obtain some of the records Cubero requested but certainly not all the records. What Budovsky did not do was give Cubero unfettered access to LR's computer system. This was due in part to Cubero's refusal to provide his laptop so that it could be checked for viruses, and in part due to the mutual mistrust between Budovsky and Cubero. Additionally, Budovsky did not want Cubero to see the full volume of transactions and transaction fees generated by LR as explained above. Granted, as the Government trial exhibits demonstrated, there was concern when certain information was provided unintentionally to Cubero and Lopez.

Certain information also was withheld from Cubero and Lopez. But that information related mostly to the volume of transactions moving through LR and to the fees earned by LR, which LR concealed in order to lower its Costa Rican tax obligation.

-38-

Discussion over whether LR needed to verify account users existed and continued. LR's Compliance Committee determined that only exchangers needed to be verified. Exchangers and the banks and Western Union to whom and through whom users placed money into the LR system, also had certain verification responsibilities vis-a-vis LR's end users. Additionally, as noted above, LR had some AML controls. And even after Lopez filed a Suspicious Activity Report with the UIF in May, 2011, no one shut LR down. Instead, SUGEF continued to correspond with LR regarding LR's registration application. It was not until August 22, 2011 that SUGEF advised LR that LR needed to verify users.[14]

The contemplated sale of Liberty Reserve was part of a plan to move LR's business out of Costa Rica. Accountants and lawyers (Exhibit "43") were hired and paid. Bank accounts in Cyprus were set up. El Amine was the signatory and emails reflect that El Amine was aware that accounts were being set up. The reason for the move to Cyprus – a more hospitable business climate – was set forth in a letter to SUGEF. In anticipation of the transaction, money was transferred from Costa Rica to bank accounts in Cyprus.

As noted above, the sale was not finalized because most of LR accounts were frozen and seized; LR thereafter continued to operate in Costa Rica.

---

[14] Lopez was let go not because of any concerns she had voiced to anyone at LR, but rather because LR was being sold and moved to Cyprus. The desire to sell LR was real. Budovsky and others wanted to move LR Costa Rica because the SUGEF registration process was taking so long and it was thought that registration in Cyprus would be easier. The sale never was completed because LR accounts were frozen and seized by law enforcement. As a result, LR continued its operations in Costa Rica, albeit without Cubero, its General Manager, without Lopez, its Compliance Officer, without verifying all users even after SUGEF said that verification of users was necessary, and without adequate AML controls. Budovsky was aware that LR's AML shortcomings continued, thereby continuing to enable criminals to launder money through LR, which they did.

-39-

### 2. The history and characteristics of Arthur Budovsky.

In imposing sentence, we ask the court to consider Arthur's age, and family ties and the humanity in Arthur. We already have pointed out certain facts in Arthur Budovsky's life which we ask the Court to consider in imposing sentence: the abandonment of Arthur and his mother by Arthur's biological father and the difficulties that caused (*see* Mrs. Belanchuk's letter contained as part of Exhibit "1"), Arthur's anxiety and depression, his attempt at suicide and his fear of leaving home).[15]

Under Section 3553(a), the circumstances here merit a court's favorable consideration and a Guidelines variance. Arthur Budovsky has been involved in charitable activities and has strong emotional family ties to his parents. Copies of letters of support are annexed hereto as Exhibit "1". These letters, including those from the young man for whom Arthur paid his medical expenses, his parents, friends and acquaintances are testaments to the good within Arthur. Further, it should be emphasized that upon completion of his sentence, Arthur will be removed from the United States and will have to start life anew.

### 3. The kinds of sentences available.

Section 3553(a)(3) requires sentencing courts to consider the kinds of sentences available when imposing a sentence, even if under the Guidelines the only permitted or encouraged sentence would be prison. *See Gall*, 552 U.S. at 602 & n. 11, 594 (finding court did not abuse

---

[15] Courts must consider all Section 3553(a) factors, including those that the Guidelines reject, ignore, or demand to an extraordinary degree. *Booker*, 543 U.S. at 220; *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Pursuant to 18 USC § 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

discretion in imposing three years of probation where guidelines calculated range of 30-37 months). This is not really a factor in this case.

