UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

ARTHUR BUDOVSKY,
    a/k/a "Arthur Belanchuk,"
    a/k/a "Eric Paltz,"

        Defendant.

13 Cr. 368-4 (DLC)

## GOVERNMENT SENTENCING SUBMISSION

PREET BHARARA
United States Attorney

Christian R. Everdell
Christine I. Magdo
Assistant United States Attorneys
  -Of Counsel-

LESLIE CALDWELL
Assistant Attorney General
Criminal Division

M. KENDALL DAY
Chief, Asset Forfeiture and Money
Laundering Section

Kevin G. Mosley
Trial Attorney
  -Of Counsel-



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

April 29, 2016

By ECF and Hand Delivery
Hon. Denise L. Cote
United States District Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

> Re:   *United States v. Arthur Budovsky*, 13 Cr. 368-4 (DLC)

Dear Judge Cote:

The Government respectfully submits this letter in advance of the sentencing of defendant Arthur Budovsky, which is currently scheduled for May 6, 2016 at 3:00 p.m.  On Friday, January 29, 2016, three days before trial in this case was set to begin, Budovsky pled guilty, pursuant to a plea agreement with the Government, to Count One of the Superseding Indictment S1 13 Cr. 368 (DLC), charging him with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), for his role in creating and running Liberty Reserve.  Pursuant to the plea agreement, the parties have stipulated that the Sentencing Guidelines call for a sentence at the statutory maximum – 240 months' imprisonment – which Probation recommends.  But for that statutory cap, the parties have stipulated that Budovsky would face a Guidelines range of 360 months to life imprisonment, based principally on the hundreds of millions of dollars in criminal proceeds that Liberty Reserve laundered for U.S.-based criminal enterprises.

## PRELIMINARY STATEMENT

As set forth below, a Guidelines sentence is amply warranted in this case, based on numerous grounds.  First, as the co-founder, leader, and principal beneficial owner of the digital currency company, Liberty Reserve, Budovsky was responsible for running a money laundering operation of unprecedented size and scope, which became the financial hub for cybercriminals around the world who used it to launder billions of dollars of criminal proceeds.  Second, Budovsky is a proven recidivist who developed Liberty Reserve shortly after being convicted for running a similar unlicensed digital money transmitting business in New York, and who has made his living through such businesses for most of his life.  Third, Budovsky has repeatedly minimized his conduct and shown no remorse for his actions, which have facilitated cybercriminals worldwide and led to the financial ruin of numerous victims.  Based on these facts, a Guidelines sentence is appropriate under 18 U.S.C. § 3553(a), in light of the seriousness

of the offense, as well as the need for specific deterrence and to protect society from further crimes of the defendant.

## FACTUAL BACKGROUND

The section below tracks the facts set forth in the Presentence Report ("PSR") prepared by Probation. As the PSR notes, Budovsky has submitted to Probation a lengthy alternative version of the offense conduct, which is repeated in his sentencing submission to the Court, in which he raises a number of objections to the facts contained in the PSR. (PSR at 42). However, as the PSR and Budovsky's offense conduct summary both note, almost all of the objections are not true objections to underlying facts, but rather arguments about the inferences that should be drawn from those underlying facts or the characterization of certain facts. (*Id.*). We address the most important of these disagreements in Discussion section below.

To the extent that a dispute truly relates to a contested fact, as opposed to a disputed inference or characterization, we believe that the Court can resolve the dispute – if the Court feels it needs to – by relying on the documents in the record, without the need for additional testimony at a *Fatico* hearing. We note further that the parties extensively discussed whether a *Fatico* hearing was necessary and the defendant did not request one, electing instead to rely on the existing documentary record to support his arguments. *See United States v. Ghailani*, 733 F.3d 29, 54 (2d Cir. 2013) ("'[I]t is well established that a district court need not hold an evidentiary hearing to resolve sentencing disputes, as long as the defendant is afforded some opportunity to rebut the [g]overnment's allegations.'") (quoting *United States v. Broxmeyer*, 699 F.3d 265, 280 (2d Cir. 2012) (internal quotation marks omitted). In any event, as set forth more fully below, there are more than enough uncontested facts before the Court to warrant imposition of a Guidelines sentence.

Overview

Liberty Reserve S.A. ("Liberty Reserve") operated one of the world's largest and most widely used digital currencies, which could be used to send and receive payments, via the Internet, to and from people located all over the world. By May 2013, when it was shut down as a result of the Government's criminal investigation, Liberty Reserve had more than 5.5 million user accounts worldwide, and had processed more than 78 million financial transactions with a combined value of more than $8 billion. United States users accounted for the largest segment of Liberty Reserve's total transactional volume – between $1 billion and $1.8 billion – and the largest number of user accounts – over 600,000. (GX-1320A; GX-1320B; GX-1320C; GX-1320D) (PSR ¶ 14).

Liberty Reserve was originally conceived by Arthur Budovsky and co-defendant Vladimir Kats in Brooklyn, New York, in approximately 2001, and became operational in late 2005. From his previous experience with "GoldAge" – a digital currency exchange business that he ran with Kats – Budovsky was aware that a substantial volume of digital currency transactions were related to Internet investment schemes called high-yield investment programs ("HYIPs"), which he knew to be online Ponzi schemes. Budovsky was also aware that digital currencies

were used by other online criminals, such as credit card traffickers and identity thieves.  (PSR ¶ 15).

Budovsky and Kats designed Liberty Reserve to appeal to these online criminals in order to capture their business.  Among other things, Budovsky and Kats set up Liberty Reserve to have weak anti-money laundering ("AML") controls and allowed users to move money anonymously through Liberty Reserve's system, regardless of the volume or provenance of the funds.  Budovsky and Kats also marketed Liberty Reserve specifically to HYIP operators and other criminal clientele.  (PSR ¶ 16).

In May 2006, Budovsky and Kats were arrested and later pled guilty to operating GoldAge as an unlicensed money transmitting business.  Following their arrests, over the next two years, Budovsky and Kats moved Liberty Reserve's operations offshore to Costa Rica in an attempt to insulate themselves from the reach of U.S. law enforcement.  At the end of this period, Budovsky pushed Kats out of Liberty Reserve and became the sole beneficial owner and principal operator of the company, with final decision-making authority over company decisions.  Budovsky maintained this role until Liberty Reserve was shut down in May 2013.  (PSR ¶ 17).

During the time period from 2009-2013, Liberty Reserve reached the height of its activity.  In late 2012, Liberty Reserve handled a transactional volume of over $300 million per month (GX-1320E), a significant portion of which came from users in the United States.  Budovsky knew that a substantial number of these transactions were connected to HYIPs and other online criminal activities, and continued to operate Liberty Reserve to cater to these customers.  Among other things, Budovsky and his co-conspirators intentionally failed to implement effective AML controls at Liberty Reserve.  Budovsky and his co-conspirators also took steps to prevent the Costa Rican regulatory authorities and Liberty Reserve's own compliance officials from discovering the criminal transactions flowing through Liberty Reserve.  (PSR ¶ 18).

Liberty Reserve ultimately grew into a financial hub for cybercriminals around the world who used it to launder billions of dollars of criminal proceeds derived from HYIPs, credit card trafficking, stolen identity information, and computer hacking.  As set forth in his plea agreement with the Government, Budovsky was responsible for laundering between $250 million and $550 million in criminal proceeds, which represents a conservative estimate of the amount of laundered funds originating from Liberty Reserve users in the United States.  (PSR ¶ 19).

Budovsky also increased his own profits by participating in fraudulent ventures and side businesses with his co-conspirators that were related to Liberty Reserve.  In late 2010, Budovsky created a HYIP with co-defendant Azzeddine El Amine that was modeled on profitable HYIPs that used Liberty Reserve.  From February 2011 through May 2013, Budovsky and El Amine jointly owned Swiftexchanger, one of the largest exchangers of Liberty Reserve currency.  At the same time, Budovsky and El Amine falsely reported to Liberty Reserve's own customer verifications department that Swiftexchanger was owned by a third party.  Budovsky also stole money from several HYIP operators by freezing their Liberty Reserve accounts and keeping the money for himself.  (PSR ¶ 20).

All totaled, Budovsky netted over $25 million in profits from his criminal activity. Budovsky caused the majority of these criminal proceeds to be transferred to several different countries through a complex network of third-party and nominee accounts that he controlled in order to obfuscate the location, ownership and control of the funds.  (PSR ¶ 21).

<u>How Liberty Reserve Worked</u>

A.     *Liberty Reserve Website*

To use the Liberty Reserve digital currency, commonly referred to as "LR," a user first needed to open an account through the Liberty Reserve website: www.libertyreserve.com.  (GX-110A).  To register for an account, the user just needed an email address and was required to provide basic identifying information, such as name, address, and date of birth.   (PSR ¶ 22).

However, unlike mainstream banks or online payment processors, Liberty Reserve did not require users to validate their identity information in any way when opening an account.  As a result, a criminal could easily open a Liberty Reserve account using identity information that was fabricated or stolen.  For example, during the course of the investigation, an agent opened an undercover Liberty Reserve account under the name "Joe Bogus," with the address, "Completely Made Up City, New York, United States."  (GX-120A; GX 120I).  Users commonly established Liberty Reserve accounts under blatantly fictitious names, often using names signaling the users were involved in criminal activity, such as hacking or "carding" (*i.e.*, selling stolen credit card data, also known as "cvvs," "fulls" or "dumps").   Examples include:

| | | |
|---|---|---|
| card biz | FullzGalore | hacker account |
| carder boss | fullzseller | hell hacker |
| Carder Profit | GANG DUMPS | Master Carder |
| Cardshopteam | Good Hacker | mR dumps |
| cc carding fullz | Great Hacker | Oliver Hacker |
| ccv hacker | hack banks | Public Dumps |
| CooLHacK | Hack Crew | real hacker |
| Cyber Hacker | HACK DUMPS | Russia Hackers |
| Devil Hack | hack good | seller hacker |
| dumpfullz101 | hack great | Shop Fullz |
| dumps lord | Hack Lord | Spamming Tools |
| Dumpsmall | hack master | tasty hacker |
| dumpsseller89 | hack more | viet hacker |
| freshdumps | hack pro | wise hacker |
| Fullz.CVV | hack them | worlddumps |
| Fullz Trader | Hack Tools | young carder |

(GX-1039A, GX-1039B, GX-1039C, GX-1039D, GX-1039E, GX-1039F, GX-1039G (additional examples of usernames reflecting criminal activity)) (PSR ¶ 23).

Once a user established an account with Liberty Reserve, the user could then conduct LR transactions with other Liberty Reserve users through the Liberty Reserve website.  That is, the user could receive transfers of LR from other Liberty Reserve accounts, and could likewise transfer LR from his own account to other users' Liberty Reserve accounts.  (PSR ¶ 24).

However, unlike with mainstream banks or legitimate online payment processors, a Liberty Reserve user could not fund his account by transferring money to Liberty Reserve directly.  Nor could a Liberty Reserve user withdraw funds from his account directly.  Instead, Liberty Reserve users were required to purchase and redeem LR by using third-party "exchangers."  These exchangers were individuals or entities separate from Liberty Reserve who bought and sold LR in bulk from Liberty Reserve (or other sources, such as other exchangers) in exchange for mainstream currency.  The exchangers in turn would buy and sell this LR in smaller transactions with end users in exchange for mainstream currency.  (PSR ¶ 25).

In order to fund a Liberty Reserve account, a Liberty Reserve user was required to transmit mainstream currency to an exchanger of the user's choosing.  Upon receiving the user's payment, the exchanger credited the user's Liberty Reserve account with a corresponding amount of LR, by transferring LR from the exchanger's Liberty Reserve account to the user's Liberty Reserve account.  (GX-100A).  If a Liberty Reserve user wished to withdraw funds from his account, the user was required to transfer LR from his Liberty Reserve account to an exchanger's Liberty Reserve account, and the exchanger then would make arrangements to send the user a corresponding amount of mainstream currency.  (GX-100B) (PSR ¶ 26).

Because transferring money through the system entailed moving money through multiple financial institutions or money transmitting businesses, there were several separate fees that users incurred.  First, to send real currency to a Liberty Reserve exchanger (for the exchanger to convert into Liberty Reserve), a user would typically have to send the money through a bank, or a money transmitter such as Western Union, which would charge a fee for the transfer.  Second, the Liberty Reserve exchanger would then charge the user for exchanging the user's currency for LR and sending the LR to the user's Liberty Reserve account.  These fees would typically be high – amounting to five percent or more of the funds being exchanged.  Finally, once the LR was in the user's Liberty Reserve account, Liberty Reserve would charge the user a fee for any transfer the user made from his account to any other user's LR account.  In order for the other LR user to convert the funds received back into real currency, that user too would have to pay a series of fees – to Liberty Reserve, and then to an exchanger – in order to cash out the funds.  Accordingly, moving significant amounts of money through Liberty Reserve tended to be more cumbersome and expensive than moving money through traditional financial institutions.  (GX-100A, GX-100B (showing typical fees associated with each transaction)) (PSR ¶ 27).

B.    *Absence of AML Controls*

Budovsky, along with Kats and the other co-conspirators, consciously chose to implement weak AML controls at Liberty Reserve to facilitate its use by online criminals.

- First, Liberty Reserve intentionally adopted ineffective "know your customer" or "KYC" policies.  In particular, Liberty Reserve took the position that its customers

were the exchangers, not the end users.  Accordingly, Liberty Reserve attempted to verify only the bona fides of its exchangers, and not the identities of its end users.  This was a conscious choice by Budovsky and his co-conspirators to make Liberty Reserve more appealing to online criminals, who needed to transfer money anonymously and did not want to provide extensive identification information.  The registration process for a Liberty Reserve user account reflected this policy – anyone could open an account at Liberty Reserve with simply an email address and no validated identity information was required.  Budovsky knew that users would routinely register with identity information that was fictitious or fabricated.

- Second, Budovsky consciously chose not to implement an effective system to monitor Liberty Reserve transactional activity.  In particular, there were no transaction limits at Liberty Reserve – *i.e.*, there were no ceilings on transaction amounts or account balances that would trigger further scrutiny if they were exceeded.  As a result, criminals were able to move tens or hundreds of thousands of dollars through Liberty Reserve, without being required even to verify who they were, or verify what type of business they were transacting through Liberty Reserve's system.

- Third, Budovsky and his co-conspirators consciously chose not to report and take action to remedy suspicious activity on Liberty Reserve's system to law enforcement.  Budovsky knew that criminal enterprises were regularly moving large amounts of money through Liberty Reserve and knew – or had the ability to identify – the specific accounts they were using to do so.  Yet, he did not report these accounts to law enforcement.  Although Liberty Reserve did respond to occasional law enforcement requests for information about Liberty Reserve customers, Budovsky did not take any affirmative action to report suspicious activity to law enforcement.  When Budovsky did freeze suspicious accounts, he typically did so in order to steal the money in the accounts for himself or for Liberty Reserve, and would take no action to make whole the victims of the crime that the money derived from or to report the account holders to law enforcement.

(PSR ¶¶ 28-31).

<u>The Creation of Liberty Reserve</u>

A.    *Early Money Laundering Activity and Introduction to Digital Currency*

Budovsky and Kats conceived of Liberty Reserve in approximately 2001, at a time when both were engaged in various money laundering schemes together.  Budovsky and Kats were longtime friends.  Budovsky and Kats first met in or about 1991, when they both worked as camp counselors at a summer camp located in Brooklyn, New York.  (PSR ¶ 32).

Beginning in or about 1999, Budovsky and Kats began participating in different money laundering schemes.  Among other things, they used a fake charity they created, named "United Support for Humanity," to help others evade taxes.  Budovsky and Kats established "United Support for Humanity" as a 501(c)(3) organization in 2000, and put up a website claiming that

the organization served to "improve the lives of children who are suffering from birth defects, disease, blindness, and poverty." (GX-502A; GX-502B). In fact, Budovsky and Kats used bank accounts they opened under the name of this "charity" to accept checks from others; but, instead of applying the money toward charity, Budovsky and Kats would simply return the "donations" in cash to the donors (who knew the charity was a sham), minus a commission that Budovsky and Kats kept for themselves. The donors thus were able to receive a fraudulent tax write-off from the "donation" and thereby conceal the money from the Internal Revenue Service. (PSR ¶ 33).

