# DOAR RIECK DEVITA KALEY & MACK

ATTORNEYS AT LAW

JOHN DOAR (1921-2014)
JOHN JACOB RIECK, JR.
JOHN F. KALEY
WALTER MACK
JAMES R. DeVITA

OF COUNSEL
JAMES I. WASSERMAN
MICHAEL MINNEFOR

ASTOR BUILDING
7TH FLOOR
217 BROADWAY
NEW YORK, N.Y. 10007-2911

TELEPHONE: (212) 619-3730
FACSIMILE: (212) 962-5037
e-mail: firm@doarlaw.com
website: www.doarlaw.com

May 4, 2016

**By ECF and Email**
Hon. Denise L. Cote
United States District Judge
500 Pearl Street
New York, NY 10007

Re: United States v. Arthur Budovsky
Docket No. 13 Cr. 368 (DLC)

Dear Judge Cote:

We represent the defendant Arthur Budovsky in this matter. We write to raise an objection to the Probation Department's refusal to include in the Final Presentencing Report the objections and comments regarding the Initial Presentencing Report ("PSR") which were submitted to Probation by the Defense by letter dated April 15, 2016. The PSR's "Final Disclosure" on April 27, 2016 (after the filing of the Defendant's Sentencing submission) did not include the Defendant's objections and comments contained in the April 15, 2016 letter. As the Final PSR largely is the same as the Initial Disclosure, our letter of April 15, 2016 also serves as our objections to the Final PSR. We also object to the sentencing recommendation in the Final PSR as not adequately considering the sentencing factors enumerated in 18 U.S.C. § 3553(a). Finally, from our perspective, there is no good reason for not including the April 15, 2016 letter in the body of the Final PSR or as an Addendum to it, and our view further is that it should have been included under the dictates of Rule 32(d), particularly where, as here, the Final PSR incorporates almost verbatim the Government's version of the offense but refuses to include a Defense Statement of the offense conduct.

Hon. Denise L. Cote                    -2-                              May 4, 2016

Instead, Probation seeks to justify its refusal with two reasons, neither of which has merit.
First, in the Addendum to the Presentence Report ("APSR") dated April 27, 2016, Probation
notes that the defendant's April 15, 2016 submission "does not impact the offense level or
sentencing options [and] will unduly complicate the Offense Conduct section." While true in
that the offense level has been stipulated to by the parties, the submission plainly bears on the
"sentencing options" in that the Court must determine where within the range of time-served to
twenty-years is the appropriate sentencing option in this case. Of course, by Probation's logic, it
also then was unnecessary to include in the PSR paragraphs "15" through "132," which simply
repeat the Government's version of the offense conduct submitted to Probation, because the
offense level also is not affected by the Government's narrative in light of the parties' Guidelines
stipulation (and the parties' letter of April 8, 2016, previously provided to the Court). The error
of Probation in this regard is compounded in that in its sentencing submission the Government
cites to the PSR as if that document is the result of an independent investigation by Probation,
when, in reality, it is the Government citing itself. Further, contrary to Probation's statement
which seeks to justify its position, there is nothing complicating about including the contents of
the Defense's letter in the Final PSR and noting it as such.

Probation's second proffered reason for refusing to include the letter of April 15, 2016 is
that it "will substantially increase the volume of the report." A preference not to increase the
PSR's page volume hardly is an adequate justification for denying inclusion of the April 15, 2016
letter as part of the Final PSR or as part of an Addendum to it.

Accordingly, while we are mindful that Probation has provided a copy of the April 15,
2015 letter to the Court, we request that the Court direct Probation to include the April 15, 2016
letter as part of the PSR or as an Addendum to it. For the Court's ease of reference, we attach a
copy of the April 15, 2016 letter hereto.

Respectfully submitted,

/s/

John F. Kaley
Donna Newman
Jeffrey Pittell

cc:    All counsel and Probation Department
       (via ECF filing and email)

# DOAR RIECK DeVITA KALEY & MACK

ATTORNEYS AT LAW

JOHN DOAR (1921-2014)
JOHN JACOB RIECK, JR.
JOHN F. KALEY
WALTER MACK
JAMES R. DeVITA

OF COUNSEL
JAMES I. WASSERMAN
MICHAEL MINNEFOR

ASTOR BUILDING
7TH FLOOR
217 BROADWAY
NEW YORK, N.Y. 10007-2911

TELEPHONE: (212) 619-3730
FACSIMILE: (212) 962-5037
e-mail: firm@doarlaw.com
website: www.doarlaw.com

April 15, 2016

**VIA EMAIL**
Ms. Smyla Jones
United States Probation Officer
233 Broadway
New York, NY 10007

> Re: United States v. Arthur Budovsky
> Revised Objections/Comments Re: PSR
> 2013 Cr. 368 (DLC)

Dear Ms. Jones:

Please accept this revised letter as setting forth the defendant's objections and comments to the Pesentencing Report ("PSR") pursuant to Rule 32(f)(1) and (2) submitted on behalf of Arthur Budovsky. Our prior letter of April 7, 2016 is revised in light of the agreement reached with the Government on April 8, 2016 regarding certain factual matters. As in our initial letter of April 7, 2016, we have broken this submission down into two parts. Part I addresses certain paragraphs in the PSR not related to the Offense Conduct. Part II addresses the Offense Conduct portion of the PSR.

## I.    Non-Offense Conduct Paragraphs of the PSR

a) Regarding PSR ¶ 161. It should be noted in the PSR that at the time referenced, as a result of the panic disorder discussed in that paragraph, Mr. Budovsky did not leave the home for between three to six months. Thereafter, he left the home sporadically for short but gradually

1

increasing intervals. In connection with his panic disorder, Mr. Budovsky received medical care and was prescribed anti-depressants. Mr. Budovsky notes that as of this writing and to his knowledge, no one from Probation has contacted either his mother or his step-father regarding these and other facts.

b) Regarding PSR ¶ 171. The paragraph is a bit confusing but Mr. Budovsky has a private detective license.

c) Regarding PSR ¶ 172. It should read from "on or about 2005 until 2013."

d) Regarding PSR ¶ 173. It should read that from in or about 2002 until 2006, Budovsky and Kats operated Gold Age and various other digital currency exchange businesses including . . . .

e) Regarding PSR ¶ 192. As sentencing we intend to urge the Court, based on an analysis of the factors cited in 18 U.S.C. § 3553(a), to impose a sentence below the Guidelines range stipulated to in the plea agreement and below the statutory maximum for the count to which Mr. Budovsky pleaded guilty. We believe that an analysis of those factors supports a non-Guidelines sentence below the statutory maximum. We will address this further in our sentencing submission to the Court April 22, 2016.

## II.   The Offense Conduct Paragraphs of the PSR

We understand that the account of the offense conducted set out in the PSR at ¶¶ 14-134 was provided by the Government. We have been in discussions with the Government regarding its version of the offense conduct and had provided the Government with an initial draft of the Defense version of the offense conduct provided by letter to Probation on April 7, 2016. We also discussed the April 7th letter document with the Government prior to its submission and again since its submission on April 7, 2016. To be sure, there are some disagreements with the Government. However, many involve not disputes about facts but rather disputes about the inferences to be drawn from certain facts not in dispute. There are, however, some actual factual disputes. We address all of these matters below in response to the Government's version of the offense conduct contained in the PSR.

2

At the outset, it is worth noting, that despite our at times differing view of the inferences to be drawn from certain facts or our differing view of certain facts, nothing set forth herein should be read in any way to contradict Mr. Budovsky's forthright plea and allocution or the parties' agreement memorialized in the letter of counsel to the Court dated April 8, 2016 (the "Letter"). Moreover, to be clear, nothing stated herein is intended to minimize Budovsky's offense conduct or role in the conspiracy to which he plead guilty. Nor should any statement be understood as intended to deflect the criminal conduct from Budovsky to any other individual, including any coconspirator.

In his plea allocution, Budovsky, described how he was first approached by Kats to join Kats in the development of Liberty Reserve virtual currency and that he did. Budovsky stated that "it was not until about 2005 that Liberty Reserve was launched by booting up a website." *See* Plea transcript p. 18. Budovsky was a 50/50 partner with Kats. Budovsky and Kats were aware from the outset that high yield investment programs ("HYIPS") run by fraudsters were frauds and understood that these fraudsters would be attracted to and use Liberty Reserve's e-currency to launder the proceeds of their frauds. *Id.* at pp. 18-19, 23. Budovsky was also aware that Liberty Reserve had insufficient safeguards and insufficient anti-money laundering safeguards in place and that some of Liberty Reserve's features would be used by criminals to conceal and to launder their criminal proceeds, that a percentage of users were from the United States and that he was aware that facilitating money laundering for these users was contrary to United States law and illegal. *Id.* at pp. 19-20. Budovsky also admitted that certain features of Liberty Reserve were designed to help criminals transmit money and conceal the source of these funds and the identities of the users who were able to conduct transactions with a level of anonymity which, in turn, allowed users to conceal their identity and the nature of the monies passing through the Liberty Reserve system. *Id.* at pp. 20-22. In response to further inquiry from the Court, Budovsky admitted that part of the way he, along with Kats and others, designed Liberty Reserve "was to make sure it didn't have the anti-money laundering features that it should have had so that these criminals could use Liberty Reserve's services to hide their criminal activity." *Id.* at p. 23. Several other individual co-conspirators were involved with differing roles. Budovsky was a 50/50 partner with Kats (until 2008). Kats performed certain activities; Budovsky performed others; and other co-conspirators had other roles and levels of participation. *Id.* at pp. 25-26. When Kats no longer was a partner, Budovsky was the owner of Liberty Reserve and the conspiracy as among Budovsky and others continued until 2013. *Id.* pp. 25-26. In response to further questioning, Budovsky admitted that after Kats' relationship

with Liberty reserve ended, the conspiracy continued, i.e., the conspiracy to facilitate "the transfer of criminal proceeds from activities like wire fraud" and to "conceal the ownership and source of those illegal funds that were being transmitted through Liberty Reserve;" *Id.* pp. 25-26. Budovsky told the Court that he participated in the design of features at Liberty Reserve that would facilitate that concealment of illegal money transfers and intended that those features would attract HYIPs. *Id.* at p. 26.

