G56QBUDs

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA
3
            v.              13 CR 368 (DLC)
4                            Sentence
    ARTHUR BUDOVSKY, a/k/a "Arthur
5   Belanchuk," a/k/a "Eric
    Paltz,"
6
               Defendant
7   ------------------------------x

8                            New York, N.Y.
                            May 6, 2016
9                            3:00 p.m.

10
    Before:
11
                    HON. DENISE L. COTE
12                            District Judge

13
                      APPEARANCES
14
    PREET BHARARA
15      United States Attorney for the
       Southern District of New York
16   CHRISTIAN EVERDELL
    CHRISTINE MAGDO
17   KEVIN MOSLEY, D.O.J.
       Assistant United States Attorney
18
    DOAR RIECK KALEY & MACK
19      Attorney for Defendant
    JOHN F. KALEY
20
    DONNA R. NEWMAN
21      Attorney for Defendant

22   JEFFREY G. PITTELL
       Attorney for Defendant
23
    -also present-
24   JEREMIAH HAYNIE, IRS
    MOLLY ROSEN, Paralegal
25   NICK EVERT, Paralegal

G56QBUDs

1          (In open court; case called)

2          THE DEPUTY CLERK:  Is the government ready to proceed?

3          MR. EVERDELL:  We are, your Honor.  Chris Everdell for

4     the government.  I'm joined by Trial Attorney Kevin Mosely from

5     AFMLS, Christine Magdo from our office, Jeremiah Haynie from

6     IRS Criminal Investigations, and Molly Rosen and Nick Evert who

7     are paralegal specialists in our office.

8          THE DEPUTY CLERK:  For the defendant, are you ready to

9     proceed?

10         MR. KALEY:  Yes.  Good afternoon, your Honor.

11         John Kaley for Mr. Budovsky seated to my right.  Also

12    with me at counsel table is Donna Newman and Jeffrey Pittell.

13         THE COURT:  Welcome everyone.

14         I have a document which is marked the second consent

15    preliminary order of forfeiture as to specific property.  It

16    lists certain electronics that were seized.  That list goes on

17    for pages.  I see that it's been signed by Ms. Magdo and

18    Mr. Mosley, Mr. Budovsky, Mr. Kaley and Ms. Newman.  I will

19    sign it.  It is part of the sentence today.

20         We have a presentence report in this case of April 27.

21    Mr. Kaley, have both you and your client read the presentence

22    report?

23         MR. KALEY:  We have, your Honor.

24         THE COURT:  We will get to the objections later.

25    There are issues that have been argued to me in written

1   submissions.  Besides those issues contained in written

2   submissions, do you have any other objections to the

3   presentence report, Mr. Kaley?

4           MR. KALEY:  No, your Honor.

5           THE COURT:  Thank you.

6           The presentence report -- I'm sorry, Mr. Kaley, have

7   you and your client discussed it with each other?

8           MR. KALEY:  We have, your Honor.  We've discussed all

9   of our submissions to the Court in connection with sentencing

10  as well and we've discussed the presentence report.

11          THE COURT:  Thank you so much.

12          The presentence report will be made part of the record

13  in this case and placed under seal.  If an appeal is taken,

14  counsel on appeal may have access to the sealed report without

15  further application to this Court.

16          Let me list the submissions I've received in

17  connection with sentencing.  I should indicate as well that, of

18  course in addition to the plea, there was a letter of April 8,

19  2016, and as a result of that letter, a Fatico hearing which

20  had been tentatively scheduled was canceled.  I don't remember,

21  Mr. Kaley, if I've had occasion to discuss the April 8 letter

22  with you on the record, but the April 8 letter had essentially

23  two significant paragraphs of undisputed facts and made a

24  representation that the parties agree to the factual

25  representations in those paragraphs.  I take it you've

G56QBUDs

1    discussed each of those issues with care with your client?

2              MR. KALEY:  I did, your Honor, and Mr. Budovsky

3    approved the letter, and I so notified the government.

4              THE COURT:  Thank you so much.

5              So obviously, besides the plea, I relied on that

6    letter.  I have a sentencing letter on behalf of Mr. Budovsky.

7    I have a volume of exhibit materials submitted in connection

8    with that sentencing memorandum.  I have a sentencing

9    memorandum from the government.  And in connection with that

10   sentencing memorandum, I have two volumes of materials.

11             As I understand it, all these materials have been

12   filed on ECF.  Is that right, Mr. Everdell?

13             MR. EVERDELL:  That's correct, your Honor.

14             THE COURT:  Is that right, Mr. Kaley?

15             MR. KALEY:  Yes, your Honor.

16             THE COURT:  Thank you so much.

17             I also have received two sets of letters from the

18   government's victim witness coordinator.  The cover letters are

19   January 21 and April 26, and they contain statements offered by

20   victims, and I've reviewed those materials as well.

21             In addition, we have letters concerning a document

22   called the defense version of offense conduct.  I have a letter

23   of May 4 in which defense counsel asks that the defense version

24   be submitted or joined to the PSR either in its body or as an

25   addendum.  In response to that request, I issued an order, and

1    I have two additional submissions from defense counsel today.

2    And I thank you, Mr. Kaley, for turning so promptly to these

3    issues.  The two letters from defense counsel are May 6.  And I

4    want to turn to the issues raised by the defense version and

5    those three letters in a moment.

6         I noticed that the PSR had what I believe is an error

7    in it in connection with the description of the defendant's

8    citizenship at the very front of the report, and again at

9    paragraph 164 it describes him as a U.S. citizen.  I don't

10   believe he is, and I intend to instruct the probation

11   department to correct those errors.

12        Is there any objection to that?

13        MR. KALEY:  He had been a United States citizen, your

14   Honor.  He is no longer.

15        THE COURT:  That's right, but the report reflects that

16   he currently is.

17        MR. KALEY:  I understand.

18        THE COURT:  So there is no objection to me asking for

19   that to be changed.

20        I want to put counsel on notice that when they address

21   me, I would like them to feel free to talk about the following

22   guidelines issue.  I notice that the parties' plea agreement

23   and the PSR both do a guidelines calculation that includes a

24   third point for timely acceptance of responsibility.  This has

25   no impact whatsoever on what would otherwise be a guidelines

1    calculation, but I think the correct offense level is 42 and

2    not 41.  There is agreement that the Criminal History Category

3    is II.  I think Mr. Budovsky's plea on the Friday before a

4    Monday trial was not timely acceptance of responsibility.  In

5    any event, you should feel free to discuss that with me when

6    you speak.

7            There is in this case a 20-year maximum sentence

8    provided by statute, and as a result, its theoretical issue at

9    most under either offense level 41 or 42, the guidelines range

10   would otherwise be 360 to life.

11           The government makes a reference in its submissions to

12   something called a petition for remission as opposed to a

13   restitution proceeding or order.  I don't understand the legal

14   framework for a petition for remission.  I don't know if the

15   90-day period that would ordinarily apply to resolving

16   restitution issues applies to a petition for remission.  I

17   don't know what the statutory authority is for that to be part

18   of the sentence, and I'd like to hear from counsel on that

19   issue.

20           MR. EVERDELL:  Thank you, your Honor.  I may end up

21   turning this over to one of my colleagues who is more familiar

22   with the asset forfeiture issues.

23           But as I understand it, because the defendant pled to

24   a money-laundering offense, there are no direct victims of

25   money-laundering offenses for purposes of restitution.  The

victim of a money-laundering offense is society at large.

However, if you are a victim of the underlying crimes that the

laundered money relates to, then the forfeited assets, those

victims of those crimes can petition for remission and get a

share of the forfeited assets to make them whole.

That procedure of remission is different from

restitution.  It is not a judicial proceeding, as I understand

it.  I think it's something that's handled by our office.  So I

don't know if the Court has much of a role in that, but I would

defer to one of my colleagues if the Court needs further

information.

THE COURT:  I think you've given me the information I

need, which means I don't need to address this issue further.

MR. EVERDELL:  That's correct, your Honor.

THE COURT:  So let me turn then to the document

labeled defense version of the offense conduct.  This is a

document that, as I understand it, the defense prepared as sort

of response to that section of the presentence report which was

drafted by the government, and as the PSR reflects, it's the

government's version of the offense.  And what I did is compare

the defense version to the offense conduct version in the PSR,

which I'll refer to as the government's version, and try to

identify whether there were any disputes regarding facts that I

had to resolve either to correct the PSR or identify a Fatico

hearing potential.

1          I identified 20 potential, I'll say broadly, disputes.

2     I thought, however, that only six of those could really be

3     considered fairly direct disputes with the precise wording and

4     meaning of the PSR.  Most of the other issues were just

5     quibbles with facts or a gloss on facts or added facts or

6     suggesting that the PSR contained language or wording that

7     actually wasn't found there.

8          So I issued an order with respect to the six potential

9     issues that I needed to resolve for accuracy of the PSR and

10    invited defense counsel to identify any additional issues

11    beyond the six.  Mr. Kaley was kind enough to do that.  As a

12    result of his submissions today, my list of 20 has become a

13    list 23, and the bottom line from all of this is I think there

14    is only one issue that really requires our attention today.