    4.    <u>The amount of money laundered drives up the offense level disproportionately and should not be followed.</u>

We believe that the emphasis on this metric in the Guidelines does not square with the other § 3553(a) factors. For that reason (and others), Judges "may vary [from the calculated guideline range] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 707 (internal quotations omitted). The 2 B1.1 table used in this case was not developed by the Sentencing Commission based upon "empirical data and national experience," and thus it is not an abuse of discretion for a court to conclude that the § 2 B1.1 guideline results in a sentence "greater than necessary" to achieve the purposes set forth in § 3553(a). *See Kimbrough*, 552 U.S. at 575; *see also Spears*, 555 U.S. at 264-66 (2009) (explaining when Commission fails to fulfill its institutional role, a district court can vary from the guidelines based on policy disagreement). The Guidelines table used in this case was not based on pre-Guidelines practice and the Commission adopted the "loss" table contained within § 2B1.1 of the Guidelines with no empirical basis.

In fact, Guidelines based on this type of "loss" table have been widely criticized by judges and legal scholars. As stated in one opinion, the Guidelines "in an effort to appear 'objective,' tend to place great weight on putatively measurable quantities, such as . . . [the] amount of financial loss in fraud cases, without, however, explaining why it is appropriate to accord such huge weight to such factors." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), citing Kate Stith & Jose A. Cabranes, *Fear of Judging: Sentencing Guidelines in the Federal Courts* 69 (1998)). *See also* Derek R. Vollrath, *Losing the Loss Calculation: Toward a*

*More Just Sentence Regime in White-Collar Criminal Case*, 59 Duke L.J. 1001, 1025 (2010)

("The Guidelines fail to achieve justice in white-collar criminal cases. Their sentencing

recommendations are irrationally high and, due to the Guidelines' overemphasis on the loss

calculation, fail to accurately reflect a defendant's culpability"). Courts have found Guidelines

increases based on amounts in the 2 B1.1 table to defy common sense. *See Adelson*, 441 F.

Supp. 2d at 509 (criticizing "the inordinate emphasis that the Sentencing Guidelines place in

fraud cases on the amount of actual or intended financial loss"); *United States v. Emmenegger*,

329 F. Supp. 2d 416, 427-8 (S.D.N.Y. 2004) (reasoning amount of loss is often "a kind of

accident" and therefore "a relatively weak indicator of [ ] moral seriousness . . . or the need for

deterrence." *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (recognizing

Guidelines range of 360 months to life resulting from increases caused by Guidelines

amendments passed after highly publicized frauds such as Enron defied common sense in that

securities fraud case and imposed 60-months sentence); *see also* Frank O. Bowman III,

*Sentencing High-Loss Corporate Insider Frauds after Booker*, 20 Fed. Sent. R. 167, 169, 2008

WL 2201039 at \*4 (Feb. 2008) ("since Booker, virtually every judge faced with a top-level

corporate fraud defendant in a very large fraud has concluded that sentences called for by the

Guidelines were too high. This near unanimity suggests that the judiciary sees a consistent

disjunction between the sentences prescribed by the Guidelines [in corporate fraud cases] and the

fundamental requirement of Section 3553(a) that judges impose sentences 'sufficient but not

greater than necessary' to comply with its objectives"). It is therefore not surprising that only

51% of § 2B1.1 sentences were within the guideline range in fiscal year 2011. U.S. Sentencing

Commission, *2011 Sourcebook of Federal Sentencing Statistics*, http://www.ussc.gov/research

-42-

_and/statistics/annual_reports_sourcebook.