Around the same time, from in or about 2000 to in or about 2003, Budovsky and Kats laundered money for medical clinics in Brooklyn and Queens involved in no-fault auto insurance fraud. The medical clinics at issue would pay car accident victims to undergo unnecessary medical tests and procedures, for which they would submit fraudulent insurance claims. These providers needed large amounts of cash to pay persons under the table who were involved in the fraud (such as the accident victims). Yet they did not want to draw attention from banks by withdrawing large sums of cash from their own accounts, so they recruited others who could cash checks for them – including Budovsky and Kats. Budovsky and Kats agreed to accept checks from these providers and deposit them into shell-company bank accounts that Budovsky and Kats controlled. The names of the companies made it appear that the payments were for legitimate services (*viz.*, technology and accounting services). In fact, Budovsky and Kats would simply deliver cash to the clinics in exchange for the checks, minus a commission that they would keep for themselves. (PSR ¶ 34).

It was through a similar scheme that Budovsky and Kats became familiar with digital currency. In or about 2000, a cousin of Budovsky's, named Ruslan Belanchuk, who was involved in "spamming" for pornography websites[1], sought Budovsky's help in concealing the proceeds of his activity. Ruslan was paid for his spamming work in the form of "E-Gold," a popular form of digital currency in use at the time. Ruslan asked Budovsky and Kats to help him set up an offshore bank account where he (Ruslan) could instruct E-Gold exchangers to send bank wires when he exchanged his E-Gold for real currency. Kats set up an offshore bank account for Ruslan (under Kats' own name) at a bank in the Bahamas; Ruslan provided him with the initial deposit to open the account. (GX-503; GX-503A). The bank went out of business, however, before Ruslan made much use of the account. (PSR ¶ 35).

B.    *Failed Launch of Liberty Reserve in 2002*

After being introduced to digital currency, Budovsky and Kats became increasingly interested in the concept. By 2002, Budovsky and Kats were already contemplating forming a digital currency of their own, to be a competitor of E-Gold. Budovsky registered the domain name "libertyreserve.com" for that purpose. They hired a programmer to help them create a website that would essentially copy E-Gold's service. (PSR ¶ 36).

---

[1] "Spamming" refers to the mass distribution of unsolicited email messages. Spamming often involves criminal conduct, such as using hacked computers to send the messages or otherwise concealing the true source of the messages through fraudulent or illegal means.

In May 2002, Budovsky and Kats announced the anticipated "launch" of Liberty Reserve on a website known as "PlanetGold" – a kind of blog related to digital currency, where Kats, using the pen name "Ragnar Danneskjold,"[2] had begun posting interviews of people involved in the digital currency business.  In the post announcing the launch of Liberty Reserve, Kats posted an "interview" of Arthur Budovsky, which was in fact a promotional piece that they worked on together.  The PlanetGold interview emphasized various planned features of Liberty Reserve that Budovsky and Kats believed would appeal to the niche clientele they intended to serve: criminals and others seeking to hide their money from law enforcement.  For example, the "interview" contains statements that

- Liberty Reserve was "based in the Caribbean" and stored client information on "offshore servers, and as a result was not subject to U.S. legal process;

- Liberty Reserve was "not a bank" and did not intend to "collect much in the way of personal information;

- Liberty Reserve clients could have "easy and discreet access to their funds" through "anonymous debit cards" linked to their accounts.[3]

(PSR ¶ 37).

C.    *Operation of Digital Currency Exchange Businesses from 2002 to 2006*

Although the PlanetGold interview stated that Liberty Reserve would launch at the end of May 2002, the programmer that Budovsky and Kats hired for the job did not follow through, and the project was shelved.  Instead, Budovsky and Kats turned their attention to operating digital currency exchange businesses.  In or about March 2002, Kats acquired an E-Gold exchange business named "GoldAge" for approximately $15,000.  Kats invited Budovsky to join him as a business partner, which he did.  Over the next several years, Budovsky and Kats acquired other digital currency exchanges as well, including "Cambist," "Autocambist," "FastGold," and "AsianaGold."  Budovsky and Kats were 50/50 partners in all of these businesses.  (PSR ¶ 38).

In or about 2004, Budovsky and Kats hired Mark Marmilev to assist them with customer support.  Marmilev's job quickly evolved, however, into a more technical role: he became responsible for programming and maintaining the websites for Budovsky and Kats' digital currency exchange businesses, working with contract programmers in Eastern Europe whom Budovsky hired over the Internet.  (PSR ¶ 39).

Through their operation of "GoldAge" and their other exchange businesses, Budovsky, Kats, and Marmilev became intimately familiar with the world of "high yield investment

---

[2]  The pen name was a reference to a character in the Ayn Rand novel, "Atlas Shrugged."

[3]  The PlanetGold interview also is replete with factual misrepresentations about Budovsky, including misrepresentations that Budovsky was involved in operating an international import/export business, and that he had a "university degree in international business and economics."

programs" or "HYIPs" – which they knew to be online Ponzi schemes.  These websites purport to offer various "investment" opportunities (whether they be in stock trading, foreign currency exchange, natural resources, or anything else) that promise patently unrealistic rates of return. *See* Tyler Moore *et al.*, *The Postmodern Ponzi Scheme: Empirical Analysis of High-Yield Investment Programs*, *available at* http://tylermoore.ens.utulsa.edu/fc12.pdf.  HYIPs overwhelmingly rely on unscrupulous and under-regulated digital currency services as their "payment processors" to collect "investments" from victims – because the payments are "irrevocable" once made (per policy of the digital currency providers), and because HYIP operators can receive and cash out money through these digital currency services anonymously. (*Id.* at 9-10).  (PSR ¶ 40).

Through the customer support inquiries they received from users, Budovsky, Kats, and Marmilev came to learn that most of the customers buying digital currency through their exchange businesses were purchasing it to be able to invest in HYIPs.  They further learned that most of the customers cashing out large quantities of digital currency were HYIP operators. (PSR ¶ 41).

Budovsky and Kats' digital currency exchange businesses grew into profitable enterprises.  In 2003, Budovsky and Kats quit their day jobs and began working full time on running their digital currency exchanges.   By in or about 2006, Budovsky and Kats were each netting approximately $100,000 a year from the businesses.  (PSR ¶ 42).

D.      *Launch of Liberty Reserve Website*

In the meantime, Budovsky and Kats continued to develop plans for their own digital currency service, Liberty Reserve, which they launched in or about late 2005.  The Liberty Reserve website contained numerous misrepresentations.  For example, the homepage featured a logo supposedly reflecting the "accreditation" of Liberty Reserve by the "Global Digital Currencies Association" – which was nothing more than a website created by Budovsky and Kats themselves.  (GX-511).  The About Us page claimed (falsely) that Liberty Reserve was incorporated under the laws of Panama (whereas, in fact, it was not incorporated anywhere at the time) and that it had "offices worldwide, including New York, Germany, and France."  In fact, Budovsky and Kats ran it simply out of their homes in Brooklyn.  (GX-511A) (PSR ¶ 43).

At the same time, the website subtly touted features that were designed to appeal to HYIPs and other criminal users.  For example, the About Us page emphasized that all payments on the system were "irrevocable" and that one could "send payments to many users at once" through a "batch pay" feature.  These features were designed to appeal to HYIPs, which sought out systems that allowed them to collect money from victims without the risk that the money could be clawed back once the fraudulent nature of the scheme was exposed, and which also needed the ability to send payments to many users at once in order to complete enough Ponzi scheme cycles before ultimately imploding.  The About Us page also emphasized users' ability to transfer money "anonymously," and to convert Liberty Reserve currency through "independent" exchangers.  (PSR ¶ 44).

10

The use of "independent" exchangers added an additional layer of anonymity into Liberty Reserve's system, as it meant that Liberty Reserve would not be able to follow funds from its system into the bank accounts where the funds were ultimately deposited after being converted into real currency; only the exchanger used for the conversion would see this bank account information.  This feature was intended to help market Liberty Reserve to HYIPs and other criminal users, who wanted assurance that they would be able to cash out their Liberty Reserve proceeds anonymously and untraceably.  In fact, the primary exchangers listed on Liberty Reserve's website – GoldAge, FastGold, and Cambist – were not "independent" at all; they were controlled by Budovsky and Kats.  (GX-511B)  But Budovsky and Kats concealed their association with these exchangers so that Liberty Reserve users would not be concerned that their anonymity would be jeopardized by using them.  (PSR ¶ 45).

E.   *E-Gold Investigation / Arrest and Conviction of Budovsky and Kats for Operating GoldAge*

In December 2005, not long after Liberty Reserve was launched, the offices of E-Gold were raided by federal authorities as part of an investigation into the company for money laundering and operating an unlicensed money transmitting business.  Budovsky and Kats became aware of the E-Gold investigation at the time, as it was reported in the media and discussed in email lists and on discussion forums that Budovsky and Kats followed.  (PSR ¶ 46).

Approximately six months later, in May 2006, Budovsky and Kats themselves were arrested and their homes searched in connection with an investigation by the Manhattan District Attorney's Office into the operation of their digital currency business, GoldAge – which, by that point, had grown into the largest E-Gold exchanger based in the United States.  Budovsky and Kats were released on bail.  They pled guilty in December 2006 to operating an unlicensed money transmitting business in violation of New York state law, and were sentenced to probation.  (GX-1061) (PSR ¶ 47).

F.   *Operation of Liberty Reserve in the United States from 2006 to 2008*

Soon after their arrests, Budovsky and Kats returned to operating Liberty Reserve as well as their other digital currency exchange businesses besides GoldAge (*viz.*, Cambist, Autocambist, and AsianaGold).  Budovsky and Kats knew by this point that U.S. law enforcement authorities were concerned about the money-laundering risks posed by digital currency companies such as theirs, and that such companies could be prosecuted if they failed to register in the United States as money transmitting businesses and submit to the AML rules applicable to such businesses.  Yet, Budovsky and Kats chose not to register Liberty Reserve or their exchange businesses with federal or state authorities in the United States – precisely because they knew it would require them to incorporate effective AML policies.  (PSR ¶ 48).

Instead, Budovsky and Kats sought to operate Liberty Reserve and their exchange businesses surreptitiously.  For example, they registered the domain names for the websites of these companies under false names or nominees, and otherwise avoided associating their true names with the companies.  They also concealed their involvement in operating digital currency companies from their probation officers, to whom they lied about their sources of employment,

as well as the IRS, to whom they intentionally failed to report their income from their digital currency companies.  (PSR ¶ 49).

To further insulate themselves from U.S. law enforcement, Budovsky and Kats decided to incorporate and set up bank accounts for Liberty Reserve offshore in Costa Rica.  Kats had a contact in Costa Rica – Ahmed Yassine – who agreed to act as a nominee for Budovsky and Kats.  Yassine filed incorporation papers for Liberty Reserve in Costa Rica and set up bank accounts for the company at Costa Rican banks – listing himself as the owner of the company. In return, Budovsky and Kats helped Yassine set up a Liberty Reserve exchange service – "Money Central Market" – and agreed to list it prominently on the Liberty Reserve website. (PSR ¶ 50).

Meanwhile, Budovsky and Kats continued to operate Liberty Reserve from their homes in Brooklyn, with Marmilev's help.  Together, they grew the business by marketing it to HYIPs. One of the main ways they did so was by creating their own HYIP discussion forum, where they sought to promote Liberty Reserve to the HYIP users and administrators they hoped to attract to the forum.  At Marmilev's suggestion, Budovsky and Kats hosted this forum at goldage.net – the same domain name they had previously used to host the "GoldAge" digital currency exchange. (GX-513 (goldage.net homepage); *see also* GX-520C (chat between Budovsky and Kats[4] evidencing their control of goldage.net)).  They chose to host the GoldAge HYIP discussion forum at the goldage.net domain name because many of the users coming to the GoldAge website previously, when it was a digital currency exchange, were HYIP victims seeking to "invest" in HYIPs or HYIP administrators seeking to cash out their proceeds; so the website already had name recognition among the types of users they were seeking to attract to it now, in its new incarnation.  (PSR ¶ 51).

Budovsky, Kats, and Marmilev used the GoldAge discussion forum to market Liberty Reserve and their digital currency exchange businesses to HYIPs in various ways.  They prominently featured ads on the forum for Liberty Reserve and their exchange businesses.  (GX-513).  They posted "sticky" discussion threads (threads that always stayed at the top of the discussion lists) about "HYIPs that accept Liberty Reserve."  (GX-513A; GX-513B).  And they offered commissions to users of the forum if they could recruit HYIPs to start accepting Liberty Reserve as payment.  (GX-514).  Budovsky and Kats' objective was to popularize Liberty Reserve with HYIPs, as they believed that HYIPs would be their most lucrative source of business.  (PSR ¶ 52).

At the same time, Budovsky and Kats knew that HYIPs were online Ponzi schemes.[5] Indeed, at the very same time they were seeking to drive HYIP traffic to Liberty Reserve, they posted a "Consumer Alert" on Liberty Reserve's webpage, specifically warning users to watch out for "scams and frauds" such as "HYIPs (High Yield Investment Program), or Ponzi

---

[4]  In chats with Kats, Budovsky used the usernames "0@0" and "Seelen866."

[5]  In one chat between Budovsky and Kats, Budovsky confided to Kats that his understanding from speaking with people in the "underground" was that HYIPs (referred to in the chat as "yasli" – a Russian word for nursery schools used by Budovsky and Kats as code for HYIPs) were run by Russian organized crime groups such as the "RBN" (*i.e.*, "Russian Business Network") to support their activities.  (GX-520G at 3-4).

schemes." (GX-512B). Budovsky and Kats were not concerned that the warning would drive away HYIP business because they regarded HYIP victims as highly gullible and unlikely to be deterred by such warnings. (PSR ¶ 53).

Besides promoting Liberty Reserve on the GoldAge forum, Budovsky, Kats, and Marmilev also promoted Liberty Reserve on other HYIP forums, of which "Talkgold" was the most popular. (GX-515). Posing as ordinary users of the site (as they knew their posts would be deleted if they were flagged for "spamming" or advertising on the site), Budovsky, Kats, and Marmilev used their Talkgold accounts to subtly promote Liberty Reserve and disparage its competitors. For example:

- In one post from March 2006, Marmilev posted a message using the username "Redd,"[6] in a discussion thread where users were discussing whether they should pull their money out of digital currency services given the legal action that had been taken against such services by U.S. law enforcement authorities. In response, "Redd" told users on the thread that they had nothing to worry about as long as they "[j]ust stick to [] non-US currencies that do not OPENLY work with or promote HYIPs" – in other words, as long as they used a digital currency like Liberty Reserve. (GX-515A).

- Budovsky likewise touted Liberty Reserve's offshore status as a feature that would insulate Liberty Reserve accounts from the reach of U.S. law enforcement. For example, in one post dated January 31, 2008, Budovsky, using the username "Opi8,"[7] responded to a discussion about whether Liberty Reserve would block accounts and "honor court ordered requests from other governments, including the US." "Opi8" wrote that he had "asked them [Liberty Reserve] the same question a few weeks ago," and had been told that "only Costa Rican issued court orders and subpoenas can be enforced in Costa Rica," adding: "Can someone imagine going to China with Canadian subpoena. They will simply laugh at you." (GX-515D).

- In another post, dated December 15, 2009, Marmilev, using the username "Redd," responded to a question from another Talkgold user asking whether Liberty Reserve or WebMoney ("WMZ") – a Liberty Reserve competitor – had ever "blocked an account . . . only for the main reason that it had over 10k in it and was unverified." "Redd" responded that he had once had more than $10,000 in a WebMoney account from a "questionable" source and that WebMoney had "asked for more info" about it. By contrast, "Redd" stated that he had "[n]ever had any problems with any amounts"

---

[6] Marmilev's control of the "Redd" username is evidenced by a "Roboform" file found on his laptop, which is a type of password-manager file containing login credentials for websites, which the "Roboform" application automatically fills in upon visiting any website for which credentials are stored. Included in the Roboform file on Marmilev's computer were login credentials to various HYIP discussion forums, including the login credentials for the "Redd" account on Talkgold. (GX-1021A).