Additionally, in the Letter to Probation dated April 8, 2016, referred to above (the "Letter"), Budovsky elaborated on statements made during his plea allocution and the parties agreed that:

1. Budovsky and Kats jointly conceived, created, controlled, and ran Liberty Reserve as full-fledged partners from its inception in 2002 until May/June 2008, when Kats was removed from the company and Budovsky assumed full supervisory control of Liberty Reserve. Prior to their split, Budovsky and Kats discussed and jointly implemented all major strategic decisions for the company, including the design of the Liberty Reserve currency system and the marketing strategy for the company.

2. From the beginning, Budovsky and Kats intended that Liberty Reserve would engage in money laundering and assist others to engage in money laundering. Although Budovsky and Kats would have welcomed the use of Liberty Reserve by legitimate businesses, they were both aware that the majority of Liberty Reserve's business would come from, and did come from, criminal activities - predominantly high-yield investment programs ("HYIPs"), which they knew were online Ponzi schemes. Hence, Budovsky and Kats intentionally designed Liberty Reserve to attract HYIPs and other online criminals by including features that enabled such criminals to launder the proceeds of their ill-gotten gains. Budovsky and Kats also actively sought out HYIP business for Liberty Reserve through a variety of means, including promoting Liberty Reserve to HYIPs on various online discussion forums.

With this backdrop, we will proceed to address certain matters set forth in the Offense Conduct section of the PSR provided by the Government. Again, nothing said herein is intended to detract from his allocution, from the agreement in the April 8, 2016 letter or from the fact that from the beginning Mr. Budovsky was a knowing and willing participant in the conspiracy charged in Count One to which he pleaded guilty, that at the beginning he and Kats were 50/50

4

partners and that when Kats' relationship with Liberty Reserve ended, Mr. Budovsky owned Liberty Reserve.

## DEFENSE VERSION OF OFFENSE CONDUCT

### Overview Background of LR (Addressing PSR ¶s 14-21)

While Kats and Budovsky were full-fledged partners in Liberty Reserve from its inception and both jointly conceived, created, controlled and ran Liberty reserve, according to discovery and 3500 provided by the Government, the initial idea for Liberty Reserve ("LR") originated with Vladimir Kats, who approached Budovsky in or about 2002 and asked him to assist in developing a virtual currency. *See* Transcript of Plea Hearing held on Jan. 29, 2016 ("Plea Hrg. Trans.") at p. 18. Kats needed a "technical" person to create a platform and communicate with programmers.[1] Budovsky accepted Kats' proposal. *Id.* The currency that Kats and Budovsky developed became available to the public in approximately 2005 when the LR website was launched. Plea Hrg. Trans. at p. 18. Throughout LR's founding and early development, although 50/50 partners who discussed and jointly implemented all major strategic decisions, each had differing roles: On a day-to-day basis Kats primarily was in charge of the business operations of Liberty Reserve. Budovsky was in charge on a day-to-day basis of the technical side of the business, i.e., the computer networking and infra-structure to make possible their jointly held goals for Liberty Reserve. *See* Kats-Alex chat at 6:34 pm ("I told you before; I was the CEO and business leader. Arthur [Budovsky] was in charge mostly of technical stuff, employees (programmers, etc). He just implemented what I envisioned."); Kats-Centregold.ca chat at 11:23:12 ("I founded LR. I named it. . . . I grew it."); Kats-Alex chat at 7:31 pm (Budovsky "is stupid. He does not understand."). While discussion and strategy were joint,

---

[1] *But see* Kats chat with OlegCh on 8/7/2008 regarding hiring a programmer and indicating control of other entities as well:

> OlegCh: ... [t]ell me which salary you can pay?
> Kats: I need to see CV first and know what you can do, your experience, etc. We can pay up to 1.5 for a really good full-time programmer, plus raises, bonuses, etc. ... We also need more than one programmer, we're looking for a team of 2 or 3.
> OlegCh: ok, I understand [...] what kind of project do you have?
> Kats: Digital currency to start with, then many others, and then maintenance and constant upgrades to current ones. Digital currency is like e-gold.com or c-gold.com [...] We also need periodic, small changes to www.cambist.net, [absolutexchange.eu] and asianagold.com.

Kats' role was focused more on concepts and business development; Budovsky's role was more focused on the technical implementation of the parties' joint plan. Budovsky's day-to-day activities were more relating to computer networking, setting up an internet platform and programing. Of course, both were aware of what the other was doing, agreed to those acts and acts by one were the acts of both in the implementation of their jointly held plans for Liberty Reserve. *See* Letter.

At about the same time that Kats and Budovsky began envisioning creating a virtual currency with LR, Kats and Budovsky were engaged in the operation of GoldAge, an on-line exchanger that dealt mainly in E-Gold, a virtual currency located in the United States. To a degree conceptionally, Kats and Budovsky modeled LR on E-Gold and envisioned LR as a competitor to GoldAge. In 2006, Kats and Budovsky were arrested and charged in a New York State prosecution with violating the State money transmitting law for failing to have a New York State money-transmitting license through their operation of GoldAge, an exchanger or E-Gold, a digital currency. *See People v. Budovsky, et al.*, Ind. 03690/2006. To our knowledge Kats also was charged with possession of child pornography. Neither defendant was charged with money laundering, or with any federal offense. However, the founder of E-Gold was charged federally in the District of Columbia with money laundering and Budovsky and Kats, although not involved in that case, knew of the allegations from the media and on-line chatter. *See United States v. E-Gold, Ltd., et al.*, 07-CR-109 (RMC) (DDC).

Their concept of LR included providing its users with a high degree of anonymity, irrevocable transactions, and the use of exchangers to transfer mainstream currency in and out of the system. From LR's inception through 2008, when Budovsky bought out Kats' interest in LR, (or at least through the date of LR's move to Costa Rica), Kats was the primary decision-maker in those matters relating to his role, of course, after discussion and with Budovsky's knowledge and consent. In short, as said above, Kats was concerned with the day-to-day business operations of LR, but, as partners, each knew basically what each was doing. Kats and Budovsky knew they could not continue to operate LR in the United States and looked for alternative locations. Kats was the primary force, again with Budovsky's consent after discussion, behind the option to move to Costa Rica. *See* Kats-Alex chat at 6:38 pm (It was all my connections…that allowed us to survive when they shut down GoldAge. We could not run LR if I did not bring it to [Costa Rica]."); *id* at 7:16 pm ("[T]he current business model is all that I taught Arthur."); Kats-Trankilo chat at 13:15:09 9/10/2010 (Kats: "LR was always my idea. I founded it, named it.").

6

In their operational and functional division of responsibility, Kats took the lead in business development including, *inter alia*, the marketing and promoting of LR, and the enrollment of exchangers who were an integral part of their conception of LR. Kats 3507-07 at p. 4. To promote exchangers, Kats, as well as Budovsky, both posted on message boards, and sent messages to forum administrators. *See, e.g.*, Kats-Budovsky chat at 01:08:18 2/06/2008. Both agreed to seek out HYIP's but primarily Kats' in his function, conceived of the idea how to seek out and obtain HYIP's use of LR. *See, e.g.*, Kats 3507-15 at p. 3. Budovsky, on the other hand, was in charge of developing LR's networking platform and infrastructure, likewise with the input from Kats. *See* Plea Hrg. Trans. at p. 20. *See, e.g.*, Kats 3507-15 at p. 3 and there were times when Budovsky also posted on chat forums.