15         I'm obviously happy to hear you about any of these

16    disputes or issues, but I think there is only one that requires

17    us to have some kind of detailed conversation.  Mr. Kaley's

18    letters of today made it clear that the defendant doesn't

19    believe that his, I'll say, disputes are material, and he is

20    not requesting a Fatico hearing with respect to any of them.

21         The one issue that I think we need to discuss

22    addresses the PSR section at paragraphs 34 to 35, and the

23    defense version of the offense at page 16 which has to do with,

24    should I say, prior conduct.  It concerns, in particular, the

25    501(c)(3) charity money-laundering fraud and the no-fault auto

1   insurance fraud that took place during the period of time 2000

2   to 2003.  In the PSR, it accuses or describes the defendant of

3   participating in those frauds with Mr. Kats, a co-conspirator.

4   In his defense version, he denied participating in those

5   schemes; and in the May 6 letter today, the defendant takes the

6   position that that dispute is not material.  However, I think

7   it may be material on the issue of recidivism which defense

8   counsel have focused on appropriately in their sentencing

9   submission.

10          So let me put that aside for a moment because I think

11  that the bottom line is that I think that's the only one that

12  requires more discussion, although the parties are free to

13  discuss all the issues they'd like to today.  But I just want

14  to list that the other 22 issues that I focused on, they had to

15  do with material found in the following PSR paragraphs:  16,

16  17, 19, 18, another one at 18, another one at 19, 21, 22,

17  another one at 21, 24, paragraphs 34 to 35, 38, 39, 49, 64, 69,

18  81, 82, 101, 124 and then added in today's letters from defense

19  counsel, PSR paragraph numbers 15, 87 and 110.  Again, I am

20  prepared to go through each of the 23 disputes and talk about

21  them in detail, but the only one I think is necessary for us to

22  talk about is the one I've identified.

23          So before we focus on the one I've identified, let me

24  just ask, does the government wish to address any of the

25  potential or any of the factual disputes or potential factual

G56QBUDs

1    disputes raised by the defense version?

2              MR. EVERDELL:  No, your Honor.  I think if the Court

3    wants to hear more about that one factual dispute, we'd be

4    prepared to do that today, but we do not feel it's necessary to

5    supplement the record any further as to the other disputes.

6              THE COURT:  Thank you.

7              Mr. Kaley, other than the one factual dispute about

8    these prior fraudulent schemes which we'll get to in a moment,

9    does the defense feel the need to talk about any of the other

10   factual disputes or potential factual disputes between the

11   defense version and the PSR offense conduct version?

12             MR. KALEY:  We will rely on our submissions, your

13   Honor.  We think they are pretty thorough.

14             THE COURT:  Good.  Thank you.  So let's turn to that.

15             I am not, by the way, making any changes to the PSR

16   description of offense conduct.  I reviewed each of these

17   disputes with care.  I don't find any changes warranted.  I am

18   also not intending to order the probation department to attach

19   the defense version to the PSR.  However, it would be, I think,

20   important that it be included, and I think it is in the record

21   of the defendant's sentencing submissions to this Court.

22   Obviously, there is some significant overlap between the

23   discussions of the underlying facts in the defendant's

24   memorandum submitted to me for sentence, but I think in

25   addition, the defense version which I've read with great care

G56QBUDs

1    should be considered part of the record for this sentence, and

2    I've treated it, in essence, as an exhibit to the defense

3    memorandum of law.  I think that's the proper way for it to be

4    considered by the Court.

5         MR. KALEY:  I think also -- I'm sorry, your Honor.  I

6    was going to add, I think also it was attached to my ECF letter

7    of May 4, so I think it is already part of the court record.

8         THE COURT:  Thank you so much, Mr. Kaley.

9         Let's turn to the one outstanding issue.  I understand

10   that the defendant is not asking for a Fatico hearing with

11   respect to these two prior frauds.  Is the government asking

12   for a Fatico hearing?

13        MR. EVERDELL:  No, your Honor.

14        THE COURT:  So in terms of these two prior frauds, the

15   issue I think most significantly for sentence is whether I may

16   rely on them, and I think the way they are relevant is in

17   connection with the recidivism issue, and it would be my

18   intention to actually rely on them in that connection.

19        So, Mr. Kaley, if you want, consult with your client

20   and see if your position changes at all or if you just want to

21   address this in oral argument to me at the time you speak more

22   broadly.

23        MR. KALEY:  May I have a moment, your Honor?

24        THE COURT:  Sure.

25        (Pause)

1           MR. KALEY:  Your Honor, I am going to need another

2     moment or two.  But just a preliminary problem, particularly

3     since the government is not asking for a Fatico hearing on this

4     issue.  When we were here in connection I believe with the

5     letter that Mr. Budovsky had sent to your Honor and we came in

6     and towards the end of that conference there was some

7     discussion about the need for a Fatico hearing, and I don't

8     want to remember inaccurately what was said, but I certainly

9     was left with the impression that these earlier events would

10    increase perhaps, for lack of a better word, importance were

11    the parties not able to agree that Mr. Budovsky was a

12    full-fledged partner with Mr. Kats in Liberty Reserve from the

13    beginning.

14          I think with those thoughts in mind, the government

15    and the defense spent considerable time discussing facts and

16    the need for a hearing, and we settled upon the April 8 letter

17    which I thought had addressed that issue and made this issue of

18    the earlier 15-or-16-years-ago alleged frauds not important

19    because we don't contest -- and in fact just the opposite -- we

20    admit quite forthrightly that Mr. Budovsky was a full-fledged

21    partner in LR at the beginning.  I think given that, that's why

22    the parties in the April 8 letter said we did not believe that

23    a Fatico hearing was necessary.  I think that's our position

24    today, and we would ask your Honor not to consider it.

25          THE COURT:  OK.  Well, you know, it's important that I

1    am forthright with you.  There is a section of the defendant's

2    sentencing submission that makes an argument about recidivism.

3            MR. KALEY:  Yes.

4            THE COURT:  And to me that prior conduct, that course

5    of conduct, is relevant because of the defense argument about

6    recidivism, and I don't want to mislead you in that regard.

7            MR. KALEY:  I understand, but I don't think there are

8    sufficient facts here for the Court to make a determination

9    that there was fraudulent conduct that Mr. Budovsky was a

10   knowing, willing participant in.  And as that's the position

11   we're in now, perhaps -- I could say on the one hand the

12   government hasn't met its preponderance burden, but they're not

13   seeking a Fatico hearing.  So, given where we are, I am not

14   sure there's adequate evidence for your Honor to make that

15   finding that Mr. Budovsky was a knowing and willing participant

16   in these activities.  We don't have great details on how much

17   money was involved, how long any of this lasted, what happened,

18   who did what.

19           THE COURT:  Well, of course, you -- I mean, I don't

20   have access to it, but you had access to the 3500 material and

21   all the government exhibits for trial.  The government did

22   submit at least two documents about the fake charity, and I

23   referenced them in yesterday's order.  And they are at tab 502

24   A and B to its sentencing submission in volume one, and that is

25   Mr. Budovsky's application for the 501(c)(3) exemption for the

1    charity United Support for Humanity.  And also the letter from

2    Mr. Budovsky signed by him as founder and chairman contained at

3    502B.

4                MR. KALEY:  We see those, your Honor, but based on

5    these two documents, there's no adequate proof that there was a

6    fraud afoot.  And based on that, I don't think there is

7    adequate evidence for your Honor to conclude that there was a

8    fraud there and that he knowingly participated in the fraud

9    based on these two documents.  I think given that, your Honor

10   should not consider that.

11               THE COURT:  Mr. Everdell.

12               MR. EVERDELL:  Your Honor, there are actually a few

13   other documents that we included in our bound submissions that

14   we didn't feature in our sentencing submission which I'm happy

15   to walk the Court through now if that's useful.

16               I think our position is that we think the documents

17   alone do establish by a preponderance enough input for the

18   Court to rely on this in sentencing.  To the extent the Court

19   doesn't feel that way, I guess we'd have to consider whether or

20   not we'd have to call Kats to the stand to flesh this out, but

21   I think the documents themselves are enough to go on.

22               THE COURT:  Why don't you walk me through that then.

23               MR. EVERDELL:  Yes, your Honor.  I don't know if we

24   have that -- we don't.  We will rely on the paper copy.  I

25   thought we might have a projected copy, but that's fine.

1          The Court I think already identified two of them.  We

2     are now starting with the charity, and just so I'm clear, your

3     Honor, you identified the charity and the no-fault insurance as

4     the two you were interested in.  We did make some allegations

5     about checks to his nephew Ruslan.  I will not address those

6     since the Court has said these two are the ones.

7          THE COURT:  I'm focused on the government's version of

8     the events in the PSR, and the description of that third scheme

9     focused even more on Mr. Kats rather than Mr. Budovsky though

10    it was in aid of Mr. Budovsky relative.  So I am more focused

11    on Mr. Budovsky's conduct now, and that's why I focused on the

12    first two crimes.