More recently, in *United States v. Gupta*, 904 F. Supp.3d 349 (S.D.N.Y. 2012), an insider

trading case, Judge Rakoff, repeated his concerns, expressed earlier in *Adelson*, with the

application of the Guidelines' table and its disproportionate and unrealistic effect on the measure

of an appropriate sentence. In words appropriate here, Judge Rakoff stated:

> "Imposing a sentence on a fellow human being is a formidable
> responsibility. It requires a court to consider, with great care and
> sensitivity, a large complex of facts and factors. The notion that
> this complicated analysis, and moral responsibility, can be reduced
> to the mechanical adding-up of a small set of numbers artificially
> assigned to a few arbitrarily-selected variables wars with common
> sense. Whereas apples and oranges may have but a few salient
> qualities, human beings in their interactions with society are too
> complicated to be treated like commodities, and the attempt to do
> so can only lead to bizarre results."

*Id.* at 350.

Regarding the specific Guidelines to be applied in that case, Judge Rakoff noted that

"[t]he Guidelines' calculations for this offense [insider trading] are no longer tied to the mean of

what federal judges had previously imposed for such crimes, but instead reflect an ever more

draconian approach to white collar crime, unsupported by any empirical data." *Id.* at 351.

Judge Rakoff went on to conclude that in focusing largely on the amount of monetary

gain or loss occasioned by an offense, the Sentencing Commission "effectively ignored the

statutory requirements that federal sentencing take many factors into account, *see* 18 U.S.C. §

3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on

their face." *Id.* What Judge Rakoff called the "irrationality of this approach," is, we submit,

likewise present here and causes what, in Judge Rakoff's view, created "in the name of

promoting uniformity, a sentencing disparity of the most unreasonable kind." *Id.* at 351.

-43-

According to Judge Rakoff, "this is a very rough surrogate" for determining and appropriate sentence. *Id.* We think that Judge Rakoff's analysis of the place of the 2 B1.1 table, also used by Probation in this case, hits the mark.

Other judges and scholars appear to share this view and have expressed a like dissatisfaction with the Guidelines applicable in white collar cases and the 2 B1.1 Guidelines table which disproportionately affects the Guidelines offense level and advisory sentencing range. Indeed, some have termed the Sentencing Guidelines "fundamentally broken" in high-loss cases. Frank O. Bowman, III, "Comment on Proposed Amendments to Economic Crime Guideline, § 2B.1.1" (Feb. 19, 2015) at p. 2 (citing remarks of Judge Patti B. Saris, Jan. 9, 2015, available at http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150109/Remarks.pdf). *See also* Robert J. Anello and Richard F. Albert, "Rise of ABA Task Force's 'Shadow Sentencing Guidelines,'" N.Y.L.J. April 5, 2016.

One judge recently noted that "the guidelines, even with its slight revisions, are just mindlessly accelerated once you have numbers of any size added in the loss or gain table." Sentencing Transcript, *United States v. Faibish*, 12 Cr. 265 (E.D.N.Y. March 10, 2016) at 23: 2-7 (Judge Vitaliano). In that case Judge Vitaliano sentenced a fraud defendant with Guidelines of life and with a "cap" of 80 years (based on the maximum sentence possible by stacking counts after the defendant's conviction at trial) to a sentence of 63 months. *Id.* at 54: 2-3, 10-11. The "Shadow Sentencing" article notes also that in *United States v. Litvak.* 3"14 Cr. 19 (D.Conn. July 23, 2015), Chief Judge Janet C. Hall sentenced a defendant to 24 months where the Guidelines recommendation in the PSR was 108-135 months. *Id.* at 135-136.

For all of the reasons set forth herein, the Guidelines here should not be determinative of the sentence to be imposed. Such a disjunct between the Guidelines and the Section 3553(a) factors is present in this case.

> **5.    Imposing a non-Guidelines Sentence below 180 months will not result in unwarranted sentencing disparities.**

Imposition of a non-Guidelines sentence below 180 months on Arthur Budovsky will not create sentencing disparities. In fact, imposing a Guidelines sentence would likely result in a sentencing disparity given the significant departures and variances from the Guidelines that judges have imposed in other cases.