[7] Budovsky's control of the "Opi8" Talkgold account is evidenced by a Roboform file on his laptop, which includes login credentials for the account, (GX-1002B), as well as chats between Kats and Budovsky in which he acknowledges the account as his. (GX-520D).

with Liberty Reserve, adding that "*LR is much more tolerant towards shady businesses than [WebMoney]*."  (GX-515E) (emphasis added).

- In the same vein, Budovsky, in another post by "Opi8," drew attention to the user verification policies implemented by E-Gold in an attempt to come into compliance with U.S. law while being investigated.  Responding to a user who was asking whether anyone had passed the new verification policies, "Opi8" stated: "heh, why even bother?  They have castrated e-gold so much, so it is literally 1 month away from being a regular bank. . . .  The only wise thing e-g should do is sell themselves overseas."  (GX-515F).

(PSR ¶¶ 54-58).

Through posts such as these, Budovsky, Kats, and Marmilev sought to draw HYIPs away from Liberty Reserve's competitors, based on the idea that Liberty Reserve was a more hospitable service through which they could conduct their illegal business, because Liberty Reserve lacked robust AML controls and operated outside the United States.  Liberty Reserve's website also highlighted its position that its corporate administration and bank accounts were not "under US jurisdiction," in contrast to other digital currencies and online payment processors like E-Gold and PayPal.  (GX-110D) (PSR ¶ 59).

Liberty Reserve's business started growing in 2007 and 2008, as it became more and more popular with HYIPs.  Liberty Reserve customer support was handled during this time by Budovsky, Kats, and Marmilev.  In this role, Budovsky, Kats, and Marmilev would regularly see evidence of HYIP Ponzi schemes cycling through Liberty Reserve's system, marked at the beginning by customer inquiries from users seeking to "invest" in an HYIP and then at the end by customer complaints about the HYIP having run off with their money.  Even when specifically warned ahead of time about a Liberty Reserve account being used by a HYIP Ponzi scheme, Budovsky, Kats, and Marmilev would advise Liberty Reserve users how to send money to the account and then, when they later received user complaints following the HYIP's collapse, falsely tell the users they did not know anything about the account and had never received any complaints about it before.  (GX-531A (sample of customer service communications concerning an HYIP)).[8]  Budovsky, Kats, and Marmilev would also receive customer support inquiries from HYIP administrators, asking whether Liberty Reserve would limit or block their accounts; they would respond in the negative.  (GX-530F at 2) (PSR ¶ 60).

Besides HYIPs, Budovsky, Kats, and Marmilev were also aware that digital currencies such as Liberty Reserve were also used by "carders" – *i.e.*, individuals engaged in trafficking in stolen credit card information and related crimes.  For example, in operating GoldAge, they would notice posts by "carders" discussing websites where users could buy stolen credit card data using Liberty Reserve.  (They or other moderators on the GoldAge forum would delete

---

[8]  All of the communications in this exhibit sent to or from "support@libertyreserve.com" were copied to Budovsky, Kats, and Marmilev, and those sent to or from "business@libertyreserve.com" were copied to Budovsky and Kats. Marmilev used the alias "Frank" in these communications, while Budovsky used the alias "Kathy."

these posts as "off topic.") Budovsky, Kats, and Marmilev visited some of these websites and saw that they required a username and password to access. (To join a carding site, one typically must be vouched in by an existing member or must pay a significant entry fee.) Marmilev was able to gain access to certain of these carding websites, as evidenced by login credentials for the websites found on his computer. (GX-1021D) (PSR ¶ 61).

Liberty Reserve Relocates to Costa Rica (2008-2013)

A.   *Budovsky's Emigration to Costa Rica and Split from Kats*

Beginning in 2007, as Liberty Reserve's business was starting to grow, Budovsky began traveling to Costa Rica to help set up an office for Liberty Reserve in San Jose. In March 2008, Budovsky told Kats he had decided to move to Costa Rica permanently and obtain citizenship there. (GX-521A) (PSR ¶ 62).[9]

Over the course of the next several months, Budovsky pushed Kats out of Liberty Reserve. He was in a position to do so because he controlled Liberty Reserve's domain name and technical infrastructure (and had a close relationship with Marmilev, who was in charge of maintaining that technical infrastructure), and because he controlled Liberty Reserve's bank accounts through Yassine, the nominal owner of the accounts. In a chat in May 2008, Budovsky told Kats that he wanted to "restructure" their partnership. (GX-521C). Budovsky told Kats that he (Budovsky) was "responsible for all aspects of [Liberty Reserve]" and that Kats had not done enough over the previous two years to deserve to remain part of the business. (*Id.* at 4-5). Ultimately, Budovsky agreed to pay Kats approximately $200,000 to buy him out of Liberty Reserve. As to their other businesses, including their digital currency exchange businesses, they remained 50/50 partners with respect to some of them and others were divvied up between them. (PSR ¶ 63).

B.   *Liberty Reserve's Application for Registration with SUGEF*

By relocating Liberty Reserve to Costa Rica, Budovsky hoped to operate Liberty Reserve outside the reach of U.S. law enforcement. Budovsky also intended to operate Liberty Reserve openly in Costa Rica, as a registered company, while at the same time concealing from Costa Rican authorities his role in the company and Liberty Reserve's criminal clientele. (PSR ¶ 64).

On April 17, 2008, Liberty Reserve submitted an application to be registered with the Superintendencia General de Entidades Financieras ("SUGEF"), Costa Rica's regulatory authority for the prevention of money laundering. (GX-600(T) at 1). The SUGEF application hid Budovsky's role in Liberty Reserve. Instead of reporting that Budovsky was Liberty Reserve's founder, beneficial owner and primary decision maker, the company reported to SUGEF that Ahmed Yassine was the company's sole legal representative, power of attorney and owner. (GX-600(T) at 3). The use of Yassine as a nominee owner of Liberty Reserve had certain advantages. Among other things, the SUGEF application required a criminal background

---

[9] Budovsky formally renounced his U.S. citizenship at the U.S. Embassy in San Jose, Costa Rica on July 27, 2011, after obtaining Costa Rican citizenship by marrying a Costa Rican woman. (GX-1060).

check for the owner of the company requesting registration.  (GX 602(T) at 1).  With Yassine as the official owner, Budovsky did not have to advise SUGEF of his previous conviction in New York for running an unlicensed money transmitting business, which would have all but eliminated Liberty Reserve's chances of successfully registering.  (PSR ¶ 65).

In its application, Liberty Reserve also set forth its official "know-your-customer" policy; namely, that its customers were the exchangers, and not the end users, because Liberty Reserve did not "receive money directly from the . . . end-users" and its "direct contractual relationships" were with the exchangers.  (GX-600(T) at 2).  As a result, Liberty Reserve claimed that under the Costa Rican anti-money laundering laws, it was only responsible for verifying the exchangers who bought and sold Liberty Reserve currency, and that the exchangers, in turn, were responsible for verifying the end users.  (*Id.* at 4).  This allowed Liberty Reserve to preserve what Budovsky and his co-conspirators knew to be one of the most attractive features of Liberty Reserve to its criminal clientele – that it did not seek to verify the information of its end users, which allowed criminals to use the Liberty Reserve system anonymously.  (PSR ¶ 66).

SUGEF, however, repeatedly requested proof from Liberty Reserve that it had implemented robust anti-money laundering and compliance procedures, particularly with respect to the company's responsibility to monitor user activity, before it would approve Liberty Reserve's application.  For example, on December 10, 2009, SUGEF asked Liberty Reserve to describe "the oversight measures" that Liberty Reserve had in place to ensure that the exchangers were properly verifying the end users.  (GX-602(T) at 2).  SUGEF also requested that Liberty Reserve describe the implementation of "[p]olicies, procedures and controls for detecting, evaluating and reporting to the Compliance Officer as well as to oversight entities regarding suspicious operations," in addition to the "physical and electronic monitoring procedures that the Compliance Officer will use to detect unusual transactions," and insisted that Liberty Reserve change its compliance manual to include "tools and control guidelines that allow the timely detection of money laundering related activities" by exchangers.  (*Id.* at 3) (PSR ¶ 67).

C.     *Lack of Compliance at Liberty Reserve*

Budovsky did not intend to implement the AML controls that SUGEF was requesting because it would likely cause HYIPs and other online criminals to abandon Liberty Reserve for another digital currency with weaker AML policies.  Budovsky, however, still wanted to run Liberty Reserve openly in Costa Rica and needed to complete the registration process with SUGEF.  (PSR ¶ 68).

Accordingly, Budovsky hired Marco Cubero as the General Manager of Liberty Reserve in February 2010.  Cubero had over 20 years of experience in the banking sector in Costa Rica and had an impeccable reputation.  Cubero also had close personal relationships with officials at SUGEF and other financial regulatory and law enforcement agencies.  Budovsky selected Cubero because of his reputation and because he believed Cubero could use his connections at SUGEF to push through the application.  (PSR ¶ 69).

By the time Cubero started at Liberty Reserve in March 2010, Budovsky had restructured the company.  Budovsky had removed Ahmed Yassine and installed Allan Hidalgo, the Chief of

16

Operations, as the legal representative of the company.  Budovsky also restructured Liberty Reserve's Board of Directors to include Cubero as President and Hidalgo as Secretary, and redistributed ownership of the company to his Costa Rican boyfriend, Kelsin Varela (70% owner), Hidalgo (20% owner), and Cubero (10% owner).  Liberty Reserve announced these changes in a letter to SUGEF on February 9, 2010.  (GX-605(T) at 1-3).  As in its original application, Liberty Reserve failed to reveal that Budovsky was, in fact, Liberty Reserve's principal beneficial owner and primary decision-maker.  (PSR ¶ 70).

One of Cubero's top priorities when he arrived at Liberty Reserve was to complete the SUGEF application – a task that Budovsky had discussed with him personally when Budovsky hired him.  As part of that effort, Cubero attempted to implement substantial anti-money laundering and compliance policies and procedures at Liberty Reserve.  For example, Cubero updated the company compliance manual and tasked the Verifications Department to obtain updated verification documents for all of the exchangers that did business with Liberty Reserve.  Cubero did not agree with Liberty Reserve's "know-your-customer" policy that the exchangers were the only customers that needed to be verified, and always planned to institute verification procedures for end users.  (GX-621(T)).  However, he agreed to abide by this policy temporarily until the exchangers had been properly verified.  (PSR ¶ 71).

Cubero also pushed Budovsky to implement an alert system to monitor suspicious transactions and to hire a Compliance Officer to take over customer verification and other compliance functions, both of which were requirements for SUGEF registration.  (GX-622(T) at 3, 5).  Budovsky ignored or delayed acting on Cubero proposals for a period of over eight months.  (GX-624; GX-625; GX-627 at 3; GX-628(T) at 2-3; GX-629).  As a result, Cubero became more and more frustrated and concerned with Budovsky's attitude towards compliance.  (PSR ¶ 72).

Cubero also became concerned with the lack of transparency at Liberty Reserve and his inability to obtain any information about Liberty Reserve's customers and transactional data.  From the moment he started at Liberty Reserve, Cubero had asked Budovsky for full access to the Liberty Reserve databases so that he could understand the nature of Liberty Reserve's business (both from a marketing and a compliance standpoint) and have "maximum control over [its] operations."  (GX-620(T)).  Budovsky repeatedly refused to give Cubero that access.  (PSR ¶ 73).

For example, on May 26, 2010, Cubero emailed Mark Marmilev, Budovsky's co-conspirator who controlled Liberty Reserve's database, asking for a series of reports of basic customer and transaction information so that he could respond to SUGEF, and requesting administrative access to the database so that Cubero could run reports himself.  (GX-623).  The next day, Marmilev forwarded Cubero's email to Budovsky, who responded that Cubero should only be given certain information – including a figure that intentionally misrepresented the total number of LR dollars ("LRUSD") in the Liberty Reserve system.  (GX-1001A).  Budovsky further told Marmilev that "[a]ccess to the system will not be granted [to Cubero] even if his life would depend on it."  (*Id.*) (PSR ¶ 74).

Cubero and Budovsky continued to clash over Cubero's lack of access to information and Budovsky's lack of transparency.  In an email exchange in early June 2010, Cubero sent Budovsky a list of numerous requests that Budovsky had still not acted on, including hiring a Compliance Officer, implementing an alert system to track suspicious transactions, and providing Cubero with access to the Liberty Reserve database as well as regular data reports, all of which gave him serious concerns.  (GX-624).  The following day, Budovsky sent a reply to Cubero in which he again denied or deflected Cubero's requests and maligned his leadership and integrity.  (GX-625) (PSR ¶ 75).

A few weeks after this email exchange, and continuing into the fall of 2010, Budovsky had email discussions with his co-conspirators – including Marmilev, Hidalgo, and Max Chukharev, the head of Liberty Reserve's IT Department – about creating a "Government Administrative Area" ("GAA") within the Liberty Reserve database where SUGEF could review false data regarding Liberty Reserve accounts and transactions.  (GX-1050B(T), GX-1050C, GX-1050D).  In a June 24, 2010 email from Marmilev to Budovsky and Chukharev, Marmilev explained the features of the GAA; namely, the GAA would allow the "Costa Rican government [to] view a few statistics," but the "majority of these statistics are going to be fake," and the data could be manipulated by a "Hidden Admin" ("HA") who would be invisible to the regulatory authorities.  (GX-1050B(T)).  Once operational, Liberty Reserve would be able to use these systems to feed regulators fake statistics concerning the volume of transactions passing through Liberty Reserve and to hide account information for any specific accounts flagged in the HA.  Budovsky also intended to feed these same fake statistics to Liberty Reserve's own Compliance Officer, Silvia Lopez, when she was hired in November 2010.  (GX-1050E).  In this way, Budovsky and his co-conspirators actively thwarted the efforts of Cubero and Lopez to implement meaningful anti-money laundering compliance measures at Liberty Reserve.  (PSR ¶ 76).[10]

Budovsky's co-conspirators slipped up on one occasion in January/February 2011 and mistakenly provided Cubero and Lopez with reports that included a large amount of customer information and transactional data for Liberty Reserve users and exchangers.  (GX-630(T), GX-630.1, GX-630.1A, GX-630.2, GX-630.2A, GX-631, GX-631A(T), GX-632(T), GX-632A).  Cubero noticed suspicious activity in the data, including that over 100 user accounts contained balances over $10,000, and immediately sought to verify these users (GX-634.1(T), GX-634.1A(T)).  Marmilev realized the mistake and sent an email to Budovsky and the programmer who sent the reports in which he stated: "Do not send anything to marco@lr and silvia@lr [the company email accounts of Cubero and Lopez].  Disable any automatic messages from our system to these emails."  (GX-1050F(T)).  Cubero was ultimately told by letter from the Compliance Committee that the company would not verify these users.  (GX-636(T)).  Although Silvia Lopez signed this letter, she disagreed with the decision, but was outvoted by Hidalgo and Liberty Reserve's legal officer, Angie Portela.  (PSR ¶ 77).

---

[10]  The GAA was the culmination of an idea that Budovsky and Kats had discussed as early as June 2008.  In a chat on June 11, 2008, Budovsky outlined his idea to give SUGEF access to certain Liberty Reserve data so that SUGEF will "not ask any questions" and so that Liberty Reserve could appear "legitimate looking" and "transparent" [sic]. (GX 521E).

Cubero resigned shortly thereafter.  In his resignation letter, Cubero explained that he was leaving because of the lack of transparency and access to information at Liberty Reserve. Cubero noted that he had "not been provided with the tools to obtain the necessary information" about the company, including "access to the computer systems" and reports of basic transactional data, and that he was unwilling to represent and be accountable for a company about which he had "no information." (GX-637(T)) (PSR ¶ 78).[11]

After Cubero's departure, Budovsky installed his co-conspirator, Allan Hidalgo, as General Manager.  Lopez continued to try to implement compliance reforms, but was unsuccessful.  For example, although Liberty Reserve did eventually implement an alert system to monitor suspicious transactions, the system only monitored exchanger transactions, not end user transactions.  Hence, the system ensured that illicit transfers by Liberty Reserve's criminal clients would never be detected.  (PSR ¶ 79).