It is an overstatement, we think, to claim, as the Government does, that LR was developed and created *solely* to "cater to criminals." Certainly Kats and Budovsky understood that LR, like any business that "did business solely via the internet," was susceptible to use and abuse by e-commerce criminals. *See, e.g.*, Plea Hrg. Trans. at pp. 19-20, 23, 26 and Letter. In particular, Budovsky and Kats knew that LR's anonymity feature and its irrevocable payment feature were, and were intended to be, especially attractive to fraudsters including purported high yield investment programs ("HYIPs"), the vast majority of which were Ponzi schemes. *See* Plea Hrg. Trans. at p. 19; Letter. Kats and Budovsky also knew that LR had insufficient anti-money laundering ("AML") safeguards and/or procedures in place which made LR attractive to such criminal users. *See* Plea Hrg. Trans. at pp. 19-20. Thus, Budovsky and Kats knew, anticipated and intended from the inception of LR that, because of certain LR design features, e-commerce criminals would use LR "to launder their criminal proceeds." *Id.* and Letter. Kats and Budovsky also were aware that LR had United States users and that by "facilitating money laundering for the United States users" LR was operating contrary to United States law. *See* Plea Hrg. Trans. at p. 20.

Although the majority of LR's business came from criminal activities, we do not think it accurate to state that the "vast" majority of LR "users" came from HYIPs or even from criminal activity. Some United States users were likely engaged one way or another in fraud schemes, but we doubt the accuracy of the Government's claim that the "vast" majority of United States users engaged in criminal activity or were unwitting victims of HYIPs. Indeed, to the extent that users did invest in HYIPs, we think that many of them did so knowingly, attempting to make a quick

7

profit in a scheme they knew was too good to be true by pulling their money out before the scheme collapsed. This is not denying that the majority of the HYIPs using LR were fraud schemes, but there can be no question that the HYIP's existence relied upon the "complacent victims." Here, for example, the Government's "victim" witness, Eric Boateng, was an experienced investor with an E-Trade account before he decided to speculate on HYIPs to make a quicker, faster, profit. *See* Boateng 3506-03 at p. 3. In our view, as we discuss *infra,* Boateng was not a complacent victim.

From the date of LR's creation, Budovsky's intent (and Kats' as well, if his proffers to the Government are to be believed), was for LR to build its name recognition by attracting as many users as possible including fraudsters) and then ultimately to rid itself of e-commerce criminals (to the extent possible) and become a licensed, legitimate e-currency service and a internet bank. *See* Kats 3507-10 at p. 7; Kats-Budovsky chat at 10:57:20-11:00:58 14/06/2009 (discussing banking license and IPO for LR). *See also* Kats-Alex chat at 7:09 pm-7:12 pm:

Kats:     But SUGEF still supervises, asks questions?

[…]

Alex:     yes just to decide if and IF they will give LR some [license]

Kats:     So LR can still get a license.

Alex:     no . . . they wont [*sic*] get it

Kats:     Why?

Alex:     [Because] they don't [*sic*] like the business model

> Kats:     Business models can be changed, should be changed. That was my whole vision. Get enough money with one type [of] business model, then go mainstream. Get investors, maybe even go public, etc.

Some of the same LR features that were designed for and attractive to e-commerce fraudsters also served legitimate purposes. For example, LR's anonymity features protected LR users against hackers– a real and continued threat to users of any virtual currency payment

8

system. *See, e.g.*, Kats 3507-03 at p. 4. Similarly, LR in part, required users' transactions to be processed through exchangers, as opposed to direct payment systems such as PayPal, because LR did not want to risk being scammed by taking money directly from users. *See* Kats 3507-03 at p. 7. Fees for transfer inside the LR system were particularly small—1% of a transaction's cost up to a cap of $2.99—to encourage users to engage in commerce with other LR users. Charges by exchangers were not under the control of LR, but in any event, when the overall fees charged by LR were considered, LR's fees were not considerably higher than fees for similar transactions charged by banks, Western Union, or other established institutions.

Following the demise of E-Gold and, shortly thereafter, the failure of E-Gold's other competitors, LR's star began to rise. Kats and Budovsky understood that it was unwise to operate LR in the United States and decided to move the company. Kats chose to move LR to Costa Rica on the advice of James Ray, who introduced him to Ahmed Yassine. *See, e.g.*, Kats 3507-07 at p. 3; Kats-Alex chat at 6:38 pm ("It was all my connections: exchangers, James Ray, you, that allowed us to survive when they shut down GoldAge. [. . .] We could not run LR if I did not bring it to CR.")[2]; Kats-Trankilo chat 23:16:31 14/10/2010 (Kats: "And I'm the one who conceived of everything, brought LR to CR, etc."); Kats-Sharapov [Vladimir Grinevskiy] chat at 13:22:24 9/10/2010 (Kats: Yassine is "the guy that was recommended by James Ray of e-gold (he met with him in CR), and the one that orchestrated LRs move to CR with me."). Kats believed Yassine to be reliable because Ray told him that Yassine had previously referred a prostitute to him. Kats 3507-03 at p. 5. While Budovsky would have preferred to move to Europe, he and Kats discussed the move to Costa Rica. Budovsky ultimately agreed to relocate LR to Costa Rica.

At that point in LR's existence, Kats and Yassine, after discussion with Budovsky, functionally were the primary decision-makers in their roles as managers of LR's day-to-day operations. *See, e.g.*, Kats-Sharapov chat at 13:12:07 (Yassine "incorporated and opened and managed LR's accounts with millions in them"); Kats-Trankilo chat at 13:15:09 (Kats: "LR was always my idea. I founded it, named it. Moved it to CR. I'm not happy about losing it."); *id.* at 12:50:23 (Kats: "If it were not for you, there would have been no LR in CR…"); Kats-Rafaele chat at 02:57:19-02:57:56 28/03/2009 (Kats: "Nothing is in my name, and none of the bank

---

[2] Later, Kats regretted having put Budovsky in charge of the move to Costa Rica. *See* Kats-Alex chat at 6:52-53 pm (Kats: "I should have come to CR with him…. But I did not want to [spend]

9

accounts are in the US. [. . .] [People] know I'm mastermind of LR... But I built it offshore.");
Kats 3507-07 at p. 3. Again, this is not to deny that Budovsky and Kats discussed these matters
and that decisions were joint. But at the same time, one cannot ignore the operational reality and
how they carried out and implemented their joint plan.

The "financial part of the company structur[e] that was me," boasted Yassine, "the hiring,
the image, advertising." *See* Kats-Alex chat at 6:35 pm. Kats had daily conversations with
Yassine, who opened Costa Rican bank accounts for LR, managed the company's Costa Rican
office, and filed the paperwork to incorporate LR in Costa Rica. *See* Kats 3507-03 at p. 3, 5.
*See also* Kats-Alex chat at 7:46 pm (Kats: "you were my employee"). Yassine also controlled
LR's bank accounts. *See* Kats-Sharapov chat at 13:06:49-13:12:58 9/10/2010 (discussing that
Yassine held and managed LR's bank accounts).

In part, Kats' reliance on Yassine was due to the fact that Kats was not physically present
in Costa Rica. He was stuck in New York unable to move because his term of probation from the
GoldAge sentence was longer than Budovsky's. *See, e.g.*, Kats-Budovsky chat at 19:10:52
10/06/2008 (discussing Kats' trip to probation that day). Furthermore, Kats advised Budovsky
that in his (Kats') opinion (as LR's de facto attorney) that it would be best to move LR to Costa
Rica and to use Yassine as a nominee, lest their felony convictions tarnish LR's name. *See, e.g.*,
Kats 3507-07 at p. 2. Budovsky agreed.

In or around 2009, after LR's move to Costa Rica, Budovsky bought out Kats' interest in
LR for $200,000. *See* Kats-Budovsky chat at 18:01:02 4/06/2008. Thereafter, Budovsky was
the ultimate decision-maker for LR. *See* Letter. He hired management, continued to be involved
in the installation of the network infrastructure, caused bank accounts to be opened, and caused
money to be moved from Costa Rica to other countries. *See, e.g.*, Plea Hrg. Trans. at p. 25.
Budovsky, however, while in overall charge, did not handle all of the day-to-day operations of
LR, much of which he initially left to Yassine and then to Alan Hidalgo. Budovsky himself was
absent from Costa Rica a good portion of the time from 2008-2013.

When Budovsky took charge after LR relocated to Costa Rica, Budovsky thought it wise to
apply for a license with SUGEF. Under his control, LR ultimately implemented some AML
procedures, hired an attorney, formed a verification department, developed a compliance manual,

---

additional funds on airplane, hotel, etc."); *id.* at 6:57 pm (Kats: "Maybe he was overwhelmed.
Maybe I should not have trusted him with such a big task....").

and had LR employees trained in AML and tested. This was part of his long-term goal for LR to be a legitimate company and he had high hopes it would ultimately be a bank. *See* Kats-Budovsky chat at 10:56:24-11:04:43 14/06/2009. However, Budovsky does not dispute that Cubero and Lopez, the individuals he hired to assist with the SUGEF application and AML compliance requirements, were not given access to all of LR's transactional data through implementation of the "GAA".

Budovsky did not trust Cubero, despite having hired him. In some part this was due to a misunderstanding at the beginning of their relationship, but it also was related to Budovsky's distrust of Costa Rican authorities, who he believed were infamously corrupt. In addition, Budovsky was motivated to limit the transactional data they received for fear that Cubero and Lopez would pass that information to Costa Rican authorities who, in turn, would rely on LR's transactional data to assess and collect taxes. Thus, to a large degree, the limits imposed through implementation of the "GAA" were intended to foreclose authorities' review of the transactional fees generated on behalf of LR in order to avoid Costa Rican tax obligations. Of course, Budovsky knew that the GAA also prevented Cubero and Lopez from understanding the nature of the majority of the money flowing through LR.