13         MR. EVERDELL:  Understood, your Honor.

14         So we will begin with the charity.  The first document

15    there is the one the Court pointed out which is 502A, which is

16    the application the application for a 501(c)(3) designation for

17    the charity.  You see in that document at the bottom of the

18    first page, Arthur Budovsky has signed it and is listed as the

19    director of the charity, and he's listed there as the director

20    in other places.  502B is the snapshot in time for United

21    Support for Humanity.  At the bottom it's a letter that's on

22    the website that is signed by Arthur Budovsky as founder and

23    chairman.

24         A few other things here that I think are worth looking

25    at.  You can read the text of the letter itself.  I won't read

1    it out loud for the Court now, but it just strikes me as if --

2    it reads as if it's almost a parody of a charity.  It seems to

3    throw in every disadvantaged group that you could possibly

4    think about and it doesn't seem to me just at first blush

5    looking at this from an outside perspective to be the website

6    of a legitimate charity.  They're talking about just everything

7    you can imagine that sounds terrible to the outside observer's

8    ears.  I'm quoting now.  "Struggling to improve the lives of

9    children who are suffering from birth defects, disease,

10   blindness" --

11           THE COURT:  Slow down, counsel.

12           MR. EVERDELL:  I'm sorry, your Honor.

13           "Struggling to improve the lives of children who are

14   struggling from birth defects, disease, blindness and poverty."

15   It mentions hospitals, orphanages, local medical centers,

16   clinics, etc.  It goes on and on.  It's a one-page letter and

17   there is really no needs to this at all.  This is what's on the

18   website.  It seems designed to elicit emotions, but there's

19   nothing behind it.  There is more.  I just don't want to have

20   the Court read into something that is on the page because there

21   is more.

22           If you look at 556A(f) --

23           THE COURT:  Yes.

24           MR. EVERDELL:  -- at that exhibit, you'll see examples

25   of checks that were written to United Support for Humanity

1  purportedly for donations, but these are checks that were

2  found, and our argument is that these were part of the fraud.

3  They were given to charity so that they could then be cashed

4  out and delivered back to the donors "as cash."

5      Then you see on the next tab, which is 556B(f),

6  payments from this charity United Support for Humanity to Gold

7  Age -- Gold Age which from the other allegations the Court

8  knows is the exchanger that Budovsky and Kats were running at

9  that time -- an amount for $3,500. So it seems odd that a

10  charity would be going through a Gold Age exchanger, sending

11  money to a Gold Age exchanger. If it's a legitimate charity,

12  that raises some questions. Other checks go to Kats himself

13  and to cash.

14      But the one that I think is probably the most

15  persuasive to me, your Honor, is the next one which is

16  Government Exhibits 557F. And in that one you see a chat

17  between Budovsky who uses the tag Seelen866.

18      MR. EVERDELL: Yes, Seelen866 is Budovsky. And

19  Ragnarok is Kats. This is a chat from April 13 of 2008 before

20  they're split. What they're talking about here is Kats

21  mentions at the top that he got a refund from Toyota for an

22  overpayment. This is a car that was actually used in

23  connection with the charity USH, right. So this is well after

24  USH stopped doing business, and all of a sudden he gets a

25  refund check related to the car. They talk about this for

1   awhile.  Then at the bottom they're talking about whether or

2   not they want to open a bank account so they can cash this

3   check and whether or not that's a good idea.  You'll see on the

4   second page where Seelen -- oh, sorry, Ragnarok says, "Well,

5   bank account needed for USH in any event.  I'll skip one."

6            And Seelen says, "For what?"

7            Ragnarok says, "For USH."

8            Seelen866 says, "For?"

9            And Ragnarok says, "Charity work."

10           And then there's a smiley face emoticon after that.

11   Now, to me looking at that, that is them talking

12   tongue-in-cheek with each other as if this "charity" really as

13   we both know was not a charity.  This was just a scam, and

14   lucky for us isn't this interesting we got a refund check in

15   connection with a car that was used in relation to the charity,

16   and we can all have a good laugh about it afterwards about how

17   we were doing "charity work" smiley face when in fact we never

18   were.  I think the tone of this chat is very clear.  I think by

19   itself it establishes our allegations that this was not a

20   legitimate charity and that Budovsky knew that.

21           THE COURT:  If there were a Fatico hearing, do you

22   have a proffer as to what testimony you would offer?

23           MR. EVERDELL:  Your Honor, we debated about this

24   whether or not we would want to call Vladimir Kats to the stand

25   for this purpose to talk about these earlier frauds.  I have no

1    doubt that his testimony would be that this was a sham charity

2    that he and Budovsky initiated together in order to do exactly

3    what we allege in our sentencing submission, which is to

4    launder money or give people fake tax breaks for donations that

5    were in fact not donations and that they converted the

6    donations to cash, brought them back to the people who gave the

7    "donations" and they kept a percentage for themselves and the

8    "donors" would get a tax break when in fact they hadn't

9    actually given a donation.

10          So we did not think that given -- I know before the

11   Court said why it was that the Court now found this information

12   relevant to sentencing, but we did not think that additional

13   testimony on this subject was necessary, so we decided to just

14   rely on the documents because we think that establishes it

15   enough.  But Kats has been consistent on this point with

16   respect to the charity that this was fabricated, they never did

17   any work in the Ukraine, and that this was designed as a way of

18   giving fake tax breaks to "donors" while they netted a fee in

19   exchange for giving the money back in cash.

20          THE COURT:  Let's turn to the second one.

21          MR. EVERDELL:  OK.  That is the no-fault insurance,

22   and I think the evidence there that we've provided to the Court

23   you can see at 554A(f).

24          In this exhibit you will see a number of checks that

25   were written to a company called ECSN, Incorporated, which is a

1   company that was run by Budovsky.  It stands for Express

2   Computer Services Network.  It was one of the companies he ran

3   at this time.  You'll see that the checks are written from

4   medical offices or chiropractor offices.  I think on the first

5   page you can see it says I think Tristate Acupuncture, but the

6   word acupuncture is visible.  These all come from these medical

7   offices or chiropractor offices or some sort of treatment

8   office that was participating in the no-fault scheme.

9            The way it worked as we allege was that these offices

10  were submitting fake Medicare claims and they needed to pay off

11  the people who were complicit in filing the fake claims, but

12  they didn't want to remove a whole bunch of cash from their own

13  medical office accounts or personal accounts that might attract

14  suspicion, so instead Budovsky and Kats did it for them.  They

15  transferred the money, they gave them a check which purportedly

16  looks like it's for real computer services, like computer tech

17  functions or other functions as though they looked like

18  legitimate charges.  In fact, they were for the purpose of --

19  they gave that money to Kats and Budovsky so that they could

20  then convert it to cash and bring it back to the doctors'

21  offices so the doctors and chiropractors could pay off the

22  purported patients for their role in the fraud.

23            THE COURT:  Where am I supposed to be looking at the

24  document?  The documents I see are checked "signed by Budovsky.

25  Paid to the order of Budovsky."

G56QBUDs

1          MR. EVERDELL:  I'm sorry, your Honor.  I think you may

2     be looking at the next one.  The one I'm looking at is 554A(f).

3     Maybe you're looking at 554B(f).

4          THE COURT:  I'm looking at 554A(f).

5          MR. EVERDELL:  Perhaps you have a wrongly bound copy.

6     The first page of my exhibit for me are two checks, LL

7     Compensation, Inc. written to ECSN.

8          THE COURT:  No.

9          MR. EVERDELL:  I'm sorry, your Honor, it may be that

10    we just bound a copy.  Your Honor, I have some notes in front

11    of me about what the checks are so I can provide the Court with

12    my bound copy.  Your Honor, I'm sorry, we do have them

13    electronically, so if the Court's monitor is linked here --

14         THE COURT:  As long as you show it to defense counsel

15    too.

16         MR. EVERDELL:  I believe their copy has the correct

17    documents.

18         MS. NEWMAN:  Our copy seems to coordinate with the

19    government's bound version.  So if this helps you, this is what

20    you gave us.

21         THE COURT:  We can't put it on the monitor.

22         MR. EVERDELL:  I do have a disk that has it as well.

23         THE COURT:  I can't put it on the monitor.  Our

24    monitors, for whatever reason, very helpfully are not

25    functioning.

G56QBUDs

1          MR. EVERDELL:  I can provide the Court with my own

2     copy, and I will work from my notes.  I apologize for the bound

3     copy not being complete, your Honor.

4          Your Honor, referring back now to the Government's

5     Exhibit 554A(f), I actually have the electronic copy in front

6     of me.  Should I proceed?

7          THE COURT:  Yes.

8          MR. EVERDELL:  You will see in that exhibit a number

9     of checks that are written from medical providers.

10          THE COURT:  I'm returning the government's volume.

11     Chambers received two volumes.  One must have been a corrected

12     volume.  I have the volume, and I'm at 554A(f).

13          MR. EVERDELL:  Thank you, your Honor.  So if you look

14     at that exhibit.