During fiscal year 2014, 886 federal sentences for money laundering were imposed.[16] The mean sentence was 32 months. The median was 18 months. *See* U.S. Sentencing Commission 2014 Sourcebook of Federal Sentencing Statistics Tables[17] (Table 13), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/ 2014/Table13.pdf. For the 495 defendants in CHC I, the mean sentence was 39 months and the median was 29 months. *Id* at Table 14, available at  http://www.ussc.gov/sites /default/files/pdf/research-and-publications/annual-reports-and sourcebooks/2014/Table14.pdf. In CHC II, the mean sentence was 41 months and the median was 28 months. *Id.*

---

[16] For those same 886 defendants, 65.3% were not required to pay a fine or restitution. 17.3% were required to pay restitution only. 15.6% were required to pay a fine but no restitution. Only 1.8% *just 16 defendants) were required to pay both restitution and a fine. *See* U.S. Sentencing Commission, 2014 Sourcebook of Federal Sentencing Statistics Tables (Table 15), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/ annual-reports-and-sourcebooks/2014/Table 15. pdf.

[17] The complete Sourcebook is available at http ://www.ussc.gov/research-and-publications/annual-reports-sourcebooks/2014/sourcebook-2014.

In this case, the co-defendant Chukarev received a sentence of 3 years. The co-defendant Marmalev received a sentence of 5 years. We recognize that each person presents differing facts and differences in life's narratives. The co-defendants El Amine and Kats, both Government cooperators and presumably recipients of 5K letters, are to be sentenced on May 13, 2016. Both obviously hope for leniency from the Court.

As noted above, the idea for LR originated with Kats, who was an attorney and CPA. Budovsky joined in the plan and, together, Kats and Budovsky created and operated LR. Kats and Budovsky had known each other since they had been 19 and 16 years old, respectively. Kats knew Budovsky suffered from depression and lacked a college education. *See* Kats-Alex chat at 6:42-43 pm (Kats: Budovsky "has been struggling with depression for most of his life." Alex: "[M]aybe [he's] bipolar[r]."); *Id.* at 6:52 pm (Kats: "He may be partly psychopathic."). (Exhibit "4"). In fact, at one point in his late teens or early 20s, Budovsky did not leave his house for a substantial period of time due to his anxiety and mental illness. Kats was well aware of, and, in our respectful view, exploited Budovsky's vulnerability. *See* Kats-Budovsky chat at 14:00:58-14:03:16 30/09/2008 (Budovsky: "soon will run out of pills." Kats: "You can always get more, though CR should be calmer..." Budovsky: "yes, no prescription for Paxil"). (Exhibit "8").

Budovsky trusted Kats and relied on him for business and legal advice and even for tax preparation. *See, e.g.*, Kats-Budovsky chat at 01:37:15-01:41:45 1/07/2008). (Exhibit "8"). Budovsky even trusted Kats' advice regarding renouncing his citizenship. *See* Kats-Alex chat at 7:44-8:06 pm ("What I did not know is that he did not yet give up US citizenship. That's a big mistake. . . . "I told him to do it a long time ago..."). (Exhibit "4"). *See also* Kats-Budovsky

-46-

chat 05:12:09-05:15:05 6/4/2008 (Kats discussing his draft document renouncing citizenship[18], to which Budovsky responded, "[I]'ll just say [I] like warmer climate."). (Exhibit "8")  In fact, Budovsky did not permanently leave the United States until June 2009.  *Id.* at 22:51:37-22:52:07 13/06/2009 (Budovsky: "[I]t was interesting leaving the country this time . . . [I don't] intend to return").  (Exhibit "8").

The Government seems to suggest in its version of the offense that Budovsky was the more evil operative behind the inception, creation and implementation of LR.  In our respectful view, Kats' personality was the dominant force in his relationship with Arthur.  It is worth noting that Budovsky was working at Geico as a computer technician when Kats asked him to join LR's precursor, GoldAge.  Certainly, Kats believed that he was the genius behind LR.  *See* Kats 3507-21 at p. 2 (Exhibit "44"); Kats-Alex chat at 6:37 pm ("If it were not for me, Arthur would be in USA, working for an insurance company, inspecting car damage.").  (Exhibit "8").  This of course, by no means is intended to suggest that Budovsky was not a willing participant and full-fledged partner with Kats from the beginning, as acknowledged in the Letter, but it does provide some further context and illuminates somewhat Kats' own understanding of their relationship.