Like Cubero, Lopez gradually became more and more concerned about the lack of transparency and attention to compliance at the company.  Lopez became so concerned that on May 29, 2011, she filed a Suspicious Activity Report with the Unidad de Inteligencia Financiera ("UIF"), the agency that investigates financial crimes in Costa Rica.  (*See* 3511-01 and 3511-01(T)).  In her report, Lopez detailed over ten practices or specific instances of conduct at Liberty Reserve that raised serious compliance concerns in her mind.  (*Id.*).  These included (i) the lack of access to customer information, (ii) the company's choice not to monitor end users for suspicious transactions, (iii) the fact that employees of the company, including officers, used false names to communicate with customers, (iv) the fact that the company's servers were shut down by U.S. law enforcement authorities, and (v) the fact that an employee had found reports on the Internet that Budovsky had been convicted in the past for a charge similar to money laundering.  (*Id.*).  Lopez was eventually fired in November 2011, a few days before Budovsky orchestrated a fake "sale" of Liberty Reserve and ostensibly shut down its operations in Costa Rica.  (PSR ¶ 80).

D.     *Creation of a HYIP with Azzeddine El Amine*

During this same time period, Budovsky was also working with co-defendant Azzeddine El Amine to create and run a HYIP.  In 2009, Yassine had introduced El Amine to Budovsky.  El Amine eventually replaced Yassine as a close associate of Budovsky.  In early 2010, Budovsky proposed to El Amine that they work together to create a HYIP website.  They agreed that Budovsky would do the marketing, and El Amine would work on the technical part of the website.  (PSR ¶ 81).

In an email dated March 23, 2010, Budovsky sent El Amine links to the websites of three successful HYIPs, based on Budovsky's review of their accounts within the Liberty Reserve transactional database, to use as models.  (GX 708).  Budovsky and El Amine agreed to split the

---

[11]  At the end of March 2011, a few weeks after Cubero resigned, Liberty Reserve's computer servers in the Netherlands were seized as a result of a criminal investigation into Liberty Reserve by U.S. law enforcement authorities in Las Vegas.  In a chat between Budovsky and Marmilev on April 4, 2011, Budovsky speculated that Cubero – who he referred to as the "banker" who received the report "that he wasn't supposed to" – was responsible for the seizure.  (GX-1002A(T) at 3-4).

proceeds of their new HYIP – originally Budovsky received 60% and El Amine received 40% (GX 708, GX 709), but later these percentages were reversed.  Budovsky sent El Amine money through the Liberty Reserve system to fund the start-up costs associated with the HYIP and so that El Amine could make small trial investments in various HYIPs to see how they worked. (GX 710, GX 712).  Budovsky also decided when the HYIP would become operational.  In an email dated April 14, 2010, El Amine told Budovsky that he was ready to begin and was "just waiting for [his] signal to start." (GX 710) (PSR ¶ 82).

Budovsky and El Amine were aware that the HYIPs that they were using as models were Ponzi schemes.  For example, at one point, just as El Amine had finished copying the so-called "investment plans" from a website called Infinitiva.com, that website appeared to shut down.  El Amine asked Budovsky if the operators of Infinitiva had run away with their "investors" money. (GX 701).  In response, Budovsky looked at Infinitiva's account in the Liberty Reserve transactional database, to "see the magic behind them" and concluded that Infinitiva "[did] not look like they [would] run away yet."  (*Id.*).  In an email exchange in August 2010 about a potential investment opportunity that El Amine had forwarded to Budovsky, Budovsky rejected it because he believed it was a HYIP and further stated, "Unless you think there is a singly hyip [t]hat is real, i dont see a reason to even waste time on that."  (GX 719) (PSR ¶ 83).

El Amine created three different HYIP websites because Budovsky explained to him that it took a while for a HYIP to become popular, so while one is winding down, the other needs to be established and gaining popularity.  El Amine presented the three HYIP websites to Budovsky for his feedback and approval.  (GX 714).  The HYIP that Budovsky ultimately chose to pursue was called Working Capital Group.  As Budovsky and El Amine never intended to invest the money they received through their HYIP, the Working Capital Group website contained numerous misrepresentations about the intended use of investor funds and expected returns.  (GX 724) (PSR ¶ 84).

Budovsky drew upon his knowledge of the online HYIP world in promoting Working Capital Group.  In September 2010, Budovsky advised El Amine to find the most popular HYIPs and "then do [a] search for them and see where they advertise." (GX 722).  Budovsky further advised El Amine that he should use online services such as Alexa to understand the "clickstream" – or "referrer traffic" – for the most popular HYIPs, so that he could discover the websites from which the most popular HYIP websites were getting their customers.  (*Id.*). Budovsky and El Amine decided that they would begin their advertising campaign on an HYIP monitoring website called "incredible-earnings.com," and then later advertise on the Talkgold forum as well.  (GX 723).  In the end, Budovsky and El Amine did not devote much effort into marketing their HYIP website after they created it, and it made only minimal profits.  Budovsky and El Amine eventually abandoned the HYIP in late 2011 in favor of more lucrative joint ventures, such as Swiftexchanger.  (PSR ¶ 85).

E.     *Joint Ownership of Swiftexchanger*

From February 2011 through May 2013, Budovsky and El Amine jointly owned a Liberty Reserve exchanger called Swiftexchanger, which would eventually become one of the largest exchangers by volume of LR currency.  From February 2011 to May 2013, when Liberty

Reserve's operations were shut down, Swiftexchanger's transactions within the Liberty Reserve system totaled more than $35 million.  As partners in Swiftexchanger, Budovsky and El Amine split the profits from the business: Budovsky received 40% and El Amine received 60%. (GX 736, at 3) (PSR ¶ 86).

Swiftexchanger was similar to other exchangers in that it bought and sold LR to and from "retail" users (*i.e.*, end users) for a fee.  Approximately 31% of the end users who purchased LR currency from Swiftexchanger were known to be located within the United States, based on the address provided in the wire transfer memo field.  (GX 827).  Swiftexchanger did not take any steps to verify the identity or location of its users or the source of their funds, even for large transactions, as evidenced by the successful undercover transactions involving more than $10,000.  In addition to serving its retail customers, Swiftexchanger eventually became the only "wholesaler" of LR currency.  (GX 734).  As a result, exchangers transferred millions of dollars to Swiftexchanger to purchase LR currency.  (PSR ¶ 87).

Budovsky helped El Amine create the Swiftexchanger website.  For example, on July 5, 2011, Budovsky sent El Amine an email attaching a detailed script he had drafted for the "Frequently Asked Questions" link on the Swiftexchanger website.  (GX 751).  Budovsky asked El Amine to review the document and to let him know "if something [was] not right" so that he "[could] change it." (*Id.*) (PSR ¶ 88).

Soon after Budovsky and El Amine created Swiftexchanger, they sought to have Swiftexchanger "verified" by Liberty Reserve.  The benefits of being a "verified" exchanger included being listed on the Liberty Reserve website and having a Liberty Reserve account number that began with "X" (to signify an official exchanger).  However, in the Liberty Reserve system, exchangers were supposed to be third-party entities, independent from Liberty Reserve. In order to hide their ownership of Swiftexchanger from Liberty Reserve's compliance department, Budovsky and El Amine misrepresented to Liberty Reserve that Swiftexchanger was owned by a friend of Budovsky's, a Ukrainian citizen living in Germany named Anatoly Gursky. Budovsky and El Amine submitted copies of Gursky's passport and utility bills to Liberty Reserve's verifications department. (GX 727, 728, 729, 729(T), 661A, 661(T)).  When asked by Liberty Reserve to provide a notarized income statement for Gursky, Budovsky drafted a false response that El Amine then forwarded to Liberty Reserve. (GX 730, 731).  The official verification process was taking too long, so Budovsky asked Hidalgo to intervene, and Swiftexchanger became a verified exchanger.  (PSR ¶ 89).

El Amine maintained Swiftexchanger's bank account at a company called Technocash in Australia.  By mid-2011, Technocash was repeatedly informing Swiftexchanger that wire transfers into Swiftexchanger's account were being recalled by the sending bank, based on allegations that the transfers were fraudulent.  (GX 741, 742, 744).  Rather than comply with Technocash's request to return the wire to the sender's account (which had likely been compromised), El Amine replied to Technocash that Swiftexchanger had already funded the user's Liberty Reserve account, and therefore it could not return the money.  In truth, El Amine and Budovsky had not funded the user's LR account, and simply kept the amount of the wire transfer for themselves.  In addition, they frequently also "froze" that user's LR account and kept those funds for themselves as well.  (PSR ¶ 90).

Budovsky and El Amine worried that Technocash might close the Swiftexchanger account due to the numerous fraud complaints and requests for chargebacks, so they frequently transferred money from the Swiftexchanger account to other accounts controlled by Budovsky and held in the name of nominee owners and shell companies, such as "Business Logic" and "Admiral Trading." (GX 749). When there was a large balance in the Swiftexchanger account, Budovsky directed El Amine to "flush" (*i.e.*, transfer) the funds from Swiftexchanger's Technocash account to the Business Logic Technocash account. For example, on December 23, 2011, Budovsky wrote to El Amine, "please don't forget to transfer the high balances from swift[exchanger]." (GX 774). Similarly, on March 23, 2012, Budovsky wrote to El Amine, "before I forget, clean the TC [Technocash account] not to keep funds there, I will send them away right away." (GX 782). By "send them away" Budovsky was referred to the fact that he would transfer funds out of the Business Logic account to another account under Budovsky's control, such as the Admiral Trading account. (PSR ¶ 91).

F.     *Freezing Liberty Reserve Accounts of HYIP Operators*

Budovsky also increased his profits by freezing the accounts of HYIP operators and keeping the money for himself or for Liberty Reserve. By monitoring the Liberty Reserve transactional database, Budovsky was able to follow the life cycle of HYIPs that used Liberty Reserve. Typically, the balance in these accounts would gradually build up, as the HYIPs attracted "investors." The reputation of the HYIPs would become more favorable as the earliest "investors" received their "returns," thereby attracting more "investors." At some point, the HYIP operators would stop paying their "investors," and instead would cash out the balance of their Liberty Reserve accounts through exchangers. This distinctive pattern of boom and bust can be seen, for example, in a graph of the account balance of the HYIP "TVI Express" over time. (GX 1031B) (PSR ¶ 92).

When Budovsky noticed that the HYIPs were starting to cash out large quantities of LR currency, he would often let them withdraw some portion of it, but would "freeze" the rest. He did this (as opposed to freezing the entire amount) in order to preserve Liberty Reserve's reputation among HYIP operators, who were Liberty Reserve's most important customers. Budovsky knew that HYIP operators regarded losing $100,000 or $200,000 from their LR accounts as an acceptable cost of running their (illegal) business, and that even after losing such amounts, they would continue to do business with Liberty Reserve. This process is set out clearly in a chat between Yassine and El Amine from August 2010, in which Yassine ("Creative") described to El Amine ("Moro") how Budovsky would monitor the accounts of HYIPs and decide when to freeze them. (GX 828, 828(T)). Yassine explained that because HYIP operators are engaged in "stealing" from their investors, "they don't care if they lose that money" – *i.e.*, the money that Budovsky blocked. (*Id.*) (PSR ¶ 93).

For example, in May 2011, Budovsky noticed three Liberty Reserve accounts linked to HYIPs. Budovsky asked Marmilev to look at these accounts "for exit tax / verification implementation," which was their code language for freezing all or part of an HYIP's Liberty Reserve account. (GX 1001H). Later that month, Budovsky reminded Marmilev to look at two of the accounts, saying "my hands are itching," meaning that Budovsky was eager to get his

hands on the money in those accounts. (GX 1020A). A few days later, Budovsky again asked Marmilev about the two accounts, and also proposed some possible explanations for freezing the accounts. (GX 1001I). The options included claiming that Liberty Reserve had received a "subpoena" for all or part of the account balance, and claiming that the account was undergoing "verification," parenthetically noting that such verification would be "to death and beyond." (*Id.*). "Death and beyond" signified that Liberty Reserve would request verification documents, with increasingly impossible particularity, until the owner of the account gave up in frustration. Budovsky also noted that if the owners of the accounts in question "are not working via internet, it may not effect as much the internet reputation" of Liberty Reserve, meaning that the freeze of an account belonging to an obscure HYIP without much of an internet presence would not negatively affect Liberty Reserve's reputation among HYIPs. (*Id.*) (PSR ¶ 94).

On June 5, 2011, Marmilev responded to Budovsky and recommended that Budovsky tell the owners of the frozen accounts that Liberty Reserve had received subpoenas for the accounts. (GX 1049). Marmilev noted that the balances in the two accounts singled out by Budovsky were $1,220,408 (the Delbeke account) and $1,125,717 (the TVI Express account). (*Id.*). Marmilev also found another account belonging to TVI Express containing $614,303. (*Id.*). The following day, Budovsky made notes in the "admin notes" field of each of the LR accounts, saying "Verification to death and beyond. DO NOT RELEASE WIHTOUT EP APPROVAL." (GX 1030, 1032). "EP" referred to Eric Paltz, the alias Budovsky used at Liberty Reserve. (PSR ¶ 95).

The freeze of Delbeke's account prompted Delbeke to send email complaints to Liberty Reserve. Budovsky responded that Liberty Reserve had "been forced, by a valid court order, to take this action." (GX 1001K). When Delbeke demanded a copy of the court order, Budovsky responded that a "gag order" prohibited him from discussing the details of the court order with Delbeke. (*Id.*). When Delbeke filed a lawsuit against Liberty Reserve in Costa Rica, seeking the unfreezing of his account, Liberty Reserve had no choice but to release the funds in his account. On August 3, 2011, Liberty Reserve wrote a letter to UIF claiming that the existence of a court order was merely a "misunderstanding." (GX 645, GX 645(T)). Although the letter was signed by Compliance Officer Silvia Lopez, it was drafted by Liberty Reserve's attorney Angie Portela. (PSR ¶ 96)

Although Budovsky was ultimately unable to profit from the freeze of the Delbeke account, the same was not true of the freeze of the TVI Express accounts. Like Delbeke, TVI Express complained to Liberty Reserve's customer service department. Portela responded by saying that TVI Express would "need to undergo a verification process." (GX-1001P). For the next four months, Portela and TVI Express traded emails regarding the verification process, with Portela constantly asking for new and different verification documents, until ultimately TVI Express abandoned its attempt to have its accounts unfrozen. (*Id.*) (PSR ¶ 97).

G.   *Fake "Sale" of Liberty Reserve*

By mid-2011, Budovsky realized that his efforts to obtain a license from SUGEF to operate in Costa Rica would not succeed. On August 22, 2011, SUGEF informed Liberty Reserve that it still had not met the regulator's requirements for registration. In particular,

SUGEF noted several continuing deficiencies in Liberty Reserve's anti-money laundering policies and procedures. Notably, SUGEF rejected Liberty Reserve's insistence that it had no responsibility to monitor user activity, informing that company that

> *Liberty Reserve S.A. is required to adequately identify its customers, and to review and document the true origin and destination of the funds received, in order to prevent money laundering and terrorist financing. Consequently, the company cannot attempt to free itself from this responsibility through an agreement, and it therefore must make the appropriate changes.*

(GX-610(T) at 5) (PSR ¶ 98).

In addition, SUGEF noted that Liberty Reserve failed to make Compliance Manual changes that SUGEF requested almost two years before. For example, Liberty Reserve failed to show how the company would implement "manual or computerized monitoring procedures that the Compliance Officer uses or will use to detect unusual transactions," policies focusing on "oversight tools and guidelines that allow for the timely detection of activities related to money laundering [by exchangers]," and a "procedure for notifying [SUGEF] of suspicious transactions found during the analysis of unusual transactions." (*Id.* at 6). SUGEF also noted deficiencies in Liberty Reserve's "know your customer" policy, procedures designating personnel responsible for suspicious activity reporting, and anti-money laundering training for employees. (*Id.* at 7-9) (PSR ¶ 99).