LR ultimately became successful in the sense that there were roughly 5.23 million accounts on its books. However, looking solely at the number of accounts opened is misleading as to the number of actual users of LR. In fact, of the roughly 5.23 million total, 3,690,546 (or 70.94%) of these accounts were never funded and no transactions were conducted in these accounts. Of the 5.23 million accounts, 749,062 (or 14.40%) had a total transaction volume ranging from $0.01 to $100.00 and 464,816 accounts (or 8.93%) had a total transaction volume ranging between $100.01 to $1,000.00. The remaining accounts, representing approximately 6% of the total LR accounts can be broken down as follows:

- 4.55% (or 236,853 accounts) had a total transaction volume ranging between $1,000.00 to $10,000.00
- 1.03% (or 53,605 accounts) had a total transaction volume ranging between $10,000.01 to $100,000.00
- 0.13% (or 6,501 accounts) had a total transaction volume ranging between $100,000.01 to $1,000,000.00
- 0.02% (or 831 accounts) had a total transaction volume greater than $1,000,000.00.

11

The vast majority of the high transactional volume were exchanger accounts.

Further, although the transactional volume handled by LR certainly was significant, the Government's calculation of the total dollar value is misleading because, among other things, the Government's calculation double-or even triple- (if not even more) counts money flowing into and out of the same LR accounts or within the LR system. Thus, if $10 was received into an LR account and then that same $10 was transferred to another LR account, in the Government's math, that equals $20 in transactional volume, even though it involves the same $10. Further, contrary to the Government's implication, from 2009 to 2013, LR had only two months where the transactional volume exceeded $300,000,000.00. It was not an every month occurrence, as the Government suggest. Approximately 10% of LR's transactions came from United States "users." Notably, even that figure may be high as an IP address is not a reliable indicator of from where the user was transacting business. Nor, in light of the Government's allegations regarding the fraudulent information submitted by LR registrants on their LR applications, is any registrant's given address a reliable indicator of whether the user was located in the United States. In any event, Budovsky and the Government stipulated in the plea agreement that Budovsky is responsible for laundering between $250 and $500 million (not $550 million) in the criminal proceeds originating from U.S. users.

While we do not dispute that LR monies were moved to different countries, the Defense has seen no evidence that Budovsky *personally* netted over $25 million in profits as the PSR asserts in ¶ 21. Yes, money was moved into accounts in Budovsky's name and in the names of others, but a good deal of that money was frozen. For these reasons, it is our view that Budovsky himself did not *personally* benefit in the amount claimed by the Government and recited in the PSR.

Budovsky, like Kats, also had interests in other business, including interests in exchangers that had LR accounts to facilitate users' transfers of LR to mainstream currency. Budovsky initially had an interest in some of Kats' exchangers, but that interest ended after their split in 2008-2009. While Budovsky did have an interest in Swift-Exchanger with Azzeddine El Amine, El Amine had the larger interest and received the greater percentage of monies generated by Swift-Exchanger. El Amine was the signatory on Swift-Exchanger's bank accounts and controlled the money it generated.

12

Lastly, El Amine created HYIPs, with Budovsky's knowledge and concurrence, but these three HYIPs did not earn money and the venture was quickly abandoned.

### How Liberty Reserve Worked (Addressing PSR ¶s 22-27)

**Liberty Reserve Website**

It is true that there were LR users who took advantage of LR's minimal verification policies and opened accounts using "blatantly fictitious names," but it does not follow that all of these accounts were intended for criminal purposes. In fact, many, whose names were identified for the defense in discovery and in the submission by the Government to Probation, appear to have been created by pranksters. The more telling inquiry is an analysis of the transactional volume of these accounts. Many of these of the 48 identified by the Government in its version of the offense conduct had no transactions at all, and many conducted transactions of only insignificant volume. The total transactional volume for the 48 listed accounts in the information provided to the defense and in the Government's version of the offense conduct provided to Probation was less than $66,000.00 and the total fees that LR earned from those accounts was less than $400. Out of over five million account users, the names of these 48 accounts raised no "red flag. The use of a fictitious or criminal sounding name did not by itself suggest wrongdoing.

LR never purported to be a "mainstream" bank, nor did its business model resemble that of a traditional banking institution. As discussed above, LR deliberately limited its direct involvement with users' transactions by requiring the use of exchangers in order to protect itself against scams and fraud and to make LR more attractive to criminal users. LR charged a fee of either 1% or up to a maximum of $2.99 for transfers from one LR account to another. It also charged exchangers a certain percentage when exchangers sought to "cash out" LRs. LR's fees enabled LR to provide its services to individuals around the world, including a significant number of non-criminal users who had no way to make use of the traditional banking system. *See, e.g.*, Customer Service Inquiry from Collins Boateng in Ghana (asking if LR could help him to pay his "sky soccer camp registration fee"). As noted above over 3 million users never funded their accounts and almost 750,000 users transacted between $0.00 to $100.00 in volume, hardly suggestive of illicit use by them.

13

### Absence of AML Controls (Addressing PSR ¶s 28-31)

Budovsky acknowledges that he and Kats chose not to implement sufficient anti-money laundering ("AML") controls. *See* Plea Hrg. Trans. at p. 19. But, although they were aware and intended that LR's anonymity and other features made it attractive to criminals, as noted above, this was not the sole reason for the implementation of those features. In part, in the later years, LR's insufficient AML controls were due in part to Budovsky's inability to set up a system with the required sophistication. *See* Kats-Budovsky chat 4:20:24-04:21:27 9/04/2008 (discussing the work required to set up LR platform and servers).

After Kats' involvement with LR ended, Budovsky did make some efforts to implement AML controls including verifying exchangers and, occasionally, users. *See, e.g.*, Email dated June 22, 2011, from LR Verification Department to Duxton Ventures Pte. Ltd. re: Verification. Even prior to Kats' departure from LR., Budovsky, began efforts to eliminate clearly criminal LR usage. In a chat in 2009, Budovsky instructed Kats to tell an exchanger to stop providing false information. *See* Kats-Budovsky chat at 10:40:06-10:40:52 17/02/2009 (Budovsky: "he contacted support under 3 different names . . . and the stories were different all times . . . tell him not to do it").

LR took the position that its customers were the exchangers and not the users. Therefore LR asserted that it bore no responsibility for the users' AML compliance and was entitled to rely on the AML verification procedures of those banks and/or Western Union through which the users' funds were transferred. It is not accurate to say that LR transactions were completely untraceable. Through the transactional data and the exchangers' records, LR transactions could be traced to bank wires and Western Union transfers received by the exchangers going in both directions.

Additionally, from 2009 through at least 2012, LR made some strides (albeit small) in AML compliance. LR crosschecked accounts against the list of names published by the U.S. Office of Foreign Asset Control ("OFAC"). LR hired counsel and a compliance officer, provided AML training and created a compliance manual, responded to inquiries from law enforcement authorities regarding particular users, and applied to SUGEF (the Costa Rican regulatory authority) for registration. *See, e.g.*, LR Compliance Manual; Email dated July 28,

14

2010 from Eric Paltz [Budovsky] to Detective Inspector Henrik Engelkes re: Request from Swedish Police.

LR's verification department was instructed to check the credentials of the exchangers. In addition, in the development stage were flags embedded into the system to detect accounts with transactions over $10,000.00. Verification also had begun in the post Kats' period to verify some users, although admittedly very few attempts were made in this direction. Nonetheless, it is important to recognize that the vast majority of the accounts (about 4 million accounts) had no transactions or insignificant transactions and thus, verification of these accounts was not necessary.

### The Creation of Liberty Reserve (Addressing PSR ¶s 32-37)

#### Early Money Laundering Activity and Introduction to Digital Currency/Failed Launch of Liberty Reserve in 2002

As noted above, the idea for LR originated with Kats, who was an attorney and CPA. *See* Kats CV. Budovsky joined in the plan and, together, Kats and Budovsky created LR. Kats and Budovsky had known each other since they had been 19 and 16 years old, respectively. Kats knew Budovsky suffered from depression and lacked a college education. *See* Kats-Alex chat at 6:42-43 pm (Kats: Budovsky "has been struggling with depression for most of his life." Alex: "[M]aybe [he's] bipolar[r]."); *id.* at 6:52 pm (Kats: "He may be partly psychopathic."). In fact, at one point in his late teens or early 20s, Budovsky did not leave his house for several months due to his mental illness. Kats was well aware of, and, in our respectful view, exploited Budovsky's vulnerability. *See* Kats-Budovsky chat at 14:00:58-14:03:16 30/09/2008 (Budovsky: "soon will run out of pills." Kats: "You can always get more, though CR should be calmer…" Budovsky: "yes, no prescription for Paxil").