15          THE COURT:  I remember what you said.

16          MR. EVERDELL:  Yes.  You will see the checks from the

17     medical providers to ECSN, which is Budovsky's company.  There

18     are a number of them paying Budovsky to then cash them out and

19     then provide the cash back to them.

20          One thing to note about this is the amounts.  They're

21     in the thousands of dollars.  These are not very large medical

22     providers purportedly paying a computer tech thousands of

23     dollars for computer work being done in a very small office.

24     The amounts do not comport with that sort of service Budovsky

25     working on his own providing tech support to a small medical

1    office would actually receive for that work.  These are

2    thousands and thousands of dollars over not a very extensive

3    time frame coming into Budovsky's computer company.  It doesn't

4    really fit, we believe, with -- and certainly doesn't fit with

5    what we were told by Mr. Kats, but doesn't fit on its face with

6    a small computer company and the services they'd be able to

7    provide and the amount of money they'd be able to reap for

8    those services.

9        If you look also at 554B(f), you will see the next

10    stage in the process, which are ECSN checks, checks written

11    from that company's bank account to Budovsky himself in, again,

12    amounts in the thousands.  These are checks that are written

13    for the purposes of Budovsky being able to cash them and then

14    return the cash to the medical clinics for them to do with it

15    to complete the fraud scheme and pay off the fake patients.

16    There are a number of them, and they are in large amounts.

17    Again, it doesn't seem very consistent with legitimate computer

18    work.  In our view it is consistent with participating in a

19    no-fault conspiracy.

20        And to your point before, your Honor, if Mr. Kats were

21    called to the stand, he would say the same thing; that this was

22    a no-fault scheme that both Budovsky and Kats were aware of.

23    In fact, they both went together often to deliver the cash back

24    to the medical clinics.  In fact, Kats would say that the whole

25    reason why they knew about this in the first place was because

1  Budovsky had done tech work for some of these companies in the

2  past and that was their in.  Kats, I don't think, was aware of

3  or had relationships with these people.  I would have to check

4  that before I say that definitively, but I believe what I

5  recall is that it was Budovsky's relationships with these

6  medical providers that provided the in that allowed the scheme

7  to take place

8           THE COURT:  Thank you.

9           Mr. Kaley.

10          MR. KALEY:  Your Honor, Ms. Newman will address this.

11          THE COURT:  Ms. Newman.

12          MS. NEWMAN:  Thank you very much, your Honor, for

13  allowing us to split.

14          Your Honor, we may go a little bit backwards.  Since

15  your Honor has before you the evidence the government has

16  offered with respect to the no-fault checks, we'll address that

17  first and then go to the charity since it's opened already.

18          So the first that we would be looking at with respect

19  to what they call the no-fault money-laundering scheme would be

20  the Exhibit 554A(f).  What we see are various companies, and

21  they admit that they're medical-related facilities which our

22  addressed to ECSN, Inc. which we concede was Mr. Budovsky's

23  company for doing computer work.  There are several such checks

24  over a period of time and they are for, in my humble opinion,

25  having dealt with IT outsourcing, not particularly large, even

1     for a small firm, but that's beside the point.  They are not

2     for tens of thousands of dollars, we can agree, but for a few

3     thousand and most -- from a thousand, I believe, to $3,000 at

4     the most for seniors which we say are for services rendered.

5             In fact, if we look at 554B(f), the next tab, we see

6     that on a company check, Arthur Budovsky is writing a check to

7     himself.  And in several of those -- I'm going to direct the

8     Court, for example, to page 8.  There's a small number at the

9     bottom of the exhibit pages in the line, the bottom line, the

10    reference line, it says August.

11            We go to page 11.  That is a check, it's a copy of a

12    check.  And we go to the reference line, it says salary.

13            If we go to page 12, it gets more specific.  Salary

14    for July 18 through August 29.

15            Page 13, it says a bonus.  And while not all of them

16    have that, it's -- I know that sometimes not everybody puts

17    that in but it's sufficient to say that there is evidence here

18    of what those checks were written for, and they are signed by

19    Arthur Budovsky.  So what we have as far as evidence is we have

20    checks written to Mr. Budovsky's computer company, and then we

21    have checks written from his checking account, company checking

22    account to himself for his salary.  In addition, to further

23    corroborate that work was done, we have in our sentencing

24    submission under tab one, it's actually the last letter.

25            So if we go to tab two, it's the one right before

1    that, just for convenience sake.  You will see a letter that

2    was submitted on behalf of Mr. Budovsky from Dr. Cariton, who,

3    by the way, happens to be in the audience here today in support

4    of Mr. Budovsky, along with family and relatives and his mother

5    and stepfather.  We forgot to introduce them, but I think it is

6    important for the Court to know who is here on his behalf.  I

7    know the Court wants to know that.

8        A March 18, 2016 letter does indicate that in the

9    second paragraph, if I may read, "I first met Arthur in 2001

10   when he was helping me with setting up a computer network in my

11   office after renovation."  So not only do we have the flow of

12   the evidence, but we have here support of what exactly the

13   payments were for.

14       And we do have chats, and I can find them, in which

15   Mr. Budovsky -- excuse me -- Mr. Kats in chats with others

16   tells other people that Mr. Budovsky was the tech guy, and if

17   it wasn't for him, in fact, that's what he would still be doing

18   was, you know, fixing computers.  So we even have from

19   Mr. Kats's own words at the time contemporaneously -- not with

20   this event, but with the offense conduct, that that's what

21   Mr. Budovsky did and was paid for it.

22       THE COURT:  This is very helpful, Ms. Newman.  As I

23   understand it then with respect to the medical fraud scheme as

24   alleged by the government, you've walked through the physical

25   evidence, and based on that, without Mr. Kats's testimony, I

1  would not be able to find that the government has carried its

2  burden of proof that this was a fraud.  And as I understand it,

3  Mr. Budovsky denies involvement in any medical office fraud in

4  connection with these documents.  Is that right?

5          MS. NEWMAN:  That is correct, your Honor.

6          THE COURT:  We can move then to the first date.

7          MS. NEWMAN:  Thank you very much.  That would be the

8  charity and they directed you, if I'm correct, to 502B.  If I

9  can just find that.  It was 502B and then the corporate

10  documents.  Well, we do not deny and certainly we have not

11  denied that -- we knew of the charity, we absolutely

12  acknowledge that Mr. Budovsky knew of the charity, absolutely

13  acknowledges that, and that he signed the corporate documents.

14  He's not saying that the documents themselves are fraudulent.

15  So I wanted that here for the Court.

16          However, the question is not whether Mr. Budovsky

17  signed a corporate document and knew of this United Support for

18  Humanity, but rather whether he engaged or knew of and agreed

19  to Mr. Kats's engagement in any kind of fraud or if there was

20  fraud with respect to this charity.

21          So the next document that they have directed the Court

22  to is 502, and they say by looking at 502B that the Court

23  clearly would know that this is a fraud because, after all,

24  they're asking for charity for so many different ailments to a

25  group of people.  But to Mr. Budovsky's recollection, this

1  charity began soon after Chernobyl, or around that time.

2  That's what his recollection is.  It's been quite a number of

3  years.  In any event, even besides that, if his recollection is

4  not correct, what is correct is that in and of themselves they

5  asked for help for so many different ailments, and for a very

6  poor country doesn't mean it's a fraud, your Honor.  That's

7  really speculation.

8        We then had, I think they directed you to 556B(f)

9  which were checks, if I recall.  Those were checks from the

10  checking account of United Support for Humanity.  If you look

11  at those checks carefully, you see they're all signed by

12  Mr. Kats.  There's no numbers on those pages, but if we turn

13  the first page on the back, assuming that would be page 2 of

14  that exhibit, in fact this one is made up to Mr. Kats's mother.

15  Some of them are not clear.  I understand it's hard it's hard.

16        THE COURT:  I'll take your representation, counsel.

17  You can move along.

18        MS. NEWMAN:  So what we're saying is what the

19  government has proposed, even the documents do not support even

20  by a preponderance a finding that Mr. Budovsky was engaged in

21  the kind of fraud involved in that charity that the government

22  alleged existed.

23        THE COURT:  And he's denying he was involved in a

24  fraud.

25        MS. NEWMAN:  Yes, he's not denying though that he knew

1    of the charity.  So I wanted that clear.

2            Thank you, your Honor.  Unless there's any other

3    questions, thank you.

4            THE COURT:  No.  So I am not going to rely on either

5    of these prior instances of alleged fraudulent activity in

6    sentencing the defendant unless the government wishes to put on

7    further evidence.

8            MR. EVERDELL:  May we have a moment, your Honor.

9            (Pause)

10           MR. EVERDELL:  Your Honor, we are going to not choose

11   to supplement the record, although we will highlight the fact

12   that even if the Court does not choose to rely on this earlier

13   evidence of money laundering and fraud, there are other things

14   in the record to rely on in terms of recidivism.

15           THE COURT:  Absolutely, you are right to make any

16   other arguments you wish from the record.