The PSR's and the Government's recitation of the circumstances surrounding the period 1999 – 2005 and the launch of LR, particularly Kats' claims regarding alleged other unrelated frauds (an alleged tax fraud, insurance fraud and money laundering for Budovsky's cousin), should be ignored as not material to any sentence to be imposed in this case, particularly in light of the factual recitations in the Letter as to their partnership in LR.  As important, much of the

---

[18] In a proffer session, Kats falsely represented to the Government that he had drafted this statement for Budovsky.

inferences which the Government asks the Court to draw regarding these three early matters relies heavily on Kats. A fuller understanding of Kats is warranted.

Kats has repeatedly violated the law despite having repeatedly received leniency in consideration of his cooperation. When he is caught, he expects that he will cooperate, blame others for things and escape incarceration.

In 1998, while Kats was living with his parents, agents tried to execute a search warrant of his residence. *See* Kats 3507-01. (Exhibit "32"). Kats destroyed voluminous evidence including suggestive videos and photographs of his young nephew and nephew's friend. *Id.* Kats cooperated with the Government and admitted that he had viewed several thousand images of child pornography. *Id.* Apparently, because of his cooperation he was not prosecuted for this offense.

Proving that he failed to learn from his near arrest in 1998, Kats continued to engage in child pornography. In 2006, Kats was charged with child pornography when, as a result of a search of his computers in connection with his GoldAge arrest, a significant amount of child pornography was found on his computer. Facing substantial jail time, Kats persuaded Budovsky to resolve the case in a plea rather than fighting the unlicensed money transmission charges. Budovsky agreed because Kats was his friend. Instead of jail for Kats, both defendants were sentenced to probation. Kats then attempted to terminate his probation early by falsifying a letter from the clinic at which he was receiving sex offender treatment purporting to support his fabricated claim that he was behaving appropriately and not engaging further in child pornography, which future events in this case prove was untrue. *See* Compliance Letter from Mustard Seed Forensic Social Work Services, P.C. dated Sept. 23, 2009. (Exhibit "33").

-48-

Not surprisingly, when Kats was arrested with respect to the instant case and again was caught with hundreds of images of child pornography, he again signaled his willingness to cooperate, effectively telling the agents, "You need me." Kats then proceeded to do what he was now a pro at doing: talking for his "get out of jail" card.

Kats' repetitive deal-making to avoid prison, his lies to his State probation officer and the fraudulent documentation he created to attempt to obtain an early discharge from his State probation term, his hate-filled rant against the Government of the United States, his attempt to obtain Ukrainian citizenship by bribing foreign officials, and also his wholesale creation of fictitious "interviews" with individuals, including Osama bin Laden, whom he claimed to have interviewed at a secret location,  under his Ayn Rand-inspired pen name of Ragnar Danneskjold are reflective of his dominant personality. *See, e.g.*, Compliance Letter from Mustard Seed Forensic Social Work Services, P.C. dated Sept. 23, 2009 (Exhibit "33"); Kats "Manifesto" ("The history of the present United States of America ("USA") is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over me. . . . I, therefore, do solemnly publish and declare, . . . that I am Absolved from all Allegiance to the USA, and that all political connection between me and the USA, is and ought to be totally dissolved; …") (Exhibit "34")[19]; Kats-Budovsky chat at 22:52:15 and 22:54:25 (Kats: "I may go

---

[19] Kats' hatred of America is also revealed in his conversation with "Spacegold.com," in which Kats discusses his manifesto and his plans to leave the United States. Kats-Spacegold. com chat at 19:26:01-19:29:01 27/04/2007 (Exhibit "5"); *Id.* at 19:58:01 27/04/2007 (Kats: "Vigilance is the price we must pay to keep government at bay. Those that are not vigilant deserve to die, and the government will eventually help them to that."); *Id.* at 20:01:33 27/04/2007 (Kats: "Smart people see the winds of change, pick up their assets, and leave. The ignorant stick around when it's too late.").

to Kiev soon… or not." "I pretty much bribed everyone in gov't over there.") (Exhibit "8")[20]   R.