Budovsky therefore devised a plan to orchestrate a fake "sale" of Liberty Reserve to a shell company in Cyprus. In fact, Budovsky himself ran both ends of the deal. In the summer of 2011, Budovsky engaged a law firm in Cyprus, the Fuamari Group, to set up a shell company called Ediago Holdings Limited, which would "act as the purchasers" of Liberty Reserve. (GX-1001M). In September 2011, Budovsky sent an email to the Fuamari Group to offer them "some pointers" on how the sale would take place. (GX-1001O). In the email, Budovsky stated that he had hired the largest law firm in Costa Rica to "represent the sellers." (*Id.*). He also gave the Fuamari Group, which represented the buyer Ediago Holdings, "points that [they had] to insist on as conditions of sale," including instructions regarding the domain name, website management, clients, customer support, sale price, and payment schedule. (*Id.*). With the assistance of the Fuamari Group, Budovsky set up bank accounts in Cyprus in the name of Ediago Holdings. (GX-1001R). Without El Amine's knowledge, Budovsky made El Amine the signatory on the bank accounts of Ediago Holdings. (*Id.*) (PSR ¶ 100).

In November 2011, the "sale" of Liberty Reserve to Ediago Holdings was finalized. On November 28, 2011, Liberty Reserve voluntarily withdrew from the SUGEF application process, claiming it would "cease its business activities" in Costa Rica due to its "sale" to a buyer in Europe. (GX-614(T) at 1). In its letter to SUGEF, Liberty Reserve falsely claimed that the "move" to Europe was in part made because the law there was "more agile and secure and [the alleged buyer] will be in a better position to balance its growth and comply with the international rules that regulate its activities." (*Id.* at 1-2) (PSR ¶ 101).

Budovsky also transferred Liberty Reserve's money out of Costa Rica. In late November and early December 2011, about $14.8 million was transferred from Liberty Reserve's Costa Rican bank accounts to the Ediago Holdings account at Hellenic Bank in Cyprus. (GX 901F, GX 931A). Of this amount, about $13.5 million was transferred from Costa Rica to Cyprus through a correspondent account at JP Morgan Chase Bank in New York, New York. (GX 931A). In late February 2012, the funds from the transfer to Ediago Holdings were transferred to an account in Russia held in the name of "Olyp-47 LLC." (GX 931A) (PSR ¶ 102).

Even after the "sale" of Liberty Reserve to Ediago Holdings, Budovsky continued to operate Liberty Reserve in Costa Rica for over a year until the company was shut down in May 2013. Budovsky concealed that Liberty Reserve was still operating in Costa Rica by separating the company's functions into different offices, with different company names. Liberty Reserve's customer service department was purportedly "outsourced" to a new company owned by Hidalgo, called "Silverhand," whose office was located in a residential building in San Jose. According to the customer service employees who worked for Silverhand, they continued to do the same work they had done for Liberty Reserve. The remainder of Liberty Reserve's operations were moved to an office complex in San Jose called Golden Plaza. There, Budovsky and El Amine did real estate work for a company called Grupo Lulu, but Budovsky also continued to run Liberty Reserve and El Amine continued to operate Swiftexchanger. Also in Golden Plaza, Chukharev continued to manage Liberty Reserve's computer infrastructure through an IT consulting company called WEBSA. (PSR ¶ 103).

On September 19, 2012, SUGEF noted that the Liberty Reserve website appeared to still be operational and it demanded that Liberty Reserve produce financial records and other documentation showing that Liberty Reserve had ceased operations in Costa Rica. (GX-615(T) at 1-2). On October 2, 2012, Hidalgo responded to SUGEF on behalf of Liberty Reserve, providing bank records for Liberty Reserve's Costa Rican banks and falsely claiming that he could not reach the operator of the website. (*Id.*). In truth, Budovsky was the true owner of the website – and the company – and Liberty Reserve continued to operate and maintain a physical presence in Costa Rica. (PSR ¶ 104).

H.   *Budovsky's Profits from Liberty Reserve*

From 2007-2013, Budovsky moved more than $25 million in exchanger funds out of the Liberty Reserve system into other accounts he controlled. (GX 901A, GX 930). During this period, exchangers paid Liberty Reserve approximately $122 million to purchase LR currency. After accounting for the $15 million in exchanger cash-outs, the company had approximately $107 million available. (GX 901A, GX 942B). Of that $107 million, approximately $65.8 million in exchanger deposits went into accounts for three Liberty Reserve-affiliated entities, Swiftexchanger, Admiral Trading, and Business Logic. As noted above, the Swiftexchanger account was established in El Amine's name; Admiral Trading and Business Logic were established in Ahmed Yassine's and in Kelsin Varela's names, respectively. The accounts were administered by Technocash, an Australian online money remitter that specialized in digital transfers for businesses. (GX 901A, GX 943B) (PSR ¶ 105).[12]

---

[12]   After accounting for exchanger cash-outs, about $41 million in exchanger funds went into Liberty Reserve's Costa Rican Bank accounts. (GX 901A, GX 943B). Of that amount, about $14.8 million went to the "sale" of

To obfuscate the location, ownership, and control of the funds, Budovsky directed the movement of money from Technocash through a complex network of third-party and nominee accounts.  Thus, the $25 million figure is an estimate.  For example, beginning in June 2012 and continuing until his arrest in May 2013, Budovsky funneled $20 million in exchanger funds to bank accounts located in Hong Kong and China.  (GX 930).  From there, a portion of the funds were layered through two accounts in Cyprus (GX 950B, GX 950C), and then disbursed to four different accounts in Cyprus.  (GX 930).  When he was arrested in May 2013, Budovsky had debit cards for these four accounts in his wallet, as well as key fob passes linked to these accounts.  (GX 1010B, GX 1010E) (PSR ¶ 106).

Approximately $11.6 million in exchanger funds was deposited in these four accounts.  As of May 2013, these accounts had balances totaling $10 million.  (GX 921A, GX 921C, and GX 921G).  Each account was held in the name of an individual close to Budovsky.  Masfiloti and Milomeri Limited were in the name of Maxim Chukharev, Gardinia Limited was in the name of Gleb Pavlukhin (Budovsky's Dutch boyfriend), and Lorys Limited was in the name of Anatoly Gursky.  With the $11.6 million detailed above, the approximately $25 million in exchanger funds Budovsky transferred included approximately $3.6 million sent to accounts of which Budovsky was the beneficial owner, approximately $8.6 million sent to accounts in various countries of which Varela was the beneficial owner, and approximately $1.1 million sent to an account in Cyprus, in the name of Makelina Limited, of which Hidalgo was the beneficial owner.  (GX 901A, GX 930).  Budovsky also had a debit card from this account in his wallet at the time of his arrest.  (GX 1010B) (PSR ¶ 107).[13]

### Criminal Use of Liberty Reserve

The Government's investigation uncovered a wide variety of evidence reflecting the extensive use of Liberty Reserve by criminal users – in particular, criminal websites or online fraud schemes that used Liberty Reserve to receive payments from their customers or victims and to launder the proceeds of their illegal enterprises.  (PSR ¶ 108).

By contrast, the Government's investigation uncovered no evidence of substantial use of Liberty Reserve by legitimate, mainstream online businesses (such as Amazon.com or other online shopping venues).  Hence, while many of the users of Liberty Reserve – particularly HYIP investors – were unwitting victims of online scams and believed that Liberty Reserve was a legitimate online payment processor, virtually all of the "merchants" that used Liberty Reserve – including HYIP operators and "carders" – were criminal, and all of the funds in their Liberty Reserve accounts were proceeds of criminal activity.  (PSR ¶ 109).

---

Liberty Reserve described above.  In December 2011, law enforcement seized any funds remaining in the Liberty Reserve's Costa Rica accounts.  (GX 918B).  Including the funds seized in Costa Rica, law enforcement has seized or restrained about $45 million in accounts located in several countries.

[13]  The remainder of the exchanger funds can be accounted for in three categories: either (1) the funds were transferred to a country from which sufficient bank records were unavailable, (2) the funds were transferred to a country from which a response to a request for records is pending, or (3) the funds were provided to a third party for a good or service for Liberty Reserve or one of its principals.

A. *Data from Liberty Reserve Servers*

Data obtained from Liberty Reserve's servers reflects the extensive use of the company's payment system by criminal websites.  The Government analyzed the top 500 accounts by transaction volume, *i.e.* funds sent and received, to attempt to determine the type of activity associated with each account.  The total transaction volume for these accounts is approximately $7.26 billion, or approximately 43% of the total volume of transactions on Liberty Reserve's entire system.  For each account, the Government reviewed the registration information, transaction memos[14], and private messages[15] associated with the account, as well as the contents of any website associated with the account (as reflected in the registration information, transaction memos, and private messages), to see what type of activity they reflected.  (PSR ¶ 110).

Of these top approximately 500 accounts, 44 percent were associated with Liberty Reserve exchangers – reflecting that many transactions on Liberty Reserve related simply to moving money in or out of the system.  Another 18 percent of the top 500 accounts could not be categorized based on the available account data standing alone.[16]  (GX-1305B; GX-1305C) (PSR ¶ 111).

The remaining 38 percent of the accounts in the top 500 were categorized as follows:

- 157 of the accounts, accounting for approximately $2.6 billion in transactions, were associated with some form of purported "investment" opportunity.  (GX-1311A; GX-1311C; GX-1311D; GX-1311F; GX-1311I; GX-1311J (examples of account data/associated websites reflecting "investment" activity)).  The vast majority of these accounts were linked to websites that, on their face, were clearly Ponzi schemes, *i.e.*, HYIPs.  Others, at best, were associated with unregulated "forex" (foreign currency trading) websites – which are likewise known to be prominent sources of fraud.[17]

---

[14]  Liberty Reserve users had the option of including a transaction memo on any payment sent through the system, akin to the memo line on a check.

[15] Liberty Reserve enabled users to communicate with one another through a "private message" system, akin to an internal email system.

[16]  The analysis of the top 500 Liberty Reserve accounts reflected herein differs from the analysis reflected in the sentencing submission for Mark Marmilev, largely because the analysis conducted for the Marmilev submission drew not only from Liberty Reserve account data but also from investigative information from law enforcement files concerning various accounts within the top 500.  As a result, more accounts were able to be associated to a particular type of activity as opposed to being categorized as "unknown."  For purposes of this submission, however, the Government has restricted its analysis to sources of information that would have been available to the defendant himself – *i.e.*, data on Liberty Reserve's system pertaining to each account and any website associated with the account.

[17]  *See* Commodity Futures Trading Commission, "Commission Advisory: Beware of Foreign Currency Trading Frauds," *available at* http://www.cftc.gov/opa/enf98/opaforexa15.htm.  As explained in the advisory, unregulated websites offering individuals the opportunity to make money through foreign exchange trading are often forms of "high-yield investment programs" or "get rich quick" schemes.  By contrast, mainstream international currency swap markets typically operate on government-regulated exchanges and are associated with traditional consumer and investment banking services.  Liberty Reserve was not an accepted form of payment at any such mainstream international currency swap markets.

(GX-1310A (screenshots of all websites identified for the "investment" accounts in the top 500).

- Nineteen of the accounts, accounting for approximately $138 million in transactions, were associated with trafficking in stolen credit card information. (GX-1311E; GX-1311G; GX-1311H (examples of account data/associated websites reflecting carding activity)).[18]

- Fourteen of the accounts, accounting for approximately $110 million in transactions, were associated with various Internet services, typically of a kind used by carders or other cybercriminals to anonymize their Internet activity (such as "VPN," "proxy," or "socks" services). (GX-1311K (example of account data/associated website reflecting such activity)).

(PSR ¶¶ 112-115)

B.    *Google Analytics Data*

Beyond examining the largest sources of Liberty Reserve's transactional activity, the Government also examined the largest sources of Liberty Reserve's website traffic. Liberty Reserve used various tools to monitor user traffic on its website. One of the tools it used was Google Analytics. Google Analytics is a service operated by Google, Inc., which caters to online businesses. A business subscribed to Google Analytics (the "subscriber") can use the service to monitor traffic to and within the subscriber's website. (PSR ¶ 116).

Among the user data collected by Google Analytics is "referral traffic," which lets the subscriber see what websites are referring traffic to the subscriber's website – that is, the websites that users are visiting immediately before visiting the subscriber's website. Such data can help the subscriber understand the sources of its online business. (For example, if the subscriber operates a website selling sports equipment, "www.sportsequipment.com," and advertises on various sports-related websites, the subscriber can use Google Analytics to see how much of the traffic to "www.sportsequipment.com" comes from the websites where the subscriber's site is advertised.). (PSR ¶ 117).

Liberty Reserve offered online "merchants" using its services the ability to access Liberty Reserve through a shopping cart interface ("SCI"). In this way, the "merchants" could accept Liberty Reserve payments from customers directly on their own websites, without requiring the customers to log on to Liberty Reserve's homepage and initiate a payment manually (just as many mainstream online merchants accept payments through PayPal). Among other things, Google Analytics collected the referral data for Liberty Reserve's SCI interface – *i.e.*, data reflecting the websites using Liberty Reserve's SCI interface to accept payment from their

---

[18] The accounts were categorized based on the reference to carding terms (*e.g.*, "cvv," "cv2," "fullz," "dumps," "track1," "track2") in the registration information, transaction memos, private messages, or website associated with each account.

customers.  Each referral reflects the use of Liberty Reserve to effectuate a payment for a transaction on the referring website.  (PSR ¶ 118).

The Government analyzed the top 200 websites that referred traffic to Liberty Reserve's SCI interface from 2010 to 2013 (in terms of volume of referrals) – which were responsible for more than half of all the referrals to Liberty Reserve's SCI interface during this timeframe.  (GX-1304; GX-1304A; GX-1304B).  That analysis showed that:

- Approximately 36 percent of the top 200 referral sites – including half of the top 10 sites – were "carding" websites, *i.e.* websites engaged in trafficking stolen credit card data and related illegal goods and services, as evidenced by, among other things, their use of carding terms in their domain names ("cc," "cvv," "cv2," "fullz," "dumps") and their use of a login screen on their homepage (in contrast to legitimate merchants, which typically indicate what they sell on their homepage).  (GX-1302A (screenshots of carding websites included in top 200)).[19]

- Approximately 29 percent of the top 200 referral sites were "investment" sites – most of which were fraudulent on their face.  (GX-1302D).

- The remainder of the top 200 referral sites were web services ("VPNs," "proxies," etc.), gambling sites, and exchangers. (GX-1302F; GX-1302C; GX-1302B)

(PSR ¶¶ 119-122).

C.    *Liberty Reserve's Featured "Merchants"*

The Liberty Reserve website itself included a list of "merchants" where users could spend their LR.  (GX-110C).  The list was not a comprehensive or even representative list of the businesses that accepted Liberty Reserve as payment.  There were no HYIPs or carding sites included in the list, for example.  The businesses on the merchants page were ones that Liberty Reserve selected to feature.  Yet even some of these featured business appeared to cater to a criminal clientele.  (PSR ¶ 123).

For example, one website, www.ptshamrock.com ("PTShamrock"), listed under the category "Finance," offered offshore banking services and brazenly claimed to sell academic degrees, driver's licenses, passports, and even appointments to ambassadorial or consular positions in certain countries, in exchange for Liberty Reserve.  (GX-541B; GX-541D; GX-541E; GX-541F; GX-541G) (PSR ¶ 124).

Other "merchants" featured on the Liberty Reserve website were listed under the category "Internet Services," and provided web "privacy" or "security" services, such as virtual private networks, encryption, and "offshore" website hosting (*i.e.*, hosting of websites on servers

---

[19]  While carding sites account for the highest percentage of the traffic directed to Liberty Reserve's SCI interface, they do not account for the highest percentage of Liberty Reserve's transactional activity.  This is likely because purchases on carding websites tend to be for smaller amounts of money than, for example, "investments" in HYIP websites.

located in jurisdictions with weak or lax law enforcement systems).  Such services are frequently used by online criminals to hide their tracks or to otherwise prevent detection or disruption of their criminal activity by law enforcement.  Indeed, some of the "offshore" hosting services featured on Liberty Reserve's merchants page specifically marketed to HYIPs.  (GX-542; GX-547) (PSR ¶ 125).