Budovsky trusted Kats and relied on him for business and legal advice and even for tax preparation. *See, e.g.,* Kats-Budovsky chat at 01:37:15-01:41:45 1/07/2008). Budovsky even trust Kats' advice regarding renouncing his citizenship. *See* Kats-Alex chat at 7:44-8:06 pm ("What I did not know is that he did not yet give up US citizenship. That's a big mistake. . . . "I told him to do it a long time ago…"). *See also* Kats-Budovsky chat 05:12:09-05:15:05 6/4/2008

15

(Kats discussing his draft document renouncing citizenship[3], to which Budovsky responded, "[I]'ll just say [I] like warmer climate."). In fact, Budovsky did not permanently leave the United States until June 2009. *Id.* at 22:51:37-22:52:07 13/06/2009 (Budovsky: "[I]t was interesting leaving the country this time . . . [I don't] intend to return").

Far from being the more evil operative behind the inception, creation, and implementation of LR as, in our view, the Government seems to suggest in its version of the offense, it is worth noting that Budovsky was working at Geico as a computer technician when Kats asked him to join LR's precursor, GoldAge. Certainly, in his own eyes, Kats' was the genius behind LR. *See* Kats 3507-21 at p. 2; Kats-Alex chat at 6:37 pm ("If it were not for me, Arthur would be in USA, working for an insurance company, inspecting car damage."). This of course, by no means is intended to suggest that Budovsky was not a willing participant and full partner with Kats from the beginning, as acknowledged in the Letter, but it does provide some further context and illustrates and illuminates somewhat Kats' own understanding of their relationship.

The PSR's and the Government's recitation of the circumstances surrounding the period 1999 – 2005 and the launch of LR, particularly Kats' claims regarding alleged other unrelated frauds (an alleged tax fraud, insurance fraud and money laundering for Budovsky's cousin), which Budovsky denies participating in, also should be ignored as not material to any sentence to be imposed in this case[4], particularly in light of the factual recitations in the Letter as to their partnership in LR.

Of course, we have our own issues with Kats, who Kats has clearly demonstrated that he is biased against Budovsky and has no respect for the law. Kats has repeatedly and continually violated the law at every turn and then, despite having repeatedly received leniency in consideration of his cooperation. One can only deduce that Kats has absolutely no respect for the law. When he is caught, he expects that he will cooperate, blame others for things and escape responsibility. Unlike Kats, Budovsky takes full responsibility. This is not to blame Kats or things Budovsky did but only to point out Kats' motives and unreliability when he speaks of things Budovsky has denied.

---

[3] In a proffer session, Kats falsely represented to the Government that he had drafted this statement for Budovsky.

[4] The Government has directed our attention to certain matters relating to these alleged unrelated frauds occurring circa 1998-2000 and if necessary we will address these matters further in our sentencing memorandum.

16

In 1998, while Kats was living with his parents, agents tried to execute a search warrant of his residence. *See* Kats 3507-01. Kats destroyed voluminous evidence including suggestive videos and photographs of his young nephew and nephew's friend. *Id.* Kats cooperated with the Government and admitted that he had viewed several thousand images of child pornography. *Id.* Presumably because of his cooperation he was not prosecuted for this offense.

Proving that he failed to learn from his near arrest and prosecution in 1998, Kats continued to engage in child pornography. In 2006, Kats was charged with child pornography when, as a result of a search of his computers in connection with his GoldAge arrest, a significant amount of child pornography was found on his computer. Facing substantial jail time, Kats persuaded Budovsky to resolve the case in a plea rather than fighting the unlicensed money transmission charges. Budovsky agreed because Kats was his friend. Instead of jail for Kats, both defendants were sentenced to probation. Yet, even after he received a sentence of probation, Kats was dissatisfied, and attempted to terminate his probation early by falsifying a letter from the clinic at which he was receiving sex offender treatment purporting to support his fabricated claim that he was behaving appropriately and not engaging further in child pornography, which future events in this case prove were untrue. *See* Compliance Letter from Mustard Seed Forensic Social Work Services, P.C. dated Sept. 23, 2009.

Not surprisingly, when Kats was arrested with respect to the instant case and again was caught with hundreds of images of child pornography, he immediately signaled his willingness to cooperate, effectively telling the agents, "You need me," Kats then proceeded to do what he was now a pro at doing: talking for his "get out of jail" card.

Kats was, and remains, an inveterate liar about many things. His fictions are far-ranging, and include not only many of his contradictory statements to the Government during its investigation of this case, his repetitive and repulsive deal-making to avoid prison, his lies to his State probation officer and the fraudulent documentation he created to attempt to obtain an early discharge from his State probation term, his hate-filled rant against the Government of the United States, his attempt to obtain Ukrainian citizenship by bribing foreign officials, and also his wholesale creation of fictitious "interviews" with individuals, including Osama bin Laden, whom he claimed to have interviewed at a secret location, under his Ayn Rand-inspired pen name of Ragnar Danneskjold. *See, e.g.*, Compliance Letter from Mustard Seed Forensic Social Work Services, P.C. dated Sept. 23, 2009; Kats "Manifesto" ("The history of the present United

17

States of America ("USA") is a history of repeated injuries and usurpations, all having in direct object the establishment of an absolute Tyranny over me. . . . I, therefore, do solemnly publish and declare, . . . that I am Absolved from all Allegiance to the USA, and that all political connection between me and the USA, is and ought to be totally dissolved; …")[5]; Kats-Budovsky chat at 22:52:15 and 22:54:25 (Kats: "I may go to Kiev soon… or not." "I pretty much bribed everyone in gov't over there.")[5]; R. Danneskjold, "Interview with – Osama Bin Laden, Saving The Planet One Martyr at a Time," Jan. 31, 2010.

Kats' purported "interview" with Budovsky on the PlanetGold website is one of these fictions-entirely Kats' creation. Notwithstanding Budovsky's candid and forthright statements during his allocution and in the Letter, the statements attributed to Budovsky by Kats on the PlanetGold site were never made by Budovsky.

Considering Kats' lack of truthfulness and his apparent lust for child pornography[6], it comes as no surprise that he was "less than forthright" with the Government once again during the investigation of this case. In his proffer sessions, Kats consistently downplayed his buyout from LR by Budovsky and claimed, even in his first meeting with the Government, that he had only received $80,000, which he had reported on his income tax return. Kats 3507-02 at p. 3. In fact, Kats received far more than $80,000 and he did not report this income or pay taxes on it. Kats 3507-02 at p. 2; Kats 3507-14 at p. 9.

---

[5] Kats' hatred of America is also revealed in his conversation with "Spacegold.com," in which Kats discusses his manifesto and his plans to leave the United States. Kats-Spacegold.com chat at 19:26:01-19:29:01 27/04/2007; *id.* at 19:58:01 27/04/2007 (Kats: "Vigilance is the price we must pay to keep government at bay. Those that are not vigilant deserve to die, and the government will eventually help them to that."); *id.* at 20:01:33 27/04/2007 (Kats: "Smart people see the winds of change, pick up their assets, and leave. The ignorant stick around when it's too late.").

Simultaneously, Kats asked Budovsky for a $25,000 loan, asserting that he needed the money to pay back the Russian mob, which had lent him the money to bribe the SBU, the successor to the KGB. *See* Kats-Budovsky chat at 12:36:32-18:38:09 4/11/2008.

[6]. In this regard, see also Kats-Budovsky (0@0) chat at 09:47:54-09:48:07 23/07/2007 (Kats: "Can't think about CP [child pornography]. It's a thought crime. Possession is just the evidence of the thought."); *id.* at 09:48:49 23/07/2007 (Kats: "It's just illegal to be a p [pedophile].").

18

Further, the two-faced Kats, while continuing to maintain a friendship with Budovsky and continuing to receive money and loans from his "friend," actively sought in every way to retaliate for what Kats perceived as Budovsky's "betrayal," after Budovsky bought out Kats' interest in LR. *See, e.g.*, Kats-Alex chat at 6:52 pm (Kats: "I[] never though[t] he would betray me like that."); *id.* at 6:50 pm (Kats: "You really need to be very rotten inside to betray a very close friend (we were very close for many years)."); *id.* at 6:36 pm (Kats: "Arthur ruined everything for us. He set me back several years in terms of what I wanted to accomplish."); *id.* at 6:54 pm (discussing the plan to "fuck LR and Arthur in every possible way" and agreeing that EGC [Kats' new venture, EuroGold Cash] "should be the winner" from LR's takedown). *See also* Kats-Budovsky chat at 00:44:55 12/5/2009 (Kats: ". . . can I count on you for a $50k loan?").

While matters were discussed, decided and undertaken jointly, as acknowledged in the Letter, it is our view that Kats had always been the dominant force in their relationship and Kats himself was of that view as expressed by him in his chats cited above. Kats told Budovsky that they did not need a license to operate GoldAge and so no license was obtained. Kats convinced Budovsky to allow Kats to do their taxes, to ensure that there were no discrepancies between what they reported from their jointly owned business. Thus, when Budovsky removed his mentor from LR, Kats' own larger-than-life ego wanted revenge. Kats and Yassine discussed how they had "everything in place to fuck LR and Arthur in every possible way" and that "nothing gon[n]a save him from what is coming" and both plotted to bring Arthur to the attention of the FBI. *See* Kats-Alex chat at 6:53 pm; *id.*at 6:59 pm. Yassine even noted that he had the information "about the bank accounts he got in Cyprus." *Id.* at 7:31 pm. Kats even suggested that Ahmed open a dialogue with the DOJ and offered to speak with anyone that Yassine contacted because he claimed to be "much better at telling them all the things, how things work, etc." *Id.* at 7:26 pm, 7:42 pm. But Kats also reported LR to the FBI himself. *See* 3507-02 at p. 1. They agreed to proceed without revealing anything to Budovsky. *See* Kats-Alex chat at 7:48 pm (Kats: "Keep contact with all witnesses (past, present employees), but DO NOT give any hint of what we're doing. […] Element of surprise is essential.").