17           MR. EVERDELL:  Yes, your Honor.

18           THE COURT:  Thank you, counsel, for helping clarify

19   these issues.  So I think we are ready to proceed then with the

20   core issues at sentence having, I think, clarified what's in

21   the record and what's out.  The principal arguments being made

22   by the defense in connection with a non-guideline sentence

23   here -- the guideline sentence being 20 years, and that is the

24   sentence recommended by the probation department as well -- the

25   defendant's age, the likelihood he will be deported, his

1  mother's health condition, his own health condition, the

2  sentences I've imposed on co-conspirators, among many other

3  things.  There are some legal arguments as well.

4  Fundamentally, the defendant seeks a sentence of ten years

5  imprisonment.  He's been in custody in connection with these

6  charges since May 24, 2013, and he also argues -- and we'll get

7  to this legal issue later, I think -- that, in any event, it

8  would be inappropriate for me to impose a sentence of more than

9  15 years.  So, I think I've captured the range that defense

10  counsel wishes me to focus on.

11      Thank you, Ms. Newman.  Moving a computer screen so

12  she and I can see each other, which is helpful.

13      I think I'm ready to hear from counsel.  So I will

14  hear from the government.

15      MR. EVERDELL:  Thank you, your Honor.

16      As the Court I know is aware, the government has set

17  forth a number of arguments in a very lengthy sentencing

18  submission, so I'm not going to try to repeat everything that

19  was said in the submission, but I do want to make a few points

20  for the Court.

21      First, your Honor, as I know the Court is aware, this

22  case involves a money-laundering enterprise of unprecedented

23  size and scope.  At its height, Liberty Reserve, which was the

24  digital currency company that billed itself as the internet's

25  largest payment processor and money transfer system, was in

1  fact a massive criminal operation that laundered billions of

2  dollars for online criminals around the world, including

3  hundreds of millions of dollars for users based in the United

4  States.

5        This defendant, Arthur Budovsky, was at the helm of

6  this sweeping criminal enterprise.  He was its cofounder, its

7  leader, and its principal beneficial owner.  Liberty Reserve

8  was Budovsky's organization.  He helped design its features and

9  shrouded it in anonymity to appeal to online criminals like

10 online Ponzi schemers, credit card traffickers, identity

11 thieves and computer hackers, and Budovsky marketed Liberty

12 Reserve's services directly to these online criminals knowing

13 that the vast majority of Liberty Reserve's proceeds would come

14 from this criminal clientele.

15       And he was right.  Online fraudsters and cyber

16 criminals around the world flocked to Liberty Reserve and it

17 ultimately grew into a financial hub for these criminals who

18 used it to amass and distribute and store and launder their

19 criminal proceeds, and to keep this all hidden from law

20 enforcement and to keep himself out of the reach of U.S. law

21 enforcement in particular, he engaged in a pattern of repeated

22 deception and obfuscation to make sure that law enforcement

23 authorities in the United States would have no reach over him

24 and law enforcement authorities and regulators in Costa Rica

25 would have no idea what was going on beneath the surface of

1    this purportedly legitimate company that was operating on their

2    shores.

3         The size and the scope of this crime, your Honor, and

4    the defendant's leadership role in the offense demand a

5    significant sentence on those factors alone.  We've set forth

6    in great detail in our sentencing submission how this company,

7    Liberty Reserve, came into being and how it grew and how

8    Budovsky was the central player in the life span of this

9    enterprise from beginning to end.  We will not reiterate them

10   here, but those facts alone show that Budovsky was responsible

11   for an incredibly serious crime and should be sentenced to the

12   guidelines range of 20 years in prison, and we note your Honor

13   that this assessment is shared by the probation department in

14   its recommendation in the PSR.

15        Aside from the nature of this offense, the scope, the

16   size and what the defendant did, his role in it as its leader,

17   there are other reasons, other very important and very

18   concerning reasons that lead the government to believe that a

19   guideline sentence is appropriate in this case.

20        First -- and the Court touched upon this before in our

21   discussion of the factual disputes -- Mr. Budovsky is a proven

22   recidivist.  We know, and it is not disputed, that before

23   Liberty Reserve was launched, he was engaged in an exchanger

24   business, Gold Age, to exchange currency for E-Gold which was

25   one of the dominant digital currencies of the time.  He did

1    that with Mr. Kats.  While he was doing this, we know at the

2    end of that venture they were both arrested, and they were

3    brought up on charges.  And Mr. Budovsky, like Mr. Kats, had to

4    plead guilty to running an unlicensed money transmitting

5    business in 2006, and then he was sentenced in 2007.

6           But rather than turning away from a life of crime at

7    that point, rather than learning his lesson, and I believe,

8    your Honor, that even in the defendant's submission he says

9    he's learned his lesson, well, it seems like he's been given

10   this choice to learn a lesson before, and he didn't learn the

11   lesson.  Rather than turning away from a life of crime which

12   he'd been engaged in for several years and which provided his

13   main source of income, he went head-long right back into it

14   immediately after being arrested.  He and Kats launched Liberty

15   Reserve and that became their primary focus and the other

16   associated businesses, the exchanger businesses that they

17   worked on together after that.  He did not learn from that

18   experience.  Not only did he return to the same type of

19   money-laundering enterprise that had gotten him in trouble

20   before, he took every step that he could to insulate himself

21   from the reach of law enforcement so that he wouldn't get

22   caught again.

23          He moved Liberty Reserve to Costa Rica so it would be

24   outside the reach of law enforcement.  He incorporated the

25   company using nominee owners and nominee bank accounts so that

1   the money could flow into accounts that did not have his name

2   on it at all so that he was insulated from that.  Even the

3   Liberty Reserve website bragged about the fact that it was

4   beyond the scope of U.S. jurisdiction.  While other payment

5   processors could be got at by U.S. jurisdiction, we could not.

6        So he did all this as part of a pattern to hide his

7   criminal involvement in the company, and that pattern extended

8   during his running of the company in his repeated misdirection

9   and lies to the regulatory authorities in Costa Rica, to Sugef

10  and others, where he intentionally provided them with false

11  data and withheld information about the criminal clientele.

12  This was part of a criminal pattern.  So instead of turning

13  away from a life of crime, he decided he needed to get better

14  at it, and that was the lesson that he learned.

15       Now he's caught again.  There is every reason to

16  believe, regrettably, if he gets out, he might return to this

17  life of crime like he's done at least on one occasion before,

18  and that gives the government serious concern.  It demands that

19  the sentence reflect the need for deterrence in this case

20  because there is an extraordinary need for deterrence in this

21  case given the defendant's background.  And I note, your Honor,

22  it's not simply that he returned after being caught once to a

23  life of crime, but this type of business has been this

24  defendant's principal source of income for years.  There is a

25  need for incapacitation as well.  There is reason to believe

1  that he would return to this because this is what he knows,

2  this is what he knows and this is what he does, and that

3  society would once again suffer from the crimes of this

4  defendant if he is not given a very significant sentence, a

5  guideline sentence of 20 years.

6       Lastly, your Honor, I will add that there is another

7  very prevalent reason in the submissions in particular that

8  give the government real concern about the defendant, and we've

9  outlined that in our own submission, but it seems to be that at

10  multiple points in this process, the defendant has tried to

11  minimize his conduct and minimize his role and has not owned up

12  to the full scope of his conduct.  The Court I'm sure recalls

13  the lengthy back-and-forth that ultimately led to the April 8

14  letter where the defendant made those admissions on the record,

15  but it wasn't a smooth process.  There was a lot of

16  back-and-forth.  There was a letter sent to the Court which

17  gave the government, and I think the Court, some concern about

18  what was going through the defendant's head.  Ultimately, he

19  did admit to those facts that are in the April 8 letter and

20  those formed the core conduct of this case.

21       Then the sentencing submission comes, and as the

22  government I think rightly points out in our own submission,

23  there is a pattern there of while nominally adhering to the

24  admissions, trying to walk back, at least the spirit of those

25  admissions, if not the letter.  Trying to point to other people

1    and trying to almost blame everybody else besides himself.

2            That is not acceptable, your Honor.  That speaks

3    volumes about the level of contrition of this defendant and

4    whether or not he really is going to learn from this experience

5    and turn away from a life of crime.  And it's that blaming

6    others that I think is particularly bad in this context because

7    it's not like he's just blaming his co-conspirator -- we saw a

8    lot of that in his submission, blaming Kats, but he was blaming

9    the victims as well.  He was blaming those investors in the

10   HYIP schemes that got burned by investing in fraud schemes

11   trying to claim that at least the government's witness, Eric

12   Boateng, was actually a savvy investor; that he was part of the

13   fraud, he was complicit in it because he was trying to get in

14   and out early to make a quick buck.

15           You say you've read those letters, your Honor, and I'm

16   sure you noticed, as did the government when we read them,

17   these are really terrible stories of people who were just lured

18   by the prospect of outsized returns.  They knew they shouldn't

19   have believed it, but they did because they were in some dire

20   straits of their own, but they did it and they paid a heavy

21   price for it.  And it was Liberty Reserve that made that all

22   possible.  It made the HYIP's function, it was the digital

23   currency of choice while it was up and running among these type

24   of online fraudsters, and that had devastating consequences,

25   lots of victims who now have lost significant sums that are

1    really meaningful to these people.  You've had some examples

2    that we've quoted in our own submission but more than just

3    those.  His lack of remorse, and even his lack -- he doesn't

4    even seem to acknowledge that there are real victims in this

5    case that are suffering because of what he did.  That is

6    another reason, a very strong and powerful reason, your Honor,

7    that we think that a guideline sentence in this case is

8    appropriate.