Danneskjold, "Interview with – Osama Bin Laden, Saving The Planet One Martyr at a Time,"

Jan. 31, 2010.  (Exhibit "35").

Kats' purported "interview" with Budovsky on the PlanetGold website is a fiction –

entirely Kats' creation.  Notwithstanding Budovsky's candid and forthright statements during his

allocution and in the Letter, the statements attributed to Budovsky by Kats on the PlanetGold site

were never made by Budovsky.

Considering Kats' repeated involvement with child pornography and deal-making skills[21],

it comes as no surprise that he was "less than forthright" with the Government once again during

the investigation of this case.  In his proffer sessions, Kats consistently downplayed his buyout

from LR by Budovsky and claimed that he had only received $80,000, which he had reported on

his income tax return. Kats 3507-02 at p. 3.  (Exhibit "45").  In fact, Kats received far more than

$80,000 and he did not report this income or pay taxes on it. Kats 3507-02 at p. 2; Kats 3507-14

at p. 9.  (Exhibit "36").

Further, while continuing to maintain a friendship with Budovsky and continuing to

receive money and loans from his "friend," Kats actively sought to retaliate for what Kats

perceived as Budovsky's "betrayal," after Budovsky bought out Kats' interest in LR. *See*, *e.g.*,

Kats-Alex chat at 6:52 pm (Kats: "I[] never though[t] he would betray me like that.") (Exhibit

---

[20] Simultaneously, Kats asked Budovsky for a $25,000 loan, asserting that he needed the money to pay back the Russian mob, which had lent him the money to bribe the SBU, the successor to the KGB.  *See* Kats-Budovsky chat at 12:36:32-18:38:09 4/11/2008.  (Exhibit "8").

[21] In this regard, *see also* Kats-Budovsky (0@0) chat at 09:47:54-09:48:07 23/07/2007 (Kats: "Can't think about CP [child pornography].  It's a thought crime.  Possession is just the evidence of the thought.") (Exhibit "37"); *Id.* at 09:48:49 23/07/2007 (Kats: "It's just illegal to be a p [pedophile].").

"4"); *Id.* at 6:50 pm (Kats: "You really need to be very rotten inside to betray a very close friend (we were very close for many years)."); *Id.* at 6:36 pm (Kats: "Arthur ruined everything for us. He set me back several years in terms of what I wanted to accomplish."); *Id.* at 6:54 pm (discussing the plan to "fuck LR and Arthur in every possible way" and agreeing that EGC [Kats' new venture, EuroGold Cash] "should be the winner" from LR's takedown). *See also* Kats-Budovsky chat at 00:44:55 12/5/2009 (Kats: ". . . can I count on you for a $50k loan?"). (Exhibit "8").

While matters were discussed, decided and undertaken jointly, when Budovsky removed his mentor from LR, Kats' own larger-than-life ego wanted revenge. Kats and Yassine discussed how they had "everything in place to fuck LR and Arthur in every possible way" and that "nothing gon[n]a save him from what is coming" and both plotted to bring Arthur to the attention of the FBI. *See* Kats-Alex chat at 6:53 pm; *Id.* at 6:59 pm. (Exhibit "4"). Yassine even noted that he had the information "about the bank accounts he got in Cyprus." *Id.* at 7:31 pm. Kats suggested that Ahmed open a dialogue with the DOJ and offered to speak with anyone that Yassine contacted because he claimed to be "much better at telling them all the things, how things work, etc." *Id.* at 7:26 pm, 7:42 pm. Kats also reported LR to the FBI himself. *See* 3507-02 at p. 1. They agreed to proceed without revealing anything to Budovsky. *See* Kats-Alex chat at 7:48 pm (Kats: "Keep contact with all witnesses (past, present employees), but DO NOT give any hint of what we're doing. [...] Element of surprise is essential."). (Exhibit "4").