As of May 2013, only two links to "merchants" were featured under the category "Shopping."  One link led to a Facebook page of an individual in Indonesia offering to "resell" a seemingly random collection of clothing, electronics, and other goods, consistent with fencing stolen merchandise.  The second link led to www.kupitam.com ("Kupitam"), a site which Kats participated in operating and which allowed a user to specify any item on the Internet that the user wished to purchase (for example, an item for sale at Amazon.com).  Kats would then purchase the specified item for the user.  After the item was delivered to Kats, Kats would re-ship the item to the user, in exchange for payment in LR.  The website charged high "processing" fees that would deter most users from using the site for legitimate business activity.  (GX-545).  Instead, the site enabled Liberty Reserve users to purchase goods from mainstream vendors – who otherwise would not accept such form of payment – and to do so indirectly, in a way that avoided leaving a record of their identities or shipping locations with the vendors.  (PSR ¶ 126).

D.       *Aftermath of Liberty Reserve Shutdown*

Following the shutdown of Liberty Reserve in May 2013, law enforcement agents monitoring various online criminal forums (such as "hacking" or "carding" forums) observed numerous postings by users of these forums bemoaning Liberty Reserve's closure and the resulting loss of funds that they had on Liberty Reserve's system.  Many users complained of losing tens of thousands of dollars or more that they had in their Liberty Reserve accounts.  (PSR ¶ 127).

By contrast, very few Liberty Reserve users have contacted the Southern District of New York seeking to recoup their Liberty Reserve funds on the basis that they were conducting legitimate business on the site.  When the Liberty Reserve takedown was announced to the public in May 2013, users were instructed to contact the Southern District of New York if they wished to recoup their funds.  Notwithstanding that Liberty Reserve had more than 5 million registered user accounts, only approximately 50 individuals have contacted the Southern District of New York since May 2013.  Based on their comments, many of these people appear to be victims of HYIPs and other online scams.  Similarly, notwithstanding that numerous Liberty Reserve accounts were doing a high volume of business as Liberty Reserve "exchangers," only one Liberty Reserve exchanger has contacted the Southern District of New York about a potential claim since May 2013, and that claim was ultimately not pursued.  (PSR ¶ 128).

E.       *Impact on HYIP Victims in SDNY*

Countless victims in the United States and elsewhere were defrauded by online HYIPs that accepted payment through Liberty Reserve, including several located in the Southern District of New York.  One example is Eric Boateng, a Bronx resident and father of two, who

works full-time as a security guard while taking vocational courses, and whom the Government planned to call as a witness. In 2012, Mr. Boateng "invested" in over a dozen HYIPs, believing them to offer a good way to "diversify" his investments. Mr. Boateng understood Liberty Reserve to be the "bank" through which he had to send his money to the operators of the HYIPs. In total, Mr. Boateng "invested" over $6,000 in various HYIPs via Liberty Reserve, believing them to be legitimate investment opportunities. Mr. Boateng also advised a co-worker and two relatives (also Bronx residents) to invest in HYIPs, all of whom invested significant sums through Liberty Reserve as well. As Mr. Boateng believed he was making a long-term investment, he "re-invested" his supposed "returns" from the HYIPs, and never withdrew any money. Eventually the HYIP websites shut down, and Mr. Boateng lost his entire "investment." (PSR ¶ 133) (*see also* Boateng Victim Impact Statement).

## DISCUSSION

### I.  The Court Should Not Disregard Section 2B1.1 of the Sentencing Guidelines

Although Budovsky reaffirms that the Guidelines calculation in the plea agreement and the PSR is correct, he argues that reliance on the "amount of money laundered drives up the offense level disproportionately," and urges the Court to disregard the stipulated offense level to the extent that it relies on the loss table in U.S.S.G. Section 2B1.1. (Def. Mem. at 41). In effect, Budovsky challenges Section 2B1.1 "based solely on policy considerations." *Kimbrough* v. *United States*, 552 U.S. 85, 101 (2007).

There are three major lines of cases criticizing specific Guidelines under *Kimbrough*. The first line of authority relates to Section 2D1.1, the drug Guidelines, as applied to offenses involving crack cocaine. *See Kimbrough* v. *United States*, 552 U.S. at 109. The second involves the Guidelines relating to child pornography, Section 2G2.2. *See United States* v. *Dorvee*, 616 F.3d 174, 183-84 (2d Cir. 2010). And the third relates to Section 2B1.1, the Guideline at issue here. *See, e.g., United States* v. *Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 Fed. Appx. 93 (2d Cir. 2008).

Although the Second Circuit has endorsed policy-level challenges to the Guidelines in cases involving crack and child pornography, it has explicitly not done so with respect to Section 2B1.1. *See United States* v. *Goffer*, 721 F.3d 113, 131 (2d Cir. 2013) ("Defendants in this case assert that several district court judges have chosen to exercise this ability to issue below-Guidelines sentences to white collar criminals. [The defendants] raise broad questions as to how harsh federal courts are, and how harsh they should be, in sentencing white collar defendants. We need not answer either question.").

In *Kimbrough*, the Supreme Court held that Section 2D1.1 was subject to policy-level disagreement by district courts in cases involving crack because the Commission had merely adopted, without deliberation, the 100-1 crack to cocaine ratio that Congress enacted in the Anti-Drug Abuse Act of 1986. *See Kimbrough*, 552 U.S. at 96. The *Kimbrough* Court also noted that the Commission "later determined that the crack/powder sentencing disparity is generally unwarranted." *Id.* at 97. In *Dorvee*, the Second Circuit expressed concern that Section 2G2.2 had been increased largely by congressional fiat in the PROTECT Act, and that the Commission

"has often openly opposed these Congressionally directed changes" to the child pornography Guidelines. *Dorvee*, 616 F.3d at 184-85.

The Commission's development of Section 2B1.1 is not subject to the same degree of criticism. Over a five-year period between 1996 and 2001, the Commission engaged in a deliberative process to address the Guidelines' treatment of white-collar offenses, with the involvement of relevant stakeholders including the defense bar, the Department of Justice, probation officers, and the U.S. Judicial Conference. *See* Federal Register Notice BAC2210-40, 62 Fed. Reg. 152, 171-74 (1997) (proposals by the Commission for comment regarding economic crime sentencing reform). The resulting amendments were referred to as the "Economic Crime Package," and they became effective on November 1, 2001. *See* Sentencing Guidelines for the United States Courts, 66 Fed. Reg. 30,512, 30,540 (June 6, 2001). The Commission explained the amendments to Section 2B1.1 as follows:

> [M]ost fraud statutes cover a broad range of conduct with extreme variation in severity. The specific offense characteristics and cross references contained in this guideline are designed with these considerations in mind.

> The Commission has determined that, ordinarily, the sentences of defendants convicted of federal offenses should reflect the nature and magnitude of the loss caused or intended by their crimes. Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under this guideline.

*Id*. at 30,533. Thus, the 2001 amendments to Section 2B1.1 reflected the considered view of the Commission, following a collaborative process with relevant stakeholders, that loss amount should be a central consideration in determining the seriousness of an offense to which that Guideline applies.

In 2002, Congress instructed the Commission to amend the Guidelines for white-collar crime again, this time as part of the Sarbanes-Oxley Act. Congress's instructions at that time were far more open-ended than the congressional mandates regarding Section 2G2.2 in the PROTECT Act. In emergency amendments promulgated pursuant to Sarbanes Oxley in January 2003, the Commission modified the loss-amount enhancement in Section 2B1.1 for high-loss cases—that is, cases involving loss amounts in excess of $200 million. *See* U.S. Sentencing Comm'n, Emergency Guidelines Amendments, 15 Fed. Sentencing Reporter 281, 283 (Apr 1, 2003) ("[T]he amendment expands the loss table at § 2B1.1(b)(1) to punish adequately offenses that cause catastrophic losses of magnitudes previously unforeseen, such as the serious corporate scandals that gave rise to several portions of the Act."), *available at* 2003 WL 22016909. Following a period of notice and comment, *see* 68 Fed. Reg. 2615, *available at* 2003 WL 131508, the Commission conducted hearings on the amendments in March 2003. *See* U.S. Sentencing Comm'n, Hearing on Amendments in Response To Sarbanes-Oxley, 15 Fed. Sentencing Reporter 291 (Apr. 2003), *available at* 2003 WL 22016911.

The hearings included testimony from the chair of the Sentencing Guidelines Subcommittee of the Attorney General's Advisory Committee; the co-chairs of the Commission's Practitioners Advisory Group; the president of the National Association of Criminal Defense Lawyers; and Professor Frank Bowman.  *See id*. at 291.  Thus, as with the Economic Crime Package amendments, the final amendments to Section 2B1.1 following Sarbanes Oxley were the product of deliberation by the Commission rather than rote application of a congressional mandate.  To the extent Section 2B1.1 emphasizes loss amount to the degree it does, that was an intentional decision by the Commission based on years of consideration and guidance from Congress.  *See United States* v. *Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006) ("[T]he Guidelines reflect Congress' judgment as to the appropriate national policy for [white collar] crimes.").

The District Court decisions cited by Budovsky as critical of Section 2B1.1's loss calculations involve sentences imposed for securities fraud offenses, and the applicability of those opinions to the facts of Budovsky's offenses is limited.  *See, e.g., United States* v. *Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012) (in an insider trading case, criticizing the Guidelines for "assign[ing] [the defendant] no fewer than 18 points for the resultant but unpredictable monetary gains made by others, from which Mr. Gupta did not in any direct sense receive one penny); *United States* v. *Parris*, 573 F. Supp. 2d 744. 754 (E.D.N.Y. 2008) (expressing the concern that "any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment"); *United States* v. *Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) ("the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart"); *United States* v. *Emmenegger*, 329 F. Supp. 2d 416 (S.D.N.Y. 2004) ("[t]o a considerable extent, the amount of loss caused by this crime is a kind of accident").

By contrast, the "the value of the laundered funds" for which Budovsky was accountable in connection with Liberty Reserve was neither "unpredictable" nor "a kind of accident," and Budovsky himself profited handsomely as a result of this large volume of laundered funds. Budovsky was uniquely positioned to monitor both the volume of transactions with exchangers and the volume of user transactions conducted on the Liberty Reserve website.  Budovsky oversaw the funding of exchanger accounts, and he had full access to the transactional database. As Budovsky told El Amine, as he was checking an account in Liberty Reserve's transactional database, "there are no secrets from me."  (GX 701)  Budovsky knew exactly how much money Liberty Reserve was laundering—there was nothing unpredictable or accidental about it.

Furthermore, although the Guidelines for both fraud and money laundering offenses use the tables in Section 2B1.1, the "value of the laundered funds" is a different measure than fraud loss because it is not based on harm to victims, but rather harm to society.  *See United States* v. *Martin*, 320 F.3d 1223, 1227 (11th Cir. 2003) (noting that "value of the funds" is different from fraud "loss" because "[t]he harm from such a transaction does not generally fall upon an individual, but falls upon society in general.  Each unlawful monetary transaction harms society by impeding law enforcement's efforts to track ill-gotten gains." (internal citations and quotation marks omitted)).

In sum, Budovsky's arguments regarding the unfairness of the application of Section 2B1.1 to his case, and his request for a non-Guidelines sentence on that basis, should be rejected.

## II.     The Parties' Preliminary Plea Discussions Have No Bearing on the Appropriate Sentence in this Case

Budovsky argues that the Court should impose a sentence of no greater than 15 years on the grounds that, at one point during the plea discussions between the parties, the Government believed that a "15-year cap" was an appropriate resolution to the case.  (Def. Mem. at 16).  This argument is baseless and ignores the differences between the plea bargaining process and the process of determining an appropriate sentence.[20]

The factors that the Government considers when negotiating a plea deal pre-trial are different from the factors a court considers when determining a defendant's sentence post-conviction.  A sentencing court looks solely at the factors set forth in 18 U.S.C. § 3553(a).  In the context of plea discussions, the Government considers the same Section 3553(a) factors, but also considers other legitimate factors that the sentencing court does not.  These include, *inter alia*, the need to conserve the Government's resources, to protect the identity of an informant, or to hedge against the "litigation risk" inherent in any trial and achieve the certainty of a conviction.  But in order to achieve these objectives, the Government must offer the defendant some benefit in return; such benefit normally takes the form of a reduction in the severity of the defendant's punishment.  This mutual give-and-take between the Government and the defendant take in the plea bargaining context is expected and entirely legitimate.  *See Bordenkircher* v. *Hayes*, 434 U.S. 357, 363 (1978) ("Plea bargaining flows from the mutuality of advantage to defendants and prosecutors, each with his own reasons for wanting to avoid trial." (internal quotations and citation omitted)).

Furthermore, the Government's plea calculus frequently changes as the case proceeds closer to trial.  For example, it is often the case that the need to protect an informant is mooted by the production of the 3500 material, or that the perceived "litigation risk" diminishes substantially as the Government's proof becomes stronger.  In those situations, it is entirely appropriate in the plea bargaining context for the Government to offer less of a benefit to the defendant in exchange for his guilty plea.  In fact, the Sentencing Guidelines themselves recognize the value of an early guilty plea, and explicitly provide for a sentence reduction for a defendant who has "timely notif[ied] authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1.

---

[20]  As the Court is aware, the parties made an extensive record about the plea discussions at the April 6, 2016 conference at the request of the Court.  Among other things, the Court found that "there was no formal offer made by the government to accept a plea at any time to a series of charges that had a 15-year maximum."  (Tr. 4/6/16 Hrg. at 32).  Budovsky claims that he does not seek to re-litigate these issues, but then proceeds to set forth at length his version of how the plea discussions transpired.  (*See* Def. Mem. at 13-16).  Although the Government does not agree with the defendant's version of the facts, we do not believe it is necessary or appropriate to respond to them here. We rely on the Court's prior findings.

Accordingly, the Government's calculus of an appropriate plea offer is very different than a sentencing judge's calculation of an appropriate sentence. It is therefore incorrect for Budovsky to suggest that the Government's discussions about a potential 15-year plea deal months before trial should inform the Court's determination of his sentence. Indeed, if Budovsky's argument were accepted as a principle for determining a defendant's sentence, it would completely upend the incentives in the plea bargaining process. Budovsky is in effect arguing that once a prosecutor makes a plea offer to a defendant, the sentence associated with that plea offer should forever remain presumptively reasonable, and also "sufficient" for purposes of Section 3553(a). Such an outcome would be the functional equivalent of requiring prosecutors to keep open indefinitely any plea offer made to a defendant. The Government's inability to modify a plea offer as a case proceeds toward trial would undercut any benefit the Government could hope to obtain from the plea bargaining process, as the defendant would have no incentive to take an early plea. The Court should therefore reject Budovsky's argument.

### III.   A Guidelines Sentence Is Warranted in Light of the Unprecedented Scope of the Money Laundering, Budovsky's Leadership Role at Liberty Reserve, and His Deception of Law Enforcement Authorities

Although Budovsky disputes several aspects of the factual summary in the PSR (which we address later in this submission), the facts comprising the core criminal conduct in this case are not disputed. Budovsky has explicitly admitted these core facts in his plea allocution, in his additional admissions in the parties' April 8, 2016 letter to the Court (the "April 8 Letter"), and in his response to the PSR offense conduct summary:

- Budovsky and Kats jointly conceived, created, controlled, and ran Liberty Reserve as full-fledged partners from its inception in 2002 until May/June 2008, when Kats was removed from the company and Budovsky assumed full supervisory control of Liberty Reserve. Prior to their split, Budovsky and Kats discussed and jointly implemented all major strategic decisions for the company, including the design of the Liberty Reserve currency system and the marketing strategy for the company.