As part of Kats' desire for revenge, Kats continued to create e-currency sites to compete with LR. *See* Kats-Verbeek chat at 17:17:06-17:17:13 10/04/2009 (Kats: "I'm developing a casino, 2 other DGC's [digital gold currencies], cam/youtube type businesses that will incorporate DGC's, dutch/gambling auction, etc.... Actually, 3 other DGC's."). One of these

19

sites was EuroGold Cash, which Kats promoted by warning his correspondents that LR was "going mainstream" and would no longer be friendly to fraudulent business practices. *See, e.g.*, Kats-Soleiman [Me-gold] chat 11:39:24-11:41:06 18/05/2009 (Kats discussing starting new e-currencies to compete with LR, complaining that LR has changed its verification rules and now demands corporate papers and real identification); *Id.* at 15:13:50-15:14:40 26/05/2009 (Kats: "EGC [EuroGold Cash] will never compete with exchangers. […] If I were still boss at LR, it would not be the way it is now. Move people over to EGC, if you can."); *Id.* at 12:13:17 10/6/2009 (Kats: "Within a year LR will be kicking out HYIP's. They'll be going to EGC."); Kats-Verbeek chat 12:11:22 8/04/2009 (Kats: "LR intends to go mainstream eventually, to go after moneybookers, etc. Maybe go on European stock exchange eventually. So egc, Admiral, etc., will be here for you. : )"); *Id.* 12:00:53 8/04/2009 (Kats: "I'll be able to give you better deals if you add Admiralgold.com and eurogoldcash.com to your forms this summer, including loans."); Kats-Rafaele chat at 11:57:44 24/03/2009 (Kats: "You see, LR is going the way of Moneybookers, etc. So new systems are need like eurogoldcash, admiralgold (coming soon)."); *Id.* at 12:37:06 24/03/2009 (Kats: "In a few years, LR will be like moneybookers, and the industry will need a replacement for the low-end (hyip's. etc.). EGC and Admiral will fill that role."); *Id.* at 02:31:07 28/03/2009 (Kats: "I made LR what it is today; I can do it with the others."). Not surprisingly, EuroGold Cash was much more aggressive in assuring its users that no verification would be required. *See, e.g.*, Email dated June 2, 2011 re: Contact Us – Business Development concerning EuroGold Cash ("We only directly exchange with exchangers, and we do not require documents."). In these schemes, Kats used Yassine to open bank accounts for him. *See* Kats-Trankilo chat at 16:14:04-16:16:50 6/06/2008 (Kats: "Well, I would develop the site, you or a very trusted relative would simply hold the brokerage account."); *Id.* at 16:16:56 6/06/2008 (Kats: "All they need to do is hold a bank account open, and it would be nothing close to as complicated as LR or Cambist."); *See* Kats-Sharapov chat at 13:06:14 9/10/2010 (discussing that Yassine was going to set up a EuroGold Cash account for Kats in Costa Rica and "maybe one in Morocco as well."); Kats-Trankilo chat at 13:20:12 9/10/2010 (Yassine promises Kats that he can obtain a license from SUGEF for EGC and has access to prepaid ATM cards); *id.* at 13:07:11-13:07:20 9/10/2010 (Yassine: "as i told u wiit Tecnocash i have several accounts and in mo[r]occo to[o]" Kats: "Very good. I'm building several new "LRs" and could use your help.").

Further, Kats also confirmed that Yassine had certain control over LR's accounts. *See* Id. at 13:06:49-13:12:58 9/10/2010:

20

Sharapov:     What does it mean?

Kats:         It means the guy that originally held LR's accounts with millions of
              dollars will do it for EGC as well. Arthur fird him from LR.

Sharapov:     Held-managed?

Kats:         both.

              He incorporated and opened and managed LR's accounts with millions in
              them. He knows how things work, he knows the vice president of a bank,
              etc.

Sharapov:     You mean Bank account?

Kats:         Yes.

Moreover, Kats was not above stealing from his customers, which he did repeatedly, and
he instructed others to do that as well. *See* Kats-Paulio chat 08:34:01-08:43:19 7/02/2008 (Kats
instructing Paulio to contact DA Gary Fishman: "Just tell him that you sent money, $20k to
GoldAge, and that we never paid you for your order. ... Don't tell him it was a loan."). *See also*
Kats-Sharapov chat 13:55:01-13:59:55 9/10/2010:

Kats:         Let me know if there is an order of at least $50k in Armani.

Sharapov:  Ok. We will just take the money and shut down.

              Kats:    Not shut down.

                       Just blame it on something. I took $80k from customer in FastGold
                       after Arthur trusted some guy in Florida and lost $60k of our money.
                                I blamed e-gold.

21

It was eg to LR exchange.

[...]

Kats:    FBI does not investigate consumer fraud under $1m.

*Id.* at 14:02:05-14:05:56:

Kats:    They have no way to find out anything without court order, plus we can always say LR took it or our account in LR was hacked and the LR was sold to other exchangers (which it will be).

Sharapov:    Strange, the german guy sent one e-mail about the 10k, and is quiet for a week.

Kats:    The money went to CR, Panama, Russia, etc.

I thought you sold all the LR? How come you didn't send him the wire?

Sharapov:  Allan will close our account.

I did.  Now we have everything in TC [Technocash].

Kats:    We'll open another one.  Plus, why would he close it if we had virus and got hacked? Not our fault.

We'll log in to account with TOR, and sell off the funds through various exchanges (convert to EGC, etc).

[...]

Kats:    We can do $50k order easy.  Just hack our account (as someone to log in with different IP or use TOR), and ox the funds to EGC.  Then if anyone asks (the victim has to go to LR first, and then ask LR where it went, etc.)

EGC will say we need court order (so will LR, btw).

Trust me, this is what most crooked exchangers do.

But we're not crooked, we're just broke. ; )

22

The foregoing is in no way intended to detract from Budovsky's plea allocution or the statements in the Letter. Rather, it is intended to place in better context the activities of both Budovsky and Kats in the operation of LR and certainly to illuminate Kats' views of activities and their respective roles in the operation of LR before and after Kats' departure.

## Operation of Digital Currency Exchange Business from 2002 to 2006 (Addressing PSR ¶s 38-42)

Kats acquired Cambist, Autocambist, Fast Gold and Asiana Gold. While a partner, Budovsky's involvement in these ventures was minimal. In fact, in his proffers with the Government, Kats asserted specifically that he was the operator of Asianagold and Cambist. *See* Kats 3507-03 at p. 4.

Budovsky does not dispute that he was aware that HYIPs were being sought as users of LR, that he intended that HYIPs would be sought, that he and Kats sought them, that HYIPs were predominantly Ponzi schemes and that they found e-currencies attractive. *See* Plea Hrg. Trans. at p. 19; Letter. But it is worth noting that not every HYIP is a fraud. Investors in HYIPs assumed a risk, as do traditional stock market investors. The difference with HYIP investors was that some of the investors themselves hoped to achieve an end they knew to be near impossible, and ignored the adage, "If it is too good to be true, it probably isn't." Although Budovsky knew that the majority of Liberty Reserves business would and did come from criminal activity, *see* Letter, neither LR's attractiveness to HYIP investors alone nor the fact that LR's transactions were irrevocable is by itself suggestive of fraud or criminality by all of LR's users. Western Union and MoneyGram transactions are also irrevocable. Again, this is not to say that Kats and Budovsky did not design intentionally features to be attractive to HYIPs. They did. The point is offered only to demonstrate that not every HYIP was fraudulent and that not every HYIP investor was unwitting.

## Launch of Liberty Reserve's Website (Addressing PSR ¶s 43-45)

We have addressed elsewhere the main points in this section of the PSR's and the Government's version of the offense conduct.

23

### E-Gold Investigation/Arrest and Conviction of Budovsky and Kats for Operating Gold Age (Addressing PSR ¶s 46-47)

To our knowledge, Kats also was charged with, and pleaded guilty to, a child pornography offense. Budovsky wanted to fight the charges, but Kats persuaded him to plead guilty because a global resolution of the case would allow Kats to escape jail time for his child pornography offenses.

### Operation of Liberty Reserve in the United States from 2006 to 2008 (Addressing PSR ¶s 48-61)

Kats advised Budovsky that it was not necessary to register LR in the United States because the business would be and was being operated from Costa Rica. Budovsky relied on Kats' advice, because Kats was a lawyer and a CPA. Hence, the decision not to register in the United States was a joint decision.