9              One moment, your Honor.

10             (Pause)

11             Unless the Court would like to address any of legal

12   arguments with the government, I think we rely on our papers

13   for that, but we have no further comment.  Thank you.

14             MR. KALEY:  May I have a moment, your Honor?

15             THE COURT:  Yes.

16             (Pause)

17             MR. KALEY:  Thank you, your Honor.

18             So perhaps where I will start, your Honor, is towards

19   where Mr. Everdell ended.  You know, we talk about remorse or

20   lack of remorse.  I mean, to me, remorse has been exhibited

21   here.  A person doesn't have to get down and prostrate

22   themselves on the ground.  I mean, we have remorse here.  We

23   have a guilty plea with an exposure of 20 years, an acceptance

24   of responsibility for that, we have the April 8 letter which is

25   a full admission of the conduct at issue here, the core conduct

1   at issue here.  There's no walking away.  Sure, Mr. Everdell

2   and I had discussions before we arrived at the final product

3   because we're both lawyers and we're both trying to do our

4   best, but this April 8 letter says it all.  We're not walking

5   away from the magnitude of what happened here, and to suggest

6   that we are, we think is just wrong.

7          Now, we're also not insensitive to folks who lost

8   money.  I will only add that they lost money to frauds outside

9   of Liberty Reserve, these various Ponzi schemes and other

10  fraudsters.  We weren't intending to pick on Mr. Boateng in our

11  submission, but we just thought it was fair to point out that

12  Mr. Boateng when he invested in the HYIP knew exactly what he

13  was doing, and at one point I think he used another name or

14  another payment method or something.  I don't recall the exact

15  details, but it's in our submission.  So he had some sense.  It

16  reminded me of what my parents told me:  If it's too good to be

17  true, it's probably not true.  And that was the only reason why

18  we pointed that out.  Of all the victims that the government

19  had thought they might call at trial, Boateng was the only one,

20  and we just thought that in fairness, a little bit about

21  Mr. Boateng was not inappropriate, but there is no effort on

22  our part to minimize what we've agreed to as the conduct here.

23         THE COURT:  So, the discussion of Mr. Boateng, and

24  indeed the discussion of the other victims more generically in

25  the defense submissions, should not be read by me as an

argument or a suggesting that the defendant doesn't realize

that real people lost money that was very important to them

through fraud.

          MR. KALEY:  Of course we realize that, your Honor.

          THE COURT:  There's no debate that there were real

victims here who lost collectively enormous sums of money to

fraud.

          MR. KALEY:  I don't know how much they lost, your

Honor, but it's clear --

          THE COURT:  Millions and millions of dollars.

          MR. KALEY:  I've read the victim letters.  Those

people lost money, there's no question about it.  We've never

disputed that those people lost money.  We were never intending

to dispute that those people lost money, but the only point I

was making is that I understand that Liberty Reserve allowed

these Ponzi schemes to launder the money.  We never said

anything other than that.  But I just thought in fairness,

particularly regarding Mr. Boateng, who was the one that came

to our attention, he may have been in dire straits, I don't

know, but he entered this somewhat with his eyes open.  Now, of

course the existence of Liberty enabled the fraudster to

launder the money through Liberty, and Mr. Boateng lost his

money, no question about it.  But we do realize Mr. Boateng is

a victim of what happened here.  We're not denying that at all.

So we are not trying to minimize what Mr. Budovsky did and what

1    happened.  The question really becomes what is an appropriate

2    sentence.

3         Our submission, we thought, tried to put in a little

4    more context of what happened here.  We never denied that

5    Mr. Budovsky was a 50 percent owner; that they strategized;

6    that they discussed everything, but there was certain

7    realities, the government calls it Mr. Kats's bluffing, but by

8    the same token, these were things that Mr. Kats said, and that

9    it was, you know, Mr. Budovsky would be --

10        THE COURT:  You're talking about the statement that

11   Mr. Kats said in chat rooms after or in chats after

12   Mr. Budovsky kicked him out of Liberty Reserve?

13        MR. KALEY:  Yes.

14        THE COURT:  Those are the statements you're talking

15   about?

16        MR. KALEY:  Yes, your Honor.

17        THE COURT:  OK.

18        MR. KALEY:  But we just thought it was important to

19   include those because it added some context to what we think

20   happened, but it's not a walk-back from what we agreed to in

21   the April 8 letter, what Mr. Budovsky pled guilty to and what

22   he said during his allocation.  So I don't think we're

23   minimizing at all the core criminal conduct.  Do we have some

24   issues perhaps around some of the edges?  Sure.  But that's

25   going to happen, but it's not at all that we are minimizing

1   what happened here.

2          The question, as I said, then becomes what becomes an

3   appropriate sentence in this particular case.  The government

4   says 20 years.  We say something less than 20 years.  We think

5   that it should be less than 15 years.  That doesn't mean it

6   shouldn't be a substantial sentence.  So what substantial

7   sentence is sufficient here to satisfy all the reasons of why

8   we sentence people?

9          Now the government says, well, one of the things we've

10  got to do is make sure that Mr. Budovsky doesn't become a

11  recidivist again.  We acknowledge the Gold Age conviction.  I

12  will only point out in connection with Gold Age, Mr. Budovsky

13  received a sentence of probation.  Now he's looking at a whole

14  different situation.  He's looking at a very substantial

15  sentence.  If the Court imposes a substantial sentence along

16  the lines that we've suggested, that's going to alter a

17  person's outlook on life, and if your Honor were to impose a

18  substantial sentence but one less than 15 years, that's a very

19  substantial sentence.

20         Mr. Budovsky has never spent that time in prison.  He

21  will be spending it now.  He will be deterred specifically to

22  himself.  Other people who may engage in digital money

23  laundering also will be deterred because this will be a

24  substantial sentence.  My recollection of looking at the Gold

25  Age sentences -- not the Gold Age -- the E-Gold sentences were

most of those folks received sentences of probation; but a

sentence to Mr. Marmilev of five years, to Mr. Chukharev of

three years and the sentence of whatever your Honor gives

Mr. Budovsky, we hope under 15 years, is still a very

substantial sentence.

          I think that sometimes we can get lost in the offense.

There's no question this is a serious offense, but we can't

lose sight of the humanity of people, and I think here there is

a good deal of humanity in Mr. Budovsky.  Your Honor has seen

the letters.  They're very nice letters, heart-felt from people

who've known him for years.  I pointed to one or two in

particular that just struck me, and it was the young boy in the

Ukraine who needed surgery that Mr. Budovsky paid for and was

there when the young boy woke up from the surgery.  I mean, it

was a touching letter.  The boy's mother's letter was equally

touching.  I say that because the narrative of Mr. Budovsky's

life is not just the crime.  There's much more to it than that.

It's just simple human acts of kindness that people exhibit in

everyday life that are reflected in Mr. Budovsky's letters that

were submitted on his behalf.  He's not an animal.  He's not

evil.  He committed a serious crime.  But now what is enough?

A double digit sentence less than 15 years would be very much.

It's not a walk in the park.  It has a deterring effect both on

the individual and on the society at large.  It's substantial.

People will know.  I guess I get upset to just ignore a

1    person's humanity.

2             I kind of was anticipating somewhat the government's

3    sentencing submission for Mr. Kats, which I read of course

4    because I was curious, and I read the government's submission

5    on Mr. Kats, and it was kind of done in a monotone, without

6    some of the gloss that we saw in their sentencing memo for

7    Mr. Budovsky.  Mr. Kats isn't being sentenced now.  He'll get

8    sentenced whenever, but here is my observation:  The government

9    spent a lot of time with Mr. Kats in preparing him, meeting

10   with him, proffers.  When you do that, you get a bit of a

11   window into a person.  You see some of their humanity which you

12   otherwise don't see.  I've spent enormous amounts of time with

13   Mr. Budovsky, as has my co-counsel, and because of that we also

14   are able to see his humanity.  So we don't have the window into

15   Mr. Kats's humanity because we don't know him.  All we know is

16   that he was involved in this case, Gold Age and he's got some

17   child pornography stuff, but we have never looked into

18   Mr. Kats's soul.  We've never met him.  So we can't say

19   anything about him other than what we've read.

20             It's the same thing with Mr. Budovsky.  The government

21   doesn't know Mr. Budovsky other than the crime, but we've had

22   an opportunity to know him and we see humanity there, your

23   Honor, and he's continued that in the jail over at the MCC.  We

24   submitted the paperwork from the MCC.  He's a suicide watch

25   companion and he counsels other inmates.  The director of the

1  Bureau of Prisons wrote a letter saying this is noble and

2  terrific service, and he didn't have to do that.  He could just

3  sit there in his cell and cubical and read a book and be left

4  alone, but he didn't.  So that also is a window inside him

5  beyond just the offense conduct.