As part of Kats' desire for revenge, Kats continued to create e-currency sites to compete with LR. *See* Kats-Verbeek chat at 17:17:06-17:17:13 10/04/2009 (Kats: "I'm developing a casino, 2 other DGC's [digital gold currencies], cam/youtube type businesses that will

incorporate DGC's, dutch/gambling auction, etc.... Actually, 3 other DGC's."). (Exhibit "38").

One of these sites was EuroGold Cash, which Kats promoted by warning his correspondents that

LR was "going mainstream" and would no longer be friendly to fraudulent business practices.

*See, e.g.*, Kats-Soleiman [Me-gold] chat 11:39:24-11:41:06 18/05/2009 (Kats discussing starting

new e-currencies to compete with LR, complaining that LR has changed its verification rules and

now demands corporate papers and real identification) (Exhibit "39"); *Id.* at 15:13:50-15:14:40

26/05/2009 (Kats: "EGC [EuroGold Cash] will never compete with exchangers. [...] If I were

still boss at LR, it would not be the way it is now. Move people over to EGC, if you can."); *Id.* at

12:13:17 10/6/2009 (Kats: "Within a year LR will be kicking out HYIP's. They'll be going to

EGC."); Kats-Verbeek chat 12:11:22 8/04/2009 (Kats: "LR intends to go mainstream eventually,

to go after moneybookers, etc. Maybe go on European stock exchange eventually. So egc,

Admiral, etc., will be here for you.") (Exhibit "38"); *Id.* at 12:00:53 8/04/2009 (Kats: "I'll be

able to give you better deals if you add Admiralgold.com and eurogoldcash.com to your forms

this summer, including loans."); Kats-Rafaele chat at 11:57:44 24/03/2009 (Kats: "You see, LR

is going the way of Moneybookers, etc. So new systems are need like eurogoldcash, admiralgold

(coming soon).") (Exhibit "14"); *Id.* at 12:37:06 24/03/2009 (Kats: "In a few years, LR will be

like moneybookers, and the industry will need a replacement for the low-end (hyip's. etc.). EGC

and Admiral will fill that role."); *Id.* at 02:31:07 28/03/2009 (Kats: "I made LR what it is today; I

can do it with the others."). Not surprisingly, EuroGold Cash was much more aggressive in

assuring its users that no verification would be required. *See, e.g.*, Email dated June 2, 2011 re:

Contact Us – Business Development concerning EuroGold Cash ("We only directly exchange

with exchangers, and we do not require documents."). In these schemes, Kats used Yassine to

open bank accounts for him. *See* Kats-Trankilo chat at 16:14:04-16:16:50 6/06/2008 (Kats: "Well, I would develop the site, you or a very trusted relative would simply hold the brokerage account.") (Exhibit "6"); *Id.* at 16:16:56 6/06/2008 (Kats: "All they need to do is hold a bank account open, and it would be nothing close to as complicated as LR or Cambist."); *See* Kats-Sharapov chat at 13:06:14 9/10/2010 (discussing that Yassine was going to set up a EuroGold Cash account for Kats in Costa Rica and "maybe one in Morocco as well.") (Exhibit "13"); Kats-Trankilo chat at 13:06:30-13:19:24 9/10/2010 (Yassine promises Kats that he can obtain a license from SUGEF for EGC and has access to prepaid ATM cards) (Exhibit "6"); *Id.* at 13:07:11-13:07:20 9/10/2010 (Yassine: "as i told u wiit Tecnocash i have several accounts and in mo[r]occo to[o]" Kats: "Very good. I'm building several new "LRs" and could use your help.").