- From the beginning, Budovsky and Kats intended that Liberty Reserve would engage in money laundering and assist others to engage in money laundering. Although Budovsky and Kats would have welcomed the use of Liberty Reserve by legitimate businesses, they were both aware that the majority of Liberty Reserve's business would come from, and did come from, criminal activities – predominantly high-yield investment programs ("HYIPs"), which they knew were online Ponzi schemes. Hence, Budovsky and Kats intentionally designed Liberty Reserve to attract HYIPs and other online criminals by including features that enabled such criminals to launder the proceeds of their ill-gotten gains. Budovsky and Kats also actively sought out HYIP business for Liberty Reserve through a variety of means, including promoting Liberty Reserve to HYIPs on various online discussion forums.

- Liberty Reserve laundered between $250,000,000 and $550,000,000 in criminal proceeds from user accounts based in the United States. These transfers represented proceeds derived from a wide range of cybercrimes, including HYIP scams, credit card trafficking, stolen identity information, and computer hacking.

The undisputed core facts set forth above show that Budovsky co-founded and led a massive money laundering enterprise that was specifically designed for, and deliberately marketed to, cybercriminal enterprises across the world to help them launder hundreds of millions of dollars in criminal proceeds.  Throughout its entire existence, Budovsky led Liberty Reserve – at first as a 50/50 partner with Kats and later as the sole decision-maker – and developed it into a criminal operation of unprecedented size and scope that was critically important to online criminals.  On these facts alone, the defendant's crime is an extraordinarily serious offense that warrants a Guidelines sentence.

To carry out this criminal enterprise, Budovsky engaged in a persistent pattern of obfuscation and deception of law enforcement authorities and regulators.  For example, after their arrest in 2006 for running GoldAge as an unlicensed money transmitting business, Budovsky and Kats went to great lengths to conceal their involvement with Liberty Reserve and insulate it from the reach of U.S. law enforcement authorities.  Among other things, Budovsky and Kats moved Liberty Reserve to Costa Rica and incorporated the company and its bank accounts under the names of nominee owners.  Budovsky then provided the false documentation, which concealed his involvement in Liberty Reserve, to SUGEF, the Costa Rican financial regulatory authority.  (PSR ¶¶ 50-51, 63-66; GX-600(T)).

Once Liberty Reserve had been set up in Costa Rica, Budovsky repeatedly misled SUGEF and Liberty Reserve's own compliance team about the criminal nature of Liberty Reserve's business.  Among other things, Budovsky intentionally withheld information about Liberty Reserve's clients and transactional history from his General Manager, Marco Cubero, and his Compliance Officer, Silvia Lopez.  (*See* GX-1001A (Budovsky telling Marmilev that Cubero will not be granted access to the Liberty Reserve transactional database "even if his life would depend on it"); GX-1050F(T) (Marmilev chastising a programmer for mistakenly sending reports of customer information and transactional volumes to Cubero and Lopez)).  In addition, Budovsky had Marmilev and Chukharev create a special "Government Administrative Area" within the Liberty Reserve database into which they populated "fake" data and statistics to mislead SUGEF and the Liberty Reserve compliance team about the volume of transactions passing through Liberty Reserve and to thwart efforts to implement meaningful compliance measures at the company.  (PSR ¶ 77; GX-1050B(T); GX-1050C; GX-1050D).  This pattern of deception highlights the extraordinary lengths to which Budovsky was willing to go to conceal his crime and underscores the need for a Guidelines sentence.

Budovsky's conduct is even more reprehensible because it is marked by numerous instances of gratuitous and unbounded greed.  For example, at the end of May 2008, Budovsky unilaterally "restructured" his partnership with Kats and pushed Kats out of the business against his will.  (PSR ¶ 64; GX-521C).  Budovsky knew he could do this because Kats was still on probation for his GoldAge conviction and was unable to travel to Costa Rica to contest Budovsky.  Moreover, the timing of Kats ouster was not a coincidence.  It occurred just as Liberty Reserve's business was sharply increasing due to the demise of E-Gold and E-Bullion – two competitor digital currencies, whose users flocked to Liberty Reserve – making Liberty Reserve much more profitable than it had been in the past.  (*See* GX-1320E (F) (showing the difference in Liberty Reserve's transaction volume when Budovsky and Kats were partners

versus when Budovsky was the sole owner of Liberty Reserve)).  Budovsky deliberately cut out his partner of seven years in order to keep the increased criminal profits for himself.

If these profits were not enough, Budovsky sought to increase his ill-gotten gains by starting his own HYIP scam with El Amine (PSR ¶¶ 82-86; GX-701; GX-708-710; GX-712; GX-714; GX-719; GX-722-724), and by freezing the accounts of HYIP operators and keeping the money for himself.  (PSR ¶¶ 93-98).  Budovsky knew that the criminal HYIP operators would have no legal recourse to challenge the seizures, and as long as he kept the amounts below a certain level, the HYIP operators would treat it as a cost of doing business with Liberty Reserve.  (*See* GX-828(T)).  Indeed, Budovsky's greed was so intense that, as he described it, his hands were literally "itching" to grab the money.  (GX-1020A).  These examples suggest that Budovsky will have considerable difficulty curbing his venal motivations and may revert to criminal activity after he has served his sentence.

Moreover, a Guidelines sentence would not cause an unwarranted sentence disparity as compared to Budovsky's co-conspirators, Marmilev and Chukharev, who received sentences of five years and three years, respectively, or as compared to money laundering defendants nationwide.  (*See* Def. Mem. at 45-46).  Marmilev and Chukharev were much differently situated than Budovsky.  First, those two defendants pled to a different crime – conspiracy to run an unlicensed money transmitting business, in violation of 18 U.S.C. §§ 1960 and 371 – which carries a five-year maximum sentence.  Hence, their crimes of conviction were much narrower in scope and exposed them to a much lower maximum sentence.  Second, Marmilev and Chukharev played supporting roles in the conspiracy, not a leading role like Budovsky.  Their lesser culpability warranted a lesser sentence, and does not set up an unwarranted sentence disparity if Budovsky receives a Guidelines sentence.  In addition, the fact that the national average for money laundering sentences in 2014 was far lower than 240 months does not carry much weight.  The average includes numerous minor money laundering offenses that do not approach the unprecedented size and scope of Liberty Reserve.  Accordingly, a Guidelines sentence is appropriate.

## IV.    A Guidelines Sentence Is Further Warranted Because Budovsky is a Proven Recidivist

Budovsky argues that a Guidelines sentence would be greater than necessary because he presents a low risk of recidivism based on his age, education level, and other predictive factors.  (*See* Def. Mem. at 19-21).  Hence, according to Budovsky, a long prison sentence is not required to deter him from re-engaging in criminal activity or to protect the public.  (*See id.*).  In support of his argument, Budovsky cites several research studies by the U.S. Sentencing Commission, and a number of cases in which the court imposed a lenient non-Guidelines sentence due to the defendant's low risk of recidivism based on these same objective factors.  (*See id.*).

Budovsky's argument completely misses the mark.  It is not necessary to rely on objective factors like age and education level to predict whether Budovsky will likely commit crimes again in the future.  Budovsky is already a *proven* recidivist.  In 2006, Budovsky was convicted of running GoldAge as an unlicensed money transmitting business, and was given a lenient sentence of 5 years' probation.  (PSR ¶ 147).  Immediately after his conviction, and just

after starting his term of probation, Budovsky returned to the exact same type of criminal activity by running Liberty Reserve with Kats.  (PSR ¶ 49).  Not only did Budovsky quickly return to a life of crime, he did everything in his power to insulate himself so that he could continue his criminal money laundering enterprise with no interference from U.S. law enforcement.  For example, he and Kats registered the domain names for Liberty Reserve and their other exchanger businesses under false names or nominees to avoid having their true names associated with the companies.  (PSR ¶ 50).  Budovsky and Kats also incorporated Liberty Reserve in Costa Rica and opened several offshore bank accounts there.  (PSR ¶ 51).  Budovsky later moved to Costa Rica and ultimately renounced his U.S. citizenship.  (PSR ¶ 63).  Hence, the "lesson" Budovsky took from his prior conviction was not to steer clear of crime.  It was that he needed to be a smarter criminal.  Given those circumstances, a Guidelines sentence is absolutely warranted to promote respect for the law and to deter Budovsky from committing crimes again in the future.

The research studies and cases that Budovsky cites are not to the contrary.  In fact, the principal study upon which Budovsky relies states that the best tool for predicting the likelihood of recidivism is not the defendant's age or education level, but rather the defendant's criminal history point score – *i.e.*, whether the defendant has committed a crime in the past.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (noting that recidivism rates increase steadily with higher criminal history point scores).

A Guidelines sentence is also necessary to incapacitate Budovsky and protect society from further crimes.  If Budovsky receives a sentence of 15 years or lower, as he requests, then taking into account the roughly three years he has already been incarcerated, he will be released from prison when he is 54 years-old or younger.  At that age, Budovsky could easily re-engage in fraud and money laundering crimes.  Indeed, Budovsky has made his living committing these kinds of crimes since he was in his twenties, and there is every reason to believe that he will revert to the same sort of criminal activity upon his release from prison.  Moreover, the Government does not accept Budovsky's claim that he is already substantially incapacitated because he no longer has any assets.  (*See* Def. Mem. at 5).  The Government is aware of millions of dollars that were transferred to Russia and other countries from accounts controlled by Budovsky that the Government has not been able to locate and forfeit.  Budovsky may still have access to these funds and, if so, could use them to get on his feet quickly and restart his criminal activity.  Furthermore, the Court should not consider the fact that Budovsky will be removed from the United States after his release as a mitigating factor.  (*See id.*).  Budovsky brought that outcome on himself when he chose to renounce his U.S. citizenship to facilitate his money laundering enterprise.

## V.    A Guidelines Sentence Is Further Warranted Because Budovsky Continues to Minimize his Criminal Conduct and Shows No Remorse for his Actions

Budovsky's sentencing submission repeatedly mischaracterizes the factual record and minimizes his conduct and role in the offense.  Budovsky's arguments raise a real concern that he has truly acknowledged the full scope of his actions, which counsels strongly in favor of a Guidelines sentence.

Budovsky's sentencing submission is remarkable in its focus and tone. He expresses virtually no remorse for running a massive money laundering business, which facilitated the movement and concealment of hundreds of millions of criminal proceeds and left a stream of victims in its wake. Budovsky, instead, choses to quibble with a litany of factual representations in the PSR in an effort to downplay his criminal responsibility in the scheme – even when the points he raises do not seem to bear on the core conduct of the case – and to deflect the Court's attention from his own conduct by blaming others, like his co-conspirator, Vladimir Kats, and even the HYIP victims like Eric Boateng. Indeed, Budovsky's submission is marked by a recurring pattern. He repeatedly avers that he is not stepping back from his plea allocution or his admissions in the April 8 Letter, but then in same breath attempts to argue an inference or draw a distinction that is inconsistent with, if not the letter of his prior admissions, then certainly the spirit of those admissions.

The Government will not attempt to rebut every one of Budovsky's arguments, as many of his points relate to peripheral issues that have little bearing on the appropriate sentence. However, in the sections below we do address and rebut several of his principal points, which are at odds with the factual record and his prior admissions, and which attempt to paint a misleading picture of Budovsky's relative culpability, particularly vis-à-vis Kats.

A.      *Kats Was Not the "Dominant Force" in the Relationship with Budovsky and Did Not "Exploit" Budovsky's Purported "Vulnerabilities"*

As part of a recurring theme in his sentencing submission, Budovsky attempts to lay more of the blame for the crime at the feet of Kats by portraying Kats as the "dominant force" in their relationship. (*See* Def. Mem. at 47). Budovsky goes even further, claiming that Kats knew about Budovsky's depression and intentionally "exploited Budovsky's vulnerability." (Def. Mem. at 46). The notion that Kats held more sway in their relationship and that Budovsky was somehow the victim of Kats' emotionally predatory behavior is patently absurd and demonstrably false.

First, the documents upon which Budovsky relies to show that Kats was supposedly preying on Budovsky's weaknesses show nothing of the sort. The chats between Kats and Yassine that Budovsky cites show only that Kats was aware that Budovsky struggled with depression and was taking medication. (*See* Def. Ex. 4, Ex. 8). There is nothing in the chats that even hints that Kats exploited Budovsky's depression for his advantage. To the contrary, in his chat with Yassine (referred to as "Alex" in the chat), Kats expresses genuine sympathy for Budovsky's medical problems and hopes that they can reconcile in the future, despite the fact that Budovsky had betrayed Kats and kicked him out of Liberty Reserve against his will only two years before. (*See* Def. Ex. 4 at 6:48 PM (Kats: "I hope the drugs (Paxil, etc.) helps him to cope."); at 6:43 PM (Kats: "Like I said, I still have a small hope for Arthur. Maybe one day, he will realize what he did and try to make things right for both you and me."")).

The documents and the record as a whole also contradict Budovsky's assertion that Kats was in the driver's seat in their relationship and that Budovsky simply went along with Kats because he trusted him. (*See* Def. Mem. at 46-47). If Kats had enjoyed the upper hand in the

relationship and Budovsky were simply acceding to Kats' wishes, Budovsky would never have been able to kick Kats out of the company in May 2008.  In fact, the text of the chats between Budovsky and Kats in May/June 2008 when Budovsky informed Kats that he (Budovsky) was unilaterally restructuring their partnership and removing Kats from Liberty Reserve against his will, clearly shows that Budovsky was not weak and vulnerable, but rather was a calculating (even ruthless) businessman, who was willing to cut out his partner of seven years for a pittance just as the business was becoming profitable.  (*See* GX-521C at 01:19:39 2/06/2008 (Budovsky: "[Y]ou have said yourself this is not personal . . . and I am not treating this as personal . . . so comments about 20 years [of friendship] . . . do not mean much, because i look only at business side of everything.").  Moreover, the chat utterly refutes the idea that Kats' personality was the "dominant force" in their relationship.  If anything, by this point in the relationship, Kats was at the mercy of Budovsky, not vice versa.

Budovsky appears to go even further with his argument by intimating, although not stating outright, that Kats was also the "dominant force" – *i.e.*, the more culpable actor – in the creation and management of Liberty Reserve.  (*See* Def. Mem. at 47 ("The Government seems to suggest in its version of the offense that Budovsky was the more evil operative behind the inception, creation and implementation of LR.  In our respectful view, Kats' personality was the dominant force in his relationship with Arthur.")).  To the extent that Budovsky is making this argument, it directly contradicts his admissions in the April 8 Letter ("Budovsky and Kats jointly conceived, created, controlled, and ran Liberty Reserve as full-fledged partners from its inception in 2002 until May/June 2008[.]").  Moreover, the chat referenced above directly refutes this position.  In the chat, Budovsky (Seelen866) justifies Kats' ouster by telling him that he (Budovsky) had been primarily responsible for running the company for some time and that Kats had contributed almost nothing to the operation of Liberty Reserve in the roughly two year period since their arrests for running GoldAge in May 2006.  And Kats (Ragnarok) *agrees* with him.

```
--------------------------------------<
Seelen866 (01:02:39  2/06/2008)
i never took [Liberty Reserve]
--------------------------------------<
Seelen866 (01:03:02  2/06/2008)
it happened that i am responsible for all aspects of it
-------------------------------------->


-------------------------------------->
Ragnarok (01:22:17  2/06/2008)
Partnership is 50-50. I've put in 7 years into growing everything, directly
and indirectly. No?
-------------------------------------->
Ragnarok (01:22:45  2/06/2008)
Sure, in last 2 years you were much more involved with developing LR,
but does that mean it discounts the rest of the 5 years?
--------------------------------------<
```

(GX-521C).  Similarly, another chat from the same time period shows Budovsky bragging to Kats about his central position and importance in the digital currency industry.  (*See* GX-520G at 12:48:38 31/05/2008 (Budovsky: "[I] am in the middle of the whoel [sic] industry now . . . you need to be on top.").