Budovsky and Kats were concerned about their names being associated with LR because of the New York conviction and because of false reports on the internet that Budovsky had been convicted of money laundering.

As discussed above, the move to Costa Rica was Kats' idea because he had the contact with Yassine, who was in Costa Rica. Budovsky agreed to the move to Costa Rica but would have preferred to move to Europe.

The discussion forum postings were Kats' idea. The defense does not contest that HYIPs were attracted to LR and that Budovsky and Kats were aware and intended that some of LR's features would encourage HYIPs' use of LR. *See* Plea Hrg. Trans. at pp. 19-20; Letter. But it was Kats, with Budovsky's knowledge and agreement, who offered commissions to chat forum users to recruit HYIPs. *See, e.g.*, Kats-djblade chat at 17:33:46 (Kats: "Well, you can get commissions by having HYIP's advertise on GoldAge. Also, I know Liberty Reserve could hire you to promote them to HYIPs to accept them."); *id.* at 18:30:00 23/03/2007 (Kats: "LR pays up to $500 if you bring in a large HYIP that will accept LR payments.").

Some of the alleged "victims" of HYIPs were, in fact, not necessarily victims in the traditional sense–as we noted above they were well aware that they were taking a calculated risk

24

that they could make money and "get out" before the scheme collapsed. The defense has seen no evidence that Budovsky or LR sought out vulnerable victims or attempted to persuade LR users to invest in HYIPs. Nor is it possible to say that Budovsky reviewed every email on which he was copied, or that he directed the responses to every individual who complained of having lost money in an HYIP investment.

Insofar as the PSR and the Government assert that HYIP investors were victims of LR, the Defense notes that the sole purported "victim" whom the Government intended to call at trial, Eric Boateng, was an experienced investor who deliberately chose to invest in multiple HYIPs after his E-Trade account lost money. 3506-02 at p. 1-2. Boateng came to the United States on a tourist visa, which he overstayed, eventually earning United States citizenship through marriage. 3506-02 at p. 1. Boateng worked as a computer salesman and would have been well aware of sales tactics and the manner in which salesmen inflate the claimed capabilities of their products. *Id.*

A review of Boateng's 3500 material suggests that, at trial, Boateng would have testified that he became interested in investing when he read a book on achieving the American dream by using your brain. 3506-02 at p. 1. He invested in E-Trade but was unsatisfied with his rate of return, especially when he lost money. *Id.* at p. 2. He used his own first and last name as his user name when he set up the E-Trade account. 3506-01 at p. 7.

Boateng would have testified that he learned about HYIPs from a person who saw him reading an investment book on the train. 3506-02 at p. 1. The person seemed like a "novice" to him. *Id.* Nonetheless, Boateng Googled "HYIP" and saw websites promising high rates of return. *Id.* at p. 2. He decided to take a chance and invested small sums in various HYIPs, setting up accounts with them under an assumed name, both for himself and for two other individuals. *Id.* at p. 2-3. *See also generally* 3506-01 (listing accounts and user names used for each). Although Boateng told the Government that he was looking for long-term investments, he invested multiple times in HYIPs promising quick returns. 3506-02 at p. 2. In fact, the average term of the HYIPs in which he invested was about 46 days and the longest was 180 days. *See generally* 3506-01 (listing each investment including rates and terms).

Several of the HYIPs in which Boateng invested accepted credit card payments, yet Boateng chose to use LR. Further, it appears that Boateng may have used an assumed name and

transferred LR to his HYIP accounts rather than using his own credit card not because he had to or was scammed into doing so but because he was well aware that many HYIPs were frauds and he did not want his online activity to be linked to his name. He chose to accept the higher fees and inconvenience of transferring money through an exchanger because of the increased anonymity that LR provided. Likewise, he made multiple investments of small amounts, hoping to outsmart the system by pulling his money out with a profit before any one of the HYIPs collapsed. *See generally* 3506-01 (showing individual investments of small amounts) and Boateng's transactional history. Far from an innocent victim, Boateng understood the difference between a legitimate investment program like E-Trade and the HYIPs in which he dabbled. He was an unlucky opportunist, not an unwitting victim.

### Liberty Reserve Relocates to Costa Rica (2008-2013)

#### Budovsky's Emigration to Costa Rica and Split From Kats (Addressing PSR ¶s 62-63)

Kats chose to move LR to Costa Rica because of his contact with Yassine, who set up LR's offices and bank accounts there. Kats 3507-07 at p. 3. Kats and Budovsky discussed it and Budovsky agreed to that move. Budovsky traveled to Costa Rica to provide needed technical support to further their criminal goals. When Kats and Budovsky split, Kats agreed to sell his interest in LR to Budovsky for $200,000 and in turn, Budovsky gave up any interest in any other ventures in which he and Kats had been partners. *See* Kats-Budovsky chat 18:01:02 4/06/2008 (Kats: "Please, let's reach an equitable deal and move on. I'd prefer to work together on most business as before, but if not then I need at least $4k (in addition to the $200k payment for salaries) to pay for team of programmers, hosting, etc."). Notably, during his first proffer session on May 24, 2013, Kats tried to mislead United States Secret Service Agent Tate Jarrow by stating that he had only received $80,000. Kats 3507-02 at p. 2.

#### Liberty Reserve's Application for Registration with SUGEF (Addressing PSR ¶s 64-67)

The following discussion is provided to illuminate what we think was the regulatory uncertainty as to LR's status in Costa Rica and should not be construed in any way as detracting

26

from Budovsky's acceptance of responsibility for money laundering under the charge to which he pled guilty.

Kats chose to move LR to Costa Rica. Budovsky agreed but would have preferred to move to Europe. Budovsky's involvement was not reflected on LR's filings but LR's "criminal clientele" was not specifically concealed from Costa Rican authorities. The names of account users were available to Sylvia Lopez, LR's compliance person.

LR took the position, and so advised SUGEF, that the exchangers, not the end users, were LR's customers and that only exchangers needed to be verified according to "know-your-customer" procedures. It appears that the Costa Rican authorities themselves were unsure whether LR was required to do more or even to be registered.

LR's application to SUGEF began in April 2008 and continued into late 2011, even after LR sought to withdraw its application. When SUGEF requested changes to LR's compliance manual, they were made. SUGEF never sought to shut LR down for non-compliance; nor did the dialogue between LR and SUGEF cease up to the point where LR sought to withdraw its application in November 2011. At the time of the application, Budovsky and Kats both were owners of LR and both made decisions with the knowledge of the other.

LR's application for registration under Article 15, Law 8204 stated that LR marketed digital currency which was used as an electronic means of payment over the internet. LR explained that it did not receive money directly from members of the public or end users, that LR converted physical money from the exchangers into electronic digital currency, that LR had contractual agreements with exchangers, and that LR received commissions from the exchangers. LR explained that the exchangers had responsibility for the exchangers' own clients.

SUGEF then began to conduct its review and investigation of LR's application. By letter dated December 1, 2008, SUGEF requested additional information from LR to determine if LR was engaged in activities which could be classified as an unauthorized currency exchange operation as well as a financial brokerage of third party funds regulated under Article 15, Law 8204 and Articles 116 and 156 of the Basic Law of the Central Bank of Costa Rica. In response, another office within the Costa Rican regulatory authority concluded that LR was not violating said laws

27

and that as a result, LR was permitted to continue the registration process. SUGEF then reviewed LR's documents, interviewed individuals, analyzed LR's contracts with its exchangers and noted that LR did not receive money directly from the public or end users. SUGEF also noted LR's position that the exchanger was accountable to the end users and that the exchanger was responsible for verifying its clients and complying with the regulations and laws in the country where an exchanger operated. After reviewing LR's operations, the internal SUGEF report concluded that LR was not violating Article 59 or Article 86 or Article 116. The SUGEF application for registration under Article 15, Law 8204 was allowed to continue and did continue. LR submitted further information as requested and the process moved forward. LR complied with further requests for information and comments regarding LR's Compliance Manual in 2009.

The process continued into 2010. LR advised SUGEF through counsel that LR had put in place a system of alerts when a user account received an amount greater than $10,000 from an exchanger and would review any suspicious accounts. SUGEF responded to a request from the Technical Services Office for an opinion whether LR was legally authorized to create a digital currency as an electronic means of payment over the internet or whether doing so infringed on the powers of the Central Bank. SUGEF concluded that LR was not money and not subject to the laws of the Central Bank.

In March 2011, SUGEF inquired of Banco Central whether LR was a permanent system which qualified as one of systemic importance. By letters dated July 29, 2011 and August 11, 2011, Banco Central responded that the activity engaged in by LR was legal, that the business of LR was neither prohibited nor regulated because people were free to transact business at their own risk and that the LR system was not considered as "having systemic significance." The August 11, 2011 letter concluded that the activities of LR were neither regulated nor prohibited in Costa Rica.

In a letter dated August 22, 2011, SUGEF advised LR that it also needed to verify users. After further discussions, LR withdrew its application for registration from SUGEF in a letter dated November 28, 2011.

## Lack of Compliance at Liberty Reserve (Addressing PSR ¶s 68-80)

It is not correct that Budovsky did not intend to implement any AML controls requested by SUGEF. Some were implemented.