6         So when we talk about what is a just sentence here, we

7  take into account the prospect of recidivism.  We've briefed

8  that point, your Honor.  I'm not going to belabor it terribly,

9  but a substantial sentence here for Mr. Budovsky, as I said,

10 will prevent recidivism.  I mean, he's going to come out of

11 prison, he is going to -- I don't know where he'll be.  He's

12 not a citizen here.  He won't be here.  He may be sent back to

13 Costa Rica where he has no family, and it's potentially

14 possible, I guess, that he might be sent to the Ukraine if they

15 would accept him.  I don't know.  But his parents who have been

16 with him are here.  All the folks in court who wrote letters

17 and are here.  They're here.  He's not going to be, and that's

18 important because he will survive, I'm sure, but the one thing

19 I have confidence of, and the government may say, well, in Gold

20 Age, he just got a slap on the wrist and look what he did after

21 Gold Age.  But what I say is, OK, he got a slap on the wrist

22 with Gold Age, but what's going to happen to him here is going

23 to be different, and that's going to matter, and the result

24 will be different.  So, if he got a double digit sentence less

25 than 15 years, he's going to come out at the age of 54, 55.

1    The world is going to be an entirely different place, and he's

2    going to know that he can't do what he had done before or the

3    rest of his life is over.  And I think that's important.  So,

4    when we look at the potential for future recidivism, I don't

5    see it because I think the sentence the Court will impose will

6    address that.

7         A lot of the other points about insulating himself

8    your Honor, we don't deny a lot of that.  It was operating in

9    Costa Rica.  These are facts.  These are things we acknowledge.

10   There are some other things though we thought were on the

11   positive side.  Like there was really no reason to apply to

12   SUGEF for a license.  As I look back, it was silly, but it was

13   what was done, and the government's not wrong when they say

14   SUGEF wasn't given all of the information, but I would say

15   there was some effort to do some things right, but there was

16   more of an effort to do things wrong.  We are not, as I said,

17   walking away from our April 8 letter.  He never got it right.

18   He intentionally allowed it and didn't get it right and did it,

19   so we're here.

20        But now what happens?  We've set forth a lot of

21   reasons in our submission, and I'm not going to repeat all of

22   those, your Honor.  Just essentially, a double digit sentence

23   less than 15 years is quite, quite substantial and will have a

24   dramatic impact on Mr. Budovsky as well as on other people out

25   in the community who may consider doing something.

G56QBUDs

1          Let me just confer and see if there are any other

2     thoughts, your Honor.

3          (Pause)

4          Thank you, your Honor.

5          THE COURT:  Mr. Budovsky, is there anything that you

6     would like to say to me on your behalf in connection with this

7     sentence?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  OK.  You may be seated.

10          Well, of course, there is no dispute about some

11     critical facts here that give context to this sentence.  The

12     defendant ran an extraordinarily successful and large-scale

13     international money-laundering operation.  It was designed to

14     be used by cyber criminals, and it was, to hide and move their

15     ill-gotten gains.  It was designed to appeal to them, and it

16     did.  It was successful in capturing a very significant share

17     of this international business.  There were over 78 million

18     financial transactions processed by Liberty Reserve.  The

19     combined value was over $8 billion.  This money laundering for

20     criminal activity had a huge U.S. footprint.  The parties have

21     agreed that at least a quarter of a billion dollars in criminal

22     proceeds from user accounts based in the United States went

23     through the Liberty Reserve system.

24          Defendant and Mr. Kats conceived of this whole scheme.

25     It began as operations in 2005.  Shortly after the operations

1    were moved to Costa Rica in 2008, the defendant forced Mr. Kats

2    out, and he was in charge by himself running the operation.

3    Obviously, he had a staff and people who he employed who he

4    used in various ways in running the group, but he was the

5    master of the operation from that point on until it was shut

6    down by the government in 2013.  I want to address some of the

7    defendant's arguments that it made in its sentencing submission

8    here.  Let me address some of the legal arguments first.

9         There was an argument that the parties have made with

10   respect to the guidelines contained in Section 2B1.1, and the

11   defendant asked me to disregard that guideline, and I think

12   there is absolutely no reason to do so here.  The point of this

13   entire money-laundering scheme, this entire overarching fraud

14   that empowered, enabled, facilitated other fraudsters around

15   the world, the volume of the fraud in capturing as much of a

16   market share as possible of these world-wide networks of

17   fraudsters, that was the whole purpose of the scheme.  It was

18   all designed and oriented to be a successful, huge financial

19   operation.  The scale of it was its point.  So to the extent

20   the guidelines capture the scale, they do so appropriately.

21        Of course, the footprint just in the United States was

22   enormous.  So to the extent that it's appropriate for me to

23   just look at the United States and the fraud that was promoted

24   and facilitated here through the defendant's activities, I

25   don't think it is inappropriate at all to apply 2B1.1.  I think

1  in this case, looking at this crime and these facts, and the

2  defendant's role in it, looking at the extent of lives

3  impacted, destroyed, changed forever, the lost savings, the

4  lost retirement funds, the emotional distress, the loss of

5  self-respect, the recriminations, the strain in family life,

6  they're all appropriately captured, I think, through this

7  guidelines application.

8        Another argument that the defendant makes is that

9  whatever sentence I impose should be no greater than 15 years

10  because of the history of plea negotiations here.  I don't

11  think the defendant is right at all in connection with this

12  legal argument.  As we all know, a Court is not involved in

13  plea negotiations.  We're forbidden by law to be involved in

14  those negotiations.  Federal Rule of Criminal Procedure 11

15  controls that.  And as the Supreme Court has discussed in

16  *Davila*, 113 S.Ct. 2146, there are great risks to the defendant

17  and to the entire process from a court being involved in the

18  plea negotiation process.  So in the normal course, a court

19  doesn't even know how those negotiations unfolded, the

20  strategies that were employed, the timing of the negotiations.

21  We don't know about rejected offers in the normal course,

22  because it's not relevant to sentencing.

23        But when a defendant is proceeding to trial, it is the

24  court's practice in this district, and now I believe around the

25  country, to inquire about plea negotiations.  As the Supreme

1    Court has explained in *Missouri*, 132 S.Ct. 1408:  The court has

2    a duty to inquire to ensure against fraudulent or fabricated

3    claims after trial asserting that defense counsel was

4    ineffective for not sharing a plea offer with the defendant

5    before trial.  These issues have been discussed at length in a

6    number of Second Circuit cases.  I'll name just two*. Kovacs*,

7    744 F.3d 44.  *Fulton*, 802 F.3d 257.

8           Therefore, at our final pretrial conference, I

9    inquired, as it is my custom to do, about whether or not there

10   had been plea offers or plea negotiations and whether defense

11   counsel had communicated, as it is required to, any plea offers

12   to the defendant.

13          Later, it became important after the defendant pled

14   and wrote a letter to the Court which implied that he might

15   seek to have new counsel for purposes of sentencing or implied

16   that he might be pursuing an ineffective assistance claim, it

17   became important for me to address the plea negotiation issues

18   in more detail, and so we had an April 6 conference, and I set

19   forth my findings beginning at page 31 of that transcript about

20   the progress of those negotiations.  I found, and I still find,

21   that there was no formal offer of a 15-year plea at any point

22   by the government.  The defendant's April 22 memorandum in

23   connection with this sentence I don't think correctly and

24   accurately captures the history of those plea negotiations, but

25   at page 15 of that memorandum it explicitly indicates that the

1  defendant does not seek to re-argue the April 6 issues or my

2  findings.

3            But that takes us to the broader issue here.  Whatever

4  those negotiations were, what is their impact on this

5  sentencing proceeding?  The defendant argues in its sentencing

6  memorandum that those negotiations should set a cap for

7  sentencing here; that no sentence should be greater than 15

8  years because the government once believed that that was

9  adequate to meet the Section 3553(a) goals.  Of course, the

10  defendant doesn't cite any law to support that proposition, and

11  I think it's entirely wrong both factually and legally.  Plea

12  negotiations are driven by a variety of factors at many points

13  during prosecution -- factors the defendant considers, factors

14  that the government considers.  There is an evolution.  I've

15  described my findings as to what happened in this case at the

16  April 6 conference, and I'm not going to repeat them here, but

17  it is not the policy factors that drive plea negotiations that

18  govern a sentencing decision.  A sentencing decision is

19  governed by Section 3553(a).  Those are the considerations that

20  drive my sentencing decision.  There may be some overlap

21  perhaps in some case, but there's no general duty that a court

22  would inquire at sentencing about the history of plea

23  discussions.  That's not normally a part of the sentencing

24  discussion.

25            Many of the Section 3553(a) factors have nothing to do

1  with the issues that might drive negotiations in a particular

2  case between the government and a defendant.  There are, I

3  think, strong policy reasons to keep those two parts of the

4  process separate.  If the history of plea negotiations were

5  essential to a Section 3553 analysis, then I think they would

6  be part of every sentencing proceeding.  There is some

7  precedent that applies to this.  *Negron*, 524 F.3d 361 (2d Cir.