Further, Kats also confirmed that Yassine had certain control over LR's accounts. *See Id.* at 13:06:49-13:12:58 9/10/2010:

| | |
|---|---|
| Sharapov: | What does it mean? |
| Kats: | It means the guy that originally held LR's accounts with millions of dollars will do it for EGC as well. Arthur fird him from LR. |
| Sharapov: | Held-managed? |
| Kats: | both. |
| | He incorporated and opened and managed LR's accounts with millions in them. He knows how things work, he knows the vice president of a bank, etc. |
| Sharapov: | You mean Bank account? |
| Kats: | Yes. |

Moreover, Kats was not above stealing from his customers, which he did repeatedly, and he instructed others to do that as well. *See* Kats-Paulio chat 08:34:01-08:43:19 7/02/2008 (Kats instructing Paulio to contact DA Gary Fishman: "Just tell him that you sent money, $20k to GoldAge, and that we never paid you for your order. ... Don't tell him it was a loan."). (Exhibit "40"). *See also* Kats-Sharapov chat 13:55:01-13:59:55 9/10/2010 (Exhibit "13"):

Kats:        Let me know if there is an order of at least $50k in Armani.

Sharapov:    Ok. We will just take the money and shut down.

Kats:        Not shut down.

             Just blame it on something. I took $80k from customer in FastGold after
             Arthur trusted some guy in Florida and lost $60k of our money.

             I blamed e-gold.

             It was eg to LR exchange.

[...]

Kats:        FBI does not investigate consumer fraud under $1m.

*Id.* at 14:02:05-14:05:56:

Kats:        They have no way to find out anything without court order, plus we can
             always say LR took it or our account in LR was hacked and the LR was
             sold to other exchangers (which it will be).

Sharapov:    Strange, the german guy sent one e-mail about the 10k, and is quiet for a
             week.

Kats:        The money went to CR, Panama, Russia, etc.

             I thought you sold all the LR? How come you didn't send him the wire?

Sharapov:    Allan will close our account.

             I did. Now we have everything in TC [Technocash].

-54-

Kats:       We'll open another one. Plus, why would he close it if we had virus and
            got hacked? Not our fault.

            We'll log in to account with TOR, and sell off the funds through various
            exchanges (convert to EGC, etc).

[...]

Kats:       We can do $50k order easy. Just hack our account (as someone to log in
            with different IP or use TOR), and ox the funds to EGC. Then if anyone
            asks (the victim has to go to LR first, and then ask LR where it went, etc.)

            EGC will say we need court order (so will LR, btw).

            Trust me, this is what most crooked exchangers do.

            But we're not crooked, we're just broke. ; )

The foregoing is in no way intended to detract from Budovsky's plea allocution or the
acknowledgments in the Letter or to deflect responsibility from Arthur Budovsky's own actions
on to anyone else. Rather, it is intended simply to place in better context the activities of both
Budovsky and Kats in the operation of LR and certainly to illuminate Kats' views of their joint
activities and their respective roles in the operation of LR before and after Kats' departure.

         6.      No fine should be imposed

Arthur Budovsky's financial picture is poor. His outlook for future prospects of earning a
living is worse still and he has lost all that he had.

## CONCLUSION

Arthur Budovsky is a complex individual, like most people. He has many redeeming
qualities and there is much more to him than the narrative of his offense conduct. He has been
described as kind, caring, generous, a good friend and loving. Those narratives also help to
define his humanity.

-55-

For all of the foregoing reasons, Arthur Budovsky respectfully requests, on the facts of this case and considering all of the sentencing factors, that the Court impose a non-Guidelines sentence below 180 months.  Such a sentence will be sufficient, but not greater than necessary, to achieve the purposes set forth in 18 U.S.C. § 3553(a).

Dated: April 22, 2016
   New York, New York

Doar Rieck Kaley & Mack

By:      _____/S/_____
   John F. Kaley
   217 Broadway, Suite 707
   New York, New York 10007
   Tel: (212) 619-3730

   _____/S/_____
   Donna Newman, Esq.
   20 Vesey Street, Suite 400
   New York, New York 10007
   (212) 229-1516

   _____/S/_____
   Jeffrey Pittell, Esq.
   Maher & Pittell, LLP
   4299 East Shore Road
   Great Neck, New York 11023
   (516) 829-2299

   *Attorneys for Arthur Budovsky*

To:   All Counsel
   (Via e-mail & ECF filing)

   Ms. Smyla Jones
   U.S. Probation Officer
   (Via e-mail & ECF filing)