Rather than looking at his own contemporaneous statements, Budovsky attempts to support his argument by relying on chats between Kats and Yassine, El Amine, and others in the digital currency world, which occurred after Budovsky had removed Kats from Liberty Reserve.  (*See* Def. Exs. 4, 5, 6, and 14).  Although Kats made some grand claims about his importance in the development of Liberty Reserve, these comments are taken out of context.  It is important to bear in mind that when Kats was ousted from Liberty Reserve, he started a digital currency that he hoped would compete with Liberty Reserve called EuroGoldCash ("EGC").  Hence, Kats had an interest in puffing himself up to others in the digital currency world so that they would do business with him and with EGC.  That is exactly how these chats read.  Indeed, his chat with Yassine reads like two people who are grousing about how their business partner (Budovsky) cut them out of a very profitable enterprise and are massaging each other's egos about how important they each were to its development.  They are not consistent with the contemporaneous chats and other evidence from the time period when Kats was still at Liberty Reserve, which show that Kats and Budovsky were 50/50 partners up until the point where Kats was removed from the company.

The argument that Kats was the "dominant force" in their relationship is the most obvious example of a larger, unexpressed theme in Budovsky's submission – namely, that Kats was more to blame for the early phase of Liberty Reserve's criminal activity than Budovsky.  There are hints of this argument in several places in the submission.  For example, Budovsky claims that "Kats and Yassine, after discussion with Budovsky, functionally were the primary decision-makers in their roles as managers of LR's day-to-day operations" after the move to Costa Rica.  (Def. Mem. at 27).  First, as the May/June 2008 chat makes clear, that is simply not true.  Budovsky accused Kats of having very little involvement in running the company after the move to Costa Rica.  (*See* GX-521C).  Indeed, the reason why Budovsky was able to oust Kats was that Budovsky was able to travel to Costa Rica and take an active role in the company operations there, whereas Kats was not.  Second, although Budovsky nominally acknowledges that he had some role in the day-to-day decisions in Costa Rica before Kats was removed, he attempts to make himself seem less responsible for the conduct by pointing out the "operational reality" (Def. Mem. at 27) that others made the decisions in Costa Rica prior to May 2008.

B.    *Budovsky Knew that the Vast Majority of Liberty Reserve's Revenue Was Derived from Criminal Activity*

Budovsky also downplays the extent to which criminals used Liberty Reserve.  Budovsky admits that the "majority of LR's business came from criminal activities."  (Def. Mem. at 24).  He must admit this because he agreed to this factual representation in the April 8 Letter.  (*See* April 8 Letter).  However, Budovsky then splits hairs and contends that it would be inaccurate to state that the "'vast' majority" of Liberty Reserve's business came from "HYIPs or even from criminal activity."  (Def. Mem. at 24).  Budovsky offers no factual support whatsoever for this

assertion.  Rather, he contends that because certain HYIP investors were complicit in the fraud, their investments in the HYIPs somehow do not count as criminal proceeds.  (*See* Def. Mem. at 24-25).  Budovsky even appears to assert that some portion of the HYIPs that used Liberty Reserve were not Ponzi schemes and were legitimate.  (*See id.* at 24 (agreeing only that "*a majority* of the HYIPs using LR were fraud schemes") (emphasis added)).

Once again, these assertions are demonstrably incorrect and advance the false premise that some significant portion of Liberty Reserve's business was legitimate.  As we previously set forth in our analysis of the top 500 Liberty Reserve accounts by transactional volume, after eliminating the exchanger accounts, which house money moving in and out of the Liberty Reserve system, the remaining accounts are almost all linked to criminal ventures.  (PSR ¶¶ 110-115; GX-1310A; GX-1311A-K).  Budovsky offers nothing to rebut this analysis except a specious argument that the proceeds generated by complicit HYIP investors are less criminal. To be sure, there are numerous, more experienced HYIP investors who are aware of the criminal nature of the HYIP and attempt to "ride the Ponzi" and cash out before the scheme collapses. *See* Tyler Moore *et al.*, *The Postmodern Ponzi Scheme: Empirical Analysis of High-Yield Investment Programs*, *available at* http://tylermoore.ens.utulsa.edu/fc12.pdf.  But that does not change the fact that HYIPs are, by definition, fraudulent Ponzi schemes, and any transfer of funds collected by a HYIP operator via Liberty Reserve is a money laundering transaction.

Budovsky's inability to admit that all of the HYIPs using Liberty Reserve were fraudulent is especially troubling because Budovsky stated this *himself* at the time he was running Liberty Reserve.  In an August 10, 2010 email with El Amine, in which El Amine asked Budovsky whether he should invest in a HYIP, Budovsky replied, "*Unless you think there is a single hyip hat [sic] is real*, i dont see a reason to even waste time on that."  (GX-719 (emphasis added)).  The text of the email speaks for itself.   Budovsky clearly recognized that *all* HYIPs, not just "a majority," were frauds.

Moreover, if Liberty Reserve had a significant number of legitimate merchants who used its system, then one would expect those merchants to be prominently displayed on the Liberty Reserve website to project a veneer of legitimacy to the outside world.  However, the merchants that Liberty Reserve featured on its website did not offer mainstream goods and services, but rather appeared to cater to a criminal clientele.  (PSR ¶¶ 123-126; GX-110C; GX-541B-G; GX-542; GX-545; GX-547).

    C.     *Budovsky Did Not Implement Effective AML Controls in Costa Rica and Had No Intention of Converting Liberty Reserve into a "Bank"*

Budovsky concedes, as he must, that he intentionally designed Liberty Reserve with weak AML controls and features that would attract HYIPs and other criminals.  (*See* Def. Mem. at 24; April 8 Letter).  Yet, at the same time, Budovsky asserts that he attempted to implement real AML controls while in Costa Rica in order to rid Liberty Reserve of its criminal users and ultimately convert it into a legitimate "bank," and that the same features that were attractive to the criminal users of Liberty Reserve also served legitimate purposes.  (*See* Def. Mem. at 25-26, 28-29, 31, 38).

All of these assertions are flatly contradicted by the record. First, it was never Budovsky's intention to eventually legitimize Liberty Reserve and convert it into a bank. Although, he may have had discussions with Kats about this idea, Budovsky never seriously entertained it and was much more focused on achieving short term profitability and growth with HYIPs and other criminal clientele. (*See* Def. Ex. 11 at 2 ("[Kats wanted] IP restrictions and PayPal style verifications. Budovsky didn't want that because it would stifle growth.")). Indeed, the documents that Budovsky cites in support of this argument show that it was Kats, not Budovsky, who held out hope that Liberty Reserve might eventually become a bank. (*See* Def. Ex. 11 at 3 ("Kats wanted an actual bank."); Def. Ex. 4 at 7:12 (Kats: "That was my whole vision. Get enough money with one type [of] business model, then go mainstream. . . . It looks like once [Budovsky] went by himself, the vision of future growth was lost. He got blinded by ego, by the money LR was making, and that was enough for him.")).

Second, the AML controls that Budovsky implemented in Costa Rica were not part of an AML overhaul to purge Liberty Reserve of its criminal users, as Budovsky claims. Instead, the measures were intentionally ineffective and were designed to placate SUGEF so that Liberty Reserve could be licensed without disrupting its criminal clientele. The record is replete with evidence that Budovsky had no intention of engaging in real AML reform at Liberty Reserve.

For example, at a very basic level, Liberty Reserve's AML policies were meaningless because Liberty Reserve intentionally failed to verify the identities of its users, opting instead to classify only a handful of Liberty Reserve *exchangers* as the company's "customers," while ignoring the company's actual end users. (GX-600(T) at 2). Although SUGEF objected to this policy (*see* GX-602(T) at 2), Budovsky did nothing to change it because it allowed him to avoid having to verify the identity of end users and having to learn the true origin and destination of the funds going through Liberty Reserve. Budovsky knew that implementing this type of end user verification would cause criminal users to flee to other, less restrictive digital currencies. (*See* Def. Ex. 11 at 2 ("Budovsky didn't want [verifications] because it would stifle growth.")). Hence, although it is true that Budovsky made cosmetic reforms like updating the compliance manual and eventually hiring a compliance officer, he knew that these efforts would never address the root problem, which was that Liberty Reserve was intentionally turning a blind eye to its criminal end users. Moreover, the evidence shows that the few reforms that Budovsky did implement had to be grudgingly extracted from him over the course of more than a year by his well-intentioned compliance staff, Marco Cubero and Silvia Lopez. (*See* GX-624; GX-625; GX-627 at 3; GX-628(T) at 2-3; GX-629). This was not due to fact that the measures were difficult to implement or because Budovsky did not trust Cubero, as Budovsky claims. (*See* Def. Mem. at 31, 38). It was because Budovsky knew that the robust AML controls that Cubero was proposing would negatively impact Liberty Reserve's criminal business.

Moreover, the evidence shows that Budovsky did not even take the verification of exchangers seriously. For example, one of Liberty Reserve's primary exchangers was Swiftexchanger, an exchange service secretly owned by Budovsky and El Amine and operated by El Amine. (PSR ¶ 87). In seeking to hide the fact of his ownership of the company, Budovsky submitted false documentation to Liberty Reserve's own verifications department, which was forwarded to SUGEF. Specifically, at the end of February 2011, Budovsky sent an email to El Amine attaching identity documents in the name of "Anatoly Gursky," which

Budovsky instructed El Amine to use to update El Amine's "profile." (PSR ¶ 90; GX-727). About two days later, the Swiftexchanger "management" sent these identity documents to Liberty Reserve's verifications department via email, with the subject line "Documents for Verification." (GX-728). This false documentation was subsequently forwarded to SUGEF in November of 2011, in response to a request by SUGEF for information about the identities of Liberty Reserve's clients. This act of deception by Budovsky underscores how the company's "verification" policy was a sham.

Budovsky also deceived SUGEF and Liberty Reserve's compliance staff. As the PSR explains, Budovsky and his co-conspirators devised a system to provide false statistics to, and hide account information from, Liberty Reserve's compliance officer, Sylvia Lopez, and SUGEF. (PSR ¶ 77; GX-1050B(T); GX-1050C; GX-1050D; GX-1050E). While Budovsky asserts that Liberty Reserve used these administrative areas to underreport Liberty Reserve's transactions in order to avoid taxation (*see* Def. Mem. at 38), Liberty Reserve's internal emails make it clear that the fake statistics were intended to be seen by the compliance officer and SUGEF, neither of whom had anything to do with Liberty Reserve's taxes. Moreover, the administrative areas were the natural culmination of a longstanding policy of deceiving SUGEF that Budovsky and Kats had discussed as early as June 2008. In a chat on June 11, 2008, Budovsky outlined his idea to give SUGEF access to certain Liberty Reserve data so that SUGEF will "not ask any questions" and so that Liberty Reserve could appear "legitimate looking" and "transparent" [sic]. (GX 521E). Hence, the record amply shows that the administrative areas were not simply for tax evasion, and that Budovsky did not see any need to be honest and transparent with SUGEF or with his own compliance officer.

Finally, contrary to Budovsky's assertions, the features that Liberty Reserve implemented to attract criminals served no legitimate purposes. Liberty Reserve's anonymity features did not help protect legitimate users against outside hackers, as Budovsky contends. (*See* Def. Mem. at 25-26). The example provided by Kats, which Budovsky misunderstands, was that a user who pays a hacker for his services with Liberty Reserve currency does not have to provide the hacker with his account number. (*See* Def. Ex. 12 at 4). In that example, both the payor and the hacker are Liberty Reserve users and both are engaged in criminal activity. In addition, while it is true that using exchangers protected Liberty Reserve against being scammed by users (*see* Def. Mem. at 26), only a payment processor that knew it was catering to untrustworthy criminal end users would worry enough about being scammed to use exchangers to protect against that risk. By contrast, legitimate payment processors like Western Union and PayPal do not use exchangers because exchangers add additional fees and generally complicate the process, which are unappealing to legitimate users.

D.     *Budovsky Inappropriately Deflects Responsibility by Blaming Kats and Others*

Apart from his attempts to minimize the scope of his criminal conduct, Budovsky also spends a great deal of time in his submission tearing down others – particularly Kats – in a transparent attempt to deflect the Court's attention from his own culpability. Budovsky argues that it is important for the Court to gain a "fuller understanding" of Kats so that the Court can "place in better context" the respective roles of Budovsky and Kats at Liberty Reserve. (Def. Mem. at 48, 55). Yet if this is the stated purpose, then it is mystifying how repeated references

to Kats' involvement with child pornography (*see* Def. Mem. at 48-50), or a discussion about Kats feelings towards the United States government (*see id.* at 49), or how he allegedly stole from customers after leaving Liberty Reserve (*see* Def. Mem. at 54), would help clarify these issues in any way.  While it may be fair game to question the credibility of the Government's principal cooperator on factual issues relevant to the defendant's sentencing, it serves no legitimate purpose to engage in a lengthy and wide-ranging personal attack.  That is especially true in this case where the core criminal conduct is not in dispute.  By using roughly eight pages of his submission to thoroughly malign Kats, Budovsky is not trying to help clarify issues for the Court.  He is trying to make himself look better by smearing his former partner who cooperated against him.[21]  The Court should disregard these attacks as they do not bear on the appropriate sentence for Budovsky.[22]

Budovsky does not limit his attacks to Kats.  He also tries to blame the HYIP victims like Eric Boateng, portraying Boateng as a savvy investor who was aware of and exploited the fraudulent nature of the HYIPs in which he invested, and calling him an "unlucky opportunist" as opposed to an "innocent victim."  (Def Mem. at 34-35.)  Budovsky's lack of remorse for the victims is striking.  Like many HYIP victims, Boateng and the other victims who have submitted victim impact statements to the Court are people of modest means who were lured by the promise of high returns.  They were not sophisticated investors who knew how to game the HYIPs and they paid a heavy price for it:

> I thought I was investing safely with professionals, not knowing I was in a lion's den.  Until now my wife has not forgiven me.  Part of the investment was her money.  This crime has broken me down financially and hence sowed a seed of confusion between me and my wife.

(Victim Impact Statement of Eric Boateng).

> This crime has left me nothing but untrustworthiness.  I trusted that I was in good hands, not knowing this is a highly planned scheme to dupe innocent people like myself.  I spent all my life savings with Liberty Reserve and its counterpart.  I am so spiritually and physically broken.

(Victim Impact Statement of Elizabeth Ofori).

> It is very difficult to put in words the loss of money that impacted me and my family.  I'm embarrassed I believed that the opportunity to gain this much of a return on my money could ever

---

[21]  It is ironic, however, that Budovsky chastises Kats for submitting a false letter to his Probation officer to get early release from probation (*see* Def. Mem. at 48-49), when Budovsky had submitted a false letter to a judge to lift his travel restrictions two years earlier.  (GX-561 (F))

[22]  Budovsky makes numerous allegations against Kats, many of them unsupported, which Kats vigorously disputes. We do not believe that this submission is the appropriate forum to address these allegations, and instead will respond to them in Kats' sentencing submission.

> happen.  Due to a number of health issues creating a need for such
> a windfall of return on investment seemed like at the time a
> possible solution for my needs faced with my economic dilemma.
> I should have known it was too good to be true[.]

(Victim Impact Statement of Bill Norton).

Liberty Reserve made it possible for these HYIPs to operate and was directly responsible for the pain and suffering that these victims have experienced, and continue to experience. Budovsky offers no apologies to these victims, only accusations that they were complicit in the fraud.  Budovsky's callous disregard for the economic destruction his crimes have caused speaks volumes about his lack of contrition.  A Guidelines sentence is therefore appropriate.

## CONCLUSION

For the reasons set forth above, the Court should impose a Guidelines sentence of 240 months' imprisonment, consistent with the recommendation made by Probation and the principles of sentencing set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

PREET BHARARA
United States Attorney

LESLIE CALDWELL
Assistant Attorney General
Criminal Division

M. KENDALL DAY
Chief, Asset Forfeiture and Money
Laundering Section

By: _____
    Christian R. Everdell
    Christine I. Magdo
    Assistant United States Attorneys
    (212) 637-2556/2297

By: _____
    Kevin Mosley
    Trial Attorney
    (202) 598-2801

cc:    John Kaley, Esq. (by hand delivery and ECF)
       Donna Newman, Esq. (by hand delivery and ECF)