Cubero, LR's General Manager, was hired to assist LR with its SUGEF application and to assist LR to go more mainstream. Budovsky also hired in-house counsel (Portela) and a Compliance Officer (Lopez), demonstrating LR's efforts, albeit insufficient ones, to legitimize LR and implement some AML controls. Cubero helped draft and update LR's Compliance Manual, worked to verify all exchangers, and planned to institute verification procedures for end users. Some of these matters were works in progress at the time of Budovsky's arrest.

While Budovsky may not have acted at Cubero's preferred speed, some (although not sufficient) controls were being implemented. Budovsky also was ill for a period of time, which slowed the process. Budovsky did direct that Cubero obtain some of the records he requested but certainly not all the records. What Budovsky did not do was give Cubero unfettered access to LR's computer system. This was due in part to Cubero's refusal to provide his laptop so that it could be checked for viruses, and in part due to the mutual mistrust between Budovsky and Cubero. Additionally, Budovsky did not want Cubero to see the full volume of transactions and transaction fees generated by LR as explained above. Granted, as the Government trial exhibits demonstrated, there was concern when certain information was provided unintentionally to Cubero and Lopez.

Yassine was removed because he was a tyrant, uniformly disliked by LR's employees, and because he became involved in matrimonial matters and spent less and less time tending to business at LR. *See* Kats-Trankilo chat at 12:43:58-12:45:23 9/10/2010 (explaining that Yassine is no longer associated with LR "basical[l]y because of my divorce").

Certain information was withheld from Cubero and Lopez. But that information related mostly to the volume of transactions moving through LR and to the fees earned by LR, which LR concealed in order to lower its Costa Rican tax obligation. Some "suspicious" transactions were tracked, and LR did conduct some verification procedures.

29

Disagreements over whether LR needed to verify account users existed and continued. LR's Compliance Committee determined that only exchangers needed to be verified. Exchangers and the banks and Western Union to whom and through whom users placed money into the LR system, also had certain verification responsibilities vis-a-vis LR's end users. Additionally, as noted above, LR had some AML controls. And even after Lopez filed a Suspicious Activity Report with the UIF in May, 2011, no one shut LR down. Instead, SUGEF continued to correspond with LR regarding LR's registration application. It was not until August 22, 2011 that SUGEF advised LR that LR needed to verify users.

Lopez was let go not because of any concerns she had voiced to anyone at LR, but rather because LR was being sold and moved to Cyprus. The desire to sell LR was real. Budovsky and others wanted to move LR Costa Rica because the SUGEF registration process was taking so long and it was thought that registration in Cyprus would be easier. The sale never was completed because LR accounts were frozen and seized by law enforcement. As a result, LR continued its operations in Costa Rica, albeit without Cubero, its General Manager, without Lopez, its Compliance Officer, without verifying all users, and without adequate AML controls. Budovsky was aware that LR's AML shortcomings continued, thereby continuing to enable criminals to continue to launder money through LR, which they did.

### Creation of an HYIP With Azzedine El Amine (Addressing PSR ¶s 81-85)

The idea to create HYIPs was El Amine's. Budovsky was aware of El Amine's activities, did nothing to stop them and, indeed, encouraged them. Budovsky knew that HYIPs were largely fraudulent. The three HYIPs referenced made minimal profits, if any (Budovsky is not aware of any even minimal profits), and were abandoned. Many HYIP customers were aware of what they were getting into but hoped to make a profit and get out, as noted above.

### Joint Ownership of SwiftExchanger (Addressing PSR ¶s 86-91)

Regarding the profit "split," while the agreement was 60% to El Amine and 40% to Budovsky, Budovsky did not always receive his 40%. In fact, he seldom did, and the records fail to show that Budovsky personally received these monies. Regarding the SwiftExchanger website, Budovsky provided technical assistance. El Amine prepared the script referenced and Budovsky edited it.

To a certain extent, Budovsky directed the opening of accounts and the transfer of funds. But Budovsky did this with the complicity of others. As all of the bank accounts were held in the name(s) of others, the control over the funds plainly was joint with the holder of the account and, in fact, as a non-signatory on the accounts, Budovsky, in certain respects, had less control over the accounts than the actual named account holder even though he possessed debit cards and other access devices. Regarding the funding of the account specifically referenced in PSR ¶ 90, El Amine was responsible for funding accounts.

### Freezing Liberty Reserve Accounts of HYIP Operators
### (Addressing PSR ¶s 92-97)

The Defense notes that all of Delbeke's money was released to him. Further, the conduct noted in ¶ 93 was the view of Yassine, but certainly Budovsky was aware of it and participated in it. Regarding TVI referenced in ¶ 97, to Budovsky's knowledge, TVI's money was in TVI's account and is still there. LR's counsel, Portela, had been in the process of verifying the account.

### Fake "Sale" of Liberty Reserve (Addressing PSR ¶s 98-104)

LR filed its registration request with SUGEF in April 2008. SUGEF did not notify LR that it was required to verify its users until August 2011. LR never concealed from SUGEF that it was not verifying users and SUGEF could have required that LR conduct user verifications early on in the registration process.

LR and SUGEF were in constant discussion concerning the other deficiencies noted by SUGEF. SUGEF never sought to shut LR down.

The sale was part of a plan to move LR's business out of Costa Rica. Accountants and lawyers were hired and paid. Bank accounts in Cyprus were set up. El Amine was the signatory and emails reflect that El Amine was aware that accounts were being set up. The reason for the move to Cyprus – a more hospitable business climate – was set forth in a letter to SUGEF. In anticipation of the transaction, money was transferred from Costa Rica to the bank account in Cyprus.

As noted above, the sale was not finalized because certain LR accounts were frozen and seized and LR continued to operate in Costa Rica.

### Budovsky's Profits From Liberty Reserve (Addressing PSR ¶s 105-107)

We do not dispute that monies were transferred. But Budovsky and others were responsible for the movement of funds, which is reflected by the fact that once funds were transferred into others' names, the person(s) in whose name(s) the money was held also had control over those funds. Budovsky would have had to have acted in concert with them to access these monies, even if he had debit cards or key fob passes linked to some of the accounts. There clearly was control by several people and not just Budovsky.

### Criminal Use of Liberty Reserve (Addressing PSR ¶s 108-109)

LR was used by criminals to launder the proceeds of crimes. But LR also was used for legitimate reasons.

### Data from Liberty Reserve Servers (Addressing PSR ¶s 110-115)

The PSR's and Government's assertions regarding the "Top 500" accounts' volume do not provide a clear picture in that the Government's accounting calculates the same money multiple times as it moves from one LR account to another, sometimes as much as four times, and possibly more. Of those Top 500 accounts, 44% were associated with Liberty Reserve exchangers and simply reflect the movement of money into or out of the system.

LR had over 5.2 million user accounts. The 190 accounts that the Government has chosen to focus on – 157 accounts related to some type of "investment" opportunity, 19 accounts associated with trafficking in stolen credit card information, and 14 accounts associated with internet services of a kind used by carders and other cyber criminals – are a small percentage of that total.

### Google Analytics Data (Addressing PSR ¶s 116-122)

LR was used by criminals to launder the proceeds of their crimes. But the Google Analytics data shows that a substantial portion of the traffic coming to LR's website did not originate from sites associated with criminal activity. In addition, the Google Analytics data does not show whether the person or persons who came to LR's website from one of the sites associated with criminal activity actually opened a user account or engaged in any transaction involving LR. As noted above, over 3 million of the accounts had no transactions at all and almost 750,000 accounts each had transaction activity totaling less than $100.

### Liberty Reserve's Featured "Merchants" (Addressing PSR ¶s 123-126)

Not every merchant and every transaction through a "featured" merchant involved criminality. While some may have, there is no evidence that all merchant transactions did.

### Aftermath of Liberty Reserve Shutdown (Addressing PSR ¶s 127-128)

Given that almost 94% of the LR account users had total transactions in their accounts of nothing or less than $1,000.00, it is not surprising that they did not contact the United States Attorney's Office. It is misleading to use the over five million users as a baseline and juxtapose that number against the number of individuals who did contact the United States Attorney's Office. Furthermore, it is naïve to assume that even legitimate users eagerly would invite the United States Attorney's Office into their finances. Most people hesitate to report anything financial to the Government fearing multiple forms, multiple questions and interviews. In light of the minimal amount of money held in the average account it is predictable that few LR holders contacted the Government.

### Calculation of Loss (Addressing PSR ¶s 129-130)

The defense has no objection to the stipulated Guidelines calculations set forth in the plea agreement. The $250-500 million range agreed to constitutes a reasonable estimate by the parties.

33

## Victim Impact (Addressing PSR ¶s 131-133)

We have addressed these PSR paragraphs elsewhere in this submission both generally and specifically as to Mr. Boateng and incorporate those objections/comments here.

We appreciate the opportunity to present these objections/comments to you for your consideration. If you should have any questions, please do not hesitate to contact the undersigned.

Very truly yours,

/s/
John F. Kaley
Donna Newman
Jeffrey Pittell

cc: All counsel
(via email)

34