8  2008) indicates that a court may consider a rejected plea offer

9  but is not required to do so.  *Kadir*, 718 F.3d 126 (2d Cir.

10  2013) recognizes that a Court may impose a sentence higher than

11  that contained in a rejected plea agreement.  And, of course,

12  we're all very familiar with the law that governs stipulated

13  guidelines ranges.  The law is well-established that even when

14  the parties agree as to a stipulated guidelines range, the

15  Court must make its own separate evaluation and may vary and

16  depart, either one, from the parties' agreement or may reach

17  another range based on its fact-finding of what is appropriate.

18  I will cite just one case in that regard.  *Woltmann*, 610 F.3d

19  40.  So here I will try to follow to the best I can Section

20  3553(a), its various factors and considerations.  I will give

21  the history of plea negotiations here such weight as I believe

22  they deserve in the context of all the other information the

23  parties have provided to me.

24          There is another argument that is made in the

25  defendant's sentencing submissions, and that has to do with the

1    sentences imposed upon the two co-defendants that I've already

2    sentenced Mr. Marmilev and Mr. Chukharev.  I've considered

3    those sentences, I've considered their roles, I've considered

4    the facts, as I have with respect to Mr. Budovsky.  I'm aware

5    of the potential for disparity here in imposition of sentence

6    and in trying to weigh what I think is appropriate in their

7    cases and in this case and give each the weight they deserve.

8         So let's turn to what I think is a real significant

9    issue here -- and the parties have addressed this orally today

10   as well as in their submissions -- the issue of recidivism.

11   Defendant argues that he's at a low risk for being a

12   recidivist.  I don't find that to be true at all.  Defense

13   counsel in his very eloquent statement to me today has said

14   that the government's submission ignores the humanity of the

15   defendant.  I think the defendant's submissions -- and I've

16   received several written submissions -- ignore the humanity of

17   the many victims of the underlying frauds here which were

18   facilitated, encouraged, assisted in significant ways by

19   Mr. Budovsky and the money-laundering operation he ran.  I

20   don't find any genuine remorse expressed to me.  I don't find

21   any heartfelt acknowledgment of the depth of criminality, the

22   widespread impact or the enormity of what he did.  I find

23   submissions that attempt to shift blame:  Shift blame to

24   Mr. Kats, shift blame to the victims of the various frauds,

25   ultimately whose money was laundered by the people who stole

from them or defrauded them through the Liberty Reserve system. In the face of overwhelming evidence of criminal intent and a massive complex criminal scheme, he's chosen to quibble around the edges. He's made it seem like there are disputes when there really are none in so many of the individual cases.

And, of course, there is the history of what happened with the Gold Age prosecution. He entered a plea of guilty in 2006. By then he'd already launched Liberty Reserve. That happened in 2005. He didn't discontinue the operations. In fact, he then took steps to move the operation offshore to Costa Rica, which is where he went in 2008. And after he went there, he forced Mr. Kats out of the business and ran it essentially by himself from then on.

While there, he engaged in a massive deception of SUGEF and the Liberty Reserve compliance team such as it was. And when Costa Rica did what it did, he took steps to appear to be moving the operations a second time to another country. So I think he presents a grave risk of recidivism here.

Beyond that, in terms of the issues of deterrence, I think there is enormous importance to deterring him from returning to this kind of fraudulent activity. Sad to say, Mr. Budovsky has used his enormous talents here in a way that has led to widespread harm, countless victims of fraud around the world, many, many, many in the United States, and, of course, there's the issue of general deterrence. This is such

1  a difficult crime to investigate and bring to justice -- moving

2  operations offshore, moving them to countries that have less

3  diligent antimoney-laundering procedures, less well-healed in

4  terms of funding its regulatory and law enforcement

5  communities.  The challenges are enormous in this digital age

6  of having effective law enforcement in this kind of e-currency

7  market and money-laundering scheme.  So there is an enormous

8  importance to thinking about general deterrence here.  And, of

9  course, I have to return again to the issue of appropriate

10  punishment.  I've spoken about the enormity of the crime here,

11  the scale, the success, the longevity, the complexity.  All of

12  these deserve appropriate punishment.

13          Mr. Budovsky, please stand.

14          I impose a term of imprisonment of 20 years to be

15  followed by a term of supervised release of three years with

16  the following special conditions:  You shall report to the

17  probation office in the district in which you are released

18  within 72 hours of release from custody.

19          You shall not commit another federal, state or local

20  crime.

21          You are prohibited from possessing a firearm or other

22  dangerous weapon.

23          You shall cooperate in the collection of DNA.

24          You must pay the fine I am going to impose.

25          You must comply with the standard conditions of

G56QBUDs

1   supervised release.

2           You shall submit to a reasonable search by the

3   probation department.

4           You shall comply with the immigration laws of this

5   country.

6           You shall submit to deportation and not unlawfully

7   reenter this country.

8           You shall provide the probation department access to

9   any and all requested financial information.

10          You shall pay a special assessment of $100.

11          You shall pay a fine of $500,000.

12          I am imposing terms of supervised release here, and a

13  term of supervised release because while I understand the

14  defendant will be deported, it's impossible for me to foretell

15  the future, and therefore I want to make sure that should the

16  defendant not be deported or should he unlawfully reenter this

17  country, that I have a period of supervised release that will

18  address that.

19          Mr. Everdell, is there any legal reason why I cannot

20  impose the sentence I've described as stated?

21          MR. EVERDELL:  No, your Honor.  There is a matter of

22  forfeiture, but we will attend to that later, I suppose.

23          THE COURT:  I have signed one forfeiture order which

24  you presented to me.

25          MR. EVERDELL:  Yes, your Honor.  There is also a money

G56QBUDs

 1   judgment of $122 million.  I believe the Court needs to orally

 2   impose that at the time of sentencing.  It's in the plea

 3   agreement with the parties.

 4           THE COURT:  I believe that's the preliminary order

 5   that was already signed in connection with the plea.  Is there

 6   a different document you're talking about?

 7           MR. EVERDELL:  I apologize, your Honor.  You're

 8   absolutely right.  I think that all that needs to happen is for

 9   the Court to say the two consent preliminary orders of

10   forfeiture are now final as to the defendant.

11           THE COURT:  Yes.  Both orders of forfeiture are a

12   component of this sentence.

13           MR. EVERDELL:  Thank you, your Honor.

14           THE COURT:  A schedule for a fine should be paid at

15   15 percent of the defendant's gross monthly income.  Should he

16   be in UNICOR work program while in prison, he shall pay

17   50 percent of his monthly earnings.  If he's in a non-UNICOR

18   work program, he shall pay $25 per quarter towards the fine.

19           Mr. Kaley, is there any legal reason I cannot impose

20   the sentence I've described as stated?

21           MR. KALEY:  No, your Honor.

22           THE COURT:  I order the sentence I've described on the

23   record to be imposed as stated.

24           Mr. Budovsky I need to advise you of your right to

25   appeal.  If you are unable to pay the cost of an appeal, you

1  may apply for leave to appeal in forma pauperis.  Any notice of

2  appeal must be filed within 14 days of the judgment of

3  conviction.  You may be seated.

4           I believe there is an underlying instrument.

5           MR. EVERDELL:  Yes, your Honor.  At this time the

6  government moves to dismiss all underlying counts against the

7  defendant.

8           THE COURT:  Your application is granted.

9           Counsel, is there anything further that we need to do?

10          MR. KALEY:  Yes, your Honor.  We would respectfully

11  request that the Court recommend to the Bureau of Prisons that

12  Mr. Budovsky be designated to Fort Dix to facilitate family

13  visitations.

14          THE COURT:  I'm going to decline that recommendation.

15          Is there any medical care that you wish me

16  particularly to bring to the Bureau of Prisons' attention?

17          MR. KALEY:  Your Honor, what I will do is I will get

18  the medical records from the MCC and make sure that they travel

19  with Mr. Budovsky.

20          THE COURT:  OK.

21          MR. KALEY:  Your Honor, as opposed to recommending

22  Fort Dix, would you at least recommend the metropolitan area.

23          THE COURT:  No.

24          MR. KALEY:  Then one final --

25          THE COURT:  We have a 20-year term of imprisonment

1    here.  I want to give the Bureau of Prisons ample opportunity

2    to think what the appropriate institution is.

3            MR. KALEY:  Because the period of incarceration is so

4    long, all the more reason to recommend something so that his

5    family can at least visit him.

6            THE COURT:  I've declined your request.

7            MR. KALEY:  Then one final question, your Honor.  My

8    understanding is that Mr. Budovsky would receive credit towards

9    his sentence for the time when he was arrested in Spain on

10   May 24, 2013.

11           THE COURT:  Yes, and I'm going to make that specific

12   recommendation to the Bureau of Prisons.  My understanding is

13   that he should receive credit for the time he has been in

14   custody, which would run from May 24, 2013.

15           MR. KALEY:  Thank you, your Honor.

16           THE COURT:  Yes.  Thank you.

17           (Adjourned)

18

19

20

21

22

23

24

25